No. 25-1157

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————————

TRAVIS DARDAR, NICOLE DARDAR, KENT DUHON, MARY ALICE
NASH, JERRYD TASSIN, ANTHONY THERIOT, FISHERMEN INVOLVED
IN SUSTAINING OUR HERITAGE, FOR A BETTER BAYOU, HEALTHY
GULF, LOUISIANA BUCKET BRIGADE, NATURAL RESOURCES
DEFENSE COUNCIL, SIERRA CLUB, TEXAS CAMPAIGN FOR THE
ENVIRONMENT, and TURTLE ISLAND RESTORATION NETWORK

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

———————————————————————

## JOINT PETITION FOR REVIEW

———————————————————————

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), and

Federal Rule of Appellate Procedure 15(a), Petitioners Travis Dardar, Nicole

Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, Fishermen

Involved in Sustaining Our Heritage, For a Better Bayou, Healthy Gulf, Louisiana

Bucket Brigade, Natural Resources Defense Council, Sierra Club, Texas Campaign

for the Environment, and Turtle Island Restoration Network ("Petitioners")

respectfully petition the United States Court of Appeals for the District of

Columbia Circuit to review and set aside the following order of the Federal Energy

Regulatory Commission ("Commission"):

1. Order Addressing Arguments Raised on Rehearing and Granting

   Clarification, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 &

   CP22-22-000, 191 FERC ¶ 61,153 (May 23, 2025) ("Clarification

   Order") (attached as Exhibit A).

By extension, this Petition for Review also seeks review of the

Commission's related orders which were modified or affirmed in the Clarification

Order. *Am. Rivers v. FERC*, 895 F.3d 32, 44 (D.C. Cir. 2018), *Clifton Power Corp.

v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002). Those Commission orders are:

2. Order Granting Authorizations Under Section 3 and 7 of the Natural Gas

   Act, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000,

   187 FERC ¶ 61,199 (June 27, 2024) ("Authorization Order") (attached as

   Exhibit B); and

3. Order Addressing Arguments Raised on Rehearing And Setting Aside

   Prior Order, In Part, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000

   & CP22-22-000, 189 F.E.R.C. ¶ 61,148 (Nov. 27, 2024) ("Rehearing

   Order") (attached as Exhibit C).

These orders already are properly before the Court in Case Nos. 24-1291

(L), 24-1292. Petitioners timely intervened before the Commission and timely

requested rehearing of the Authorization Order. The Commission issued its Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration on August 29, 2024. On September 4, 2024, Petitioners timely challenged the Authorization Order in Case Nos. 24-1291 (L), 24-1292. ECF Doc. 2073429. On November 27, 2024, the Commission issued its Rehearing Order, which modified and set aside, in part, the Authorization Order. On December 23, 2024, Petitioners filed a Motion for Clarification or, in the Alternative, Amendment. ECF Doc. 2091188. Petitioners requested confirmation that the Court in Case Nos. 24-1291 (L), 24-1292 had jurisdiction to review and that the record would include the Rehearing Order. In the alternative, Petitioners requested to amend their petition to identify the Rehearing Order.

Petitioners take the position that the Clarification Order also is already properly before the Court in Case Nos. 24-1291 (L), 24-1292. *See Sierra Club v. FERC*, 68 F.4th 630, 646 (D.C. Cir. 2023) ("Petitioners were under no obligation to file a new petition for review challenging that additional order"), *petition dismissed as moot and opinion vacated*, No. 20-1512 (D.C. Cir. Aug. 25, 2023). However, Petitioners file this Petition for Review out of an abundance of caution. *See Smith Lake Improvement & Stakeholders Ass'n*, 809 F.3d 55, 58 (D.C. Cir. 2015) (advising parties facing procedural uncertainty to err on the side of invoking additional process).

The Court has jurisdiction and venue is proper under Section 19(b) of the
Natural Gas Act, 15 U.S.C. § 717r(b), over the above-noted orders because:

a) Petitioners sought timely rehearing of the May 23, 2025 Clarification
   Order on June 20, 2025, and on July 21, 2025, that request for rehearing
   was deemed denied under 15 U.S.C. § 717r(a); *or*

b) The Clarification Order was a rehearing order for which further requests
   for rehearing were not required, and this petition is filed within 60 days
   of the May 23, 2025, Clarification Order; *or*

c) Petitioners intervened[1] before the Commission, timely requested
   rehearing of the Authorization Order, and filed a timely petition before
   this Court in Case Nos. 24-1291 (L), 24-1292. ECF Doc. 2073429.

Petitioners intend to move for an order consolidating this case with Case
Nos. 24-1291 (L), 24-1292 after this Petition for Review is docketed.

In accordance with Federal Rule of Appellate Procedure 15(c), the list of
parties served with copies of this Joint Petition is attached as Exhibit D.

DATED: July 21, 2025                    Respectfully submitted,

                                        */s/ Rebecca McCreary*

---

[1] The Commission granted all but one of Petitioner's respective motions to
intervene in the proceedings below. FERC denied intervention to Petitioner
Fishermen Involved in Sustaining Our Heritage. *See* Authorization Order PP 15-
17. Petitioners take the position that this denial was arbitrary and capricious.

/s/ Caroline Reiser
Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Thomas Zimpleman
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 513-6244
tzimpleman@nrdc.org

Gillian Giannetti
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 836-9454
ggiannetti@nrdc.org

*Counsel for Natural Resources Defense Council*

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Counsel for Louisiana Bucket Brigade, Healthy Gulf, Sierra Club, Texas Campaign for the Environment, and Turtle Island Restoration Network*

/s/ Megan C. Gibson
Megan C. Gibson
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
(202) 828-8382
mgibson@selcdc.org

Spencer Gall
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, Virginia 22902
(434) 977-4090
sgall@selcva.org

*Counsel for Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

## EXHIBITS

**Exhibit A:**  Order Addressing Arguments Raised on Rehearing and Granting Clarification, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 191 FERC ¶ 61,153 (May 23, 2025).

**Exhibit B:**  Order Granting Authorizations Under Section 3 and 7 of the Natural Gas Act, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 187 FERC ¶ 61,199 (June 27, 2024).

**Exhibit C:**  Order Addressing Arguments Raised on Rehearing And Setting Aside Prior Order, In Part, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 189 F.E.R.C. ¶ 61,148 (Nov. 27, 2024).

**Exhibit D:**  Official Service List in Federal Energy Regulatory Commission Docket Nos. CP22-21-000 and CP22-22-000.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

TRAVIS DARDAR, NICOLE
DARDAR, KENT DUHON, MARY
ALICE NASH, JERRYD TASSIN,
ANTHONY THERIOT, FISHERMEN
INVOLVED IN SUSTAINING OUR
HERITAGE, FOR A BETTER BAYOU,
HEALTHY GULF, LOUISIANA
BUCKET BRIGADE, NATURAL
RESOURCES DEFENSE COUNCIL,
SIERRA CLUB, TEXAS CAMPAIGN
FOR THE ENVIRONMENT, and
TURTLE ISLAND RESTORATION
NETWORK

**No.** 25-1157

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

*Respondent*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Petitioners make the following disclosures:

**Fishermen Involved in Sustaining Our Heritage (FISH)** is a community based non-profit organization based in Louisiana dedicated to championing the rights of commercial fishermen to flourish and prosper. FISH has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in FISH.

**For a Better Bayou** is a community based non-profit organization based in Louisiana dedicated to protecting the people and environment of Southwest Louisiana. For a Better Bayou has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in For a Better Bayou.

**Healthy Gulf** has no parent companies, and there are no publicly held companies that have a ten-percent or greater ownership interest in Healthy Gulf. Healthy Gulf is a nonprofit corporation organized and existing under the laws of the State of Louisiana, dedicated to collaborating and serving with communities who love the Gulf of Mexico by providing the research, communications, and coalition-building tools needed to reverse the long pattern of over exploitation of the Gulf's natural resources.

**The Louisiana Bucket Brigade** has no parent companies, and there are no publicly held companies that have a ten-percent or greater ownership interest in the Louisiana Bucket Brigade. The Louisiana Bucket Brigade, a corporation organized

and existing under the laws of the State of Louisiana, is a nonprofit organization using grassroots action work to create an informed, healthy society that hastens the transition from fossil fuels.

**Natural Resources Defense Council** (NRDC) is a non-profit environmental and public health organization committed to protecting the public and environment through research and advocacy. NRDC has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in NRDC.

**Sierra Club** has no parent companies, and there are no publicly held companies that have a ten-percent or greater ownership interest in Sierra Club. Sierra Club, a corporation organized and existing under the laws of the State of California, is a nonprofit organization dedicated to the protection and enjoyment of the environment.

**Texas Campaign for the Environment** has no parent companies, and there are no publicly held companies that have a ten-percent or greater ownership interest in Texas Campaign for the Environment. Texas Campaign for the Environment is a nonprofit organization, organized and existing under the laws of the State of Texas, dedicated to supporting frontline communities against pollution in the Gulf South.

**Turtle Island Restoration Network** has no parent companies, and there are no publicly held companies that have a ten-percent or greater ownership interest in Turtle Island Restoration Network.

DATED: July 21, 2025

/s/ *Rebecca McCreary*
Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

## CERTIFICATE OF SERVICE

I certify that, on July 21, 2025, copies of this Petition for Review and exhibits were served on all parties admitted to participate in the agency proceedings by email to the official service list in Federal Energy Regulatory Commission Docket Nos. CP22-21-000 and CP22-22-000. As required by Federal Rule of Appellate Procedure 15(c)(2), a list of those so served is attached as Exhibit D.

In accordance with D.C. Cir. Rule 15(a), I further certify that I emailed a copy of the foregoing to the following:

Robert Solomon
Solicitor
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
Robert.Solomon@ferc.gov

DATED: July 21, 2025                    /s/ *Rebecca McCreary*
                                        Rebecca McCreary
                                        Sierra Club
                                        1650 38th Street, Suite 103W
                                        Boulder, CO 80301
                                        (305) 449-5595 ext. 103
                                        rebecca.mccreary@sierraclub.org

191 FERC ¶ 61,153
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Mark C. Christie, Chairman;
David Rosner and Lindsay S. See.

| | |
|---|---|
| Venture Global CP2 LNG, LLC | Docket Nos. CP22-21-001 |
| Venture Global CP Express, LLC | CP22-21-002 |
| | CP22-22-001 |
| | CP22-22-002 |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING AND GRANTING
CLARIFICATION

(Issued May 23, 2025)

1.     On June 27, 2024, the Commission issued an order:  (1) authorizing Venture Global CP2 LNG, LLC (CP2 LNG) to site, construct, and operate a new liquefied natural gas (LNG) export terminal and associated facilities on the east side of the Calcasieu Ship Channel in Cameron Parish, Louisiana (CP2 LNG Project); and (2) issuing Venture Global CP Express, LLC (CP Express) a certificate of public convenience and necessity to construct and operate a new interstate natural gas pipeline system to connect the CP2 LNG Project to the existing natural gas pipeline grid in east Texas and southwest Louisiana (CP Express Pipeline Project).[1]  On July 29, 2024, a coalition of petitioners

---

[1] *Venture Glob. CP2 LNG, LLC*, 187 FERC ¶ 61,199 (2024) (Authorization Order).  CP2 LNG and CP Express will be referred to jointly herein as Venture Global. The CP2 LNG Project and CP Express Pipeline Project will be referred to jointly herein as Projects.

(Petitioners)[2] filed a timely request for rehearing of the Authorization Order.[3]  On November 27, 2024, the Commission issued an order addressing Petitioners' arguments raised on rehearing except for those related to air quality claims.  In light of the U.S. Court of Appeals for the District of Columbia Circuit's (D.C. Circuit) July 2024 order finding the Commission's air quality analysis inadequate regarding an LNG project's nitrogen dioxide ($NO_2$) cumulative impacts,[4] the Commission set aside the analysis in the Authorization Order of $NO_2$ and particulate matter with an aerodynamic diameter of less than or equal to 2.5 microns ($PM_{2.5}$) emissions to conduct supplemental environmental analyses, with a further merits order to follow.[5]  The Commission withheld issuance of any authorizations to proceed with construction of the Projects until it issued a further merits order.[6]  On December 23, 2024, Venture Global filed a timely request for rehearing of the Rehearing Order.

2.     Pursuant to *Allegheny Defense Project v. FERC*,[7] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by

---

[2] Petitioners include: A Better Bayou, Fishermen Involved in Sustaining our Heritage (FISH), Nicole Dardar, Travis Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, Healthy Gulf, Louisiana Bucket Brigade, Natural Resources Defense Council, Port Arthur Community Action Network, Public Citizen, Sierra Club, Texas Campaign for the Environment, and Turtle Island Restoration Network.  We note that, in the Authorization Order, the Commission denied FISH's late motion to intervene. Authorization Order, 187 FERC ¶ 61,199 at P 17.  That decision was sustained on rehearing.  *Venture Glob. CP2 LNG, LLC*, 189 FERC ¶ 61,148, at PP 10-17 (2024) (Rehearing Order).

[3] Petitioners also filed a motion for stay, which the Commission denied on October 1, 2024.  *See Venture Glob. CP2 LNG, LLC*, 189 FERC ¶ 61,005 (2024) (Order Denying Stay).

[4] *Healthy Gulf v. FERC*, 107 F.4th 1033 (D.C. Cir. 2024) (*Healthy Gulf*) (remanding the Commission's authorization of the Commonwealth LNG export terminal).

[5] Rehearing Order, 189 FERC ¶ 61,148 at PP 183-185 (citing *Healthy Gulf*, 107 F.4th 1033 and *City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024) (*City of Port Isabel*)).

[6] Rehearing Order, 189 FERC ¶ 61,148 at P 186.

[7] 964 F.3d 1 (D.C. Cir. 2020) (en banc) (*Allegheny Def. Project*).

section 19(a) of the Natural Gas Act (NGA),[8] we are modifying the discussion in the Authorization Order and the Rehearing Order and continue to reach the same result in this proceeding, as discussed below.[9]  Accordingly, this order addresses:  (1) Petitioners' original claims on rehearing of the Authorization Order regarding air quality and (2) Venture Global's request for rehearing of the Rehearing Order.

## I.     Background

### A.     Projects

3.     On December 2, 2021, CP2 LNG filed an application, in Docket No. CP22-21-000, under NGA section 3[10] and Part 153 of the Commission's regulations[11] for authorization to site, construct, and operate the CP2 LNG Project, with 20 million metric tons per annum (MTPA) of nameplate liquefaction capacity and a peak achievable capacity of 28 MTPA under optimal operating conditions.[12]  The project would be constructed in two phases[13] and include a liquefaction plant consisting of eighteen liquefaction blocks, four aboveground full containment LNG storage tanks, and

---

[8] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[9] *Allegheny Def. Project*, 964 F.3d at 16-17.

[10] 15 U.S.C. § 717b.

[11] 18 C.F.R. pt. 153 (2024).

[12] Authorization Order, 187 FERC ¶ 61,199 at PP 1, 5; Rehearing Order, 189 FERC ¶ 61,148 at P 3.

[13] Each phase is designed with a nameplate liquefaction and export capacity of 10 MTPA, and a peak achievable capacity of 14 MTPA.  Authorization Order, 187 FERC ¶ 61,199 at P 6.

two marine LNG loading docks.[14]  The CP2 LNG Project would receive natural gas via the CP Express Pipeline Project.[15]

4.      In the same application, CP Express filed a request, in Docket No. CP22-22-000, under NGA section 7(c)[16] and Parts 157 and 284 of the Commission's regulations,[17] for a certificate of public convenience and necessity to construct and operate the CP Express Pipeline Project.[18]  The CP Express Pipeline Project would originate at interconnections with Transcontinental Gas Pipe Line Company, LLC's interstate system and Midcoast Energy, LLC's CJ Express pipeline in Jasper County, Texas, extend through Newton County, Texas, and Calcasieu and Cameron Parishes, Louisiana, and terminate at the CP2 LNG Project.[19]  The CP Express Pipeline Project would provide up to 4,400,000 dekatherms per day (Dth/day) of firm natural gas transportation service[20] and would include the construction and operation of the Moss Lake Compressor Station in Calcasieu Parish, Louisiana (Moss Lake Compressor Station).[21]  The CP Express Pipeline Project would be constructed and operated in two phases; the Phase I pipeline facilities would provide 2,200,000 Dth/day of firm transportation service and Phase II facilities

---

[14] *Id.* P 1; Rehearing Order, 189 FERC ¶ 61,148 at P 3.  For more specific information regarding the CP2 LNG Project, *see* Authorization Order, 187 FERC ¶ 61,199 at PP 5-9.

[15] Authorization Order, 187 FERC ¶ 61,199 at P 2; Rehearing Order, 189 FERC ¶ 61,148 at P 3.

[16] 15 U.S.C. § 717f(c).

[17] 18 C.F.R. pts. 157, 284 (2024).

[18] Authorization Order, 187 FERC ¶ 61,199 at P 1; Rehearing Order, 189 FERC ¶ 61,148 at P 6.  For more specific information regarding the CP Express Pipeline Project, *see* Authorization Order, 187 FERC ¶ 61,199 at PP 10-14.

[19] Authorization Order, 187 FERC ¶ 61,199 at PP 10-14; Rehearing Order, 189 FERC ¶ 61,148 at P 6.

[20] Authorization Order, 187 FERC ¶ 61,199 at P 10; Rehearing Order, 189 FERC ¶ 61,148 at P 6.

[21] Authorization Order, 187 FERC ¶ 61,199 at PP 11-12.

providing an additional 2,200,000 Dth/day of firm transportation service to correspond to the two phase construction of the CP2 LNG Project.[22]

### B.     Cumulative Air Impacts Analysis

#### 1.     Methodology

5.     On July 28, 2023, Commission staff issued the final Environmental Impact Statement (EIS) for the Projects.  Relevant to this order, the final EIS addressed air quality and cumulative impacts.  Under the Clean Air Act (CAA), new major sources of air emissions in attainment areas,[23] such as the CP2 LNG Project and Moss Lake Compressor Station, must demonstrate that they will not cause or contribute to a violation of any applicable National Ambient Air Quality Standards (NAAQS) before obtaining a permit under the Prevention of Significant Deterioration (PSD) program.[24]  With respect to the six criteria pollutants, the U.S. Environmental Protection Agency (EPA) has developed Significant Impact Levels (SILs) as a tool that permitting authorities, typically state agencies, may use to demonstrate that emissions from a proposed source or modification will not cause or contribute to air pollution in excess of the NAAQS for purposes of complying with the PSD program requirements.[25]  When considering a PSD

---

[22] *Id.* (discussing, in detail, the proposed facilities for Phase I and II); Rehearing Order, 189 FERC ¶ 61,148 at P 7.

[23] An attainment area is an area with air quality that is currently compliant with the National Ambient Air Quality Standards (NAAQS) for a particular criteria pollutant. Final EIS at 4-336 to 4-337.

[24] 42 U.S.C. § 7475(a)(3).  NAAQS are limits on the atmospheric concentration of six pollutants, called criteria pollutants, that are harmful to public health and the environment.  The six criteria pollutants are:  carbon monoxide (CO), lead (Pb), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter (PM), and sulfur dioxide ($SO_2$).  *See* 42 U.S.C. § 7409.

[25] *See, e.g.*, EPA, *Guidance on Significant Impact Levels for Ozone & Fine Particles in the Prevention of Significant Deterioration Permitting Program* 11 (April 2018) (EPA Ozone and PM SILs Guidance), https://19january2021snapshot.epa.gov/sites/static/files/2018-04/documents/sils_guidance_2018.pdf (noting that the SILs for ozone and PM are numerical values "below which the EPA considers a source to have an insignificant effect on ambient air quality" because the degree in changes in pollutant concentrations caused by an individual contribution below the SIL are "indistinguishable from the inherent variability in the measured atmosphere and may be observed even in the absence of the increased emissions" and "changes in air quality within this range are not meaningful, and, thus, do not contribute to a violation of the NAAQS"); *see also* EPA, *Guidance*

application, state permitting agencies generally require an analysis involving up to three steps that uses modeled project emissions in comparison to the SILs to determine if a facility would not cause or contribute to any exceedances of the NAAQS.[26]  The Commission, in the 2023 final EIS and Authorization Order followed this three-step process to analyze the Projects' air emissions as part of its examination of project effects under the National Environmental Policy Act (NEPA).[27]  The three-step analysis includes:  (1) a preliminary screening step; (2) if necessary, a full cumulative impacts analysis; and (3) if necessary, a cause and contribute (i.e. culpability) analysis.[28]

6.      Generally, during the preliminary screening step (i.e., step one) a state models a source's potential emissions and compares the proposed facility's highest projected ambient air quality impact at the facility to the SIL for each criteria pollutant to determine if any such concentrations exceed the SIL.[29]  With respect to the six criteria pollutants

---

*Concerning the Implementation of the 1-hour NO$_2$ NAAQS For the Prevention of Significant Deterioration Program* 4, 11 (June 29, 2010) (EPA Interim 1-hour NO$_2$ SIL Guidance), https://www.epa.gov/sites/default/files/2015-07/documents/appwno2.pdf (noting that it "considers a source whose individual impact falls below a SIL to have a de minimis impact on air quality concentrations that already exist" and that further analysis would "yield trivial gain" with regard to reducing ambient pollutant concentrations).

[26] The three-part analysis is outlined in EPA's air quality modeling procedures at 40 C.F.R. pt. 51, app. W (2024).

[27] *See, e.g.*, *Healthy Gulf*, 107 F.4th at 1043-44 (describing the Commission's use of the three-step analysis); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1370 n.7 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC appropriately relied on EPA's [NAAQS] as a standard of comparison for air-quality impacts.  By presenting the project's expected emissions levels and the NAAQS standards side-by-side, the EIS enabled decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard."); *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1046 (10th Cir. 2023) (*Diné Citizens*) (finding the Bureau of Land Management appropriately relied on NAAQS in its cumulative effects analysis for oil and gas drilling permit applications); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1364–66 (11th Cir. 2023) (*Lowman*) (upholding the Federal Aviation Administration's reliance on its regulations defining a significance threshold for air quality as one where the "action would cause pollutant concentrations to exceed one or more of the NAAQS").

[28] Authorization Order, 187 FERC ¶ 61,199 at PP 186-88 and 194; final EIS at 4-369; final supplemental EIS at 14.

[29] Final EIS at 4-369.

(carbon monoxide, lead, $NO_2$, ozone, particulate matter (PM), and sulfur dioxide), EPA has developed SILs as a tool that permitting authorities may use to demonstrate that emissions from a proposed source or modification will not "cause, or contribute to, air pollution in excess" of the NAAQS for purposes of demonstrating compliance with the PSD program requirements.[30]  If the predicted impacts for a particular pollutant and averaging period (e.g., 1-hour, 8-hour, 24-hour, or annual) are below the applicable SIL, then no further analyses or modeling are required for that pollutant/averaging period because individual contributions below the SIL would not cause or contribute to an exceedance of the NAAQS.[31]  If model-predicted concentrations for a particular pollutant and averaging period are greater than the applicable SIL, a cumulative impact analysis is performed for this pollutant and averaging period (i.e., step two).[32]  This cumulative impact analysis must consider emissions from existing regional sources in addition to the project's modeled emissions.[33]  Each criteria pollutant is modeled separately.  If there are no predicted NAAQS exceedances identified in the cumulative impact analysis, there is no need to proceed to the cause and contribute analysis (i.e., step three).  Under the CAA, in cases where a potential NAAQS exceedance of a criteria pollutant is identified, the modeled contribution from the project is not considered to have caused or contributed to the exceedance if its own impact is less than the SIL at the receptor and time period of the predicted exceedance.[34]  For those cases where there is no simultaneous exceedance of the NAAQS and the SIL by the proposed project source, the modeling analysis is deemed

---

[30] 42 U.S.C. § 7475(a)(3) (generally prohibiting construction of a major emitting facility unless the facility operator demonstrates that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any: (a) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (b) NAAQS in any air quality control region, or (c) any other applicable emission standard or standard of performance under this chapter).

[31] *Id.*; EPA Ozone and PM SILs Guidance at 11 ("a permitting authority can reasonably conclude that emissions of a proposed source that have a projected impact below the SIL values provided in this memorandum are not the reason for, responsible for, or the 'but for' cause of a NAAQS violation"); EPA, *Legal Memo: Application of Significant Impact Levels in the Air Quality Determination for PSD Permitting under the CAA* at 13 (Apr. 17, 2018), https://www.epa.gov/sites/default/files/2018-04/documents/legal_memorandum_final_4-17-18.pdf (EPA SIL Memo).

[32] Final EIS at 4-369.

[33] *Id.*

[34] *Id.*

to demonstrate that the proposed source would not cause or contribute to the potential NAAQS exceedance and the state may issue the permit.[35]

## 2.    Project Modeling: 1-hour NO$_2$ and PM$_{2.5}$ Results

7.    The cumulative air dispersion modeling in the final EIS was conducted in accordance with EPA's 40 C.F.R. Part 51, Appendix W.[36]  Venture Global conducted cumulative impact analyses for the CP2 LNG Project and Moss Lake Compressor Station for each pollutant that exceeded the SIL for the averaging period during step one.  The results from the cumulative impact analyses showed NAAQS exceedances for the 1-hour NO$_2$ NAAQS.[37]  Venture Global conducted a cause and contribute analysis (i.e., step three) to determine if and to what extent the CP2 LNG Project and Moss Lake Compressor Station emission sources contributed to the exceedance of the 1-hour NO$_2$ NAAQS.[38]  The analysis showed that the contribution by the CP2 LNG Project and Moss Lake Compressor Station to each exceedance concentration at the same receptor and time period was less than the EPA-designated SIL of 7.5 micrograms per cubic meter ($\mu g/m^3$), and thus, under the step 3 cause and contribute analysis, concluded that the exceedances would occur even in the absence of the Projects' emissions.[39]

8.    Additionally, the Moss Lake Compressor Station showed a NAAQS exceedance for 24-hour PM$_{2.5}$ for which a cause and contribute analysis (i.e., step three) was performed.  That analysis showed that the contribution by the Moss Lake Compressor Station to this exceedance concentration at the same receptor and time period fell below the SIL.[40]  Venture Global further determined that although the model-predicted maximum 24-hour PM$_{2.5}$ increment concentration for the Moss Lake Compressor Station exceeded the PSD Class II increment[41] at the facility, a cause and contribute analysis

---

[35] *Id.*

[36] Authorization Order, 187 FERC ¶ 61,199 at P 184 (citing final EIS at 4-369 to 4-373).

[37] Final EIS at 4-371 to 4-373.

[38] *Id.*

[39] *Id.* at 4-372-373, 4-553.

[40] *See id.*

[41] A PSD increment is the maximum allowable increase in the ambient concentration of a specific pollutant in an area that is in attainment of the NAAQS.  *Id.*

showed that the contribution by the Moss Lake Compressor Station to each exceedance at the same receptor and time period was less than the EPA-designated PSD Class II SIL of 1.2 μg/m$^3$ for the 24-hour PM$_{2.5}$ concentrations.[42]  Therefore, Commission staff determined that the Moss Lake Compressor Station did not cause or contribute to these exceedances.

9.      Last, with respect to annual PM$_{2.5}$, the results of the step 2 cumulative air modeling for CP2 LNG showed a concentration of 9.4 μg/m$^3$, which was below the NAAQS threshold of 12.0 μg/m$^3$.[43]  Because there were no NAAQS exceedances for annual PM$_{2.5}$, staff was able to conclude in the final EIS that there would be no significant impact without moving to the step 3 cause and contribute analysis.

## C.    Subsequent Air Modeling for Annual PM$_{2.5}$ and NO$_2$

10.     On March 6, 2024, after the issuance of the final EIS, EPA revised the primary annual PM$_{2.5}$ NAAQS standard from 12.0 μg/m$^3$ to 9.0 μg/m$^3$.[44]  Because EPA lowered the annual PM$_{2.5}$ NAAQS standard to 9.0 μg/m$^3$, Commission staff issued a data request to Venture Global requiring updated air modeling.[45]  On April 4, 2024, Venture Global provided updated cumulative air modeling for PM$_{2.5}$, but changed the monitoring station from the West Orange Monitoring Station to the Vinton, Louisiana monitoring station (Vinton Monitoring Station).[46]  According to Venture Global, it used the Vinton Monitoring Station because it was more representative of background PM$_{2.5}$ based on proximity, population density, and air emissions profile.[47]  Venture Global stated that it did not previously use the Vinton Monitoring Station due to concerns with data from the

---

Significant deterioration of air quality is deemed to occur when the amount of additional new pollution exceeds the applicable PSD increment.  *Id.*

[42] *Id.* at 4-374.

[43] *Id.* 4-371 to 4-373.  CP2 LNG used data from the West Orange, Texas monitoring station (West Orange Monitoring Station) for this modeling.

[44] 89 Fed. Reg. 16,202 (Mar. 6, 2024).

[45] *See* March 26, 2024 Data Request.

[46] Authorization Order, 187 FERC ¶ 61,199 at P 192; *see* April 4, 2024 Response to Data Request.

[47] Authorization Order, 187 FERC ¶ 61,199 at P 192; *see* April 4, 2024 Response to Data Request.

third quarter of 2021, which data the EPA had since confirmed to be valid.[48]  The updated air model using the Vinton Monitoring Station showed an annual $PM_{2.5}$ level of 8.1 µg/m$^3$ for the CP2 LNG Project, below the new NAAQS threshold of 9.0 µg/m$^3$.[49]

11.    Also after the final EIS, on March 17, 2024, Venture Global filed a request with Louisiana Department of Environmental Quality (LDEQ) to increase air emissions from its Calcasieu Pass LNG (CP1 LNG) terminal, which would result in increased cumulative $PM_{2.5}$ and oxides of nitrogen (NOx) impacts in the surrounding area.[50]  On May 15, 2024, the Commission issued a data request asking CP2 LNG to provide additional air modeling to account for these increased emissions.[51]  CP2 LNG responded that its prior modeling included this information and provided its application materials for the CP1 LNG terminal permit.[52]  Commission staff confirmed that the modeling reflected the increase in the CP1 LNG terminal's operational emissions, but determined that it did not include emissions from associated LNG ships and support vessels.[53]  Therefore, Commission staff issued a data request on May 29, 2024, requiring CP2 LNG to include the CP1 LNG terminal's marine emissions in its cumulative air modeling analysis.  On June 3, 2024, CP2 LNG filed an updated cumulative air modeling analysis that included the requested information.[54]

### D.    Authorization Order

12.    Based on its review of the final EIS, the Commission determined that the Projects would not cause or contribute to the anticipated exceedances of the 1-hour $NO_2$ or the 24-hour $PM_{2.5}$ NAAQS.[55]  Further, although the post-final EIS air modeling submitted by Venture Global showed an increase in the CP1 LNG terminal emissions of $NO_2$ and

---

[48] Authorization Order, 187 FERC ¶ 61,199 at P 192; *see* April 4, 2024 Response to Data Request.

[49] Authorization Order, 187 FERC ¶ 61,199 at P 192 (citing April 4, 2024 Response to Data Request).

[50] *Id.* PP 196-197.

[51] May 15, 2024 Data Request.

[52] Authorization Order, 187 FERC ¶ 61,199 at P 196.

[53] *Id.*

[54] Venture Global June 3, 2024 Response to Data Request.

[55] Authorization Order, 187 FERC ¶ 61,199 at P 186 (citing final EIS at 4-553).

$PM_{2.5}$, including marine mobile emissions associated with the CP1 project, the updated analysis demonstrated that operation of the CP2 LNG Project would not result in air quality impacts that would cause or contribute to an exceedance of any NAAQS in the surrounding communities because the project's contribution at each NAAQS exceedance point was below the SIL.[56]  The Commission also accepted Venture Global's use of data from the Vinton Monitoring Station as being more representative of the project area than that from the West Orange Monitoring Station and found that, with the Vinton Monitoring Station, the total cumulative concentration of annual $PM_{2.5}$ will be 8.1 $\mu g/m^3$ once the CP2 LNG Project is in operation, below EPA's revised annual 9.0 $\mu g/m^3$ $PM_{2.5}$ NAAQS threshold.[57]

13.      After considering the information and analysis contained in the final EIS, as well as other information in the record, as supplemented or clarified in the Authorization Order, the Commission found that the Projects, if implemented as described in the applications and in compliance with the environmental conditions in the Authorization Order, were environmentally acceptable actions.[58]

### E.      Subsequent D.C. Circuit Decisions

14.      After the issuance of the Authorization Order, the D.C. Circuit issued its opinion in *Healthy Gulf*, disagreeing with the Commission's determination that the cumulative effects of a project's $NO_2$ emissions were insignificant because incremental $NO_2$ emissions fell below the applicable SIL at several NAAQS exceedance locations.[59]  The court remanded the proceeding to the Commission to either explain how its use of the 1-hour $NO_2$ SIL is consistent with a proper cumulative effects analysis or to adequately assess the cumulative effects of the project's $NO_2$ emissions using a different methodology.[60]

15.      The D.C. Circuit also issued its opinion in *City of Port Isabel*, which remanded orders authorizing other LNG projects for failure to issue a supplemental EIS where the Commission "issu[ed] an entirely new and significantly expanded" environmental

---

[56] *Id.* P 197.  This updated air modeling included the revisions represented in the April 4, 2024 air modeling provided by Venture Global showing compliance with the updated NAAQS for annual $PM_{2.5}$.

[57] *Id.* P 192 (citing Venture Global April 4, 2024 Response to Data Request).

[58] *Id.* P 198.

[59] *Healthy Gulf*, 107 F.4th at 1044.

[60] *Id.*

Docket No. CP22-21-001, et al.                                    - 12 -

analysis "that reached new conclusions" in an order, without a separate NEPA document.[61]  *City of Port Isabel* also faulted the Commission for relying on updated data without providing the public with an opportunity to comment on either the underlying data or the Commission's interpretation of that data, and found that the public was deprived of an "adequate 'springboard for public comment'" under NEPA.[62]

## F.    Rehearing Order

16.    Petitioners sought rehearing of the Authorization Order and alleged that the Commission:  (1) violated the NGA and Administrative Procedure Act (APA) by authorizing the Projects (including arguments related to jurisdiction,[63] public interest,[64] need,[65] and project benefits[66]); (2) violated NEPA[67] and related APA responsibilities (including arguments related to alternatives,[68] greenhouse gases (GHGs),[69] impacts to commercial and recreational fishing and local communities,[70] safety,[71] the carbon capture

---

[61] *City of Port Isabel*, 111 F.4th at 1215.  We note that the D.C. Circuit has since granted rehearing, in part, and amended its opinion to remand *without* vacatur.  *City of Port Isabel v. FERC,* 130 F.4th 1034, 1039 (D.C. Cir. 2025).

[62] *City of Port Isabel*, 111 F.4th at 1211 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (*Methow Valley*)).

[63] Petitioners' Rehearing Request at 34-46.

[64] *Id.* at 87-92.

[65] *Id.* at 47-62.

[66] *Id.* at 62-75.

[67] 42 U.S.C. §§ 4321 *et seq.*; *see also* 18 C.F.R. pt. 380 (2024) (Commission's regulations implementing NEPA).  The Council on Environmental Quality's (CEQ) final rule rescinding its NEPA regulations became effective on April 11, 2025. 90 Fed. Reg. 10,610 (Feb. 25, 2025).

[68] Petitioners Rehearing Request at 109-16, 165-66.

[69] *Id.* at 116-25.

[70] *Id.* at 75-85, 125-28.

[71] *Id.* at 128-35.

and sequestration (CCS) system,[72] socioeconomics,[73] impacts to the Rice's whale,[74] wetlands impacts,[75] impacts to surrounding communities,[76] and air impacts[77]); and (3) failed to properly balance the benefits and adverse impacts of the Projects.[78]  With the exception of Petitioners' rehearing arguments regarding air impacts, the Commission addressed each of Petitioners' arguments in the Rehearing Order, and provided further justification for and sustained the Commission's determinations in the Authorization Order.[79]

17.    The Rehearing Order set aside the Authorization Order, in part, based on the Commission's analysis of $NO_2$ and $PM_{2.5}$ and potential conflict with the D.C. Circuit's specific directives to the Commission in *Healthy Gulf* and *City of Port Isabel* for the purpose of conducting additional environmental review.[80]  The Commission explained that the Commission's analysis of $NO_2$ and $PM_{2.5}$, as well as other air quality issues

---

[72] *Id.* at 162-66.

[73] *Id.* at 64-69.

[74] *Id.* at 166-87.

[75] *Id.* at 188-91.

[76] *Id.* at 85-87.  The Commission's analysis of the impacts of the Projects on communities with environmental justice concerns was based on Executive Orders 12898, 13985, and 14096.  Authorization Order, 187 FERC ¶ 61,199 at section III.C.7; Final EIS at 4-299 to 4-329.  These Executive Orders were revoked in January 2025.  Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 28, 2025) (revoking Executive Orders 13985 and 14096); Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) (revoking Executive Order 12898).  However, the Commission continues to fulfill its NEPA responsibilities by considering impacts to all potentially affected communities.  *See* 42 U.S.C. § 4331 (setting forth NEPA's environmental protection objectives, including to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings").  Accordingly, in this order we focus on consideration of the environmental effects of the Projects on all communities as relevant to Petitioners' arguments on rehearing.

[77] Petitioners Rehearing Request at 135-62.

[78] *Id.* at 75-92.

[79] *See generally* Rehearing Order 189 FERC ¶ 61,148.

[80] *Id.* P 185.

Docket No. CP22-21-001, et al.                                                          - 14 -

raised by Petitioners, would be addressed in a future order to be issued upon completion of supplemental environmental review.[81]  The Commission also explained that the Authorization Order remained in full force and effect but that no authorization to proceed with construction of the Projects would be issued until the Commission issued a further merits order.[82]  Venture Global sought rehearing of the Rehearing Order.

### G.     Supplemental Environmental Review

18.     On November 27, 2024, the Commission issued a *Notice of Schedule for the Preparation of a Supplemental Environmental Impact Statement for the CP2 LNG Project and CP Express Pipeline Project*.  The notice was published in the *Federal Register* on December 4, 2024.[83]

19.     On December 10, 2024, Commission staff requested that Venture Global: (1) explain and justify its selection of the Vinton Monitoring Station; (2) provide updated and validated air quality background data for the CP2 LNG Project and Moss Lake Compressor Station; and (3) update the air quality modeling for the CP2 LNG Project and Moss Lake Compressor Station.[84]  On December 23, 2024, Venture Global provided the requested information and air modeling.[85]

20.     On February 7, 2025, Commission staff issued a draft supplemental EIS for the Projects, that addressed cumulative air impacts for $NO_2$ and $PM_{2.5}$.  Notice of the draft supplemental EIS was published in the *Federal Register* on February 13, 2025[86] and mailed to Commission staff's environmental mailing list.  The notice established March 31, 2025, as the deadline for filing comments or motions to intervene.[87]

21.     In response to the draft supplemental EIS, the Commission received written comments from federal agencies, Tribes, companies and non-governmental organizations, and individuals.  Primary issues raised by the commenters relate to air

---

[81] *Id.*

[82] *Id.*

[83] 89 Fed Reg. 96237 (Dec. 4, 2024).

[84] December 10, 2024 Data Request.

[85] Venture Global December 23, 2024 Response to Data Request.

[86] 90 Fed. Reg. 9539 (Feb. 13, 2025).

[87] 18 C.F.R. § 380.10(a)(1)(i) (2024).

quality, as well as project need, alternatives, wildlife, wetlands, cumulative impacts, environmental justice, noise, and socioeconomics.

22.    Commission staff issued the final supplemental EIS for the Projects on May 9, 2025.  The *Notice of Availability* of the final supplemental EIS was published in the *Federal Register* on May 15, 2025[88] and mailed to Commission staff's environmental mailing list.  The final supplemental EIS addresses cumulative air impacts for $NO_2$ and $PM_{2.5}$.  It also addresses all environmental comments that were within the scope of the draft supplemental EIS.  In response to the final supplemental EIS, the Commission received one written comment from an individual regarding wildlife, which is outside the scope of the final supplemental EIS.[89]

23.    As disclosed in the final supplemental EIS, project emissions either fell below the applicable SIL in step one or the area concentrations complied with NAAQS.  As discussed below, the final supplemental EIS concludes, and we agree, that the emission impacts, including 1-hour $NO_2$ and annual and 24-hour $PM_{2.5}$ impacts from the Moss Lake Compressor Station and CP2 LNG Project, when combined with past, present, and reasonably foreseeable emissions within the regional air environment, are not significant.[90]

## II.    **Interventions**

24.    On March 31, 2025, Fisherman Involved in Sustaining our Heritage (FISH) and James Steven Broussard, Cheryl Kim Broussard, J.S. Broussard Farms, LLC, Eric Paul Dugas, Blair Gayle Dugas, Henning Management, LLC, and Thornwell Hunting Club,

---

[88] 90 Fed. Reg. 20663 (May 15, 2025).

[89] Final supplemental EIS at 3-4; Rehearing Order, 189 FERC ¶ 61,148 at PP 185-186.

[90] Final supplemental EIS at 20.

LLC, filed timely unopposed motions to intervene based on the issuance of the draft supplemental EIS,[91] which are granted.[92]

## III.   Procedural Issues

### A.   Venture Global's Answer to Petitioners' Request for Rehearing

25.   On rehearing, Venture Global argues that the Commission erred by rejecting its August 13, 2024 answer to Petitioners' request for rehearing.[93]   According to Venture Global, its answer included a discussion of how the Commission could respond to Petitioners' challenge of the cumulative air impacts analysis of $NO_2$ and $PM_{2.5}$ and the usefulness of further explanation in light of the D.C. Circuit's decision in *Healthy Gulf*.[94]  It also asserts that the answer included a discussion of harm that would result from a stay of construction authorizations which the Commission should have considered.[95]   It maintains that the Commission summarily rejected its answer without explanation despite providing explanation for its rejection of FISH's late motion to intervene, and that Commission precedent provides insufficient guidance for when an answer to a request for

---

[91] FISH March 31, 2025 Motion to Intervene (citing environmental impacts on the commercial fishing industry due to the projects); Broussard et al. March 31, 2025 Motion to Intervene and Comments (citing air and noise impacts from the Moss Lake Compressor Station on their wellbeing and livelihoods).  FISH previously filed a late motion to intervene in the proceeding that was denied.  *See* Rehearing Order, 189 FERC ¶ 61,148 at PP 10-17.

[92] Interventions were solicited by the Commission in the *Notice of Availability of the Draft Supplemental Environmental Impacts Statement for the Proposed CP2 LNG and CP Express Pipeline Projects*, 90 Fed. Reg. 9539 (Feb. 13, 2025).  Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214 (2024).

[93] Venture Global Rehearing Request at 23-25.  Venture Global incorporates by references various pages of its Answer and attached them to its rehearing request as an exhibit.  *See id.* at 25 (referencing pages 35-57 of its Answer); *see id.* at 44 (referencing pages 46-57 of its Answer).

[94] *Id.* at 24.

[95] *Id.*  To the extent Venture Global suggests that accepting their answer to Petitioners' request for rehearing would have obviated the need for a supplemental EIS, we note that even if the Commission accepted Venture Global's answer, under the circumstances of this proceeding, a supplemental EIS would have still been required as explained in the Rehearing Order.  Rehearing Order 189 FERC ¶ 61,148 at PP 183-186.

rehearing will assist the Commission's decision-making.[96]  It also asserts, without support, that there is no longer any bar preventing the Commission from considering its answer.[97]

26.     We continue to reject Venture Global's answer to Petitioners' request for rehearing of the Authorization Order.  Rule 213 of the Commission's Rules of Practice and Procedure states that "an answer may not be made to a . . . request for rehearing, unless otherwise ordered by the decisional authority."[98]  Similarly, Rule 713 states that "the Commission will not permit answers to request for rehearing."[99]  Although the Commission has found occasion, on a case-by-case basis, to accept an otherwise prohibited answer to a request for rehearing,[100] the interests of administrative efficiency and finality support the Commission's general approach of rejecting answers to rehearing requests.[101]  Venture Global's motion for leave to respond to Petitioners' rehearing request contained only a bare assertion that its answer would assist in the Commission's decision-making process, without context or further explanation.[102]  We continue to find

---

[96] Venture Global Rehearing Request at 23-24.

[97] *Id.* at 25.

[98] 18 C.F.R. § 385.213(a)(2) (2024).

[99] *Id.* § 385.713(d)(1) (2024).

[100] 18 C.F.R. § 385.101(e) (2024); *Algonquin Gas Transmission, LLC*, 170 FERC ¶ 61,144, at P 5 (2020); *Nat'l Fuel Gas Supply Corp.*, 164 FERC ¶ 61,084, at P 9 (2018); *Aquila Merch. Servs., Inc.*, 127 FERC ¶ 61,218, at P 28 (2009); *Re Wis. Pub. Serv. Corp.*, 60 FERC ¶ 61,279, at 61,948 (1992).

[101] *Re Hous. Tex. Gas & Oil Corp.*, 17 FPC 303, at 311 (1957) ("To permit such answers, giving rise in turn to requests for opportunity for replies thereto, would complicate and prolong proceedings before the Commission, would unduly delay finality of decision, and would be inconsistent with the Commission's timely execution of its functions.").

[102] Venture Global Aug. 15, 2024 Motion for Leave to Answer and Answer at 2 ("The Commission accepts answers to rehearing requests for good cause when they are likely to assist with its decision-making process.  This answer will do just that, which provides the Commission good cause to accept it.") (citations omitted).

this insufficient to overcome the Commission's generally applicable reasons for rejecting answers to requests for rehearing.[103]

27.    We also disagree that the Commission should now accept Venture Global's answer.  As an initial matter, under the NGA, "the application for rehearing shall set forth *specifically* the ground or grounds upon which such application is based."[104]  The Commission's practice, with which courts have agreed, is to reject arguments made on rehearing without sufficient specificity.[105]  Here, Venture Global fails to cite any authority or otherwise explain why the Commission is now no longer barred from accepting its answer or how the circumstances have changed such that the record is no longer sufficient to respond to Petitioners' request for rehearing.  Moreover, "the Commission's regulations require rehearing requests to provide the basis, in fact and law, for each alleged error including representative Commission and court precedent."[106]  Bootstrapping of arguments is not permitted.[107]  Accordingly, to the extent Venture Global attempts to resurrect its rejected answer by incorporating it by reference and attaching it as an exhibit, we find such attempts improper.  Nonetheless, to the extent

---

[103] *See Cal. Indep. Sys. Operator Corp.*, 149 FERC ¶ 61,058, at PP 20-22 (2014) (denying request for rehearing of Commission's rejection of answer to an answer based on 18 C.F.R. § 385.213(a)(2) and agency discretion to manage its own dockets); *see also Kourouma v. FERC*, 723 F.3d 274, 279-80 (D.C. Cir. 2013) (finding it was not an abuse of discretion for the Commission to adhere to Rule 213 and deny an answer); *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 366 (D.C. Cir. 2003) (citing *Telecomm. Resellers Assoc. v. FCC*, 141 F.3d 1193, 1196 (D.C. Cir. 1998) (administrative agencies enjoy broad discretion to manage their own dockets)); *Ameren Energy Generating Co.*, 108 FERC ¶ 61,081, at P 23 (2004) ("The courts have repeatedly recognized that the Commission has broad discretion in managing its proceedings.") (citations omitted).

[104] 15 U.S.C. § 717r(a).

[105] *Colonial Pipeline Co.*, 186 FERC ¶ 61,213, at P 10 & n.19 (2024); *see also Ind. Util. Regul. Comm'n v. FERC*, 668 F.3d 735, 736 (D.C. Cir. 2012) ("We dismiss the petition insofar as it challenges the order on grounds [petitioner] did not raise with sufficient specificity in its request for rehearing by the Commission.").

[106] *Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,007, at P 7 (2016); *see also Alcoa Power Generating, Inc.*, 144 FERC ¶ 61,218, at P 10 (2013) ("The Commission, however, expects all grounds to be set forth in the rehearing request and will dismiss any ground only incorporated by reference").

[107] *Tenn. Gas Pipeline Co.*, 156 FERC ¶ 61,007 at P 7 (citing *Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006) (rejecting argument made on rehearing to FERC by incorporating by reference objections made in other pleadings)).

Venture Global's request for rehearing of the Rehearing Order reiterates arguments in their prohibited answer, those arguments are addressed below.

## B.     Updated Air Modeling and New Information

28.     Venture Global asserts that it has complied with the Rehearing Order and subsequent data requests seeking updated air modeling and argues that because the updated air modeling for the CP2 LNG Project demonstrates compliance with the NAAQS thresholds for all criteria pollutants and their respective averaging periods, the issue resulting in the remand in *Healthy Gulf* which led the Commission to order a supplemental EIS is no longer present (i.e., the third step, a cause and contribute analysis, is no longer required) rendering a supplemental EIS unnecessary.[108]  Similarly, Venture Global argues that because the updated air modeling for the Moss Lake Compressor Station shows impacts below the SIL for all pollutants and averaging periods (i.e., step one), the Commission is neither required to perform a full cumulative impact analysis (i.e., step two), nor the cause and contribute analysis (i.e., step three, which was at issue in *Healthy Gulf*).[109]  Based on the foregoing, Venture Global requests the Commission take this updated air modeling into consideration on rehearing pursuant to Rule 713(c)(3) of the Commission's Rules of Practice and Procedure.[110]  It asserts that there is a compelling showing of good cause and the new information did not exist at the time of the Commission's prior order.[111]  It maintains that the updated air modeling goes to the heart of the case, compels a contrary result because there are no longer any NAAQS exceedances, obviates the court's concern in *Healthy Gulf*, and removes the impetus behind the need for a supplemental NEPA review.[112]

29.     We disagree that the new information on rehearing confirms that supplemental NEPA analysis is not warranted.  As an initial matter, the supplemental NEPA analysis was completed on May 9, 2025, and Venture Global's arguments are now moot. Regardless, we note that, as a general matter, "parties are not permitted to introduce new

---

[108] Venture Global Rehearing Request at 45-46.

[109] *Id.* at 46.

[110] *Id.* (citing 18 C.F.R. § 385.713(c)(3)).

[111] *Id.* at 46-47; *see also id.* at 47 (further explaining that, therefore, a central reason for the Commission's general policy of not considering new evidence on rehearing is not applicable).

[112] *Id.* at 47-48 (citing *Riverstart Solar Park LLC*, 185 FERC ¶ 61,101, at P 9 (2023); *Cooley v. FERC*, 843 F.2d 1464, 1473 (D.C. Cir. 1988); and *Friends of the River v. FERC*, 720 F.2d 93, 98 n.6 (D.C. Cir. 1983) (*Friends of the River*)).

evidence for the first time on rehearing since such practice would allow an impermissible moving target, and would frustrate needed administrative finality."[113]  Allowing parties to introduce new evidence on rehearing also raises fairness and due process concerns because other parties are precluded from filing answers to requests for rehearing.[114]  Although Venture Global asserts that there is a compelling showing of good cause, it provides no further argument supporting these contentions, neither do we find good cause exists.  Commission staff specifically requested additional information to ensure the Commission's analysis here complied with *Healthy Gulf.*  Accepting Venture Global's updated information on rehearing, instead of completing the supplemental NEPA process called for in the Rehearing Order, would not satisfy the terms of that order.[115]  Moreover, completion of the supplemental NEPA process ensures the public is able to comment "at a meaningful time," particularly in light of the holding in *City of Port Isabel*.[116]  An agency's determination of whether a supplemental EIS is needed "implicates substantial agency expertise" and is thus governed by the arbitrary and capricious standard and entitled to deference.[117]

### C.      Preparation of Supplemental EIS

30.     On rehearing of the Authorization Order, Petitioners argue that because the Commission, following the final EIS, required new air modeling for PM$_{2.5}$ after the EPA

---

[113] *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 73 (2022) (citing *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197, at P 16 (2018)).

[114] 18 C.F.R. § 385.713(d)(1); *see, e.g., PJM Interconnection, L.L.C*., 126 FERC ¶ 61,030, at P 15 & n.10 (2009).

[115] Rehearing Order, 189 FERC ¶ 61,148 at P 185 (citing the "D.C. Circuit's specific directives to the Commission in *Healthy Gulf* and *City of Port Isabel*," as the basis for "conducting additional environmental review").  Accordingly, we find Venture Global's cited cases inapposite.  Venture Global Rehearing Request at 47-48 (citing *Riverstart Solar Park LLC*, 185 FERC ¶ 61,101; *Cooley v. FERC*, 843 F.2d 1464; and *Friends of the River*, 720 F.2d 93).

[116] *See City of Port Isabel*, 111 F.4th at 1210-11 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, at 371 (1989) (*Marsh*) (requiring supplemental NEPA because the Commission included significant, new analysis in an order and determining that this failure to engage in supplemental NEPA prejudiced the public's ability to comment on the Commission's analysis and underlying data upon which it relied, which is insufficient under NEPA); *see also* 42 U.S.C. § 4336a(c) (requiring a request for public comment).

[117] *Marsh*, 490 U.S. at 375-76.

lowered the NAAQS thresholds,[118] changed its ambient air quality estimate, and requested updated air modeling for the CP2 LNG Project to account for increased $PM_{2.5}$ and NOx from the CP1 LNG terminal, circumstances were sufficiently changed to warrant preparation of a supplemental EIS.[119]  Petitioners also assert that Sierra Club could address only the limited information provided by CP2 LNG regarding new CP1 LNG terminal emissions and that without access to modeling details and the Commission's rationale or sufficient time to review CP2 LNG's analysis, commenters did not have an opportunity to fully understand and comment on CP2 LNG's updated air modeling.[120]

31.    Petitioners' arguments are moot.  As explained above, after issuance of the Rehearing Order, the Commission requested additional air modeling be submitted to further evaluate the cumulative impacts from $NO_2$ and $PM_{2.5}$.[121]  This updated air modeling provided the Commission, the public, and interested parties with additional, updated data.  The Commission then engaged in supplemental NEPA and presented its analysis in the draft supplemental EIS, and, ultimately, the final supplemental EIS. Because the Commission engaged in supplemental NEPA and provided the public and interested parties sufficient time to meaningfully participate, we find Petitioners' arguments moot.[122]

---

[118] *See* EPA, *Reconsideration of the Nat'l Ambient Air Quality Standards for Particulate Matter*, 89 Fed. Reg. 16202 (May 6, 2024).

[119] Petitioners' Rehearing Request at 151-54.

[120] *Id.* at 155.

[121] *See supra* section I.G.

[122] *See A.M. v. U.S.*, No. 2022-2235, 2025 WL 323778, at *1 (Fed. Cir. Jan. 29, 2025) (quoting *Chapman L. Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007) ("A case should generally be dismissed as moot '[w]hen, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue.'");  *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015) ("A case can become moot due either to a change in the facts or a change in the law."); *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013) ("A change in factual circumstances can moot a case on appeal, such as when the plaintiff receives the relief sought in his or her claim . . ."); *Hall & Assocs. v. U.S. Env't Prot. Agency*, No. CV 18-1749 (RDM), 2021 WL 1226668, at *8 (D.D.C. Mar. 31, 2021) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–478 (1990) ("In the ordinary course, when a

32.    On the other hand, Venture Global disagrees with the Commission's decision in the Rehearing Order to engage in supplemental NEPA and further argues that the Commission failed to explain why it needed to do so or cite to the standard for determining whether additional environmental review is necessary, despite doing so elsewhere in the Authorization Order and Rehearing Order.[123]  Venture Global maintains that the D.C. Circuit's remand in *Healthy Gulf* only required additional explanation of the Commission's cumulative air emissions analysis and did not require or direct supplemental NEPA.[124]  It asserts that the court's decision was not new information that altered the Projects or their impacts nor did it otherwise meet the other criteria necessitating supplemental NEPA.[125]  Venture Global also argues that despite the Commission's reference to *City of Port Isabel*, it is inapposite because here there was no entirely new or significantly expanded information or analysis and that the Commission did not reach a different conclusion.[126]  Instead of engaging in supplemental NEPA, Venture Global asserts that the Commission should have defended and further explained its cumulative impact analysis and the reasonableness of its use of the SILs which it argues was proper and done in accordance with EPA-approved protocols.[127]  Venture

---

party receives the relief he seeks during the pendency of a litigation, the matter becomes moot and subject to dismissal.").

[123]  Venture Global Rehearing Request at 35-37 (citing Authorization Order, 187 FERC ¶ 61,199 at P 193 and Rehearing Order, 189 FERC ¶ 61,148 at P 172); *see also id.* at 42-43 (arguing that the Commission failed to explain why *Healthy Gulf* required a supplemental EIS).

[124]  *Id.* at 41 (citing *Healthy Gulf,* 107 F.4th 1044).

[125]  *Id.* (explaining that the decision did not affect the environment in a new way not already considered by the Commission nor did it paint a seriously different picture of the environmental landscape).

[126]  *Id.* at 42 (citing *City of Port Isabel*, 111 F.4th at 1205-06, 1210); *see also id.* at 40 (citing *Marsh*, 490 U.S. at 373-74; *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (*Stand Up for Cal.!*); and *Price Rd. Neighborhood Ass'n. Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997)) (asserting that there were no substantial changes to the proposed action or significant new evidence or circumstances bearing on the proposed action that would provide a seriously different picture requiring supplemental NEPA).

[127]  *Id.* at 25-32, 34-35 ((citing final EIS at 4-337 through 4-355, 4-355); *see also id.* at 27 (citing EPA PSD Guidance); *see also id.* 27-30 (citing EPA SIL Guidance; EPA SIL Memo; and 40 C.F.R. pt. 51, app. W – Guideline on Air Quality Models (outlining the CAA PSD modeling three step process to ascertain adverse cumulative air impacts);

Global also maintains that the air modeling performed in this proceeding and relied upon by the Commission in the Authorization Order overestimates background concentrations because: (1) it uses monitoring stations in proximity to moderate and/or heavily industrialized areas (as compared to the rural area surrounding the Projects), (2) it included facilities that are permitted but not constructed or operating, (3) all sources were modeled as simultaneously emitting their full emissions potential, and (4) the Commission required that Venture Global's analysis include emissions from mobile marine sources.[128] Venture Global also argues that although the Projects did not cause or contribute to NAAQS exceedances, the Commission nevertheless required it to comply with the mitigation measures it proposed for $NO_2$ and $PM_{2.5}$ which further supports the reasonableness of using the SILs.[129] Venture Global also asserts that the Commission failed to consider or address precedent and historical practice rejecting requests to conduct supplemental NEPA.[130]

33.      As an initial matter, because the Commission has already engaged in supplemental NEPA, we find Venture Global's assertions moot.[131] In any event, we disagree with Venture Global's assertions. Commission staff followed the three-step PSD

---

see id. at 31-32 (citing EPA SIL Guidance (asserting that a modeled contribution that is less than a SIL is considered to have a negligible, non-contributory impact on air quality and that regulators have discretion to conclude that a project does not cause or contribute to NAAQS exceedances); id. at 42-43 (arguing that all that was required by the Commission was to provide a more complete explanation of the reasoned basis for its existing conclusions regarding cumulative air impacts).

[128] Id. at 32-33.

[129] Id. at 33-34 (explaining that Venture Global is required to comply with the Traffic, Noxious Weed, and Fugitive Dust Plan, the Ambient Air Quality Mitigation and Monitoring Plan, and other measures to minimize cumulative impacts such as the use of equipment that meets regulatory emission standards, minimizing idling time, proper operation and maintenance, speed limits, applying water to dusty areas, installing pads or washers at site entrances, covering open haul trucks, training construction personnel on environmental compliance, employing an environmental inspector).

[130] Id. at 37.

[131] See supra note 122; see also Fund for Animals v. U.S. Bureau of Land Mgmt., 357 F.Supp.2d 225, 230 (D.D.C. 2004) (holding that a NEPA claim is moot once the government completes the action complained of because "the Court cannot undo what has already been done") (citing Fl. Wildlife Fed'n v. Goldschmidt, 611 F.2d 547, 548 (5th Cir. 1980)).

methodology discussed above[132] to assess the impacts of most criteria pollutants to ensure compliance with the court's direction in *Healthy Gulf*. Importantly, EPA has issued only interim guidance for certain criteria pollutants, including the 1-hour $NO_2$ SIL,[133] which may not be afforded the same weight in NEPA analyses after *Healthy Gulf* where a third step cause and contribute analysis is required as the more developed SILs issued for some other criteria pollutants, which use a more detailed statistical methodology.[134] An increase in cumulative effects equal to a concentration below the 1-hour $NO_2$ SIL represents a minor increase in the cumulative impact of air quality in the region. This contrasts with recent EPA guidance for other pollutants which have a statistically defined NAAQS standard, namely $PM_{2.5}$ and ozone. Cumulative air modeling for 1-hour $NO_2$ and $PM_{2.5}$ identified potential NAAQS exceedances in the areas for both Projects, but the Projects' individual exceedances fell below the SIL.[135] In response to the court's directive in *Healthy Gulf*, here the Commission conducted a supplemental EIS to consider the cumulative impacts of any modeled $NO_2$ NAAQS violation with a modeled non-zero contribution by the Projects as part of the Commission's third step cause and contribute analysis.[136]

34.     The Supreme Court has explained that under NEPA the decision to complete a supplemental EIS "implicates substantial agency expertise," and is left to agency discretion under a "rule of reason" standard.[137] "The decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance:

---

[132] *See supra* section I.B.1.

[133] EPA Interim 1-hour $NO_2$ SIL Guidance.

[134] *Sierra Club v. EPA*, 705 F.3d 458, 461 (D.C. Cir. 2013) (citing EPA guidance explaining that EPA defines the SIL for $PM_{2.5}$ as "numeric values derived by EPA that may be used to evaluate the impact a proposed major source or modification may have on the NAAQS or PSD increment"). *See also* EPA Ozone and PM SILs Guidance at 11 (noting that "changes in air quality within this range are not meaningful, and, thus, do not contribute to a violation of the NAAQS").

[135] Final EIS at app. K; *see supra* section I.B.2.

[136] *Healthy Gulf*, 107 F.4th 1033, 1044.

[137] *Marsh*, 490 U.S. at 373, 375-76; *Friends of the River*, 720 F.2d at 109-10; *see also Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1059 (D.C. Cir. 2017) (*Friends of Cap. Crescent Trail*) ("If an agency's decision not to prepare a [supplemental EIS] turns on a factual dispute the resolution of which implicated substantial agency expertise, the court defers to the agency's judgment.") (quoting *Marsh*, 490 U.S. at 376).

If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared."[138] Whether an agency must complete a supplemental EIS "turns on the value of the new information to the still pending decisionmaking process."[139]

35.    In the Rehearing Order, the Commission appropriately exercised its discretion in the circumstances of this case to provide for a supplemental NEPA process.[140] As explained above, following the Authorization Order, the D.C. Circuit in *Healthy Gulf* and *City of Port Isabel* remanded those proceedings to the Commission based on deficiencies in the Commission's use of SILs in its cause and contribute analyses (i.e., step three) and the Commission's reliance on updated data without providing the public with an opportunity to comment on the underlying data or the Commission's interpretation of that data.[141] Accordingly, the Commission concluded in the Rehearing Order that, given the D.C. Circuit's specific directives implicating issues in this proceeding, it was appropriate to conduct additional environmental review.[142] Moreover, we disagree with Venture

---

[138] *Marsh*, 490 U.S. at 374 (citing 42 U.S.C. § 4332(2)(C)).

[139] *Id.*; *see also Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 78 (D.D.C. 2013) (quoting *Pub. Emps. for Envtl. Resp. v. U.S. Dep't of the Interior*, 832 F.Supp.2d 5, 29–30 (D.D.C. 2011)) ("[W]hether a change is substantial so as to warrant [a supplemental EIS] is determined not by the modification in the abstract, but rather by the significance of the environmental effects of the changes.").

[140] Rehearing Order, 189 FERC ¶ 61,148 at P 185.

[141] *See supra* section I.E.

[142] Rehearing Order, 189 FERC ¶ 61,148 at P 185 ("Given the D.C. Circuit's specific directives to the Commission in *Healthy Gulf* and *City of Port Isabel*, we set aside the Authorization Order, in part, solely regarding the Commission's analysis of $NO_2$ and $PM_{2.5}$, for the purpose of conducting additional environmental review."); *see also WildEarth Guardians v. Haaland*, No. CV 21-175 (RC), 2022 WL 1773480, at *7 (D.D.C. June 1, 2022) (mem. op.) (*Haaland*) (finding guidance provided by the court related to the Bureau of Land Management's (BLM) environmental analysis in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (*Zinke*) which utilized a similar methodology at issue in *Haaland* to be a "more-than-sufficient reason for BLM to think that the purposes of NEPA will be furthered by re-conducting that [environmental] analysis"). The Commission has an independent obligation to engage in supplemental NEPA to remedy potential NEPA deficiencies as determined on a case-by-case basis. *See Friends of Cap. Crescent Trail*, 255 F. Supp. 3d at 67 (citing *Marsh*, 490 U.S. at 374) ("an agency is obligated to prepare a supplemental EIS . . . if there remains "major

Global's assertion that the Commission's decision to engage in supplemental NEPA process was *ultra vires* following *Marin Audubon*.[143]  In engaging in supplemental NEPA, the Commission was carrying out its responsibilities under the statute based on the D.C. Circuit's specific directives related to the air emissions issues that are the focus of the supplemental EIS and therefore did not and need not rely on CEQ regulations.[144]

36.    Venture Global next argues that because the Commission has already decided to authorize the project, and rehearing was denied by operation of law, Federal action was complete and thus, there is no basis for a supplemental EIS.[145]  Although it concedes that the Commission retained authority to modify its decision, it nevertheless argues that the Commission should be required to demonstrate some "especially compelling need" for supplemental NEPA given the late stage in the proceeding and that Federal action is complete.[146]

37.    We disagree.  The touchstone of whether NEPA applies to agency action is discretion,[147] and where an "agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no [e]ffect on the agency's actions, and therefore NEPA is

---

Federal action to occur and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered").  Accordingly, we disagree with Venture Global's assertions that because Petitioners did not advocate for supplemental NEPA to address cumulative air issues, the Commission was not required to supplement its EIS.  Venture Global Rehearing Request at 35-36.

[143] Venture Global Rehearing Request at 37-38 (citing *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024), *reh'g denied en banc*, No. 23-1067, 2025 WL 374897 (D.C. Cir. Jan. 31, 2025) (*Marin Audubon*) (holding that CEQ's regulations implementing NEPA are not judicially enforceable or binding)).

[144] *See Marsh*, 490 U.S. at 371 ("Preparation of such [supplemental environmental impact] statements, however, is at times necessary to satisfy the Act's "action-forcing" purpose.").

[145] Venture Global Rehearing Request at 38-39 (citing *Marsh*, 490 U.S. 360 and *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72-73 (2004)).

[146] *Id.* at 39.

[147] *Hammond v. Norton*, 370 F. Supp. 2d 226, 255 (D.D.C. 2005) (citing *Citizens Against Rails–to–Trails v. Surface Transp. Bd.,* 267 F.3d 1144, 1151 (D.C.Cir.2001) (*Citizens Against Rails–to–Trails*)).

inapplicable."[148]  Here, the Commission's actions and authority on rehearing are more than ministerial.  As provided for in section 19(a) of the NGA, "even after federal court jurisdiction attaches and a petition is filed, the Commission retains the power to 'modify or set aside' its findings and orders '[u]ntil the record in a proceeding [is] filed in a court of appeals.'"[149]  Because the record in this proceeding has not been filed in a court of appeals, and the Commission, on rehearing, may modify or set aside, in whole or in part, any finding in the Authorization Order, we find that major federal action remains pending, and the Commission may properly engage in additional environmental review.  Accordingly, we also disagree with Venture Global's suggestion that the Commission is required to demonstrate some "especially compelling need" for supplemental NEPA in these circumstances.  Venture Global provides no authority for its contentions,[150] and we find such assertions fall short of the specificity required on rehearing.[151]

38.    Venture Global next submits that the Commission decided to supplement its environmental analysis in order to evade the time limits for acting on a rehearing request.[152]  It argues that the Commission's decision to engage in additional NEPA analysis is akin to its prior tolling order practice that was prohibited in *Allegheny Defense Project* and that the only rationale for conducting supplemental NEPA is that the Commission needed additional time to consider the air issues.[153]  It asserts, without

---

[148] *Citizens Against Rails–to–Trails,* 267 F.3d at 1151 (citations omitted); *see also Macht v. Skinner,* 916 F.2d 13, 18 (D.C. Cir. 1990) (explaining the two-fold purposes of NEPA).

[149] *See Allegheny Def. Project*, 964 F.3d at 9 (quoting 15 U.S.C. § 717r(a)); *see also Jack M. Fuls*, 36 FERC ¶ 61,136, at 61,342 (1986) ("Because of the pending . . . rehearing request, our order issuing license does not become final until we take action on that rehearing request, and we can amend or otherwise modify the license, or even rescind it, until we take such action.").

[150] *See* 18 C.F.R. § 385.713(c)(2) (2024).

[151] *See, e.g., ZEP Grand Prairie Wind, LLC*, 183 FERC ¶ 61,150, at P 10 (2023) (rejecting argument on rehearing for lack of specificity where the petitioner "offer[ed] only [a] conclusory assertion in support of its position"); *Turlock Irrigation Dist*., 140 FERC ¶ 61,207, at P 27 (2012) (finding an argument that was "nothing more than a bald assertion" as being waived for lack of specificity).

[152] Venture Global Request for Rehearing at 43.

[153] *Id.* (citing *Allegheny Def. Project*, 964 F.3d at 9).

evidence, that the gathering of additional information was a pretext for granting a limited rehearing which is inconsistent with *Allegheny Defense Project*.[154]

39.    We disagree.  As an initial matter, we find this proceeding distinguishable from *Allegheny Defense Project*, which barred the Commission's use of tolling orders to prevent rehearing applications from being deemed denied by agency inaction and preclude the applicant from seeking judicial review until the Commission acts.[155]  Here, the Commission issued a *Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration* which informed parties that the request for rehearing may be deemed denied by operation of law, allowing aggrieved parties to seek judicial review, while noting the Commission's authority to modify or set aside the order as it deems proper.[156]  Indeed Petitioners petitioned for judicial review and, the Commission, along with Petitioners and Venture Global, agreed to an abeyance of the administrative record filing deadline until the Commission concluded its supplemental NEPA.

40.    Last, Venture Global maintains that the Commission created uncertainty in the Rehearing Order by stating "other air quality issues raised by Petitioners" would be addressed in a future order.[157]  Because we address Petitioners' other air quality issues in this order, we find Venture Global's arguments moot.[158]

## IV.    <u>Substantive Issues</u>

41.    Petitioners assert that the Commission:  (1) improperly relied on an updated air monitoring station for its $PM_{2.5}$ cumulative impacts analysis without adequate explanation, (2) improperly relied on SILs in its cause or contribute analysis contrary to *Healthy Gulf*, (3) failed to include foreseeable mobile sources, such as LNG tankers associated with other nearby LNG terminals in its cumulative air impacts analysis, (4) has acted inconsistently in its review of LNG projects such as Commonwealth LNG terminal with regard to the geographic scope of air impacts, (5) improperly evaluated criteria pollutants and health impacts under the NAAQS, including arguments that the NAAQS is insufficient, (6) failed to account for peak operating capacity emissions and emissions

---

[154] *Id.* at 43-44.

[155] *Allegheny Def. Project*, 964 F.3d at 10.

[156] *Venture Glob. CP2 LNG, LLC*, 188 FERC ¶ 62,109 (2024) (Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration).

[157] Venture Global Rehearing Request at 44.

[158] *See supra* note 122.

from uprated facilities, (7) inadequately considered construction emissions and mitigation, and (8) failed to independently verify air modeling submitted by Venture Global.  We address each of these arguments below.

### A.    Cumulative Air Modeling for Operational Emissions

### 1.    Choice of Air Monitoring Station for Modeling PM$_{2.5}$

42.    Petitioners note that in the Authorization Order the Commission relied on data provided by Venture Global from a different air monitor (Vinton Monitoring Station) than that used for the baseline for PM$_{2.5}$ in the final EIS (West Orange Monitoring Station) and argue that had the Commission used the West Orange Monitoring Station it would have shown significant PM$_{2.5}$ impacts under the EPA's 2024 NAAQS threshold.[159] Petitioners maintain that, despite public comments calling into question the validity of the Vinton Monitoring Station, the Commission failed to explain if it adopted CP2 LNG's choice of PM$_{2.5}$ air monitor.[160]

43.    EPA's procedures for monitor station selection in a multi-source area recommends visually and qualitatively assessing the modeling domain and its available characteristics (e.g., monitor locations and scales, terrain features, wind rose data, etc.) and, where there are one or more monitors within the vicinity of the project area, exercise professional judgment to determine whether the selected monitor is representative of the background concentration in the project area.[161]  EPA also generally recommends using data from the closest upwind monitor to the project; however, it recommends assessing the representativeness of the monitor location and not solely choosing one based on proximity.[162]  It further recommends that data on the location (i.e., urban vs. rural), wind patterns, and terrain features at both the monitor and the source under consideration may be used to inform the selection of representative background concentration data.[163]  In carrying out its NEPA responsibilities, Commission staff often relies on other agencies' expertise, including that of the EPA and, in this case, LDEQ, which establish

---

[159] Petitioners Rehearing Request at 154.

[160] *Id.* at 156 (citing Sierra Club April 22, 2024 Comment on Response to March 26, 2024 Data Request).

[161] EPA, *Guidance on Developing Background Concentrations for Use in Modeling Demonstrations* 20 (November 2024), available at https://www.epa.gov/system/files/documents/2024-11/background-concentrations.pdf.

[162] *Id.*

[163] *Id.*

methodologies and standards for assessing air quality impacts.[164]  Because the EPA and the states are vested with authority under the CAA, the Commission may appropriately rely on their recommended selection criteria.[165]

44.    As explained in the Authorization Order, Venture Global updated its air dispersion modeling to use the $PM_{2.5}$ design value derived from ambient air data collected at the Vinton Monitoring Station.[166]  Venture Global explained that the ambient air conditions at that location are more representative of the project area than at the West Orange Monitoring Station used in its initial modeling based on proximity, population density, and air emissions profile.[167]  Venture Global further stated that it originally used the design value from the West Orange Monitoring Station because, at the time the air modeling was performed, the data from the Vinton Monitoring Station was considered incomplete due to a 2021 hurricane; however, in early 2024, Venture Global states that the EPA found the Vinton Monitoring Station's data from 2020 to 2022 to be valid and acceptable for use.[168]

45.    To ensure a full evaluation of Venture Global's choice of air monitor for $PM_{2.5}$, following the Rehearing Order, Commission staff requested Venture Global further

---

[164] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024, at P 74 (2024) ("In carrying out its NEPA responsibilities, Commission staff relies on other agencies' expertise, including that of the EPA and Virginia DEQ, which establish methodologies and standards for assessing air quality impacts."); *Millennium Pipeline Co.*, 161 FERC ¶ 61,229, at P 134 (2017) ("In carrying out its NEPA responsibilities, Commission staff relies on other agencies' expertise, including that of the EPA and New York DEC, which establish methodologies and standards for assessing air quality impacts."); *see also Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234, at 62,704 (2022) (citing *City of Bos. Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) (*City of Bos.*) and *City of Pittsburgh v. FPC*, 237 F.2d 741, 754 (D.C. Cir. 1956)) ("The Commission may, in appropriate circumstances, rely upon standards or guidance promulgated by other agencies.").

[165] *Millennium Pipeline Co.*, 161 FERC ¶ 61,229 at P 132; *see also EMR Network v. Fed. Commc'ns Comm'n*, 391 F.3d 269, 273 (D.C. Cir. 2004) (*EMR Network*) (finding agency properly relied on outside agency expertise).

[166] Authorization Order, 187 FERC ¶ 61,199 at P 192; CP2 LNG April 4, 2024 Response to Environmental Information Request.

[167] *See* CP2 LNG Apr. 4, 2024 Response to Data Request.

[168] Authorization Order, 187 FERC ¶ 61,199 at P 192; CP2 LNG Apr. 4, 2024 Response to Data Request.

explain the selection of the Vinton Monitoring Station, identify other monitors considered, and explain why they were rejected.[169]  In response, Venture Global explained that the proximity to the facility, the surrounding area (e.g., land use and terrain), and the availability of data are key factors in the selection of the monitoring stations.[170]  The Vinton Monitoring Station is the closest monitoring station, being located approximately 55 kilometers (km) from the CP2 LNG Project and approximately 22 km from the Moss Lake Compressor Station.[171]  The CP2 LNG Project, Moss Lake Compressor Station, and Vinton Monitoring Station are located in similar areas (i.e., rural and undeveloped) with flat terrain and in the same climatological area of Louisiana.[172]  Venture Global also repeated its justification for previously using the West Orange Monitoring Station (i.e., due to hurricane-caused data issues with the Vinton Monitoring Station) and explained that although it is the next closest monitoring station, the West Orange Monitoring Station does not accurately represent background ambient air quality because it is further away and located in a more developed area with large residential areas and small industrial facilities.[173]  Accordingly, Venture Global explains that the data from the Vinton Monitoring Station most accurately represents background concentrations of air quality consistent with EPA's criteria.[174]

46.     Based on the foregoing, we agree that the Vinton Monitoring Station is more representative of background concentrations of air quality and more indicative of $PM_{2.5}$ in the project area based on proximity, population density, and air emissions profile. Therefore, we agree with Venture Global's selection and use of the Vinton Monitoring Station.[175]

## 2.     NO₂ and PM₂.₅ Cumulative Impacts

47.     Citing to the D.C. Circuit's holding in *Healthy Gulf*, Petitioners assert that the Commission failed to take a hard look at cumulative air quality impacts by improperly concluding that because the Projects' modeled contribution at each NAAQS exceedance

---

[169] Dec. 10, 2024 Data Request at 1.

[170] Venture Global Dec. 23, 2024 Response to Data Request at 1.

[171] *Id.* at 2.

[172] *Id.*

[173] *Id.* at 2-4.

[174] *Id.* at 2.

[175] Authorization Order, 187 FERC ¶ 61,199 at P 194.

is below the SIL for both $PM_{2.5}$ and $NO_2$, the Projects' predicted impacts would not cause or contribute to the exceedance for either pollutant and, therefore, would be an environmentally acceptable action.[176]  Petitioners maintain that, although the Projects' contributions to modeled exceedances falls below the SILs, they are not facially insignificant and are more than de minimis contributors to cumulative impacts and will contribute to unhealthy air quality in the surrounding communities.[177]  In short, Petitioners disagree with the conclusion that, where modeling predicted an exceedance of a NAAQS threshold, that the exceedance would have occurred even in the absence of the project.  Petitioners also aver that the Commission's failure to take a hard look at air impacts and label them as "significant" affected its analysis of alternatives and mitigation, undermining the Commission's public interest determination.[178]

48.     Petitioners further assert that the Commission failed to acknowledge that air quality will exceed the $PM_{2.5}$ 24-hour PSD increment at the Moss Lake Compressor Station,[179] despite concluding that the Projects complied with applicable NAAQS and Class II PSD Increments for pollutants subject to PSD review.[180]  Petitioners maintain that any argument by the Commission that the Moss Lake Compressor Station's contribution was so minor to render the impact insignificant is flawed by the Commission's improper use of SILs and failure to adequately consider cumulative impacts.[181]  Accordingly, Petitioners argue that the Commission's failure to address the PSD increment exceedance violates NEPA.[182]

---

[176] Petitioners Rehearing Request at 136-39 (citing *Healthy Gulf*, 107 F.4th 1042-45).

[177] *Id.* at 137-38.

[178] *Id.* at 138-39.

[179] A PSD increment is the maximum allowable increase in the ambient concentration of a specific pollutant in an area that is in attainment of the NAAQS.  Final EIS at 4-373.  Significant deterioration of air quality is deemed to occur when the amount of additional new pollution exceeds the applicable PSD increment.  *Id.*

[180] Petitioners Rehearing Request at 161 (citing final EIS at 4-373 to 4-374, 4-548).

[181] *Id.*

[182] *Id.*

49.     We rely on EPA as the air quality authority with the expertise to establish air quality thresholds/limits to protect public health required by the CAA.[183]  The Commission uses NAAQS as a tool to assess air quality impacts on the quality of the human environment pursuant to NEPA.  PSD increments are not a metric to measure impacts on human health.[184]  Pursuant to the PSD program, states must review potential new sources of pollution to ensure "that the air quality in attainment areas or areas that are already clean will not degrade"[185] by confirming that the source will not "cause or contribute" to a violation of any applicable NAAQS.[186]  PSD permitting applies to new major sources or major modifications at existing sources in attainment areas or in areas that are unclassifiable.[187]  PSD permitting is intended to prevent new air emission sources from causing the existing air quality to deteriorate beyond acceptable levels.[188]  Under the

---

[183] *See Healthy Gulf*, 107 F.4th at 1043 (EPA's NAAQS set the level "requisite to protect the public health" while "allowing an adequate margin of safety") (quoting 42 U.S.C. § 7409(b)(1)); *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74; *EMR Network*, 391 F.3d at 273 (finding agency properly relied outside agency expertise); *see Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 567-68 (5th Cir. 2024) (affirming the use of SILs in cause and contribute analyses); *see also* Venture Global Rehearing Request at 32 (citing to *Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555 and asserting that circuit courts have upheld the use of SILs in cause and contribute analyses).

[184] The PSD increments were established to prevent air quality in clean areas, or attainment areas, from deteriorating to the level set by the NAAQS.  Because the PSD increments established in 42 U.S.C. § 7473 and § 7476 and promulgated by EPA in 40 C.F.R. § 51.66(c)(1) were intended to consider clean air values while simultaneously allowing economic development in all but class I areas, the increments should not be used as a metric to measure impacts on human health.  *See, e.g.*, EPA, *Prevention of Significant Air Quality Deterioration*, Final Rule, 39 Fed. Reg. 42,510, 42,510 (Dec. 5, 1974) ("The Administrator continues to feel that a Class II increment should be compatible with moderate, well-controlled development in a nationwide context, and that large-scale development should be permitted only in conjunction with a conscious decision to redesignate the area as Class III.").

[185] *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 470 (2004).

[186] NAAQS are limits on the atmospheric concentration of criteria pollutants that are harmful to public health and the environment.  *See* 42 U.S.C. § 7409; final EIS at 4-335 to 4-336.

[187] Final supplemental EIS at 14.

[188] *Id.*

PSD program, any new major source or major modification of an existing source of air pollutants is required to obtain an air quality permit before beginning construction.[189]

50.    Both Projects are in attainment areas, as determined by EPA, for all criteria pollutants, and thus are subject to the CAA PSD permitting program.  As explained above, and consistent with EPA guidance and the PSD permitting process, the Commission engages in a three-step analysis that includes a preliminary screening step using SILs, a cumulative impact analysis, and a cause and contribute analysis.[190]  EPA delegated authority to the LDEQ to implement federal air quality programs in Louisiana.[191]  Accordingly, we appropriately rely on the EPA's and LDEQ's guidelines in assessing compliance with the PSD permitting program.[192]

### a.    Moss Lake Compressor Station

51.    On December 23, 2024, Venture Global submitted updated air modeling in response to Commission staff's December 10, 2024 data request.  As explained in the final supplemental EIS, because the updated modeled concentration results at the Moss Lake Compressor Station fall below the SILs for all criteria pollutants, a cumulative impacts analysis (i.e., second step) is not required according to CAA modeling regulation and guidance.[193]  Therefore, the Moss Lake Compressor Station will not cause or contribute to any significant cumulative air quality impacts for $NO_2$ and $PM_{2.5}$ and are appropriately classified as statistically insignificant.[194]  In addition, because the updated air modeling used in the final supplemental EIS determined that the modeled concentration results for the Moss Lake Compressor Station are below the SILs, it is not necessary to analyze whether the PSD increment will be exceeded.[195]

---

[189] *Id.*

[190] *See supra* section I.B.1.

[191] Final supplemental EIS at 13.

[192] *See supra* P 43 & notes 164-165.

[193] Final supplemental EIS at 15-17.

[194] *Id.* at 16-17 ("The EPA has indicated that facility emission impacts below the SILs would not cause ambient air quality impacts that would cause or contribute to exceedances of the NAAQS.").

[195] Final supplemental EIS at 16 (citing 40 C.F.R. pt. 51, app. W); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187, at P 59 (2023) (explaining that where modeling showed that ground-level concentrations of criteria pollutants would be below the SIL

52.    Nevertheless, Commission staff also looked qualitatively at facilities in the vicinity of the Moss Lake Compressor Station and determined that cumulative impacts from 1-hour $NO_2$ and annual $PM_{2.5}$ are not significant based on: (1) the magnitude of emissions and the distance between the Moss Lake Compressor Station and these facilities, (2) the CAA permitting programs ensuring that these individual facilities would not cause or contribute to any exceedances of the NAAQS, (3) local monitors showing ambient levels well within the NAAQS, and (4) magnitude of impacts from the Moss Lake Compressor Station being below the SILs.[196]

53.    The updated air modeling analyses for the Moss Lake Compressor Station conducted by Venture Global (and verified by the Commission) did not require an analysis beyond the first step (i.e., preliminary screening step). Because Petitioners' assertions and the D.C. Circuit's decision in *Healthy Gulf* focused on the third step in this analysis (i.e., cause and contribute analysis), Petitioners' arguments on rehearing of the Authorization Order are now moot.[197] We agree with Commission staff's analysis that the revised air modeling demonstrates compliance with the NAAQS in the project area and accordingly, based on this updated analysis, continue to find that the Moss Lake Compressor Station will not significantly impact air quality.[198]

### b.    CP2 LNG Project

54.    In the final supplemental EIS, Commission staff analyzed the updated air modeling for the CP2 LNG Project, including a cumulative impact analysis (i.e., second step) for the following pollutants and respective averaging periods that exceeded the SILs: 1-hour CO; 1-hour and annual $NO_2$; 1-hour, 3-hour, and 24-hour $SO_2$; and 24-hour and annual $PM_{2.5}$.[199] Venture Global used the American Meteorological Society/Environmental Protection Agency Regulatory Model (AERMOD) dispersion model, in consultation with the LDEQ and in accordance with EPA's *Guideline on Air*

---

emissions would not cause or contribute to an exceedance of the NAAQS or PSD increments); *Golden Pass Pipeline LLC*, 181 FERC ¶ 61,050, at n.77 (2022) (stating that "a modeled result predicting that a proposed source's maximum impact will be below the corresponding SIL value may generally be considered to be a sufficient demonstration that the proposed source will not cause or contribute to a violation of the applicable NAAQS or [PSD] increment").

[196] Final supplemental EIS at 17.

[197] *See supra* note 122.

[198] Authorization Order, 187 FERC ¶ 61,199 at PP 157-158, 183-189.

[199] Final supplemental EIS at 17-19.

*Quality Models*, 40 C.F.R. Part 51, Appendix W.[200]  The emission inventory included the emission sources at the CP2 LNG Project plus all other inventory sources (including the stationary and marine mobile sources associated with CP1 LNG) within the radius of impact.[201]  These include stationary sources and mobile sources from marine vessels associated with the operation of the CP2 LNG Project,[202] as well as the stationary and mobile sources associated with the CP1 LNG terminal, and additional offsite industrial sources obtained from the LDEQ Emissions Reporting and Inventory Center.[203]

55.     The updated cumulative modeling analysis for the CP2 LNG Project demonstrates compliance with the NAAQS for all applicable pollutants and their respective averaging periods in the project area.[204]  Accordingly, the modeling demonstrates that the emission impacts, including 1-hour $NO_2$ and annual and 24-hour $PM_{2.5}$ impacts from the CP2 LNG Project, when combined with past, present, and reasonably foreseeable emissions within the regional air environment are not significant.[205]  The updated air modeling analyses for

---

[200] Venture Global Dec. 23, 2024 Response to Data Request at 12; final supplemental EIS at 17-19.

[201] Final supplemental EIS at 18; *see also id.* at n.43 ("The background sources inventory included all sources within the area of impact plus 15 kilometers and all major sources within the area of impact plus 20 kilometers (in either case the area of impact would not extend beyond a 50 kilometer by 50 kilometer grid from the [CP2 LNG Project] due to the accuracy constraints of dispersion models)."); Venture Global Dec. 23, 2024 Response to Data Request at 13.

[202] Final EIS at 4-296 to 4-301; Venture Global Dec. 23, 2024 Response to Data Request at 12-14.

[203] *See* CP2 LNG Aug. 1, 2022 *Supplemental Response to Environmental Information Request No. 3*, app. E (listing the Louisiana DEQ offsite sources).  *See also* Venture Global Dec. 23, 2024 Response to Data Request at 11-14 (detailing the cumulative air quality modeling conducted for the CP2 LNG Project).

[204] Final supplemental EIS at 19.  Although we acknowledge that the final EIS predicted NAAQS exceedances for 1-hour $NO_2$, the updated model's prediction of no NAAQS exceedances is largely due to changes in Louisiana's emissions inventory, as well as refinements of emission rates and sources.  *See* Venture Global Dec. 23, 2024 Response to Data Request at 13 (stating that the updated modeling used for the supplemental EIS "used the most recent validated air quality monitor data and the most recent emissions inventory revisions provided by the LDEQ for facilities within the [radius of impact]" as well as updated emissions factors).

[205] Final supplemental EIS at 19.

the CP2 LNG Project conducted by Venture Global (and verified by the Commission) did not require an analysis beyond the second step (i.e., cumulative impact analyses). Because Petitioners' assertions and the D.C. Circuit's decision in *Healthy Gulf* focused on the third step in this analysis (i.e., cause and contribute or culpability analysis), Petitioners' arguments on rehearing of the Authorization Order are now moot.[206]  We agree with Commission staff's analysis that the revised air modeling demonstrates compliance with the NAAQS in the project area and accordingly, based on this updated analysis, continue to find that the CP2 LNG Project will not significantly impact air quality.

### 3.   Mobile Sources

56.     Petitioners next assert that the cumulative air modeling presented in the final EIS was insufficient because it omitted foreseeable mobile sources, such as LNG tankers associated with other nearby LNG terminals, six of which were identified in the final EIS, even though it considered mobile sources associated with the CP1 LNG terminal.[207] Petitioners disagree with Commission's arguments in the Authorization Order as to why such mobile sources were excluded.[208]  First, they argue that, just because the CAA did not require that these mobile sources be considered in the state's cumulative air impacts modeling, does not mean that the Commission was not required to include them in its NEPA analysis.[209]  Petitioners maintain that NEPA imposes obligations that differ from and are broader than those imposed by the CAA, and that NEPA requires the Commission to consider cumulative effects.[210]  Noting that the Commission included mobile source emissions from the CP1 LNG facility, but excluded similar emissions from other facilities, Petitioners state that ownership is irrelevant to the scope of NEPA

---

[206] *See supra* note 122.

[207] Petitioners Rehearing Request at 141 (citing *Healthy Gulf*, 107 F.4th 1033 and 40 C.F.R. § 1508.1(i)(3) (2024)); *id.* (citing Authorization Order, 187 FERC ¶ 61,199 at PP 196-197); *id.* at 146.

[208] *Id.* at 142; *see also id.* at 143-44 (citing Authorization Order, 187 FERC ¶ 61,199 at P 186) (disagreeing with the Commission's finding that it had no obligation to include mobile source emissions from other terminals because it would not change the analysis and argues that the Commission was required to take a hard look at cumulative effects).

[209] *Id.* at 142 (citing Authorization Order, 187 FERC ¶ 61,199 at PP 184-188).

[210] *Id.* at 142-43 (citing *Healthy Gulf*, 107 F.4th at 1043-44 and *Sabal Trail*, 867 F.3d at 1375 (citing *Calvert Cliffs' Coord. Comm. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1122–23 (D.C. Cir. 1971))).

analysis.[211]  Petitioners assert that the relevant information is already in the record and the Commission previously estimated mobile source emissions associated with other terminals in its final EISs for those terminals.[212]  They maintain that the Commission has considered the cumulative effects of marine vessels from neighboring LNG terminals in other proceedings, and failed to explain why it did not do so here.[213]  Petitioners assert that the Commission failed to demonstrate that, where NAAQS would be exceeded when cumulative mobile sources are considered, but not exceeded otherwise, the CP2 LNG Project's contribution to those additional exceedances would be below the applicable SIL.[214]  Petitioners argue that nothing in the record rules out or addresses the possibility that if appropriate cumulative mobile source emissions are included, the CP2 LNG Project's contribution to one or more NAAQS exceedances will also exceed the applicable SIL.[215]

57.    As an initial matter, because the updated modeled concentration results for the Moss Lake Compressor Station are below the SILs for all pollutants, a cumulative impacts analysis (i.e., second step) is not required per CAA modeling regulation and guidance.[216]  Accordingly, we find Petitioners arguments with respect to the Moss Lake Compressor Station moot.[217]

58.    Under NEPA, an agency need consider only those environmental effects that are "reasonably foreseeable."[218]  Although Petitioners assert that the Commission should consider the mobile source emissions associated with other LNG terminals in Louisiana, they fail to identify any methodology with which the Commission could meaningfully or

---

[211] *Id.* at 143.

[212] *Id.* (citing Authorization Order, 187 FERC ¶ 61,199 at P 193).

[213] *Id.* (citing *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), *order on reh'g*, 170 FERC ¶ 61,046, at P 55 (2020)); *id.* at 144-46 (detailing, in a table, the $NO_X$ emissions from mobile sources and comparing them as a percentage to stationary sources for nearby LNG facilities).

[214] *Id.* at 144.

[215] *Id.* (citing final EIS 4-369 to 4-370 and Authorization Order, 187 FERC ¶ 61,199 at P 187).

[216] Final supplemental EIS at 16.

[217] *See supra* note 122.

[218] 42 U.S.C. § 4332(2)(C)(i).

accurately model such data.[219]  Commission staff's practice of including the marine
mobile source emissions into the modeling analysis for individual LNG terminals is an
effort to disclose a proposed project's air quality impacts in the NEPA analysis, while
taking advantage of EPA's well-established modeling methodology for PSD permitting.
While Commission staff did consider marine mobile source emissions from the CP2 LNG
Project and adjacent CP1 LNG facility, Commission staff treated the marine mobile
sources as stationary sources, which results in a conservative maximum-impact estimate
of the facility's impacts.  This is consistent with EPA's modeling methodology; however,
due to the large number of assumptions, including other more remote marine mobile
sources from non-adjacent facilities deviates too far.[220]  For these emissions sources,
AERMOD as dictated by EPA's methodology, is not suitable for modeling all of these
facilities' intermittent and transient marine mobile sources.[221]  The Commission is not
aware of an alternative applicable methodology.

---

[219] We also note that the Commission consulted with the EPA and LDEQ
throughout the preparation of the final supplemental EIS regarding the methodologies for
various impact analyses—including air quality—and neither suggested that the
Commission should analyze mobile source emissions more than it had already done.
*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477,
491–92 (6th Cir. 2014) (citing *Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288,
296 (3d Cir. 2012) (*Tinicum Twp.*)) ("Moreover, the record shows that defendants
consulted with the EPA throughout the preparation of the Supplemental Final EIS
regarding the methodologies for various impact analyses—including air quality—and at
no time did EPA suggest that defendants should analyze "ultra-fine" particulates. 'While
additional data might enable a more detailed environmental analysis, NEPA does not
require maximum detail. Rather, it requires agencies to make a series of line-drawing
decisions based on the significance and usefulness of additional information.'").

[220] These assumptions include calculating emissions based on the upper limit of
ships that the applicant can utilize, which itself is based on:  (1) how much LNG the
applicant is actually able to produce, and (2) how many ships may traverse the waterway
based on the Waterway Suitability Assessment.  Moreover, vessel emissions calculations
involve a confluence of additional assumptions, including distance, the size and type of
vessel, and the changing nature of the LNG ship fleet.  *See* final EIS at 4-361 to 4-364
(detailing assumptions including main engine size of vessels; length of time for
maneuvering, holding, and hoteling; and vessel power requirements); *see also* Venture
Global Dec. 23, 2024 Response to Data Request att. Air-3-2 (describing assumptions for
various CP1 LNG vessels including, their activities, power requirements, and emissions).

[221] AERMOD is an air quality modeling system preferred by the EPA. EPA,
*Support Center for Regulatory Atmospheric Modeling (SCRAM) -Air Quality Dispersion
Modeling-Preferred and Recommended Models*, https://www.epa.gov/scram/air-quality-

59.     Petitioners point to the Commission's previous analysis in *Rio Grande LNG, LLC* to argue that the Commission can conduct this analysis, but that case is distinguishable. There, the Commission acknowledged that the EIS presented air quality impacts modeling that extended beyond the federal and Texas state required analyses, with the Rio Grande LNG facility's modeling examining emissions from both mobile sources and terminal operations, and the cumulative impacts modeling examining mobile and operational emissions from two additional LNG terminals[222] in Brownsville, Texas.[223] The Commission's cumulative impacts modeling reflected unique situational circumstances in the project's environmental review, as all three Brownsville LNG terminals were simultaneously undergoing initial environmental review at the time. Given these unique circumstances, the Commission's cumulative impacts modeling in the Rio Grande LNG EIS included mobile emissions from the three Brownsville LNG terminals because the Commission possessed current, facility-specific mobile source emissions data for each individual project undergoing review at the same time.[224] Such circumstances are not present in the Commission's environmental review for the CP2 LNG Project, though the cumulative air modeling incorporated mobile emissions from the CP1 LNG facility due to the unique circumstances discussed herein. Here, Petitioners ask the Commission to add mobile air emissions data from six other jurisdictional LNG terminals, which would require the Commission to seek data for projects not currently undergoing such review before the Commission.

60.     Further, in the case of the analysis for Rio Grande LNG, the Commission acknowledged that this approach was overly conservative, explaining that the analysis reflects conditions occurring only when all three nearby terminals will be loading LNG vessels simultaneously. That overly conservative approach would not account for contribution differences at different points in space and time, weather patterns, and other variables that could affect outcomes, and overestimates each project's contribution to air quality generally. Due to the large number of assumptions, even if the Commission

---

dispersion-modeling-preferred-and-recommended-models. AERMOD meets the EPA's modeling guidance in Appendix W to 40 CFR part 51 and is a steady state gaussian plume air model used to estimate concentrations due to air emissions on receptors up to 50 km from the source. EPA, *AERMOD Implementation Guide* (Nov. 2024), available at https://gaftp.epa.gov/aqmg/SCRAM/models/preferred/aermod/aermod_implementation_guide.pdf.

[222] The two additional terminals were Texas LNG and Annova LNG.

[223] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 50.

[224] Rio Grande LNG, final EIS, Docket Nos. CP16-454-000, et al., app. P at P-1 (issued Apr. 26, 2019).

incorporated marine mobile source emissions into AERMOD from more remote marine mobile sources, those assumptions compounded would not provide accurate, and therefore, not meaningful "reasonably foreseeable" information.[225]  Furthermore, we note that CEQ has rescinded its regulations related to consideration of cumulative effects under NEPA.[226]

61.    The updated cumulative air dispersion modeling presented in the final supplemental EIS for the CP2 LNG Project was conducted in accordance with EPA's 40 C.F.R. part 51, Appendix W.[227]  The cumulative air dispersion modeling for the CP2 LNG Project included:  (1) emissions inventory provided by the LDEQ and (2) both stationary sources and mobile sources (LNG vessels and tugs) associated with the operation of the CP2 LNG Project, as well as the stationary and mobile sources associated with CP1 LNG because Venture Global filed additional emissions data for CP1 LNG in the record in response to the Commission's supplemental data requests regarding the CP2 LNG Project pursuant to the Rehearing Order.[228]  The emissions inventory provided by the LDEQ does not include mobile emissions associated with the other LNG terminals, and thus, those emissions were not included in the cumulative impacts modeling in the final EIS or final supplemental EIS.[229]  This is consistent with the PSD requirements of the CAA.[230]  As explained above, the EPA is vested with

---

[225] See supra note 220; Citizens for Smart Growth v. Sec'y of Dep't of Transp., 669 F.3d 1203, 1215 (11th Cir. 2012) (citing City of Oxford v. FAA, 428 F.3d 1346, 1356 (11th Cir. 2005) ("agencies cannot be 'forced to analyze the environmental impact of a project, the parameters and specifics of which would be a mere guess.").

[226] 90 Fed. Reg. 10,610 (Feb. 25, 2025).

[227] Final supplemental EIS at 14.

[228] Id. at 17-19.

[229] Authorization Order, 187 FERC ¶ 61,199 at P 185 (citing LDEQ, Air Emissions Inventory, https://deq.louisiana.gov/index.cfm?md=pagebuilder&tmp=home& pid=EmissionsInventory (last updated Dec. 26, 2024)).  We note that the inclusion of mobile sources from the CP1 LNG terminal does not mean that the Commission, or any other agency only included mobile sources from facilities under common ownership. Petitioners Rehearing Request at 143.  The CP2 LNG Project will be built next to the CP1 LNG terminal, which tends to explain its inclusion in the air quality models submitted to LDEQ.

[230] 40 C.F.R. part 51, Appendix W – Guideline on Air Quality Models.  See also Authorization Order, 187 FERC ¶ 61,199 at P 185 & n.450; Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC, 21 F.4th 1229, 1235 (10th Cir. 2021) ("As a general rule, the States' principal responsibility is stationary sources like factories and

primary authority under the CAA and its amendments to implement and enforce
regulations to reduce air pollution,[231] and LDEQ is the state agency tasked with
implementing the relevant portions of the CAA under EPA oversight.  The Commission
routinely, and appropriately, relies on other agencies' expertise in carrying out its NEPA
responsibilities, which in this case supports using the LDEQ's emissions inventory as the
most reliable data input for the cumulative analysis.[232]

62.    For these reasons, we find it more reliable to rely on the emissions inventory
provided by LDEQ, the state agency tasked with implementing the relevant portions of

---

power plants (governed by Title I of the CAA), while the EPA has primary responsibility
over mobile sources (governed by Title II of the Act).").

[231] *Millennium Pipeline Co., L.L.C.*, 145 FERC ¶ 61,007, at P 50 (2013).  Notably,
emissions from mobile sources are covered by the state monitoring program for increases
in "background" emissions.  *See* 40 CFR parts 50, 51, 53, and 58.  With approval from
the EPA, states may adjust their implementation plans for permitting if an area/pollutant
in a region exceeded attainment thresholds (i.e., nonattainment).  Therefore, Louisiana
could implement measures to bring its air quality into attainment if future emissions,
including those from mobile sources, exceeded attainment thresholds.  *Sierra Club v.
EPA*, 47 F.4th 738, 740 (D.C. Cir. 2022) (citing 42 U.S.C. §§ 7502(c)(1), (6),
7407(d)(3)(E), 7505a(a)) ("SIPs for nonattainment areas must include emission reduction
measures designed to bring the areas into compliance with the NAAQS.  Once EPA
approves a nonattainment designation for a particular area, it can be redesignated to
attainment only upon satisfaction of five statutory conditions, including approval by the
agency of a 'maintenance plan' assuring that the area will continue to meet the NAAQS
for at least 10 years.").

[232] *See supra* P 43 & notes 164-165; *City of Bos.*, 897 F.3d at 255 (upholding the
Commission's reliance on conclusions of another agency); *EMR Network*, 391 F.3d
at 273 (finding agency properly relied outside agency expertise); *Saguaro Connector
Pipeline, LLC*, 188 FERC ¶ 61,029, at P 114 (2024); *Commonwealth LNG, LLC*,
183 FERC ¶ 61,173, at P 66 (2023); *Millennium Pipeline Co.*, 161 FERC ¶ 61,229
at P 132; *see also Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 203
(2016) ("[T]he Commission is entitled to rely on an agency's expertise.  The
Commission's capability to assess different types of environmental impacts, while
extensive, is not infinite.  Accordingly, we routinely rely on the expertise of other
agencies to evaluate the environmental or safety impacts of proposed projects, provided
we are satisfied as to their competence and the validity of their basic data and analysis.").

the CAA.[233]  "The NEPA process involves an almost endless series of judgment calls" that are vested in the agencies.[234]  And "[w]hile additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail" but instead, "requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information."[235]  Because LDEQ does not include mobile emissions in its emissions inventory nor require applicants to include such emissions in permit applications,[236] and because LDEQ's requirements are designed to ensure a sufficient assessment of a proposal's emissions under the NAAQS, upon which the Commission relies in conducting its NEPA analysis, we find the Commission has complied with its NEPA obligations.[237]  We also find that considering mobile emissions

---

[233] *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1178 (10th Cir. 2012) ("An agency has discretion to choose a methodology, so long as it explains why it is reliable.").

[234] *Duncan's Point Lot Owners Ass'n, Inc. v. FERC,* 522 F.3d 371, 376 (D.C. Cir. 2008) (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)) (citations omitted).

[235] *Tinicum Twp.*, 685 F.3d at 296 (citing *Coal. on Sensible Transp. Inc. v. Dole*, 826 F.2d at 66).  In these circumstances, the number and importance of the many assumptions that the Commission would need to make to develop a useful emissions estimate goes well beyond the sort of "reasonable forecasting and speculation" that NEPA requires.  *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) (citing *Del. Riverkeeper Network v. FERC*, 713 F.3d 1304, 1310 (D.C. Cir. 2014) ("'*reasonable*' being the operative word")); *see also Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136, at P 56 (2024) (declining to accept alternative calculations due to uncertain variables).

[236] LDEQ, Louisiana Guidance for Air Permitting Actions at 147, https://www.deq.louisiana.gov/assets/docs/Air/Air_Permit_Applications/r06_LouisianaGuidanceforAirPermittingActions.pdf (Dec. 12, 2024) ("For those engines that are located on barges or other marine vessels, these engines should not be represented in air permits at all.  These engines are not subject to any state air permitting requirements.  These engines would either be classified as nonroad engines or as marine engines depending on their use and/or method of installation.  Both engine types are regulated by federal regulations that have not been delegated to LDEQ.").

[237] *Diné Citizens*, 59 F.4th at 1046 ("[c]omparison to standards set by administrative bodies to determine whether healthy levels of pollutants would be exceeded constitutes a hard look at the health impacts"); *see also Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.,* 576 F. App'x at 491–92 (upholding NEPA analysis that omitted pollutant that was not regulated under NAAQS and recognizing that

from the CP2 LNG Project as well as additional nearby mobile source emissions from the CP1 LNG facility, extended beyond the federal and state required analyses, while remaining within NEPA's bounds of reasonableness and meaningful analysis.[238]

63.     CP2 LNG's updated modeling used the most recent validated air quality monitor data and the most recent emissions inventory revisions provided by the LDEQ for facilities within the radius of impact in its updated cumulative air modeling for the CP2 LNG Project.[239]  As discussed in the final supplemental EIS, CP2 LNG's updated modeling incorporates the updates from the LDEQ/EPA Model from December 2024 and updates the emission factors for the marine mobile sources associated with the CP1 LNG terminal, which were modeled as offsite inventory.[240]  The CP2 LNG Project air emission sources were modeled along with the inventory of offsite sources within the pollutant-specific area of impact (AOI) and added to a background concentration with the resulting total impacts compared with the NAAQS.[241]  The AOI was established as the distance from the CP2 LNG Project to the farthest receptor that showed a modeled impact greater than the SIL in the preliminary screening modeling analysis.  The background sources inventory included all sources within the area of impact plus 15 km and all major sources within the area of impact plus 20 km (in either case the area of impact would not extend beyond a 50 km by 50 km grid from the CP2 LNG Project due to the accuracy constraints of dispersion models).[242]  As in the final EIS, the sources modeled included

_____

NEPA's requirements are per se satisfied by demonstrating conformity with NAAQS); *Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), *aff'd*, 435 F. App'x 368 (5th Cir. 2011) ("The defendants' decision to consider air pollution issues through the same framework used by the EPA to enforce the Clean Air Act cannot be considered arbitrary or capricious."); *Mountain Valley Pipeline, LLC*, 172 FERC ¶ 61,261, at P 24 (2020) (finding it appropriate to rely on NAAQS).

[238] *See Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 49 (noting that the Commission presented air quality impacts modeling that extended beyond the federal and state required analyses by examining emissions from both mobile sources and terminal operations, and the cumulative impacts modeling examining mobile and operational emissions from nearby LNG terminals).

[239] Final supplemental EIS at 18.

[240] *Id.*

[241] *Id*. at 17-19.

[242] *Id.* at 18 & n.43.

the Commonwealth and CP1 LNG terminals.[243]  The updated cumulative air modeling for the CP2 LNG Project demonstrated that the maximum emission impacts based upon the cumulative modeling does not exceed the NAAQS at any receptor within the AOI.[244]  We find that the Commission's analysis of cumulative air quality impacts satisfied its responsibilities under NEPA.

### 4.     Geographic Scope

64.     Petitioners next assert that the Commission has acted inconsistently in its review of LNG projects when compared to its review of the neighboring Commonwealth LNG terminal.[245]  In particular, Petitioners argue that, despite the Commonwealth LNG terminal's smaller size, the Commonwealth LNG terminal is predicted to emit a higher maximum 1-hour $NO_2$ level than the CP2 LNG Project [246]  Petitioners also note, despite these lower emissions levels and the Commonwealth LNG terminal's location only one-half mile from the CP2 LNG Project, the Commission counterintuitively used a wider geographic scope for Commonwealth LNG, and failed to explain why a narrower scope is appropriate in this proceeding.[247]

65.     As discussed in the Projects' final supplemental EIS and the Commonwealth LNG draft supplemental EIS, the conservative dispersion modeling indicated that the maximum $NO_2$ emission impacts from the CP2 LNG Project and Commonwealth LNG facility are similar for both 1-hour $NO_2$ and annual $NO_2$.[248]  The differences in the impacts are due to various factors in the air dispersion modeling including differences in emission rates, stack heights, variability in terrain near each facility, and other terminal-specific factors.[249]  In addition, and as explained in the final EIS, because both Projects

---

[243] Final EIS at 4-552 to 4-553.  These sources were not removed from the modeling performed for the final supplemental EIS.

[244] Final supplemental EIS at 19.

[245] Petitioners Rehearing Request at 146.

[246] *Id.*

[247] *Id.* at 146-47.

[248] Final supplemental EIS at 17-19; Commonwealth LNG, draft supplemental EIS, Docket No. CP19-502-000, et al., at 15-19 (issued Feb. 14, 2025).

[249] Venture Global Apr. 21, 2025 Response to Comments at 39 ("Moreover, stack heights and diameters and other key characteristics of the turbines, flares, and other

are subject to PSD review, the LDEQ air quality regulations stipulate that all construction permit applicants must evaluate and apply Best Available Control Technology (BACT) for the stationary air emission sources.[250] The natural gas-fired combustion turbines would be designed with Dry Low-NOx Combustors.[251] Additionally, for the combined cycle units, duct burners would be Low-NOx Burner design and the heat recovery steam generator exhaust would be ducted to a selective catalytic reduction system.[252] Also, for the aeroderivative simple cycle units, the exhaust would be ducted to a selective catalytic reduction system.[253] The combination of these measures would minimize NOx emissions from the combustion turbines.[254] The hot oil heaters would also be equipped with Ultra-Low-NOx Burner, which is considered BACT for NOx emissions from these units.[255] CP2 LNG will also include an acid gas removal unit that would treat the feed gas.[256] The acid gas thermal oxidizers would be equipped with Low-NOx Burner, which is considered BACT for NOx emissions from these units.[257] The CP2 LNG Project has higher NOx emissions than Commonwealth LNG.[258] These mitigation measures listed above reduce the NOx emissions from the much larger facility and in the absence of these reduction technologies, the NOx emissions would be much larger.

66.     Moreover, "[i]n order to determine the scope of a cumulative impacts analysis for each project, the final EIS establishes a 'geographic scope' in which various resources may be affected by both a proposed project and other past, present, and reasonably

_____

facility sources differ at each facility and the locations are different—all of which contribute to different modeling results.").

[250] Final EIS at 4-365 (citing La. Admin. Code tit. 33, part III § 509.J).

[251] *Id.* at 4-366.

[252] *Id.*

[253] *Id.*

[254] *Id.*

[255] *Id.*

[256] *Id.* at 2-5.

[257] *Id.* at 4-366.

[258] *Id.* 4-359, Table 4.12.1-12 (908.2 tons per year (tpy) of NOx for the CP2 LNG Project); Commonwealth LNG, final EIS, Docket No. CP19-502-000, et al., at 4-224, Table 4.11.1-7 (issued Sept. 9, 2022) (554 tpy of NOx for Commonwealth LNG).

foreseeable future actions."[259]  For operational emissions, the Commission used the distance used by the EPA and the LDEQ for cumulative modeling of major sources for the PSD permitting.[260]  Accordingly, the geographic scope for operational emissions from the Moss Lake Compressor Station was set at 21.4 km.[261]  We note, however, that because a cumulative impact analysis for the Moss Lake Compressor Station was not required, there is no set geographic scope for operational emissions in the final supplemental EIS.

67.     The largest geographic scope for the CP2 LNG Project, based on the results of the 1-hour $NO_2$ significant impact analysis plus 20 km, is 43.7 km.[262]  Impacts on air quality from projects beyond the geographic scope are not expected to significantly contribute to a cumulative impact that includes specific project impacts.  For Commonwealth LNG, the area of impact was established as the distance from that project to the farthest receptor that showed a modeled impact greater than the SIL in the significance modeling analysis plus 15 km for all sources and plus 20 km for all major sources. The differences in geographic scope and the resulting list of industrial sources to be included in the model is specific to each facility and is based upon the facility-only air quality dispersion modeling.[263]

68.     The Commission considers each application on a case-by-case basis.[264]  The scope of the Commission's cumulative impacts analysis will vary from case to case, depending

---

[259] *Fla. Se. Connection, LLC*, 163 FERC ¶ 61,158, at P 42 (2018); CEQ, *Considering Cumulative Effects Under the Nat'l Envt'l Pol'y Act* at 12-16 (Jan. 1997); *see also* final EIS at 4-506 to 4-507.

[260] Final EIS at 4-508, Table 4.14-1.

[261] *Id.* at 4-552.

[262] *Id.*; *see also* final supplemental EIS at 18 & n.43 ("The background sources inventory included all sources within the area of impact plus 15 kilometers and all major sources within the area of impact plus 20 kilometers (in either case the area of impact would not extend beyond a 50-kilometer by 50-kilometer grid from the LNG Terminal due to the accuracy constraints of dispersion models).").

[263] Commonwealth LNG, final EIS, Docket No. CP19-502-000, et al., at 4-229 to 4-231, 4-345 (Sept. 9, 2022) (using 50 km for $NO_2$).

[264] *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 104; *Tex. E. Transmission, LP*, 131 FERC ¶ 61,164, at P 67 (2010).

on the facts presented.[265]  The determination of the extent and effect of cumulative impacts, and particularly the identification of the geographic area within which they may occur, "is a task assigned to the special competency of the appropriate agencies."[266]  Here, the Commission appropriately used the modeling submitted to the LDEQ in establishing the appropriate geographic scope for the Projects.[267]  The final EIS and final supplemental EIS conclude, and we agree, that the potential impacts of the Projects, when combined with the impacts from the other projects considered in the geographic scopes, would not result in a significant impact on resources.[268]

69.    Last, we note that in response to several comments on the draft EIS questioning why certain projects included in the Commonwealth LNG cumulative impact table were not included in the draft EIS for the Projects, Commission staff determined in the final EIS that three additional residential subdivision projects that were included in the Commonwealth LNG cumulative impact table should be included in the Projects' geographic scope as well.[269]  Importantly, the final EIS did not identify any other projects identified in the Commonwealth LNG project that were within the same geographic

---

[265] *Algonquin Gas Transmission, LLC*, 158 FERC ¶ 61,061, at P 103 (2017); *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 129.

[266] *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976) (*Kleppe*); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 & n.6 (9th Cir. 2002) ("we defer to the agency's determination of the geographic scope of its analysis under NEPA").

[267] The Commission is not required to consider cumulative effects or impacts that are outside the geographic scope of a project.  *Sierra Club v. FERC*, 38 F.4th 220, 234 (D.C. Cir. 2022) (deferring to the Commission's technical and scientific expertise where the Commission omitted certain projects outside the geographic scope of analysis); *Columbia Gas Transmission, LLC*, 170 FERC ¶ 61,246, at P 33 (2020) (stating that certain issues were outside the geographic scope of the proposed project and thus correctly not part of the cumulative impacts analysis); *Fla. Se. Connection, LLC*, 163 FERC ¶ 61,158 at P 43 ("Other projects and actions located outside a geographic scope are generally not considered because their potential to contribute to a cumulative impact diminishes with increasing distance from the proposed project. The EA appropriately omits them from the cumulative impact analysis.").

[268] Final EIS at 1-17; final supplemental EIS at 20.

[269] Final EIS at 4-509.  The three additional projects included in the cumulative impacts table were the Belle Savanne, Carlyss Place, and Graywood residential subdivision projects.  *See id.* at 4-516 to 4-517.

scope as the Projects.[270]  Accordingly, the Commission adequately addressed Petitioners' assertions that the Commission failed to include similar projects that were included in the Commonwealth LNG project's EIS.

### B.    Additional Air Arguments

#### 1.    NAAQS Is an Appropriate Standard for Evaluating Health Impacts

70.    Petitioners argue that the NAAQS are not a good measure for the health impacts to communities, including environmental justice communities,[271] that adding $NO_2$ to already unhealthy levels is a problem, and that further analysis from the Commission is required.[272]  Petitioners maintain that living near fossil fuel and chemical facilities is linked to higher rates of respiratory and cardiovascular diseases and that existing infrastructure has already exposed residents to high levels of toxic and carcinogenic emissions in excess of permitted levels.[273]

71.    The final EIS and final supplemental EIS recognized combustion of fossil fuels (e.g., natural gas) produces air pollutants (e.g., NOx, CO, $SO_2$, and inhalable particulate matter ($PM_{2.5}$ and $PM_{10}$)).[274]  Combustion of fossil fuels also produces volatile organic compounds (VOCs), a large group of organic chemicals that have a high vapor pressure at room temperature.[275]  VOCs react with NOx, typically on warm summer days, to form

---

[270] *Id.* at 4-509.

[271] *See* Petitioners' Rehearing Request at 161-62 (arguing that the Commission's analysis failed to account for the reasonably foreseeable and cumulative air pollution impacts, which it asserts affects the Commission's environmental justice analysis).

[272] *Id.* (citing EPA, *Primary Nat'l Ambient Air Quality Standards for Nitrogen Dioxide*, 75 Fed. Reg. 6474, 6480 (Feb. 9, 2010)); *see also id.* at 158-59 (maintaining that although NAAQS for ozone is 70 parts per billion, EPA has recognized that ozone levels as low as 60 parts per billion can have adverse impacts).

[273] *Id.* at 84; *see also id.* (explaining that intervenor Travis Dardar was forced to relocate due to health consequences and the CP2 LNG Project); *see also id.* at 156-59, 162 (arguing that the Commission failed to take a hard look at the impacts to air quality in environmental justice communities).

[274] Final EIS at 4-334; final supplemental EIS at 11.

[275] Final EIS at 4-334; final supplemental EIS at 11.

ozone.[276]  Other byproducts of combustion are GHGs and hazardous air pollutants (HAPs).[277]  HAPs are chemicals known to cause cancer and other serious health impacts.[278]

72.     The Commission appropriately relied on the NAAQS.  The EPA developed the NAAQS to protect human health, including the health of sensitive populations (e.g., people with asthma or cardiovascular disease, children, the elderly, and others), accounting for the latest research on health impacts.[279]  EPA has also established multiple standards for different pollutants to address both long-term chronic exposure and short-term exposure, as well as standards for HAP emissions for specific source categories under the CAA.[280]  The EPA concluded in its risk-based analysis that the NAAQS are appropriate and designed to ensure public safety by setting acceptable concentration limits that minimize health risks and to protect sensitive populations, such as at-risk populations of people with asthma, older adults, and children.[281]  The CAA requires the EPA to periodically review the NAAQS and the data used to develop the standards.[282]  In performing this periodic review, the EPA develops Integrated Science Assessments and Risk/Exposure Assessments, which consider the relevant science and risks to human health, to establish short-term and long-term NAAQS.[283]  The LDEQ has adopted the federal NAAQS for criteria pollutants.[284]

---

[276] Final EIS at 4-334; final supplemental EIS at 11.

[277] Final EIS at 4-334; final supplemental EIS at 12.

[278] Final EIS at 4-334; final supplemental EIS at 12.

[279] *See Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 182.

[280] *See id.*

[281] EPA, *Review of the Primary Nat'l Ambient Air Quality Standards for Oxides of Nitrogen*, 83 Fed. Reg. 17226, 17230-17274 (Apr. 18, 2018) (codified at 40 C.F.R. §§ 50 *et seq.* (2024)).

[282] *See Millennium Pipeline Co.*, 161 FERC ¶ 61,229 at P 135 (citing 42 U.S.C. § 7409).

[283] *See id.*

[284] Final supplemental EIS at 12-13 (citing La. Admin. Code tit. 33, Part III, §§ 711).

73.    The final EIS and final supplemental EIS found that the Projects would not cause or contribute to a NAAQS exceedance because they are either below the applicable SILs (in the case of the Moss Lake Compressor Station) or the cumulative air modeling shows no NAAQS exceedances for criteria pollutants (in the case of the CP2 LNG Project) and, therefore, would not result in significant impacts on air quality.[285]  Agencies have discretion to choose their methodology for analyzing environmental effects,[286] and courts have accepted comparison to the NAAQS as a methodology for analyzing effects on air quality under NEPA.[287]  In *Sabal Trail*, the court stated that "[the Commission] appropriately relied on EPA's [NAAQS] as a standard of comparison for air-quality impacts," and "[b]y presenting the project's expected emissions levels and the NAAQS standards side-by-side, the EIS enabled decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard."[288]  Accordingly, the Commission appropriately relies on the standards set by administrative bodies in performing its NEPA review.[289]

74.    Nevertheless, Venture Global has committed to air quality mitigation measures across the project area and surrounding communities.[290]  These mitigation measures include implementation of a Traffic, Noxious Weeds, and Fugitive Dust Control Plan and complying with applicable air quality regulations, among other measures.[291]  Moreover, as discussed below, the Commission followed EPA's *Human Health Risk Assessment*

---

[285] Final EIS at 5-21 to 5-22; final supplemental EIS at 15-20.

[286] *Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004).  *See Sierra Club v. FERC*, 38 F.4th at 228 (holding that "the Commission's judgment is supported by substantial evidence and that the methodology used in arriving at that judgment is either consistent with past practice or adequately justified").

[287] *Sabal Trail*, 867 F.3d at 1370, n.7; *Diné Citizens*, 59 F.4th at 1046 (finding the Bureau of Land Management appropriately relied on the NAAQS in its cumulative effects analysis for oil and gas drilling permit applications); *Lowman*, 83 F.4th at 1364–66 (upholding the Federal Aviation Administration's reliance on its regulations defining a significance threshold for air quality as one where the "action would cause pollutant concentrations to exceed one or more of the NAAQS").

[288] *Sabal Trail*, 867 F.3d at 1370, n.7.

[289] *See supra* P 43 & notes 164-165, 183.

[290] Final EIS at 4-327.

[291] *Id.*

*Protocol*[292] in overseeing a Human Health Risk Assessment (HHRA)[293] to estimate chronic (long-term) cancer risk and non-cancer hazard, as well as acute (short-term) non-cancer hazard via inhalation of HAP compounds potentially emitted from stationary and mobile marine sources at the terminal facilities.[294]  The results of the HHRA indicate that the estimated cancer and non-cancer risks for communities near the CP2 LNG Project would be below EPA's risk management objectives.[295]  As we explained above, the Commission may reasonably rely upon the EPA's expertise.[296]  The Commission may also rely upon the mitigation actions it has required when predicting effects in an environmental analysis under NEPA.[297]  The Commission, therefore, took a hard look at

---

[292] EPA, *Human Health Risk Assessment Protocol for Hazardous Waste Combustion Facilities*, EPA530-D-05-006 (2005) (Health Risk Assessment Protocol). The Human Health Risk Assessment Protocol incorporates risk assessment guidance and methods from the EPA, as well as the experience EPA has gained through conducting and reviewing combustion risk assessments, to provide a comprehensive method of assessing human health risk from combustion emissions.  It provides a standardized methodology for conducting combustion risk assessments and, therefore, was chosen as the most appropriate guidance to follow.

[293] Lucy Fraiser Toxicology Consulting LLC, *CP2 LNG Terminal & Mobile Sources Human Health Risk Assessment*, June 30, 2023 (Health Risk Assessment).  *See* final EIS, app. O.

[294] Final EIS at 5-21.

[295] *Id.*; *see* Authorization Order, 187 FERC ¶ 61,199 at PP 140-142 (explaining EPA's risk management objectives); *see also* EPA, Office of Emergency and Remedial Response, Risk Assessment Guidance for Superfund Volume I: Human Health Evaluation Manual (Part A) Interim Final (December 1989) at 8-1 to 8-28, https://www.epa.gov/system/files/documents/2024-10/rags_a_508.pdf (outlining risk characterization and hazard quotients).

[296] *See supra* P 43 & notes 164-165; *EMR Network*, 391 F.3d at 273 (finding agency properly relied outside agency expertise); *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 114.

[297] *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 515–17 (D.C. Cir. 2010)).

impacts to the surrounding communities and we find the Commission's mitigation analysis complete.[298]

75.      Petitioners also disagree with the Commission's single pollutant approach and argue that environmental justice communities suffer from the cumulative impacts from exposure to multiple pollutants and that such analysis ignores the interplay between pollutants.[299]  Petitioners refer to the formation of particulate matter and ozone, for which the EPA has found there are no zero-risk thresholds for health effects, and assert that the Commission failed to demonstrated how the NAAQS can account for adverse impacts to environmental justice communities.[300]

76.      Despite Petitioners' disagreements with the Commission's approach, the attainment designation of an area is determined by EPA on a pollutant-by-pollutant basis and for each established primary standard.[301]  Here, each of the measured pollutant concentrations is below the associated NAAQS, thus indicating continued, on-going attainment of the standards.[302]  The Projects would not cause or contribute to a NAAQS exceedance because they are either below the applicable SILs (in the case of the Moss Lake Compressor Station) or the cumulative air modeling shows no NAAQS exceedances for criteria pollutants (in the case of the CP2 LNG Project).[303]  Nevertheless, although Project emissions of criteria pollutants are expected to be minimal, and the NAAQS are designated to protect sensitive populations such as children, the elderly, and persons with asthma, we acknowledge that "NAAQS attainment alone may not assure there is no localized harm to such populations due to project emissions of [VOCs], [HAPs], as well as the presence of non-project-related pollution sources, local health risk factors, disease prevalence, and access (or lack thereof) to adequate care."[304]

77.      Petitioners next argue that the Commission failed to consider how health and socioeconomic factors influence environmental justice communities' susceptibility to air

---

[298] *Id.* at 4-327 to 4-328; final supplemental EIS at 15-20.

[299] Petitioners Rehearing Request at 159.

[300] *Id.* at 159-60.

[301] *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133, at P 69 (2023).

[302] Final EIS at 4-337 to 4-338, Table 4.12.1-2; Authorization Order, 187 FERC ¶ 61,199 at P 140.

[303] Final supplemental EIS at 15-20.

[304] Authorization Order, 187 FERC ¶ 61,199 at P 140 (citing final EIS at 4-324).

pollution, despite acknowledging such factors.[305]  They assert that the Commission's additional health risk assessment regarding operational emissions of 16 HAPs ignored environmental justice communities' heightened susceptibility to criteria pollutants, and that the Commission only evaluated cancer and non-cancer health risks from individual pollutants without consideration of this heightened susceptibility.[306]  Specifically, Petitioners maintain that the Commission failed to analyze:  (1) levels of existing asthma, respiratory disease, or cancer by income and area; (2) age disparities; and (3) lack of access to health care, and that, therefore, the Commission failed to take a hard look at air quality on environmental justice populations.[307]

78.    We find that the Commission fulfilled its NEPA responsibilities by considering impacts to all potentially affected communities.[308]  The final EIS identified the existing baseline conditions, including ambient air quality monitoring data over a three-year period, the attainment status of all project areas for each pollutant, and the existing emissions.[309]  Petitioners' argument that the Commission should have evaluated existing human health conditions is akin to requesting the Commission conduct a health impact assessment, which we have previously held to be redundant.[310]  As we explained above, the EPA developed the NAAQS to protect human health, including that of sensitive populations (e.g., asthmatics, those with cardiovascular disease, children, the elderly, etc.) to account for the latest research on health impacts.[311]  EPA has also established multiple standards for different pollutants to address both long-term chronic exposure and short-term exposures (e.g., 1-hour or 24-hour) and standards for HAP emissions for specific source categories under the CAA.[312]  Accordingly, we find no basis in this

---

[305] Petitioners Rehearing Request at 160 (citing final EIS at 4-324).

[306] *Id.*

[307] *Id.* at 160-61 (citing final EIS at 4-324 to 4-325); *but see supra* note 76 (explaining that Executive Orders 12898, 13985, and 14096 have been revoked).

[308] *See supra* note 76.

[309] Final EIS at 4-333 to 4-346.

[310] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at n.236; *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 182 (stating that a health impact assessment would be redundant).  We further note that a health impact assessment is not required by NEPA.  *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214, at P 116 (2020).

[311] *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 182.

[312] *Id.*

proceeding to question EPA's standards, which, we note, were subject to public comment.[313]

79.    As discussed above, the final EIS followed EPA's *Human Health Risk Assessment Protocol*[314] in overseeing an HHRA[315] for maximum HAP emissions from the LNG project (stationary and mobile marine sources) based on the highest model-predicted 1-hour and annual average ground-level concentrations of a total of 16 HAPs.[316]  The Risk Assessment evaluated both chronic and acute cancer and non-cancer hazards associated with the LNG project.[317]  The results of the Risk Assessment demonstrated that all chronic cancer, chronic non-cancer, and acute non-cancer hazards are below EPA risk management objectives.[318]  The Commission has taken the requisite hard look at potential impacts on surrounding communities.

## 2.    Peak Capacity/Future Emissions

80.    Petitioners next assert that the Commission's emissions analysis fails to estimate total vessel traffic at the CP2 LNG Project's anticipated peak capacity of 28 MTPA, and, instead, uses the number of vessels associated with the CP2 LNG Project's nameplate capacity of 20 MTPA.[319]  Petitioners argue that, assuming a pro rata increase, the Commission failed to account for an additional 40% more vessel trips, up to 165 trips annually, which represents an increase in emissions that the Commission failed to address.[320]

---

[313] *Id.* (in response to substantially similar arguments, finding "no basis to duplicate work already performed under EPA rulemakings that were subject to public comment").

[314] Health Risk Assessment Protocol; *see supra* note 292.

[315] *See* Health Risk Assessment; *see supra* note 293.  *See* final EIS, app. O.

[316] Final EIS at 4-324, 4-374 to 4-376; *see also id.* app. O.

[317] *Id.* app. O at 3-7 to 3-9, 3-18 to 3-22.

[318] *Id.* at 4-549.

[319] Petitioners Rehearing Request at 147 (citing final EIS at 2-8, 4-356, 4-358).

[320] *Id.* (citing *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (*Del. Riverkeeper*) (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (*Scientists' Inst.*)).  We note that, elsewhere in their rehearing request, Petitioners argue that the CP2 LNG Project will not

81.    The CP2 LNG Project is designed with a nameplate liquefaction and export capacity of approximately 20 MTPA, and a peak achievable capacity of 28 MTPA under optimal operating conditions.[321]  CP2 LNG estimates that its nameplate production volumes would be able to accommodate approximately three to four LNG carrier calls per week after the Phase 1 facilities are placed in service and approximately seven to eight LNG carrier calls per week after Phase 2 (a maximum of 200 carrier calls per year following completion of Phase 1 and a maximum of 400 carrier calls per year following completion of Phase 2).[322]

82.    The emissions summarized in the final EIS regarding LNG carriers and mobile sources are inclusive of 412 carrier calls per year.[323]  Although the final EIS explained that "[t]he number of carrier calls per year [412] is a conservative estimate of LNG carrier/mobile source emissions," the LNG carriers would have a "range of LNG capacity between 120,000 to 210,000 [m$^3$]."[324]  Assuming peak capacity of 28 MTPA as Petitioners suggest we do, 412 carrier calls with carriers having an LNG capacity within

_____

even have enough offtake agreements in place to proceed to Phase II of construction (i.e., 10 to 14 MTPA).  Here, Petitioners insinuate that CP2 LNG will be operating at peak achievable capacity of 28 MTPA.  These inconsistent positions undermine Petitioners' arguments.

[321] Authorization Order, 187 FERC ¶ 61,199 at P 5

[322] Final EIS at 2-8.

[323] *Id.* at 4-356, tables 4.12.1-14 (summarizing the estimated highest annual emissions associated with:  (1) LNG carriers and tugboats maneuvering from the turning basin to the CP2 LNG Project pier; and (2) LNG carriers hoteling at the pier and tugboats idling nearby) and 4.12.15 (summarizing estimated highest annual emissions associated with the following other operations of marine vessels:  (1) LNG carriers and assist tugboats transiting the Calcasieu Ship Channel and operating in state waters; and (2) pilot boats operating in state waters).

[324] *Id.* at 4-356; *see also id.* at 2-8 (explaining that the marine berths on Monkey Island would accommodate LNG carriers ranging in size from 120,000 to 210,000 m$^3$).

this range would be more than sufficient.[325]  Accordingly, we find that the Commission adequately considered carrier calls and their attendant emissions.[326]

83.    Petitioners also argue that the Commission should address, as reasonably foreseeable, CP2 LNG's future plans to uprate its capacity.[327]  They aver that CP2 LNG uses similar equipment to its CP1 LNG facility where it sought an amendment to uprate its capacity.[328]  They further maintain that other LNG terminals have requested similar uprate amendments shortly after receiving Commission authorization.[329]  Petitioners also argue that the Commission should have considered whether an alternative design with a smaller nameplate capacity could achieve the same overall output after accounting for these uprate practices.[330]  They maintain that the Commission should have accounted for the incremental emissions due to this possible future uprate of the CP2 LNG Project.[331]

84.    We disagree.  NEPA does not require an agency to consider the possible environmental impacts of speculative or hypothetical actions when preparing an impact statement on proposed actions.[332]  We find the instant proceeding analogous to *National Wildlife Federation*, which held that the Commission was not required to consider the potential environmental impact of a similarly speculative second phase

---

[325] Converting 28 MTPA into cubic meters per year results in approximately 62,720,000 $m^3$ per year assuming an average LNG density of 446 kilograms per cubic meter ($kg/m^3$).  Typical range of LNG densities within carriers is between 420 through 470 $kg/m^3$.  Assuming 412 carrier calls per year, the average ship size required would be 152,223 $m^3$ which is less than the average carrier size.  Therefore, 412 carrier calls per year would be more than sufficient under peak operating conditions.

[326] Final EIS at 4-361 to 4-364.

[327] Petitioners Rehearing Request at 148.

[328] *Id.*

[329] *Id.* (citing Magnolia LNG, LLC, Notice of Application, 83 Fed. Reg. 63849 (Dec. 12, 2018); Golden Pass LNG Terminal LLC, Notice of Application, 85 Fed. Reg. 34187 (June 3, 2020)).

[330] *Id.*

[331] *Id.* at 148-49.

[332] *Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1478 (D.C. Cir. 1990) (*Nat'l Wildlife*); *Kleppe*, 427 U.S. at 410.

expansion of a project in its EIS.[333]  Moreover, as Petitioners observe, if CP2 LNG endeavors to uprate its capacity, it will have to seek Commission approval.[334]

### 3.    Construction Emissions and Mitigation

85.    Petitioners disagree with the Commission's reliance on CP2 LNG's commitment to develop a future air quality monitoring plan to monitor 24-hour $PM_{2.5}$ and $PM_{10}$ and 1-hour $NO_2$ concentrations during construction and commissioning of the CP2 LNG Project.[335]  They argue that the development of a future plan does not address EPA's concerns and mitigation proposals regarding fugitive dust and criteria pollutant mitigation during construction and that the Commission failed to engage on this issue, or recommend mitigation or monitoring to ensure NAAQS compliance during construction.[336]  Petitioners assert that NEPA requires agencies to thoroughly evaluate mitigation measures to remediate adverse impacts to below significant levels, and that reliance on a hypothetical plan does not provide the data to determine effectiveness.[337]  Petitioners maintain that there is no indication that mitigation would be required in the event of an exceedance and that the Commission simply notes that monitoring could facilitate future, unspecified mitigation measures.[338]

86.    We disagree.  Here, EPA recommended that the Commission require CP2 LNG to develop measures to implement when air monitoring data indicates that ambient pollutant concentrations are approaching a NAAQS threshold (e.g., 75% of a NAAQS threshold), and additional construction air quality mitigation measures, such as requiring higher tier

---

[333] 912 F.2d at 1477-79.

[334] Petitioners Rehearing Request at 148; *see, e.g., Freeport LNG Dev., L.P.*, 180 FERC ¶ 61,055 (2022) (amending authorization under NGA section 3 to reflect uprated capacity); *Sabine Pass Liquefaction, LLC*, 177 FERC ¶ 61,030 (2021) (same).

[335] Petitioners Rehearing Request at 149-50.

[336] *Id.* at 149-51 (citing EPA March 13, 2023 Comments to Draft EIS at 3 and EPA September 1, 2023 Comments to Final EIS).

[337] *Id.* at 150-51 (citing *Cabinet Mountains Wilderness/Scothman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 681-82 (D.C. Cir. 1982) and *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007)).

[338] *Id.* at 151 (citing Authorization Order, 187 FERC ¶ 61,199 at P 118).

construction equipment or zero exhaust emissions equipment.[339]  As the Commission discussed in the Authorization Order, "CP2 LNG and CP Express have committed to a number of measures to reduce the air quality impacts from construction, including using construction equipment and vehicles that comply with EPA mobile and non-road emission regulations, minimizing engine idling, and maintaining construction-related equipment in accordance with the manufacturer's recommendations."[340]  As to EPA's air monitoring recommendation, CP2 LNG will develop, in coordination with LDEQ, and submit for Commission staff approval an Ambient Air Quality Mitigation and Monitoring Plan (Air Monitoring Plan) to measure and monitor ambient concentrations of inhalable particulate matter and nitrogen oxides, and CP2 LNG will include protocols to manage any potential NAAQS exceedances during construction and commissioning of the CP2 LNG Project.[341]  CP2 LNG must submit the Air Quality Plan as part of the Implementation Plan required by environmental condition 6 of the Authorization Order.[342]  The Commission's requirement that CP2 LNG develop such a plan is consistent with its approach in similar proceedings,[343] and NEPA does not require such mitigation plans to be fully developed at the time of agency action.[344]  We find that the Commission adequately addressed EPA's concerns regarding air monitoring.

_____

[339] Authorization Order, 187 FERC ¶ 61,199 at P 115 (citing EPA September 1, 2023 Comments at 2).

[340] *Id.* P 117 (citing final EIS at 3-355 to 3-356).

[341] *Id.* P 118 (citing final EIS at 1-14).

[342] *Id.* envtl cond. 6.  For more information regarding the Air Quality Plan, *see id.* P 118 and final EIS 1-14, 4-323 to 4-324, 4-355 to 4-356, 4-551, and 5-21.

[343] *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047, at P 70 (2023), *vacated on other grounds*, *City of Port Isabel*, 111 F.4th 1198; *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, at P 142 (2023), *vacated on other grounds*, *City of Port Isabel*, 111 F.4th 1198; *see also Transcon. Gas Pipe Line Co.*, 160 FERC ¶ 61,042, at P 10 (2017) (requiring applicant to monitor air quality and develop a plan of action to correct any violation of the NAAQS).

[344] In fact, "NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (citing *Methow Valley*, 490 U.S. at 352-53 & n.16).  Accordingly, the Supreme Court has held that "it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand

87.     Petitioners also maintain that the Commission's analysis of construction emissions does not account for the lower $PM_{2.5}$ NAAQS thresholds, cumulative mobile emissions or emissions from the 36 cumulative sources missing from the Commission's air quality analysis.[345]

88.     The Commission appropriately analyzed construction emissions, including mobile equipment.[346] The final EIS determined that construction activities would increase emissions and ambient concentrations in the vicinity of the Projects' site at various points during the approximate 48-month construction period.[347] The magnitude of the effect on air quality would vary with time due to the construction schedule (i.e., intensity of construction activities), mobility of the sources, the variety/type of construction equipment, and the overlap of emissions from Phase 1 commissioning and operation and Phase 2 construction activities.[348] The final EIS found that while there may be localized minor to moderate elevated levels of fugitive dust and tailpipe emissions in the vicinity of construction areas during periods of peak construction activity, construction of the Projects would impact local air quality on an intermittent basis and would not have any long-term, significant impacts on air quality.[349]

89.     The final EIS found that the total $PM_{10}$ and $PM_{2.5}$ emissions are mainly associated with fugitive dust-generating activities, with most of the fugitive dust emissions associated with land clearing/grading activities.[350] CP2 LNG and CP Express developed

---

the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Methow Valley*, 490 U.S. at 353.

[345] Petitioners Rehearing Request at 151.

[346] Final EIS at 4-346 to 4-356. As discussed above, the Commission appropriately relied on state-submitted air modeling, which excluded mobile sources. *See supra* section I.B.1 & PP 61-63. The Commission, however, appropriately included the cumulative impacts from construction activities of nearby projects, including CP1 LNG, Driftwood LNG, the Lake Charles Liquefaction Project, the Louisiana Connector Project, and the Hackberry Storage Project. *See* final EIS at 4-511 to 4-517 (listing, in total, 24 projects and reasonably foreseeable future action with the potential to contribute to cumulative impacts).

[347] Final EIS at 4-354.

[348] *Id.*

[349] *Id.*

[350] *Id.* at 4-348.

fugitive dust control plans for the CP2 LNG Project and pipeline project and compressor station construction, which encompassed regulatory requirements as well as additional measures to reduce fugitive dust emissions.[351]  The details of the plans, mitigation measures, and best work practices can be found in the final EIS.[352]  We agree with the final EIS that these measures are acceptable and that the construction-related impacts on local air quality during construction of the Projects would not be significant, including under the revised $PM_{2.5}$ NAAQS.[353]

## 4.     Independent Verification

90.     Petitioners next argue that the Commission failed to subject CP2 LNG's post-final EIS air modeling analysis to independent verification.[354]  Petitioners assert that the Commission failed to independently evaluate the information provided by the application for use in its environmental review or scrutinize CP2 LNG's modeling inputs or protocols, and simply accepted CP2 LNG's modeling.[355]

91.     As an initial matter, because the Commission, following the Authorization Order, requested updated cumulative air modeling, engaged in supplemental NEPA, and provided the public and interested parties sufficient time to meaningfully participate and comment on the underlying data and the Commission's interpretation of that data, we find Petitioners' arguments moot.[356]  Nevertheless, Petitioners' argument here overlooks the fact that the Commission independently reviews air modeling submitted by applicants and, to the extent there are any questions regarding the underlying data or conclusions, Commission staff may issue data requests.[357]  Moreover, Rule 2005 of the Commission's Rules provides that, by signing a filing submitted to the Commission, the signer is certifying that "the contents are true as stated, to the best knowledge and belief of the signer" and that the "facts alleged in any filing need not be verified, unless verification is

---

[351] *Id.* at 4-354.

[352] *Id.* at 4-354 to 4-356.

[353] *Id.* at 4-551.

[354] Petitioners Rehearing Request at 154.

[355] *Id.* at 156.

[356] *See supra* note 122.

[357] We note that just because Commission staff did not issue a data request regarding the most recent air modeling does not mean the information was not independently evaluated.

required by statute, rule, or order."[358]  Generalized claims, like Petitioners' assertions regarding the veracity of Venture Global's statements and representations before the Commission, unsupported by specific evidence, are insufficient to rebut record evidence.[359]  Here, in the absence of any evidence casting doubt on the veracity of Venture Global's statements, filings, and representations, we accept them and find the totality of the record evidence sufficient to support our conclusions.[360]

### C.  Conclusion

92.     We have reviewed the information and analysis contained in the final EIS and final supplemental EIS, as well as other information in the record, regarding the potential environmental effects of the Projects.  We continue to accept the environmental

---

[358] 18 C.F.R. §§ 385.2005(a)(2)(ii), (b)(1) (2024); *see also id*. § 157.6(a)(4)(i) (2024) ("The signature on a filing constitutes a certification that: The signer has read the filing signed and knows the contents of the paper copies and electronic filing; the paper copies contain the same information as contained in the electronic filing; the contents as stated in the copies and in the electronic filing are true to the best knowledge and belief of the signer; and the signer possesses full power and authority to sign the filing.").

[359] *Trunkline Gas Co.*, 179 FERC ¶ 61,086, at P 11 (2022); *Mich. Pub. Power Agency v. FERC*, 963 F.2d 1574, 1580 (D.C. Cir. 1992) ("We see no grounds to require [the Commission] to allocate its limited resources to full-fledged investigation of the . . . claims, which were primarily hypotheticals with no evident basis in fact or experience.  Administrative agencies are afforded wide deference in predicting the likelihood of future events.").

[360] *Am. Whitewater v. FERC*, 125 F.4th 1139, 1153 (D.C. Cir. 2025) (quoting *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 447 (D.C. Cir. 2004)) (stating that absent evidence to the contrary, the Commission is entitled to rely on representations by parties who are uniquely in a position to know the relevant information); *Mich. Consol. Gas Co. v. FERC*, 883 F.2d 117, 124 (D.C. Cir. 1989) ("That evidence comes from a single source does not alone make it either invalid or insubstantial.").  Courts generally defer to Commission expertise in assessing the reliability of record evidence. *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 255 (D.C. Cir. 1995); *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148, at P 61 (2023) (quoting *Marsh*, 490 U.S. at 377) (An agency's decision concerning the evidence before it "involves primarily issues of fact" and "because analysis of the relevant documents 'requires a high level of technical expertise,' [courts] defer to 'the informed discretion of the responsible federal agency.'"); *see also Freeport LNG Dev., L.P.*, 182 FERC ¶ 61,112, at P 7 & n.14 (2023) (stating that the Commission may rely on statement from applicants in the absence of contradicting evidence).

recommendations in the final EIS,[361] as modified in the Authorization Order.[362]  Based on our consideration of this information, as supplemented or clarified herein,[363] we agree with the conclusions presented in the final EIS and final supplemental EIS and find that the Projects, if implemented as described in the applications and in compliance with the environmental conditions appended to the Authorization Order, are environmentally acceptable actions.

93.    For the reasons discussed above, and in the Authorization Order and Rehearing Order, we continue to find that the CP2 LNG Project is not inconsistent with the public interest.[364]  Moreover, the CP Express Pipeline Project will enable CP Express to transport domestically sourced natural gas to the CP2 LNG terminal for export.  As explained in the Authorization Order and Rehearing Order, we find that CP Express has demonstrated a need for the project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project will have minimal impacts on the interests of landowners and surrounding communities.  Additionally, as noted above and in the Authorization Order and Rehearing Order, the CP Express Project is an environmentally acceptable action.  Based on the discussion above, in the Authorization Order, and in the Rehearing Order we continue to conclude under section 7 of the NGA that the public convenience and necessity requires approval of the CP Express Pipeline Project, subject to the conditions in the Authorization Order.[365]

## V.    Construction Authorizations

94.    As discussed below, with the issuance of this order, the rehearing requests in this proceeding are no longer pending, and the Commission has issued its full merits orders on rehearing, without changing the authorization for the Projects.  The Authorization

---

[361] We note that no environmental recommendations were proposed in the final supplemental EIS.

[362] Authorization Order, 187 FERC ¶ 61,199 at P 198.

[363] Although the analysis in the final EIS and final supplemental EIS provides substantial evidence for our conclusions in this order, it is the order itself that serves as our record of decision.  The order supersedes any inconsistent discussion, analysis, or finding in the final EIS and final supplemental EIS.

[364] Authorization Order, 187 FERC ¶ 61,199 at P 199.

[365] *Id.* P 200.

Order remains in full force and effect, and no further withholding of construction authorizations is required.

95.    Venture Global claims that the Commission improperly withheld authorizations to proceed with construction of the Projects until the Commission issues its further merits order.[366]  Specifically, Venture Global argues that withholding construction authorizations:  (1) contradicts statements the Commission has made;[367] (2) undermines the Authorization Order without weighing the consequences or providing legal justification;[368] (3) will harm Venture Global by delaying construction, causing it to incur significant costs;[369] and (4) deprive global markets and U.S. allies access to LNG[370] and delays domestic benefits such as employment and taxes from the project.[371]

96.    Venture Global also argues that the delay in construction is contrary to the Commission's policy in Order No. 871-B developed in response to *Allegheny Defense Project* which provided for presumptive stays of NGA section 7 certificate orders for a "limited and well-defined period."[372]  Venture Global explains that the Commission's

---

[366] Venture Global Rehearing Request at 48-49 (citing Rehearing Order, 189 FERC ¶ 61,148 at P 186).

[367] *See id.* at 49-50 (citing Order Denying Stay, 189 FERC ¶ 61,005 at P 23) (asserting that the Commission's action is inconsistent with its statement in the Order Denying Stay that halting construction would harm Venture Global and its customers); *see also id.* at 50-51 (asserting that the Commission's action is inconsistent with its statement in the Rehearing Order that the Authorization Order remains in full force and effect).

[368] *Id.* at 51 (asserting that the Commission failed to provide a NEPA or other legal justification).

[369] *Id.* at 51-52 (referring to Implementation Plans pending before the Commission).

[370] *Id.* at 52.

[371] *Id.* at 52-53 (citing final EIS at 4-263, 4-274 to 4-276) (explaining that the total estimated construction cost would exceed $10 billion, that construction will support tens of thousands of jobs across 33 states (including more than 7,400 on-site construction workers during peak construction), and that the Projects will result in the payment of more than $4 billion in taxes to Cameron Parish during its operations).

[372] *Id.* at 54 (citing *Limiting Authorizations to Proceed with Constr. Activities Pending Rehearing*, Order No. 871-B, 175 FERC ¶ 61,098 (2021)).

policy in Order No. 871-B struck a "balance that allows aggrieved parties time to access the courts while providing project developers with a predictable time period after which construction authorizations may be permitted in the event a rehearing request remains pending before the Commission."[373]  In further support, Venture Global cites language in Order No. 871-B that states "at most, any stay will last no longer than approximately 150 days following the issuance of a certificate order."[374]

97.     In the alternative, Venture Global argues that authorizations for activities that are not associated with "an air emissions unit" and do not present potential cumulative air impact concerns should move forward.[375]  It asserts that such activities do no implicate matters under review in the supplemental NEPA process and should not be halted.[376] Venture Global asserts that many of the current requests for authorization pending before the Commission have no cumulative air impact implications, including survey work, site mobilization and preparation, soil stabilization, test pile programs, staging of various equipment, and installing temporary utilities.[377]  Moreover, Venture Global maintains that many of these activities do not constitute "construction" and are outside the scope of the Rehearing Order's construction authorization prohibition.[378]  Thus, Venture Global asserts that the Commission should allow authorizations of these activities to help mitigate the delay in construction and harm to Venture Global, its customers, and the public.[379]  Venture Global further asserts that the Commission's position here is inconsistent with other proceedings where the Commission is conducting supplemental

---

[373] *Id.* at 55 (citing Order No. 871-B, 175 FERC ¶ 61,098 at P 26).

[374] *Id.* at 55-56 (citing Order No. 871-B, 175 FERC ¶ 61,098 at P 49).

[375] *Id.* at 56.

[376] *Id.* (citing *Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1426-27 (9th Cir. 1989) (*Stop H-3*)) (stating that "there is no authority for the proposition that the decision to prepare a Supplemental EIS after a Final EIS has been approved requires that work outside the area affected by the Supplemental EIS be halted. . . . NEPA permits work on those parts of a project unrelated to a Supplemental EIS to go forward when the project is already the subject of an adequate Final EIS.").  As discussed below, we find Venture Global's reliance on *Stop H-3* misplaced.  *See infra* note 390.

[377] Venture Global Rehearing Request at 57.

[378] *Id.*

[379] *Id.*

NEPA without halting construction activities.[380]  For example, it points to the
Commission's approach in *City of Port Isabel* wherein the Commission ordered
supplemental NEPA in response to the D.C. Circuit's remand and vacatur, without a halt
in construction activities, and has granted authorizations to proceed with construction for
underground piping.[381]  Venture Global also points to *Healthy Gulf*, where the court
remanded the Commission's orders without vacatur and the Commission has ordered
supplemental NEPA without stating that no construction authorizations would be
granted.[382]  Venture Global avers that because *Healthy Gulf* was the reason the
Commission decided to conduct supplemental NEPA, the Commission should also allow
construction to proceed here while it conducts supplemental NEPA review.[383]

98.    As an initial matter, because we are issuing this order, the Commission's condition
in the Rehearing Order that it would withhold authorizations to proceed with construction
until such further merits order was issued has now been satisfied and we find Venture
Global's assertions moot.[384]  In any event, we disagree with Venture Global's
contentions.  While Venture Global argues that it is ready to proceed with "early works"
and should be allowed to proceed with limited activities that do not implicate air
emissions, at the time of issuance of this order, it has not yet satisfied Environmental
Condition 10 of the Authorization Order,[385] which requires that it obtain all necessary

---

[380] *Id.* at 53; *see also id.* at 51 (citing pleadings in *City of Port Isabel* wherein the
Commission made arguments against vacatur due to NEPA violations).

[381] *Id.* at 53 (citing Rio Grande LNG, Notice of Intent to Prepare a Supplemental
EIS, Docket No. CP16-454-000, et al. (issued Sept. 13, 2024) and Texas LNG, Notice of
Intent to Prepare a Supplemental EIS, Docket No. CP16-116-000, et al. (issued Sept. 13,
2024)).  As explained above, the D.C. Circuit in *City of Port Isabel* has since granted
rehearing and amended its opinion to remand without vacatur.

[382] *Id.* at 53-54 (citing Commonwealth LNG, Notice of Schedule for the
Preparation of a Supplemental EIS, Docket No. CP19-502-000, at al., (issued Nov. 27,
2024)).

[383] *Id.* at 54.

[384] *See supra* note 122.

[385] Authorization Order, 187 FERC ¶ 61,199 at envtl. cond. 10 (requiring Venture
Global file documentation with the Commission that it has received all applicable
authorizations required under federal law and receive written authorization before
commencing construction of project facilities).

permits and satisfy all preconstruction requirements prior to receiving authorization to proceed with construction.[386]

99.    Moreover, by providing that no authorization to proceed with construction would be issued until the Commission issues a further merits order, the Commission was exercising authority it retains under the Authorization Order:

> Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued. We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of life, health, property, and environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.[387]

Consistent with this authority, the Commission took the necessary steps to ensure compliance with the intent of the conditions of the Authorization Order by withholding construction authorizations until completion of supplemental NEPA.[388]  Further, as

---

[386] Venture Global Apr. 21, 2025 Response to Comments at 10 (stating that the Title V and PSD permits for the CP2 LNG Project and Moss Lake Compressor Station are still under review by the LDEQ); Venture Global Mar. 21, 2025 Updated Permit Table, att. 1 at 3 (indicating that Venture Global expects the outstanding Title V and PSD permits in the third quarter of 2025).  *See* 42 U.S.C. § 7475(a)(3) (generally prohibiting construction of a major emitting facility unless the facility operator demonstrates that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any:  (a) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (b) NAAQS in any air quality control region, or (c) any other applicable emission standard or standard of performance under this chapter).

[387] Authorization Order, 187 FERC ¶ 61,199 at P 201.

[388] Authorization Order, 187 FERC ¶ 61,199 at envtl. cond. 10 (requiring Venture Global obtain all applicable authorizations under federal law).  Following issuance of the Rehearing Order, Commission staff has continued to process Venture Global's Implementation Plans, and Venture Global has submitted responses to the Commission's continuing data requests related to those Implementation Plans.

discussed above, NEPA requires that the agency must undertake its environmental review before making critical decisions which may result in the commitment of resources to action which may significantly affect the environment.[389]  Accordingly, we also find the Commission's action to withhold construction under these circumstances consistent with the Authorization Order and NEPA.[390]

100.    Venture Global's arguments that withholding construction authorizations is inconsistent with the Commission's Order Denying Stay and the Commission's statement that the Authorization Order remains in full force and effect fail to acknowledge important distinctions between a stay of an authorization and withholding construction authorization.[391]  In the Order Denying Stay, the Commission declined to stay the Authorization Order for an undefined period of time pending judicial review.[392]  Further, a stay can operate as to the entirety of an authorization,[393] while a decision to withhold

---

[389] *See, e.g.*, *Mobil Oil Corp. v. FTC*, 562 F.2d 170, 173 (2d Cir. 1977) (citing 42 U.S.C. § 4332(2)(c)(v)), *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (explaining that federal agencies must "evaluate the environmental consequences of their actions *prior* to commitment to any actions which might affect the quality of the human environment" and "[i]f *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken").

[390] *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 92 (2d Cir. 1975) ("Although an EIS may be supplemented, the critical agency decision must, of course, be made after the supplement has been circulated, considered and discussed in the light of the alternatives, not before.  Otherwise, the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it.").  Although Venture Global argues that it should be permitted to start construction on areas "not affected by the supplemental EIS", *see* Venture Global Rehearing Request at 56 (citing *Stop H-3*, 870 F.2d at 1426-27), we find *Stop H-3* distinguishable from the instant proceeding where there remains major federal action under agency consideration.

[391] Venture Global Rehearing Request at 50-51.

[392] Order Denying Stay, 189 FERC ¶ 61,005, at P 4; *id.* at P 22 ("We find that granting a stay of the Projects' authorizations, thereby halting any and all project construction *for an undefined period of time*, would cause delay and therefore harm to CP2 LNG and CP Express and their customers who are relying on the Projects to provide needed transportation capacity and export of natural gas—exports that have been approved following the Department of Energy's (DOE) application of the public interest standard under NGA section 3.") (emphasis added).

[393] Order No. 871-B, 175 FERC ¶ 61,098 at P 46 (citing *Allegheny Def. Project*, 964 F.3d at 8).

construction authorizations is more narrow.  Accordingly, the Commission appropriately explained that it "remains confident in th[e] authorization, which is why, *except as otherwise discussed herein*, the Authorization Order remain[ed] in full force and effect."[394]

101.    Finally, we reject Venture Global's comparisons to the Commission's procedures on remand in *Healthy Gulf* and *City of Port Isabel*.[395]  Unlike in those proceedings, construction of the Projects here has not begun, and at the time of the Rehearing Order, Commission action was not yet final, thereby allowing the Commission to supplement its NEPA review prior to authorizing construction activities, which is consistent with NEPA, as explained in the Rehearing Order and above.[396]

102.    Last, Venture Global requests that the Commission clarify that Order No. 871-B's delay in construction authorizations will not apply again following issuance of this order.[397]  It avers that this order should be considered a supplemental order that implements the original authorization, rendering the presumptive stay policy inapplicable.[398]  Venture Global maintains that any further rehearing requests would not implicate the Authorization Order and any further delay would cause additional harm to Venture Global.[399]

---

[394] Rehearing Order, 189 FERC ¶ 61,148 at P 186.

[395] Venture Global Rehearing Request at 53-54.

[396] *Supra* sections III.C & IV.A.; *see Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018); *see also id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008)) ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about *prospective* environmental harms and potential mitigating measures.") (emphasis in original); *Found. on Econ. Trends v. Weinberger*, 610 F. Supp. 829, 843 (D.D.C. 1985) (citing *Sierra Club v. Peterson,* 717 F.2d at 1414 and *Scientists' Inst.*, 481 F.2d at 1098) ("Should the defendants seek to proceed with the construction of the proposed facility, they must recognize that now is the appropriate time for filing an adequate environmental assessment, before an 'irretrievable commitment[ ] of resources is invested in the construction of the proposed facility.'").

[397] Venture Global Rehearing Request at 57.

[398] *Id.* (citing Order No. 871-B, 175 FERC ¶ 61,098 at PP 16-17).

[399] *Id.* at 57-58.

103.    We agree. Neither the presumptive stay in Order No. 871-B nor the Commission's regulations barring construction for a limited period pending rehearing will apply upon issuance of this order.[400]

<u>The Commission orders</u>:

(A)    In response to Petitioners' request for rehearing, the Authorization Order is hereby modified as discussed in the body of this order.

(B)    In response to Venture Global's request for rehearing and clarification, the Rehearing Order is hereby modified as discussed in the body of this order.

By the Commission.  Commissioner Chang is not participating.

( S E A L )

Debbie-Anne A. Reese,
Secretary.

---

[400] In addition, any further rehearing requests would not implicate the initial authorizing order and, therefore, we agree that application of section 157.23 of the Commission's regulations, as amended in Order No. 871-B, is inapplicable here.  *See* Order No. 871-B, 175 FERC ¶ 61,098 at PP 16-17 ("To the extent that a non-initial order merely implements the terms, conditions, or other provisions of an initial authorizing order—such as a delegated order issuing a notice to proceed with construction, approving a variance request, or allowing the applicant to place the project, or a portion thereof, in service— a request for rehearing of that order would not implicate the initial authorizing order and so we agree that the rule would not apply.").

187 FERC ¶ 61,199
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
Allison Clements and Mark C. Christie.

| | |
|---|---|
| Venture Global CP2 LNG, LLC | Docket Nos.  CP22-21-000 |
| Venture Global CP Express, LLC | CP22-22-000 |

ORDER GRANTING AUTHORIZATIONS UNDER SECTIONS 3 AND 7 OF THE
NATURAL GAS ACT

(Issued June 27, 2024)

1.      On December 2, 2021, Venture Global CP2 LNG, LLC (CP2 LNG) filed a request, in Docket No. CP22-21-000, under section 3 of the Natural Gas Act (NGA)[1] and Part 153 of the Commission's regulations[2] for authorization to site, construct, and operate a new liquefied natural gas (LNG) export terminal with 20 million metric tons per annum (MTPA) of nameplate liquefaction capacity and associated facilities on the east side of the Calcasieu Ship Channel in Cameron Parish, Louisiana (CP2 LNG Project or LNG project).  The CP2 LNG Project would be constructed in two phases and include a liquefaction plant consisting of eighteen liquefaction blocks, four aboveground full containment LNG storage tanks, and two marine LNG loading docks.

2.      In the same application, Venture Global CP Express, LLC (CP Express) filed a request, in Docket No. CP22-22-000, under NGA section 7(c)[3] and Parts 157 and 284 of the Commission's regulations,[4] for a certificate of public convenience and necessity to construct and operate a new interstate natural gas pipeline system to connect the CP2 LNG Project to the existing natural gas pipeline grid in east Texas and southwest Louisiana (CP Express Pipeline Project or pipeline project).  The CP Express Pipeline Project would comprise an approximately 85.4-mile-long mainline pipeline from Jasper County, Texas, to the LNG Project in Cameron Parish, Louisiana, an approximately 6.0-mile-long lateral pipeline in Calcasieu Parish, Louisiana, and associated aboveground facilities in Louisiana and Texas.  The pipeline project is designed to transport feed gas to

---

[1] 15 U.S.C. § 717b.

[2] 18 C.F.R. pt. 153 (2023).

[3] 15 U.S.C. § 717f(c).

[4] 18 C.F.R. pts. 157, 284 (2023).

the CP2 LNG Project and would allow CP Express to provide up to 4,400,000 dekatherms per day (Dth/day) of firm transportation service. CP Express also requests a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations, and a blanket certificate under Part 284, Subpart G of the Commission's regulations to provide open-access natural gas transportation services, with pre-granted abandonment approval.

3.    For the reasons discussed below, we grant the requested authorizations for the CP2 LNG Project and CP Express Pipeline Project, subject to the conditions discussed herein.

## I.    <u>Background and Proposal</u>

4.    CP2 LNG and CP Express (collectively, the applicants) are Delaware limited liability companies with their primary place of business in Arlington, Virginia. CP2 LNG and CP Express are direct, wholly owned subsidiaries of Venture Global LNG, Inc. (Venture Global).[5] Upon commencing operations proposed in its application, CP Express will become a natural gas company within the meaning of section 2(6) of the NGA,[6] and, as such, will be subject to the Commission's jurisdiction. Because its operations will not be in interstate commerce, CP2 LNG will not be a "natural gas company" as defined in the NGA but will be subject to the Commission's jurisdiction under NGA section 3.

### A.    <u>CP2 LNG Project (Docket No. CP22-21-000)</u>

5.    CP2 LNG requests authorization to site, construct, and operate the CP2 LNG Project on an approximately 737.3-acre site on the east side of the Calcasieu Ship Channel.[7] The project is designed with a nameplate liquefaction and export capacity of approximately 20 MTPA, and a peak achievable capacity of 28 MTPA under optimal

---

[5] Venture Global is also the parent company of: Venture Global Calcasieu Pass, LLC and TransCameron Pipeline LLC, which received authorizations from the Commission to construct and operate an LNG terminal and pipeline, respectively, in Cameron Parish, Louisiana, *Venture Global Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019) (*Calcasieu Pass LNG*); and, Venture Global Plaquemines LNG, LLC and Venture Global Gator Express, LLC, which received authorizations from the Commission to construct and operate an LNG terminal and pipeline, respectively, in Plaquemines Parish, Louisiana, *Venture Global Plaquemines LNG, LLC*, 168 FERC ¶ 61,204 (2019) (*Plaquemines LNG*).

[6] 15 U.S.C. § 717a(6).

[7] CP2 LNG states that it has contractually secured through agreements with landowners all land required for the construction and operation of the CP2 LNG Project. Application at 8.

operating conditions.  The project will receive natural gas via the proposed CP Express Pipeline Project.

6.      The project will be constructed in two phases, each phase designed with a nameplate liquefaction and export capacity of 10 MTPA, and a peak achievable capacity of 14 MTPA.  Each phase of construction will take approximately 36 months to complete.  CP2 LNG states that it will place each liquefaction block into service upon completion, with initial operations beginning approximately 24 months after the start of construction.  CP2 LNG anticipates Phase II construction will start 12 months after the start of Phase I construction.

7.      The proposed CP2 LNG Project consists of liquefaction facilities, LNG storage tanks, marine facilities, and associated infrastructure and support facilities.  Specifically, CP2 LNG proposes to construct:

- One natural gas gate station (constructed during Phase I);

- Six pretreatment facilities (three pretreatment facilities constructed during each phase);[8]

- Eighteen liquefaction blocks and ancillary support facilities (nine blocks constructed during each phase);[9]

- Four full-containment, underground LNG storage tanks, each with a net usable capacity of approximately 200,000 cubic meters (two tanks constructed during each phase);

- Two boil-off, flash, and gas relief systems (one constructed during each phase);

---

[8] Each pretreatment facility will contain:  an amine gas-sweetening system to remove carbon dioxide ($CO_2$) and hydrogen sulfide ($H_2S$); and a molecular sieve dehydration system to remove water and heavy hydrocarbons from the natural gas received from the CP Express Pipeline.

[9] Each liquefaction block will have a nameplate liquefaction capacity of approximately 1.1 MTPA and will contain two single mixed refrigerant process units, each with a refrigerant make-up system.  The liquefaction blocks will all be operated by a single distributed control system for all process and power control and connected to a common refrigerant storage area.

- Two LNG loading docks,[10] each designed to accommodate LNG carriers of 120,000 to 185,000 cubic meters, with accompanying turning basins within a shared recessed area along the southwest shoreline of Monkey Island, on the east side of the Calcasieu Ship Channel; a utility dock; and marine flare for gas-up/cooldown of LNG carriers (both loading docks, the utility dock, and the marine flare constructed during Phase I);

- Two electric power generation plants with a combined nameplate capacity of 1,470 megawatts (MW) (a 750 MW plant constructed in Phase I and a 720 MW plant constructed in Phase II);[11]

- Safety and security systems; and

- Other appurtenant facilities.

8.     CP2 LNG received authorization from the Department of Energy, Office of Fossil Energy (DOE/FE) to export annually up to approximately 28 MTPA of natural gas in the form of LNG to countries with which the United States has a Free Trade Agreement.[12]  In addition, CP2 LNG currently has pending before DOE/FE an application to export LNG to other nations with which the U.S. permits such trade, but has not entered into a Free Trade Agreement.[13]

9.     CP2 LNG states that it intends to construct and operate carbon capture and sequestration (CCS) facilities that will capture, compress, and sequester approximately 500,000 tons of carbon dioxide ($CO_2$) from feed gas entering the CP2 LNG Project.  As part of the pretreatment process, $CO_2$ will be removed from the feed gas as $CO_2$ vapor[14]

---

[10] Each loading dock will include:  one pipe trestle; one loading platform; one gangway; four marine loading arms; associated aids to navigation; four berthing dolphins; and, six mooring dolphins.

[11] August 15, 2022 Supplement to Previously Filed Project Information.

[12] *Venture Global CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (April 22, 2022).

[13] Venture Global CP2 LNG, LLC, December 2, 2021 Application, FE Docket No. 21-131-LNG.

[14] First, the feed gas will be sent through an acid gas absorber column where the acid gas components ($CO_2$ and hydrogen sulfide [$H_2S$]) will be removed from the feed gas through accumulation in an amine solution.  The acid-gas-rich amine solution will then be routed to an amine regenerator distillation column where the acid gases will be boiled out, creating a lean, regenerative amine solution to be cycled back to the absorber

and sent to the on-site carbon capture facility, where the $CO_2$ vapor will be compressed, condensed into a liquid, and pumped to a higher pressure.[15]  The resulting $CO_2$ liquid will then be routed to a $CO_2$ send-out pipeline for injection into saline aquifers approximately three miles offshore.[16]

### B.    CP Express Pipeline Project (Docket No. CP22-22-000)

10.    CP Express proposes to construct a new interstate natural gas pipeline system to supply feed gas to the proposed CP2 LNG Project, providing up to 4,400,000 Dth/day of firm natural gas transportation service.  The CP Express Pipeline will originate at interconnections with Transcontinental Gas Pipe Line's interstate system and Midcoast Energy's CJ Express pipeline in Jasper County, Texas, extend through Newton County, Texas, and Calcasieu and Cameron Parishes, Louisiana, and terminate at the CP2 LNG Project.  CP Express estimates that the CP Express Pipeline Project will cost approximately $1.483 billion.[17]

11.    CP Express proposes to construct and operate the pipeline project in two phases in conjunction with construction of the CP2 LNG Project.  Facilities constructed during Phase I would provide 2,200,000 Dth/day of firm transportation service, transporting enough feed gas for the nine liquefaction blocks to be constructed in Phase I of the CP2 LNG Project.  During Phase I, CP Express proposes to construct and operate the following facilities:

---

column and a vapor stream containing the acid gases.  Next, the vapor stream will be sent through a sulfur removal unit to remove the $H_2S$.  The resulting $CO_2$ vapor stream will then be routed to the carbon capture facilities.

[15] In the event the CCS system is unavailable, the acid gas stream will be routed to thermal oxidizers, where the $CO_2$, trace amounts of $H_2S$ not removed in the sulfur removal unit, and trace amounts of hydrocarbons will be incinerated and discharged to the atmosphere.  In the event the thermal oxidizers are also out-of-service during operations, the acid gas will be routed to the flare and emitted to the atmosphere.

[16] The geological sequestration of $CO_2$ is subject to the U.S. Environmental Protection Agency's (EPA's) jurisdiction under the Underground Injection Control (UIC) Program.  The state of Louisiana has primary enforcement authority for CCS projects under the federal UIC program.  The Louisiana Department of Natural Resources (Louisiana DNR) administers the UIC Class VI program in Louisiana.  State of Louisiana Underground Injection Control Program; Class VI Primacy, 89 Fed. Reg. 703 (Jan. 5, 2024).

[17] Application at Ex. K.

- An approximately 85.4-mile-long, 48-inch-diameter mainline pipeline from Jasper County, Texas, to the CP2 LNG Project, with interconnections to existing natural gas transmission pipelines;[18]

- An approximately 6-mile-long, 24-inch-diameter lateral pipeline in Calcasieu Parish, Louisiana (Enable Gulf Run Lateral);

- The Moss Lake Compressor Station, near milepost (MP) 44.4 of the CP Express Pipeline, with two 34,800-horsepower (hp) natural-gas-fired compressor units;

- Five meter stations at interconnects with existing pipelines along the mainline, with a 48-inch-diameter pig launcher at the Transco & CJ Express Interconnect Meter Station at MP 0.0 and a 24-inch-diameter pig receiver at the Enable Interconnect Meter Station at MP 6.0;

- A 24-inch-diameter pig launcher at MP 0.0 of the Enable Gulf Run Lateral; and

- A gas gate station[19] (i.e., meter station) for gas deliveries at the CP2 LNG Project.

12.    Phase II would provide an additional 2,200,000 Dth/day of firm transportation service, transporting feed gas for the nine additional liquefaction blocks constructed in Phase II of the CP2 LNG Project.  In Phase II, CP Express proposes to construct and operate three additional natural-gas-fired, 34,800-hp compression units and one natural-gas-fired, 13,000-hp booster unit at the Moss Lake Compressor Station.

13.    CP Express also requests:  (1) a blanket certificate of public convenience and necessity pursuant to Part 284, Subpart G of the Commission's regulations authorizing CP Express to provide transportation service to customers requesting and qualifying for transportation service under its proposed FERC Gas Tariff, with pre-granted abandonment authorization; (2) a blanket certificate of public convenience and necessity pursuant to Part 157, Subpart F of the Commission's regulations authorizing certain

---

[18] CP Express plans interconnections to the following pipeline systems: Transcontinental Gas Pipe Line and Midcoast Energy's CJ Express Project in Jasper County, Texas; Texas Eastern Transmission and Gulf South Pipeline in Newton County, Texas; and Florida Gas Transmission and Tennessee Gas Pipeline in Calcasieu Parish, Louisiana.

[19] The gas gate station will include a pig receiver, filter/separators, custody transfer meters, pressure regulators, emergency shutdown valves, and gas analyzers.

future facility construction, operation, and abandonment; and (3) approval of its pro forma tariff.

14.    CP Express states that it held a binding open season for the proposed firm transportation services to the CP2 LNG Project, and that as a result it executed a binding precedent agreement with CP2 LNG for 100% of the firm transportation service provided by Phases I and II of the CP Express Pipeline Project for a term of twenty years at negotiated rates.  CP Express received no other bids or expressions of interest during the open season.[20]

## II.    Notice, Interventions, and Comments

15.    Notice of CP2 LNG and CP Express's joint application was issued on December 16, 2021, and published in the *Federal Register* on December 23, 2021.[21]  The notice established January 6, 2022, as the deadline to file interventions, comments, and protests. Timely, unopposed motions to intervene[22] were filed by:  Public Citizen; Natural Resources Defense Council (NRDC); Healthy Gulf; Cheniere Creole Trail Pipeline; Driftwood LNG and Driftwood Pipeline; Southeast Laborers' District Council; the State of Louisiana; Restore Explicit Symmetry To Our Ravaged Earth (RESTORE); the American Gas Association; Travis and Nicole Dardar; Anthony Theriot and Kent Duhon; and Sierra Club, Turtle Island Restoration Network, Louisiana Bucket Brigade, Louisiana Environmental Action Network, Port Arthur Community Action Network, and, Texas Campaign for the Environment (collectively, Environmental Coalition).

16.    Between January 7, 2022 and October 30, 2023, out-of-time motions to intervene were filed by:  Golden Pass LNG; Golden Pass Pipeline LLC; Commonwealth LNG; Bernard and Georgia Webb and Jerryd Tassin; Mary Alice Nash; Niskanen Center; For a

---

[20] Application at 10.  CP Express provided a copy of the open season notice and proof of publication.  October 17, 2022 Response to Data Request.

[21] 86 Fed. Reg. 72,939 (Dec. 23, 2021).

[22] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's regulations.  18 C.F.R. § 385.214 (2023).  Timely motions to intervene include those filed dealing with environmental issues during the comment period for the draft environmental impact statement (EIS).  *See* 18 C.F.R. § 380.10(a)(1)(i) (2023).  Because Travis and Nicole Dardar, Anthony Theriot and Kent Duhon, and the American Gas Association filed unopposed motions to intervene during the comment period for the draft EIS (January 19, 2023 – March 13, 2023), their motions are timely.

Better Bayou; and Adley and Judy Dyson.  These late-filed interventions were granted by Secretary's Notices on November 13, 2023.

17.    On April 18, 2024, Fishermen Involved in Sustaining our Heritage (FISH) filed a late motion to intervene in the proceedings.  In its motion, FISH states that it is a coalition of 60 commercial fishermen who fish in and around the waters of Cameron, Louisiana, where the project will be located, and that its participation is in the public interest because it is the only organization dedicated to championing the rights of commercial fisherman in Southwest Louisiana.[23]  FISH explains that it was unable to intervene during the intervention window because it did not exist until November 2023.[24] We find that FISH failed to demonstrate that good cause exists to grant its motion to intervene out of time.  Although FISH states that it was formed in November 2023, it did not seek to intervene in the proceedings until April 18, 2024.  The Commission has previously explained that an entity cannot "sleep on its rights" and then seek untimely intervention.[25]  Further, FISH's interests are adequately represented by other parties to the proceeding, including its Executive Director, Travis Dardar,[26] as well as For a Better Bayou and Louisiana Bucket Brigade, with which FISH jointly filed comments on January 17, 2024, regarding the project's impacts on commercial fishing and shrimping. Last we note that on its website, FISH states that it partners with other groups and NGOs, including several that are intervenors in these proceedings:  Healthy Gulf; Sierra Club; For a Better Bayou; and Louisiana Bucket Brigade.[27]  Therefore, FISH's late motion to intervene is denied.

18.    On January 6, 2022, the Environmental Coalition jointly filed a protest.[28]  On March 3, 2023, CP2 LNG and CP Express filed an answer to the Environmental

---

[23] FISH April 18, 2024 Motion to Intervene at 1-2.

[24] *Id.* at 3.

[25] *See Cal. Dept. of Water Resources*, 120 FERC ¶ 61,057, at P 14 (2007) (footnote omitted), *reh'g denied*, 120 FERC ¶ 61,248, *aff'd sub nom. Cal. Trout and Friends of the River v. FERC*, 572 F.3d 1003 (9th Cir. 2009) ("an entity cannot 'sleep on its rights' and then seek untimely intervention").

[26] Travis and Nicole Dardar March 3, 2023 Motion to Intervene.

[27] *Fishermen Involved in Sustaining our Heritage (FISH)*, https://fishermenfightback.org (last accessed May 22, 2024).

[28] On October 12, 2022, Louisiana Bucket Brigade filed, in this and several other Commission gas project dockets, a letter addressed to President Biden expressing general opposition to LNG export terminals on environmental, economic, climate, and national security grounds and sharing information about its *Defend U.S. Consumers* campaign,

Coalition's protest.  Although the Commission's Rules of Practice and Procedure do not permit answers to protests,[29] we will accept the answer herein because it clarifies the concerns raised and provides information that has assisted in our decision making.

19.     The Environmental Coalition asserts that the applicants have not demonstrated market need for the project and that the project's climate impacts render it not consistent with the public interest. Individuals and other entities also filed comments expressing similar concerns.  In addition, the Commission received comments in support of the project, citing an increase in job opportunities and local economic investment, as well as comments from international energy companies and utilities that executed sales purchase agreements with CP2 LNG urging that the project is needed.  The protests and comments were addressed in the EIS, and as appropriate, below.

## III.    <u>Discussion</u>

### A.    <u>CP2 LNG Project (Docket No. CP22-21-000)</u>

#### 1.  <u>Jurisdiction over CCS Facilities</u>

20.     CP2 LNG contends that the CCS facilities are not subject to the Commission's jurisdiction, noting that certain components will be subject to the regulatory authority of other entities.[30]  Healthy Gulf asserts that the CCS facilities must be considered a part of the project,[31] and Sierra Club argues that the carbon capture facility within the terminal boundary should be considered a part of the proposed project and subject to the Commission's jurisdiction like other pollution control equipment at LNG terminals.[32]

---

which Louisiana Bucket Brigade states will increase public awareness about the risks associated with continued gas export terminal development.  Louisiana Bucket Brigade October 12, 2022 Letter at 1-4.  The Bucket Brigade's October 12th letter generally expresses the same issues already raised in its joint protest and environmental comments in this proceeding.

[29] 18 C.F.R. § 385.213(a)(2) (2023).

[30] Application at 12; CP2 LNG July 7, 2023 Response to Environmental Information Request at General Attachment 1-a.  *See infra* note 40 (discussing facilities subject to both the Commission's and another agency's jurisdiction).

[31] Healthy Gulf January 5, 2022 Intervention at 1-2.

[32] Environmental Coalition January 6, 2022 Protest at 5.  LNG Terminals often include selective catalytic reduction systems to minimize emissions of nitrogen oxides

21.     We conclude that the CCS facilities located within the terminal fence-line up to the entry point of the send-out pipeline[33] are subject to the Commission's jurisdiction under section 3(e) of the NGA.[34]  The Commission has consistently exercised its jurisdiction over pretreatment facilities within an LNG terminal's fence-line[35] that remove trace constituents[36] from the feed gas, as well as over on-site facilities for the disposition of trace constituents.[37]  The fact that another agency may have jurisdiction over some aspect of a facility within the fence-line of an LNG terminal does not serve to remove that facility from Commission jurisdiction.  Many facilities within an LNG

---

(NOx) from combustion turbines.  *See, e.g.*, final EIS at 4-365; January 2019 Final EIS for Port Arthur Liquefaction Project at 2-9 (filed in Docket No. CP17-20-000).

[33] The send-out pipeline would mostly be located outside the terminal fence-line, but the proposed entry point is located under the southern portion of the terminal's floodwall.  CP2 LNG July 22, 2022 Response to Environmental Information Request at 2-3.  The Department of Transportation's Pipelines and Hazardous Materials Safety Administration (PHMSA) states that it would have jurisdiction over the send-out $CO_2$ pipeline starting from the first flange connection downstream of the on-site $CO_2$ pipeline pumps.  Final EIS at 4-397 to 4-398.

[34] 15 U.S.C. § 717b(e).  We note that, consistent with this finding, the EIS evaluated the on-site CCS facilities.

[35] "LNG terminal" includes facilities at the terminal site that are used to process natural gas.  15 U.S.C. § 717a(11).  *See, e.g.*, *supra* note 8 (describing jurisdictional pretreatment facilities that remove $CO_2$, $H_2S$, water, and heavy hydrocarbons from feed gas); September 2022 Final EIS for the Commonwealth LNG Project at 4-264 (describing jurisdictional pretreatment facilities to remove mercury, $CO_2$, $H_2S$, water, and heavy hydrocarbons from feed gas) (filed in Docket No. CP19-502-000).  *But see Freeport LNG Dev., L.P.*, 175 FERC ¶ 61,237, at n.9 (2021) (finding that an off-site helium processing facility is not jurisdictional because "…the helium plant will be separated by a unit fence and have minimal impacts on the safety and reliability of the pretreatment facility.").

[36] Pipeline-quality natural gas typically contains trace constituents such as nitrogen, oxygen, $CO_2$, and water.  Trace constituents have no significant effect on the operational efficiency of natural gas when used as an energy source but can negatively affect liquefaction equipment and product purity when present in feed gas for LNG production.

[37] For instance, in the event the CCS facilities are unavailable, the $CO_2$ removed from the feed gas will be routed to the jurisdictional facilities and equipment for final disposition.  *See supra* note 15.

terminal's fence-line are both jurisdictional to the Commission and subject to other regulatory authorities.[38]

## 2. Public Interest Standard Under Section 3 of the NGA

22.      Because the proposed facilities will be used to export natural gas to foreign countries, the construction and operation of the proposed facilities and site of their location require approval by the Commission under section 3 of the NGA.[39]  Commenters argue that the NGA does not contain a legal standard for the authorization of LNG terminals under section 3(e), and that the Commission has not articulated a coherent policy for exercising this authority.[40]  NRDC contends that the NGA requires the

---

[38] For example, while CP2 LNG states that the emissions from the on-site combustion turbine powering the $CO_2$ compressors are included in its air permit application submitted to the Louisiana Department of Environmental Quality (Louisiana DEQ) (CP2 LNG's July 22, 2022 Response to Environmental Information Request at 3.), we note that the air permit application also covers emissions from all facilities undisputedly subject to the Commission's jurisdiction, including the project's eighteen liquefaction blocks and two power plants.  Final EIS at 4-357; CP2 LNG's August 1, 2022 Response to Environmental Information Request at Attachment 1.f.v-1. Additionally, the regulatory authorities with jurisdiction over components of the CCS system highlighted by CP2 LNG—PHMSA and EPA under the UIC permitting program—have jurisdiction over the $CO_2$ pipeline and geological sequestration of carbon dioxide, respectively, but do not have jurisdiction over the $CO_2$ extraction and compression facilities located at the CP2 LNG Project terminal site.

[39] 15 U.S.C. § 717b(a).  The regulatory functions of NGA section 3 were transferred to the Secretary of Energy in 1977 pursuant to section 301(b) of the Department of Energy Organization Act.  Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq*. (2012).  In reference to regulating the imports or exports of natural gas, the Secretary of Energy subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The most recent delegation is in DOE Delegation Order No. S1-DEL-FERC-2006, effective May 16, 2006.  Applications for authorization to import or export natural gas must be submitted to the Department of Energy (DOE).  The Commission does not authorize importation or exportation of the commodity itself. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (detailing how regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and DOE).

[40] *See, e.g.*, Better Bayou et al. March 13, 2023 Comments at 1-3; NRDC March 13, 2023 Comments at 2-3; Niskanen Center March 13, 2023 Comments at 8-9.

Commission to "meaningfully evaluate this proposed [p]roject through a genuine framework to balance those relevant costs against assessed benefits."[41]

23.    We disagree that we lack a coherent standard.  Section 3 provides that an application shall be approved if the Commission finds the proposal "will not be [in]consistent with the public interest," subject to "such terms and conditions as the Commission [may] find necessary or appropriate."[42]  The U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has explained that the NGA section 3 standard "sets out a general presumption favoring . . . [such] authorization[s]."[43]  To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an "affirmative showing of inconsistency with the public interest."[44]  In addition, NGA section 3(c) provides that the exportation of gas to nations with which there is in effect a free trade agreement (FTA nations) "shall be deemed to be consistent with the public interest."[45]  As noted above, CP2 LNG has received authorization to export to FTA nations.[46]

24.    We received comments contending that CP2 LNG fails to provide evidence of market need for the proposed project and that authorization of the project may lead to

---

[41] NRDC March 13, 2023 Comments at 2-3.

[42] 15 U.S.C. § 717b(a), (e)(3).  For a discussion of the Commission's authority to condition its approvals of LNG facilities under section 3 of the NGA, *see, e.g.*, *Distrigas Corp. v. FPC*, 495 F.2d 1057, 1063-64 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 834 (1974); *Dynegy LNG Prod. Terminal, L.P.*, 97 FERC ¶ 61,231 (2001).

[43] *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (*Alaska LNG*) (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *EarthReports v. FERC*, 828 F.3d at 953 (same); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017).

[44] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987)).  *See also KeySpan LNG, L.P.*, 112 FERC ¶ 61,028, at PP 3, 29 (2005) (finding that authorization of a proposed LNG import terminal would be inconsistent with the public interest where the proposed facilities would not fully comply with current safety standards even though the project would provide "a new source of reliable LNG imports in New England, where gas is critically needed.").

[45] 15 U.S.C. § 717b(c).

[46] *See supra* P 8.

overbuilding U.S. LNG export capacity.[47]  The Institute for Energy Economics & Financial Analysis claims that global demand for LNG exports was artificially inflated by the conflict in Ukraine and that future LNG demand growth is uncertain.[48]  Louisiana Bucket Brigade asserts that LNG companies are exploiting Russian hostilities to garner support for their proposed LNG projects and that expanding the number of LNG terminals poses national security risks.[49]  RESTORE states that the project's contribution to climate change outweighs any public benefits it may provide.[50]  NRDC argues that DOE's approval of exports of the natural gas commodity does not necessitate the Commission's approval of the proposed export facility, and that the Commission cannot solely rely on DOE's export approval to demonstrate the public benefits of the proposed project.[51]

25.    We also received comments from international energy companies and utilities that executed sales and purchase agreements with CP2 LNG, urging that the project is needed. Inpex Corporation and JERA, of Japan,[52] and EnBW Energie Baden-Wurttemberg AG, of Germany,[53] each filed comments stressing the importance of the CP2 LNG Project.  The entities note that the project will contribute to energy security in Japan, Germany, and globally.

26.    Section 3(a) of the NGA provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."[54]  As noted above, in 1977 the Department of Energy Organization Act transferred

---

[47] Environmental Coalition January 6, 2022 Protest at 2-3; Institute for Energy Economics & Financial Analysis March 13, 2023 Comments at 2-4; NRDC March 13, 2023 Comments at 2-3.

[48] Institute for Energy Economics & Financial Analysis March 13, 2023 Comments at 2-4.

[49] Louisiana Bucket Brigade October 12, 2022 Letter at 1-2.

[50] RESTORE March 13, 2023 Comments at 6.

[51] NRDC March 13, 2023 Comments at 2-3.

[52] INPEX Corporation December 7, 2023 Comments; JERA Co., Inc. December 8, 2023 Comments.

[53] EnBW Energie Baden-Wurttemberg AG December 14, 2023 Comments.

[54] 15 U.S.C. § 717b(a).

the regulatory functions of section 3 of the NGA to the Secretary of Energy.
Subsequently, the Secretary of Energy delegated to the Commission authority to
"[a]pprove or disapprove the construction and operation of particular facilities, the site at
which such facilities shall be located, and with respect to natural gas that involves the
construction of new domestic facilities, the place of entry for imports or exit for
exports."[55]

27.    However, as we have previously explained,[56] the Secretary has not delegated to
the Commission any authority to approve or disapprove the import or export of the
commodity itself.[57]  Therefore, we decline to address commenters' and protestors'
economic claims (e.g., those regarding market demand for LNG), which are relevant only
to the exportation of the commodity of natural gas, a matter within DOE's exclusive
jurisdiction, and not implicated by our limited action of reviewing proposed terminal sites
and facilities.[58]  The Commission's authority under NGA section 3 applies "only to the
siting and the operation of the facilities necessary to accomplish an export[,]"[59] while
"export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse."[60]
Similarly, issues related to the impacts of natural gas development and production are
related to DOE's authorization of the export and not the Commission's siting of the
facilities,[61] notwithstanding DOE's interpretation of its own obligations under the
National Environmental Policy Act (NEPA).  We have reviewed CP2 LNG's application

---

[55] DOE Delegation Order No. 00-004.00A.

[56] *See Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134, at P 15, *order on reh'g*, 172 FERC ¶ 61,214 (2020).

[57] *See supra* note 41.  *See also Freeport LNG Dev., L.P.*, 148 FERC ¶ 61,076, *reh'g denied*, 149 FERC ¶ 61,119 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) (finding that because DOE, not the Commission, has sole authority to license the export of any natural gas through LNG facilities, the Commission is not required to address the indirect effects of the anticipated export of natural gas in its NEPA analysis); *Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117, *reh'g denied*, 148 FERC ¶ 61,200 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016).

[58] *See Jordan Cove Energy Project L.P.*, 170 FERC ¶ 71,202, at P 32 (2020); *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, at P 13 (2022).

[59] *Trunkline Gas Co., LLC*, 155 FERC ¶ 61,328, at P 18 (2016).

[60] *Sierra Club v. FERC*, 827 F.3d at 46.

[61] *Id.*

to determine if the siting, construction, and operation of its facilities as proposed would not be consistent with the public interest.[62]

28.    CP2 LNG states that it has contractually secured through agreements with landowners all land required for the construction and operation of the CP2 LNG Project.[63]

29.    Additionally, as discussed further below, Commission staff's EIS for the project finds that, although some impacts of the project would be permanent and significant, such as impacts on visual resources, including impacts to visual resources within environmental justice communities, most impacts would not be significant or would be reduced to less-than-significant levels with the implementation of avoidance, minimization, and mitigation measures recommended in the EIS[64] and adopted by this order.  We conclude that the various arguments raised regarding the CP2 LNG Project do not amount to the affirmative showing of inconsistency with the public interest that is necessary to overcome the presumption in section 3 of the NGA.

30.    In accordance with the Memorandum of Understanding signed on August 31, 2018, by the Commission and the Pipeline and Hazardous Materials Safety Administration (PHMSA) within the U.S. Department of Transportation (DOT),[65] PHMSA undertook a review of the proposed facility's ability to comply with the federal safety standards contained in Part 193, Subpart B, of Title 49 of the Code of Federal

---

[62] *See supra* P 41; *see also Nat'l Steel Corp.*, 45 FERC ¶ 61,100, at 61,332-33 (1988) (observing that DOE, "pursuant to its exclusive jurisdiction, has approved the importation with respect to every aspect of it except the point of importation" and that the "Commission's authority in this matter is limited to consideration of the place of importation, which necessarily includes the technical and environmental aspects of any related facilities").

[63] Application at 8.

[64] As part of its environmental review, Commission staff developed mitigation measures it determined would appropriately and reasonably reduce the environmental impacts resulting from project construction and operation.

[65] *Memorandum of Understanding Between the Department of Transportation and the Federal Energy Regulatory Commission Regarding Liquefied Natural Gas Transportation Facilities* (Aug. 31, 2018), https://www.ferc.gov/legal/mou/2018/FERC-PHMSA-MOU.pdf.

Regulations.[66]  On June 28, 2023,[67] PHMSA issued a Letter of Determination indicating CP2 LNG has demonstrated that the siting of the proposed CP2 LNG Project complies with these federal safety standards.  If the proposed project is subsequently modified so that it differs from the details provided in the documentation submitted to PHMSA, further review would be conducted by PHMSA.

31.     CP2 LNG will operate its LNG terminal under the terms and conditions mutually agreed to by its customers and will solely bear the responsibility for the recovery of any costs associated with construction and operation of the terminal and associated facilities.  Accordingly, CP2 LNG's proposal does not trigger NGA section 3(e)(4).[68]

32.     In view of the above, after careful consideration of the entire record of this proceeding, including the findings and recommendations of the final EIS, we find that, subject to the conditions imposed in this order, CP2 LNG's proposal is not inconsistent with the public interest.  Therefore, we will grant CP2 LNG's application.

### B.     CP Express Pipeline Project (Docket No. CP22-22-000)

33.     Because the proposed facilities will be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[69]

### 1.     Certificate Policy Statement

34.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[70]  The Certificate Policy Statement establishes criteria for

---

[66] 49 C.F.R. pt. 193, subpt. B (2023).

[67] Commission staff July 6, 2023 memo, Docket No. CP22-21-000 (attaching PHMSA's Letter of Determination).

[68] 15 U.S.C. § 717b(e)(4) (governing orders for LNG terminals offering open access service).

[69] *Id.* §§ 717f(c) & (e).

[70] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *Certification of New Interstate Nat. Gas Facilities*

determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

35.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

### a.    No Subsidy Requirement and Project Need

36.    CP Express's proposal satisfies the threshold requirement that it financially support the project without relying on subsidization from existing customers. CP Express is a new company with no existing shippers. Thus, there is no potential for subsidization on CP Express's system.[71]

37.    CP Express asserts that the pipeline project is needed to transport domestically sourced natural gas to the CP2 LNG Project, where the gas will be liquefied and exported under CP2 LNG's DOE/FE export authorization.[72] CP Express entered a long-term

---

*Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

    [71] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 32 (2017), *order on reh'g*, 163 FERC ¶ 61,197 (2018); *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042, at P 28 (2017), *order denying reh'g*, 163 FERC ¶ 61,098 (2018); *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192, at P 23 (2014).

    [72] Application at 43.

precedent agreement with CP2 LNG for the full capacity of the pipeline system. Sierra Club asserts that the Commission may not rely on this precedent agreement as evidence of project need because CP2 LNG is an affiliate.[73]

38.    As the Commission has previously recognized, "it is not an uncommon model for entities developing LNG terminals to construct and operate, through an affiliate, an associated pipeline to provide transportation and ensure delivery of the natural gas which will serve as feedstock for the liquefaction process."[74] Further, affiliated LNG terminals, unlike affiliated local distribution companies, have no captive customers to whom they can pass the costs associated with their transportation contracts.[75] We find CP Express's precedent agreement with CP2 LNG for 100% of the pipeline's capacity to be significant evidence of project need.

> **b.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities**

39.    As discussed above, CP Express does not have existing customers. In addition, there is no evidence that the CP Express Pipeline Project will adversely affect other pipelines or their captive customers. The project is designed to connect the existing interstate grid to the proposed CP2 LNG Project. No pipeline currently provides transportation service to the CP2 LNG Project, and the project is not intended to replace service on other pipelines. No pipeline companies or their customers have protested CP Express's application. We find that the CP Express Pipeline Project will not adversely affect existing customers or existing pipelines and their customers.

40.    We are also satisfied that CP Express has taken appropriate steps to minimize adverse economic impacts on landowners and surrounding communities. CP Express states that the project's location and design were selected to minimize impacts to landowners, and CP Express revised its pipeline route based on conversations with landowners during the pre-filing process to reduce those impacts to the extent

---

[73] Sierra Club March 11, 2022 Comments at 6. *See also* Niskanen Center January 13, 2023 Comments at 5.

[74] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at P 24 (2023) (citing *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135 (2019), *order on reh'g*, 181 FERC ¶ 61,033 (2022)); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), *order on reh'g*, 170 FERC ¶ 61,046 (2020); *Plaquemines LNG*, 168 FERC ¶ 61,204; *Port Arthur LNG, LLC*, 167 FERC ¶ 61,052 (2019); *Calcasieu Pass LNG*, 166 FERC ¶ 61,144).

[75] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24.

practicable.[76]  Approximately 43% of the project (39.2 miles) will be collocated with existing pipelines, power lines, roadways, and canals.  Construction of the project would affect 1,816.8 acres of land, 608.1 acres of which would be permanently retained for operation and maintenance of project facilities.[77]  Portions of the construction right-of-way that are not retained for operations and maintenance would be restored to preconstruction conditions.[78]

41.    Niskanen Center asserts that impacted landowners whose property is crossed by or next to CP Express's right-of-way would face the potential forced taking of their property via eminent domain, overall diminution in property value, and harms from construction activities and the permanent placement of a 48-inch gas pipeline on or near their land.[79]  The EIS concludes that the CP Express pipeline is not expected to have more than negligible effects on property values, and the EIS includes protective conditions, adopted here, to mitigate construction impacts on landowner property.[80]  As of June 2022, CP Express had secured purchase/lease agreements for 94% of the project's aboveground facilities and anticipates that it will be able to secure agreements for the remaining aboveground tracts.[81]  Additionally, whether CP Express obtains land rights through agreement or eminent domain, landowners will be compensated for the use of their land.[82]

42.    In sum, we find that CP Express has demonstrated a need for the pipeline project and, further, that the project will not have adverse impacts on existing shippers or other pipelines and their existing customers and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  Therefore, we

---

[76] *See* final EIS at 3-37.

[77] *Id.* at 1-4.

[78] *Id.*

[79] Niskanen Center March 13, 2023 Comments at 5.

[80] Final EIS at 4-298.

[81] *Id.* at 4-299.

[82] *See id.* at 4-247 (explaining that, in the event the company acquires land rights through eminent domain, a court would determine the appropriate level of compensation).

conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[83]

## 2. Blanket Certificates

43.    CP Express requests a Part 284, Subpart G blanket certificate in order to provide open-access transportation services.  Under a Part 284 blanket certificate, CP Express would not need individual authorizations to provide transportation services to particular customers.  CP Express filed a *pro forma* Part 284 tariff to provide open-access transportation services.  Because a Part 284 blanket certificate is required for CP Express to participate in the Commission's open-access regulatory regime, we will grant CP Express a Part 284 blanket certificate, subject to the conditions imposed herein.

44.    CP Express also requests a Part 157, Subpart F blanket certificate.  A Part 157 blanket certificate gives an interstate pipeline NGA section 7 authority to automatically, or after prior notice, perform a restricted number of routine activities related to the construction, acquisition, abandonment, and replacement and operation of existing pipeline facilities, provided that the activities comply with constraints on costs and environmental impacts.[84]  Because the Commission has previously determined through a rulemaking that these blanket-certificate eligible activities are in the public convenience and necessity,[85] it is the Commission's practice to grant new natural gas companies a Part 157 blanket certificate if requested.[86]  Accordingly, we will grant CP Express a Part 157 blanket certificate, subject to the conditions imposed herein.

---

[83] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[84] *See* 18 C.F.R. § 157.203 (2023).

[85] *Revisions to the Blanket Certificate Reguls. & Clarification Regarding Rates,* Order No. 686, FERC Stats. & Regs. ¶ 31,231, at P 9 (2006) (cross-referenced at 117 FERC ¶ 61,074), *order on reh'g,* Order No. 686-A, 119 FERC ¶ 61,303, *order on reh'g,* Order No. 686-B, 120 FERC ¶ 61,249 (2007).

[86] *Cf. Rover Pipeline LLC*, 161 FERC ¶ 61,244, at P 13 (2017) (denying a request for a blanket certificate where the company's actions had eroded the Commission's confidence it would comply with all the requirements of the blanket certificate program, including the environmental requirements).

### 3. Rates

#### a. Initial Rates

45.    CP Express proposes separate initial recourse reservation rates for firm transportation service for Phase I service and for Phase II service of $7.637 per Dth and $4.203 per Dth, respectively, under Rate Schedule FTS.[87] CP Express states that once Phase II is placed in service, all facilities will be operated as a single, integrated system.[88] Accordingly, CP Express's proposed rates for Phase II service include the combined costs and design capacity of all project facilities constructed in both Phase I and Phase II and will apply to all service on the system after Phase II is placed into service. CP Express also proposes recourse rates for interruptible transportation service under Rate Schedule ITS that are equal to the 100% load factor equivalent of the applicable Rate Schedule FTS rate.

46.    CP Express states that it calculated the system rates using a straight-fixed-variable rate design. CP Express estimates a total cost of service of $203,732,195 for the first year of Phase I service and $223,817,850 for the first year of Phase II service.[89] CP Express states that its costs of service are based on a capital structure of 75% debt and 25% equity, with an estimated debt cost of 6.0%, a rate of return on equity (ROE) of 15.0%, and a depreciation rate of 5.0%.[90]

47.    Upon the completion and in-service of Phase I, CP Express proposes an initial cost-based reservation charge of $7.637 per Dth and a usage charge of $0.004 per Dth under Rate Schedule FTS, an interruptible rate of $0.255 per Dth under Rate Schedule ITS and an overrun charge of $0.255 per Dth.[91] CP Express calculated these rates based on its estimated first-year reservation cost of service of $200,642,025, variable costs of $3,090,170, and annual billing determinants of 2,189,272 Dth/day.

---

[87] Application at 33-34; October 17, 2022 Response to Data Request at Revised Ex. N (Revised Ex. N). CP Express revised Exhibits K, L, N, and O of its application in a response to a data request on October 17, 2022. *Id.*

[88] Construction during Phase II will consist entirely of the addition of 117,400 hp of gas-fired compression at the Moss Lake Compressor Station. *See supra* P 7.

[89] Revised Ex. N.

[90] *Id.* The 5% depreciation rate is derived from the 20-year term of CP Express's transportation service agreement with CP2 LNG.

[91] Revised Ex. N.

48.    Upon completion and in-service of Phase II, CP Express proposes an initial cost-based reservation charge of $4.203 per Dth and a usage charge of $0.002 per Dth under Rate Schedule FTS, an interruptible rate of $0.141 per Dth under Rate Schedule ITS and an overrun charge of $0.141 per Dth.[92]  CP Express calculated these rates based on its estimated first-year reservation cost of service of $220,442,714, variable costs of $3,375,136, and annual billing determinants of 4,370,422 Dth/day.

49.    We find that, once the Phase II facilities are placed in service, CP Express's system will function as an integrated system and that CP Express's proposed rate schedule appropriately establishes a single recourse rate for all Phase II service that reflects the costs and design capacities of both the Phase I and Phase II facilities.[93]  The transportation service on the capacity created by the Phase II facilities will be indistinguishable from the transportation service on the capacity created by Phase I facilities.  The Phase II facilities will create an additional 2,200,000 Dth/day of capacity at a lower cost than the 2,200,000 Dth/day of capacity created by the Phase I facilities, resulting in lower rates for Phase II service than for Phase I.

50.    We have reviewed CP Express's proposed cost of service and initial rates, as revised, and find that they are consistent with current Commission policy, subject to the modifications described below.

### i.    Variable Costs

51.    CP Express states that its operations and maintenance (O&M) expenses include $3,090,170 in variable costs for Phase I service and $3,375,136 in variable costs for Phase II service.[94]  From these variable costs, CP Express calculated a usage charge of $0.004 per Dth for Phase I service and $0.002 per Dth for Phase II service.

52.    The Commission's longstanding cost classification method assigns O&M costs to particular accounts, depending on the type of cost incurred, as defined in the Uniform System of Accounts.[95]  Costs assigned to each account are required to be itemized between two sub-accounts:  labor and non-labor.  Once the costs in each account have been itemized, these costs are then classified as fixed or variable.  Under the straight-

---

[92] *Id.*

[93] *See, e.g., Plaquemines LNG*, 168 FERC ¶ 61,204 at P 33; *Gulfstream Nat. Gas Sys., L.L.C.*, 105 FERC ¶ 61,052 (2003).

[94] Revised Ex. N.

[95] 18 C.F.R. pt. 201 (2023).

fixed-variable rate design, fixed costs should be collected through the reservation charge and variable costs should be collected through the usage charge.[96]

53.     In its Revised Exhibit N, CP Express classified costs from Account Nos. 853 (Compressor station labor and expenses), 857 (Measuring and regulating station expenses), 864 (Maintenance of compressor station equipment), and 865 (Maintenance of measuring and regulating station equipment) as variable and added them to its usage charge.  CP Express did not provide a breakdown of its accounts by labor and non-labor expenses.  Under the Commission's traditional cost classification method, non-labor costs in Account Nos. 853, 864, 857, and 865 are classified as variable, and labor costs are classified as fixed.[97]  We direct CP Express to calculate its usage charge in accordance with Commission regulations and policy and reflect only non-labor costs included in Account Nos. 853, 864, 857, and 865 in its usage charge.  Further, in its Revised Exhibit N, when CP Express calculated variable O&M expenses, CP Express did not remove the total variable O&M expenses from the fixed O&M expenses, thus double counting variable O&M expenses and increasing the total cost of service.  As stated above, fixed costs should be collected through the reservation charge and variable costs should be collected through the usage charge.  Therefore, we direct CP Express to recalculate its reservation charge in accordance with Commission policy.

54.     Furthermore, CP Express included Account No. 855 (Other fuel and power for compressor stations)[98] costs in the fixed O&M expenses used to calculate its reservation charge.  Because fuel use varies with throughput, these costs are properly classified as variable,[99] and we direct CP Express to include Account No. 855 costs in its usage charge.  When CP Express submits its tariff records before placing the project facilities into service, we direct CP Express to submit revised recourse rates consistent with the

---

[96] 18 C.F.R. § 284.7(e) (reservation charge) & § 284.10 (straight-fixed-variable rate design methodology) (2022); *Pipeline Serv. Obligations & Revisions to Reguls. Governing Self-Implementing Transp.; & Regul. Of Nat. Gas Pipelines after Partial Wellhead Decontrol,* Order No. 636, FERC Stats. & Regs. ¶ 30,939 (1992) (cross-referenced at 59 FERC ¶ 61,030); *Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,157, at P 29 (2016).

[97] *Dominion Transmission Inc.*, 153 FERC ¶ 61,382, at P 33 (2015); *Columbia Gulf Transmission, LLC*, 152 FERC ¶ 61,214, at P 20 (2015).

[98] This account includes the cost of coal, oil, other fuel, or electricity used for the to operate compressor stations.  18 C.F.R. pt. 201 (2023), Account 855 Other fuel and power for compressor stations.

[99] *Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,157 at P 25.

discussion herein, along with work papers in spreadsheet format, including formulas and a breakdown between labor and non-labor costs by account.[100]

## ii.    Design Capacity

55.    As revised, CP Express's proposed reservation rates for Phase I and Phase II service are based on a design capacity of 2,189,272 Dth/day and 4,370,422 Dth/day, respectively.[101]  Commission policy is to design initial rates based upon the full design capacity of the project.[102]  This approach ensures that the pipeline, not the rate payer, is placed at risk for underutilization of the facilities if it does not contract for its full capacity.[103]  Therefore, CP Express is directed to recalculate its initial rates based upon its design capacity of 2,200,000 Dth/day for Phase I service and 4,400,000 Dth/day for Phase II service.[104]

## iii.    Return on Equity

56.    CP Express contends its proposed 15% ROE is reasonable because its equity ratio is only 25%, and the Commission has regularly approved a 14% ROE for greenfield projects with equity ratios up to 50%, due to the increasing risks, in recent years, of developing and constructing new pipeline infrastructure.[105]

---

[100] When CP Express files its tariff records it should confirm that these Account No. 855 costs are not recoverable through its fuel reimbursement percentage.  *See Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,157 at P 25 n.22.  *See infra* section III.B.3.c.

[101] Revised Ex. N.

[102] *See, e.g.*, *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at PP 106, 112; *Cameron Interstate Pipeline, LLC*, 147 FERC ¶ 61,230, at P 43 (2014).

[103] *See, e.g.*, *Dominion Transmission, Inc.*, 104 FERC ¶ 61,267, at P 57 (2003); *Pac. Gas Transmission Co.*, 70 FERC ¶ 61,016, at 61,045, *order on reh'g*, 71 FERC ¶ 61,268 (1995).

[104] *See* Application at 3, 8, & 23.  *See also* May 1, 2023 Response to Data Request at Attachment 2, reflecting revised fuel rates based upon a capacity of 2,200,000 Dth/day for Phase I service and 4,400,000 Dth/day for Phase II service.

[105] To support its claim that the risks of pipeline infrastructure development are increasing, CP Express cites recently proposed natural gas pipeline projects that have been abandoned as a result of opposition and regulatory challenges.  Application at 34 n.37.

57.    For greenfield pipelines with equity components equal to *or less than 50%*, the Commission has previously approved ROEs up to 14% for projects to reflect the higher risks faced by new market entrants relative to existing pipelines with an existing customer base.[106]  CP Express has not provided sufficient support for why the Commission should deviate from its policy of a 14% ROE for greenfield projects; therefore we reject its proposed 15% ROE.[107]  Because CP Express's equity component is less than 50%, consistent with Commission policy we authorize the use of a 14% ROE for this project.  Accordingly, we require CP Express to revise its proposed recourse rates using an adjusted overall rate of return reflecting a 14% ROE.

### b.    Negotiated Rates and Non-Conforming Provisions

58.    CP Express proposes to grant several contractual rights to CP2 LNG, the anchor shipper, that may materially deviate from the Rate Schedule FT Form of Service Agreement contained in CP Express's proposed *pro forma* tariff.  CP Express entered into a binding precedent agreement with CP Express for 100% of its firm transportation capacity for an initial term of 20 years subject to negotiated rates.  CP Express states that the open season made the negotiated rates and certain other contractual rights available to any qualifying anchor shippers.[108]

59.    CP Express states that CP2 LNG will have the following anchor shipper rights: (1) the one-time right to delay Phase II under certain conditions; (2) the right to extend the initial 20-year primary term of its Phase I or Phase II service by an additional term ranging from one to ten years, at its election, by providing notice to CP Express no later than two years prior to the end of the primary term of its service agreement; (3) at the time of that notice, if a term extension is elected, CP2 LNG may also choose to reduce its maximum transportation quantity for the extended term, provided, however, that the reduced quantity is no less than 225,000 Dth/day; (4) entitlements at primary points of receipt that, in aggregate, exceed its Maximum Daily Transportation Quantity (MDTQ),

---

[106] *Roaring Fork Interstate Gas Transmission, LLC*, 177 FERC ¶ 62,153, at P 30 (2021).  S*ee also, e.g.*, *Double E Pipeline*, 173 FERC ¶ 61,074, at P 42 (2020); *Nexus Gas Transmission, LLC*, 160 FERC ¶ 61,022, at P 81 (2017); *Fla. Se. Connection,* 154 FERC ¶ 61,080, at P 118 (2016); *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, at P 34 (2019).

[107] *See, e.g.*, *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 42 (rejecting request for a 14.5% ROE and approving a 14% ROE); *ETC Tiger Pipeline, LLC*, 131 FERC ¶ 61,010, at P 26 (2010) (denying a request for a 15% ROE and approving a 14% ROE); *Sonora Pipeline, LLC*, 120 FERC ¶ 61,032, at P 26 (2007) (rejecting a request for a 14.5% ROE and approving a 14% ROE).

[108] Application at 29.

provided that neither the primary firm entitlement at any single point of receipt nor its aggregate receipts on any day exceed its MDTQ, as well as the right to designate primary receipt point rights among available pipeline interconnections at any time prior to the execution of the service agreement; and (5) project-specific credit provisions to support the significant financial investment associated with development of the project that will remain in place for the duration of the firm service agreement.[109]

60.    As a threshold matter, for special terms and conditions of service to be permissible, they must be offered to all shippers who submit bids in an open season.[110] We are satisfied that CP Express met this requirement.  In its binding open season, CP Express stated that "Anchor Shippers will be eligible to receive certain incentives with respect to a negotiated rate, receipt point rights, and term extensions, consistent with regulatory requirements.  Shippers qualifying as Anchor Shippers for both phases of the project will also have certain rights regarding the timing of Phase II and related conditions precedent."[111]

61.    A material deviation in a service agreement is any provision that:  (1) goes beyond filling in the blank spaces with the appropriate information allowed by the tariff; and, (2) affects the substantive rights of the parties.[112]  The Commission prohibits negotiated terms and conditions of service that result in a shipper receiving a different quality of service than that offered to other shippers under the pipeline's generally applicable tariff or that affect the quality of service received by others.[113]  However, not all material deviations are impermissible.  Provisions that materially deviate from the corresponding *pro forma* agreement fall into two general categories:  (a) provisions the Commission must prohibit because they present a significant potential for undue discrimination among shippers, and (b) provisions the Commission can permit without a substantial risk of

---

[109] *Id.* at 30.  CP Express states that these contractual rights are similar to the anchor shipper rights provided to anchor shippers on two other Venture Global pipelines. *See Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 34-38 (TransCameron Pipeline Project); *Plaquemines LNG*, 168 FERC ¶ 61,204 at PP 62-65 (Gator Express Pipeline Project).

[110] *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at PP 116-118; *Columbia Gas Transmission, L.L.C.*, 153 FERC ¶ 61,008, at PP 7-21 (2015).

[111] October 17, 2022 Response to Data Request at 7.

[112] *Columbia Gas Transmission Corp.*, 97 FERC ¶ 61,221, at 62,002 (2001).

[113] *Monroe Gas Storage Co., LLC*, 130 FERC ¶ 61,113, at P 28 (2010).

undue discrimination.[114]  Further, the Commission has found that non-conforming provisions may be necessary to reflect the unique circumstances involved with the construction of new infrastructure and to provide the needed security to ensure the viability of a project.[115]

62.    We find that the non-conforming provisions in CP Express's precedent agreement with CP2 LNG constitute material deviations from CP Express's *pro forma* service agreement; however, we further find the non-conforming provisions are permissible because they do not present a risk of undue discrimination, do not adversely affect the operational conditions of providing service, and do not result in any customer receiving a different quality of service.[116]

63.    CP Express's *pro forma* tariff provides for CP Express to charge negotiated rates for its proposed services.  CP Express proposes to provide service under negotiated rate transportation service agreements.  CP Express must file either the negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[117] and the Commission's negotiated rate policies.[118]  CP Express must file an executed copy of the non-conforming service agreement and identify and disclose all non-conforming provisions or agreements affecting the substantive rights of the parties under the tariff or service agreement.  This required disclosure includes any such transportation provision or agreement detailed in a

---

[114] *Columbia Gas Transmission Corp.*, 97 FERC at 62,003.  *See also Equitrans, L.P.*, 130 FERC ¶ 61,024, at P 5 (2010).

[115] *See, e.g.*, *Tenn. Gas Pipeline Co., L.L.C.*, 144 FERC ¶ 61,219 (2013); *Midcontinent Express Pipeline LLC*, 124 FERC ¶ 61,089 (2008).

[116] *See, e.g.*, *Gulf South Pipeline Co., L.P.*, 115 FERC ¶ 61,123 (2006); *Gulf South Pipeline Co., L.P.*, 98 FERC ¶ 61,318, at P 4 (2002).  *See also Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 34-38; *Plaquemines LNG*, 168 FERC ¶ 61,204 at PP 62-65.

[117] *Alt. to Traditional Cost-of-Service Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transp. Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *clarification granted*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[118] *Nat. Gas Pipelines Negotiated Rate Policies & Practices; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003) (Negotiated Rate Policy Statement), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304 (2006).

precedent agreement that survives the execution of the service agreement. Consistent with section 154.112 of the Commission's regulations, CP Express must also file a tariff record identifying the agreements as non-conforming agreements.[119] In addition, the Commission emphasizes that the above determination relates only to those items described by CP Express in its application and not the entirety of the precedent agreement.[120]

### c.    <u>Fuel</u>

64.    CP Express proposes to recover the costs of fuel and lost and unaccounted for gas through in-kind reimbursement percentages of shipper receipts. CP Express states that the reimbursement percentages will be adjusted annually with a true-up mechanism set forth in section 13 of the General Terms and Conditions (GT&C) of its *pro forma* tariff.[121] CP Express proposes an initial fuel reimbursement percentage of 0.29% for Phase I service and 0.42% for Phase II service[122] and an initial lost and unaccounted for percentage of 0.25%.[123] CP Express states that the initial fuel reimbursement percentage reflects the required fuel to operate the Moss Lake Compressor Station on a design day with an assumed 100% load factor.

---

[119] 18 C.F.R. § 154.112 (2023).

[120] A Commission ruling on non-conforming provisions in a certificate proceeding does not waive any future review of such provisions when the executed copy of the non-conforming agreement(s) and a tariff record identifying the agreement(s) as non-conforming are filed with the Commission, consistent with section 154.112 of the Commission's regulations. *See, e.g.*, *Tenn. Gas Pipeline Co., L.L.C.*, 150 FERC ¶ 61,160, at P 44, n.33 (2015).

[121] Application at 35-36.

[122] May 1, 2023 Data Response at attach. 2. CP Express provided a revised fuel derivation to correct the fuel reimbursement percentages provided in the October 17, 2022 Data Response. The fuel consumption is projected to be 6,380 Dth/day for Phase I service and 18,707 Dth/day for Phase II service.

[123] *Id.*; October 17, 2022 Response to Data Request at 15. CP Express states that the 0.25% initial lost and unaccounted for percentage is consistent with the Commission's approval of the percentage for the similarly situated TransCameron Pipeline. *See Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 29, 31.

65.     We find that CP Express's proposed initial fuel and lost and unaccounted for gas reimbursement percentages are reasonable, and that the proposed true-up mechanism is consistent with Commission regulation and policy.[124]

### d.     Three-Year Filing Requirement

66.     Consistent with Commission precedent, CP Express is required to file a cost and revenue study no later than three months after its first three years of actual operation of the entire system (both Phase I and II) to justify its existing cost-based firm and interruptible recourse rates.[125]  In that filing, the projected units of service should be no lower than those upon which CP Express's approved initial rates are based.  The filing must include a cost and revenue study in the form specified in section 154.313 of the Commission's regulations to update cost of service data.[126]  CP Express's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580. In addition, CP Express is advised to include as part of the eFiling description a reference to Docket Nos. CP22-21-000 and CP22-22-000 in the cost and revenue study.[127]

67.     To the extent CP Express has not begun construction of the Phase II facilities within two years of the in-service date of Phase I, CP Express is directed to file a cost and revenue study three years after the in-service date of the Phase I facilities.  After reviewing the data, the Commission will determine whether to exercise its authority under NGA section 5 to investigate whether the rates remain just and reasonable.  In the alternative, in lieu of that filing, CP Express may make an NGA general section 4 rate filing to propose alternative rates to be effective no later than three years after the in-service date for its proposed facilities.

### e.     Pro Forma Tariff

68.     CP Express filed its *pro forma* tariff as part of its application in Exhibit P. CP Express states that the CP Express Pipeline System will provide transportation

---

[124] 18 C.F.R. § 154.403 (2023); *ANR Pipeline Co.*, 108 FERC ¶ 61,050 (2004).

[125] *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at P 105; *Fla. Southeast Connection*, 154 FERC ¶ 61,080 at P 139; *Bison Pipeline, LLC,* 131 FERC ¶ 61,013, at P 29 (2010); *Ruby Pipeline, L.L.C.*, 128 FERC ¶ 61,224, at P 57 (2009); *MarkWest Pioneer, L.L.C.*, 125 FERC ¶ 61,165, at P 34 (2008).

[126] 18 C.F.R. § 154.313 (2023).

[127] *Elec. Tariff Filings*, 130 FERC ¶ 61,047, at P 17 (2010).

services on an unbundled, open access basis under nondiscriminatory terms and conditions.[128]

### i.      Negotiated Rate Authority

69.     Commission policy requires that if a pipeline files a tariff record reflecting the terms of a negotiated rate agreement, the tariff record summary must fully describe the essential elements of the transaction, including the name of the shipper, the negotiated rate, the type of service, the receipt and delivery points applicable to the service, and the volume of gas to be transported.  Also, where the price term of the negotiated rate agreement is a formula, the formula should be fully set forth in the tariff record.  CP Express is directed to modify its tariff, GT&C section 4.14(a)(v), to be consistent with the Commission's negotiated rate policy.[129]  In addition, CP Express must maintain separate and identifiable accounts for volumes transported, billing determinants, rate components, surcharges, and revenues associated with its negotiated rates in sufficient detail so that they can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case.  CP Express is ordered to add this record keeping requirement to section 4.14(c) of its tariff.[130]

### ii.     System Map

70.     CP Express's *pro forma* tariff does not include maps of its system and therefore does not comply with the Commission's regulations.  CP Express is required to revise its tariff to provide uniform resource locators (URL) designating a location on the internet for publication of its system maps.[131]

### iii.    Crediting of Operational Flow Order Penalties

71.     In section GT&C 14.2(a) of CP Express's *pro forma* tariff, CP Express proposes to credit penalties pursuant to Operational Flow Orders (OFO), net of transporter's costs, to non-offending firm transportation customers.  However, this section does not fully

---

[128] Application at 35.

[129] Negotiated Rate Policy Statement, 104 FERC ¶ 61,134, *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304.

[130] *See, e.g.*, *Gulf Crossing Pipeline Co., LLC*, 123 FERC ¶ 61,100 (2008).

[131] 18 C.F.R. § 154.106 (2023).

comply with Order No. 637.[132]  While CP Express's proposal states that it will credit OFO penalties only to non-offending firm shippers, we have generally held that a pipeline must credit revenues to all shippers.  Since all shippers, including interruptible shippers, may be subject to penalties, all shippers should therefore receive a proportional share of any net penalty revenues.[133]  We therefore direct CP Express to revise section 14.2(a) of its GT&C to provide crediting of OFO penalty revenues to all non-offending shippers, regardless of whether they are firm or interruptible.  Moreover, CP Express proposes to credit revenues "net of Transporter's costs."  CP Express will have the burden of supporting any such costs in a penalty revenue report.[134]  CP Express's customers may challenge the costs and the methods of identifying these amounts when the report has been filed.

### iv.  **Segmentation**

72.    CP Express states that it does not propose to offer segmentation rights on its system as it is not operationally feasible and not desired by its shipper.  Therefore, CP Express requests exemption from section 284.7(d) of the Commission's regulations.[135]  According to CP Express, the pipeline will operate as a uni-directional line, receiving gas from receipt-only interconnects with upstream pipelines and transporting it to the single delivery point at the CP2 LNG Project with no intermediate delivery points allowing for segmentation of the capacity.[136]

73.    We find that because CP Express has uni-directional, receipt-only interconnections with upstream pipelines and one delivery point, segmentation is not operationally feasible

---

[132] *Regul. of Short-Term Nat. Gas Transp. Servs. & Regul. of Interstate Nat. Gas Transp. Servs.*, Order No. 637, FERC Stats. & Regs. ¶ 31,091 (cross-referenced at 90 FERC ¶ 61,109), *clarified*, Order No. 637-A, FERC Stats. & Regs. ¶ 31,099 (cross-referenced at 91 FERC ¶ 61,169), *reh'g denied*, Order No. 637-B, 92 FERC ¶ 61,062 (2000), *aff'd in part and remanded in part sub nom. Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18 (D.C. Cir.), *order on remand*, 101 FERC ¶ 61,127 (2002), *order on reh'g*, 106 FERC ¶ 61,088 (2004), *aff'd sub nom. Am. Gas Ass'n v. FERC*, 428 F.3d 255 (D.C. Cir. 2005).

[133] *Destin Pipeline Co., L.L.C.*, 99 FERC ¶ 61,060, at 61,284 (2002); *Nat. Gas Pipeline Co. of America*, 101 FERC ¶ 61,200, at P 99 (2002).

[134] *See* Order No. 637-A, FERC Stats. & Regs. ¶ 31,099 at 35,742.

[135] Application at 36.

[136] *Id.*

on the system as currently configured.[137]  Therefore, we will grant CP Express a limited waiver from implementing segmentation on its system.  The waiver is granted only until CP Express adds a point to its system making segmentation operationally feasible.  Before such additional point is placed in service, CP Express must file new or revised tariff records in accordance with the Commission's regulations to provide for segmentation.

#### v.     NAESB

74.     The Commission has adopted in its regulations various standards for conducting business practices and electronic communication with interstate pipelines as promulgated by the North American Energy Standards Board (NAESB).[138]  The standards are intended to govern nominations, allocations, balancing measurement, invoicing, capacity release, and mechanisms for electronic communication between pipelines and those with whom they do business.  CP Express requests an extension of time to implement NAESB Wholesale Gas Quadrant (WGQ) Version 3.2 Standards relating to various Electronic Data Interchange (EDI),[139] Electronic Delivery Mechanism (EDM),[140] and Internet Electronic Transport (IET)[141] requirements until such time as CP Express is requested by a Part 284, open-access customer to provide such electronic data services.  CP Express states that the Commission generally has granted an extension of time to comply with

---

[137] *Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 39-40; *Plaquemines LNG*, 168 FERC ¶ 61,204 at PP 41-42; *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192 at P 56.

[138] *See Standards for Bus, Practices for Interstate Nat. Gas Pipelines*, Order No. 698, FERC Stats. & Regs. ¶ 31,251 (2007) (cross-referenced at 119 FERC ¶ 61,317), *order granting clarification and denying reh'g*, Order No. 698-A, 121 FERC ¶ 61,264 (2007).  *Standards for Bus. Practices for Interstate Nat. Gas Pipelines*, Order No. 587-S, 111 FERC ¶ 61,203 (2005).  Pursuant to the June 14, 2005 errata notice in Docket No. RM96-1-026, the title of the May 9, 2005 final rule was changed from Order No. 654 to Order No. 587-S.

[139] EDI standards require computer-to-computer electronic data interchange of information in files as mapped from the NAESB WGQ datasets and communicated between trading partners over the Internet using the NAESB Internet Electronic Transport.

[140] EDM standards relate to the use of the Internet for pertinent business practice and electronic communications.

[141] IET refers to electronic transaction messaging standards which, in concert with Quadrant-specific EDM (QEDM), enable NAESB parties to securely and reliably exchange transactions over the Internet.

these standards.[142]  For good cause shown, we grant CP Express an extension of time to comply with EDI, EDM, and IET NAESB Standards, as requested.[143]  The extension of time is limited to the NAESB WGQ Version 3.2 Standards[144] promulgated by Order No. 587-Z,[145] and will be in effect until a Part 284 customer requests CP Express to offer the EDI, EDM, and IET transactions or data via its website.[146]  Further, CP Express must be fully compliant with the NAESB WGQ Version 3.2 Standards as it relates to proprietary location codes.[147]

### vi.    **Determination**

75.    CP Express proposes to offer firm and interruptible transportation services on an open-access basis under the terms and conditions set forth in the *pro forma* tariff attached as Exhibit P to the application.  We find that CP Express's proposed *pro forma* tariff generally complies with Part 284 of the Commission's regulations,[148] with the exceptions discussed above.  We will require CP Express to file actual tariff records consistent with

---

[142] Application at 37 (citing *TransCameron Pipeline, LLC*, 174 FERC ¶ 61,186 (2021)).

[143] NAESB WGQ Version 3.2 Standards 1.3.3, 1.3.9, 1.3.13, 1.3.20, 1.3.21, 1.3.23, 1.3.48, 1.3.53, 1.3.55, 1.3.56, 1.3.58, 1.3.62, 1.4.2, 1.4.7, 2.3.5, 2.3.6, 2.3.13, 2.3.32, 2.3.40, 2.4.2, 2.4.6, 2.4.7, 2.4.8, 3.3.23, 3.3.24, 3.4.1 through 3.4.4, 4.3.1 through 4.3.3, 4.3.42 through 4.3.47, 4.3.49, 4.3.50, 4.3.52 through 4.3.55, 4.3.57, 4.3.58, 4.3.60, 4.3.62, 4.3.66 through 4.3.69, 4.3.72, 4.3.75, 4.3.78 through 4.3.82, 4.3.84 through 4.3.87, 4.3.107 through 4.3.110, 5.3.10 through 5.3.12, 5.3.70 through 5.3.72, 5.4.14 through 5.4.17, 5.4.20 through 5.4.27, 10.3.1, 10.3.3 through 10.3.12, and 10.3.14 through 10.3.29.

[144] *See B-R Pipeline Co.*, 128 FERC ¶ 61,126, at P 6 (2009) (each time the Commission adopts new versions of the standards, a pipeline seeking to retain an existing waiver must request a waiver of the new standards).

[145] *Standards for Business Pracs. of Interstate Nat. Gas Pipelines*, Order No. 587-Z, 176 FERC ¶ 61,015 (2021).

[146] CP Express states that any changes to NAESB standards, as well as any other subsequent changes in the Commission's generally applicable requirements for tariffs, that take effect prior to the in-service date of the CP Express Pipeline Project will be incorporated into the tariff when CP Express files to make its tariff effective.

[147] *See Equitrans L.P.*, 153 FERC ¶ 61,320, at PP 9-13 (2015).

[148] 18 C.F.R. pt. 284 (2023).

the directives in this order at least 30 days and no more than 60 days prior to the commencement of service. In addition, CP Express must file a redline-strikeout version of the revised tariff records to identify the changes made to comply with this order.

### C.    Environmental Analysis

76.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[149] Commission staff evaluated the potential environmental impacts of the proposed project in an EIS. The U.S. Army Corps of Engineers (Army Corps); U.S. Department of Energy; U.S. Coast Guard; Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA); and National Oceanic and Atmospheric Administration's National Marine Fisheries Service (NMFS) participated in development of the EIS as cooperating agencies, as defined by NEPA.[150]

77.    On February 17, 2021, Commission staff began its environmental review of the CP2 LNG and CP Express Projects by granting the applicants' request to use the pre-filing process, assigning Docket No. PF21-1-000.[151] The Commission's pre-filing process is designed to encourage early involvement by citizens, governmental entities, non-governmental organizations, and other interested parties in the development of proposed natural gas transmission projects, prior to the filing of a formal application. As part of the pre-filing review, staff participated in three virtual open house public meetings held by the applicants on April 6, 7, and 8, 2021, to explain the Commission's environmental review process to interested stakeholders.

78.    As part of the pre-filing process, on April 27, 2021, the Commission issued a Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned CP2 LNG and CP Express Project and Notice of Public Scoping Sessions. The notice was published in the Federal Register on May 4, 2021, and opened a scoping period, with comments due on May 27, 2021.[152] The notice was mailed to about 2,700 entities, including federal, state, and local officials; agency representatives; conservation organizations; Native American Tribes; local libraries and newspapers; non-

---

[149] 42 U.S.C. §§ 4321 *et seq. See also* 18 C.F.R. pt. 380 (2023) (Commission's regulations implementing NEPA).

[150] 40 C.F.R. § 1501.8 (2023). Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by a proposal and participate in the NEPA analysis.

[151] Approval of Pre-filing Request, Docket No. PF21-1-000 (issued Feb. 17, 2021); *see also* 18 C.F.R. § 157.21(b) (2023).

[152] 86 Fed. Reg. 23,711 (May 4, 2021).

governmental organizations; and property owners in the vicinity of the proposed project (Commission staff's environmental mailing list). Commission staff held three virtual public scoping sessions via telephone on May 11, 12, and 13, 2021, to provide government agencies and the general public the opportunity to comment about issues to be addressed in the environmental analysis. The pre-filing process ended on December 2, 2021, when CP2 LNG and CP Express filed their applications for the CP2 LNG and CP Express Projects.

79.     On February 9, 2022, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement for the Proposed CP2 LNG and CP Express Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review. The notice was published in the Federal Register[153] and established a comment period that ended on March 11, 2022. The notice was also mailed to project stakeholders on the Commission staff's environmental mailing list, including individuals who provided comments during the pre-filing process or asked to be on the mailing list.

80.     In response to the notices, the Commission received 56 comments and 1,719 individual form letters from landowners; federal, state, and local agencies; Native American Tribes; companies and non-governmental organizations; and other interested individuals. Primary issues raised by the commenters related to potential project impacts on climate change, water quality and wetlands, wildlife, aquatic resources, threatened and endangered species, recreational activities, local infrastructure, environmental justice communities, and air quality.

81.     Pursuant to NEPA requirements, Commission staff prepared a draft EIS for the projects, which was issued on January 19, 2023, and addressed all substantive environmental comments received prior to its issuance. Notice of the draft EIS was published in the *Federal Register* on January 26, 2023,[154] establishing a 45-day public comment period that ended on March 13, 2023. Copies of the notice were mailed to Commission staff's environmental mailing list.

82.     In response to the draft EIS, the Commission received written comments from three federal agencies, two state agencies, eleven companies and non-governmental organizations, and nine individuals. The Commission also received a copy of one form letter associated with an online petition which had 83 signatures at the time of filing. Commission staff held two public comment sessions in the project area on March 1 and 2, 2023, in Calcasieu and Cameron Parishes, Louisiana, respectively, to solicit and receive comments on the draft EIS. A total of 36 individuals provided oral comments. Primary issues raised by the commenters relate to potential project impacts on wetlands,

---

[153] 87 Fed Reg. 8580 (Feb. 15, 2022).

[154] 88 Fed. Reg. 4995 (January 26, 2023).

wildlife, aquatic resources, threatened and endangered species, air quality, LNG terminal safety, flooding and tropical storm systems, and greenhouse gases and climate change.

83.    Commission staff issued the final EIS for the projects on July 28, 2023.  The *Notice of Availability* of the final EIS was published in the *Federal Register* on August 4, 2023,[155] and the notice was mailed to Commission staff's environmental mailing list.  The final EIS addresses:  geology; soils; water resources; wetlands; vegetation; wildlife; aquatic resources; threatened and endangered species; land use; recreation; visual resources; socioeconomics; environmental justice;[156] cultural resources; air quality; noise; safety; cumulative impacts; and alternatives.  It also addresses all substantive environmental comments received on the draft EIS.

84.    The final EIS concludes that construction and operation of the projects would result in some adverse environmental impacts, but that with the mitigation measures recommended in the final EIS, most of these impacts would be reduced to less than significant levels.[157]  The final EIS concludes that impacts on visual resources, including cumulative visual impacts and visual impacts affecting environmental justice communities in the region, would be significant.[158]  With regard to climate change impacts, the final EIS does not characterize the project's GHG emissions as significant or insignificant, but we provide information about these emissions below, based on the information on file in the proceeding and as disclosed in the final EIS.[159]

85.    The Commission received comments on the final EIS from the U.S. Environmental Protection Agency (EPA), NMFS, Louisiana Department of Wildlife and Fisheries (Louisiana DWF),[160] the Natural Resources Defense Council (NRDC), the

---

[155] 88 Fed. Reg. 51,802 (Aug. 4, 2023).

[156] Under NEPA, the Commission considers impacts to all potentially affected communities.  Consistent with Executive Order 12,898 and Executive Order 14,008, the Commission separately identifies and addresses "disproportionately high and adverse human health or environmental effects" on environmental justice communities. Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  *See infra* section III.C.7.

[157] Final EIS at 5-1.

[158] *Id.*

[159] Final EIS at 4-549; *see infra* section III.C.8.

[160] We note that most of Louisiana DWF's comments on the final EIS were identical to its comments on the draft EIS, which were addressed in Appendix N of the

Environmental Integrity Project, Sierra Club, For a Better Bayou, Institute for Energy Economics and Financial Analysis, and landowners, stakeholders, and members of the public.[161]  Based on the comments received on the final EIS, the following issues are discussed further below:  essential fish habitat (EFH); wildlife (including special status species and nesting birds); water quality certification; vulnerability to hurricanes and high winds speeds, shoreline erosion, and sea level rise; environmental justice; commercial fisheries and shrimping; climate change; air quality; alternatives; and cumulative impacts.

## 1.    Essential Fish Habitat

86.    The final EIS evaluated the potential impacts of three alternative pipeline routes on EFH and concluded that the alternatives do not provide a significant environmental advantage over the preferred pipeline route, which avoids impacting existing oyster habitat, artificial finfish reefs, and oyster cultch plants[162] within Calcasieu Lake, as well as marsh restoration projects south of the lake.[163]  NMFS comments that it disagrees with this determination and notes that the alternative route through Calcasieu Lake would avoid a significant portion of estuarine emergent wetlands, resulting in fewer direct impacts to EFH.[164]  NMFS, however, concurs with the final EIS's conclusion that implementation of the applicants' preliminary compensatory mitigation plan and beneficial use of dredged materials plan would offset most of the EFH impacts.[165]  Therefore, NMFS states that the EFH consultation requirements of the Magnuson-

---

final EIS.  Only substantive comments not previously addressed in the final EIS are addressed in this order.

[161] *See, e.g.*, Pam Elders October 17, 2023 Comments; Adley and Judy Dyson October 19, 2023 Comments; Karen Uhlenhuth October 19, 2023 Comments; Rebecca Liberman October 20, 2023 Comments; Jarrod Baniqued Comments; Kalama Reuter November 22, 2023 Comments; Donna Gaab November 22, 2023 Comments; Wendy Ring November 27, 2023 Comments; Thomas Kitson November 29, 2023 Comments; Alexis Dekle Comments; Betty Winkler November 30, 2023 Comments.

[162] Oyster cultching involves the placement of various kinds of material into the water to provide points of attachment for oyster larvae.

[163] Final EIS at 3-64.

[164] NMFS September 29, 2023 Comments at 1.

[165] *Id.*

Stevens Fishery Conservation and Management Act have been fulfilled for the projects.[166]

## 2. Sensitive Species

### a. Endangered Species Act Consultation

87.    On December 1, 2023, the U.S. Fish and Wildlife Service's Louisiana Ecological Services Office (FWS) issued a Biological Opinion for the portions of the projects in Louisiana.[167]  Thus, consultation under Section 7 of the Endangered Species Act is now complete and as such staff's environmental recommendation 19 that was included in the final EIS, is not included as an environmental condition of this order.[168]

### b. Rice's Whale

88.    Sierra Club comments that the final EIS does not fully analyze the potential direct, indirect, and cumulative impacts the project would have on the Rice's whale.[169]  Sierra Club further states that the final EIS inappropriately relied on CP2 LNG's commitment to provide vessel operators with materials outlining voluntary measures to reduce their impacts on marine mammals as its basis for finding the CP2 LNG Project is not likely to adversely affect the Rice's whale.[170]

89.    As discussed in the final EIS, the Rice's whale has been documented off the coast of Louisiana in the Gulf of Mexico.[171]  Barges and other vessels carrying construction equipment, as well as LNG carriers, would travel through this area to the CP2 LNG terminal during construction and operation, respectively, and could potentially strike a

---

[166] Id.

[167] FWS January 17, 2024 Biological Opinion.

[168] NMFS concurred with Commission staff's conclusions for federally designated threatened or endangered species under their jurisdiction.  NMFS May 12, 2023 Letter (filed in the docket in CP2 LNG and CP2 Express May 31, 2023 supplemental filing at 327).  This letter was inadvertently excluded from the final EIS.

[169] Sierra Club March 5, 2024 Comments at 1-2.

[170] Id.

[171] Final EIS at 4-224.

Rice's whale.[172]  The final EIS further discusses that the Rice's whale may be impacted by marine pollution related to project operation.[173]

90.    The final EIS states that the potential for collisions between project-related vessels and the Rice's whale is low because these vessels will use well-established shipping lanes, noting NMFS's determination that the potential for collisions between vessels associated with the neighboring Calcasieu Pass LNG terminal and sperm whales, the most abundant whale species in the Gulf of Mexico, is highly unlikely.[174]  The final EIS notes that the risk of collision is minimized because CP2 LNG would provide the Vessel Strike Avoidance Measures to LNG carrier captains and would advocate compliance with the measures identified in the document.[175]

91.    As noted in Sierra Club's comments, the estimated population of the Rice's whale in the Gulf of Mexico is less than 50 individuals.[176]  We add here that the likelihood of a project-related vessel colliding with a Rice's whale is low because operation of the CP2 LNG Project would only marginally increase ship traffic in the Calcasieu Ship Channel and would result in an even smaller relative increase in ship traffic in the Gulf of Mexico.[177]

92.    Further, the final EIS discusses the potential impact from marine pollution from marine traffic associated with the project.[178]  To address the potential marine pollution impacts associated with offshore spills of fuel, lubricants, or other hazardous materials, the Coast Guard requires LNG carriers to develop and implement a Shipboard Oil Pollution Emergency Plan, which includes measures to be taken if an oil pollution

---

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] Sierra Club March 5, 2024 Comments at 1.

[177] CP2 LNG estimates that between 200 and 400 LNG carriers would visit the terminal annually, which would represent only a minor increase in the level of ship traffic in the Calcasieu Ship Channel.  Final EIS at 4-185.

[178] Final EIS at 4-224.

incident occurs or if a ship is at risk of one.[179]  Implementation of these measures would minimize the risk of negative effects from marine pollution on the Rice's whale.[180]

93.     The final EIS concludes that the construction and operation of the project may affect but is not likely to adversely affect the Rice's whale.[181]  Based on its knowledge, expertise, and the information provided by Commission staff and related materials, NMFS concurred with the final EIS's conclusion that the project is not likely to adversely affect any listed species under its jurisdiction, including the Rice's whale.[182]

94.     Additionally, the final EIS discusses the potential cumulative impacts on the Rice's whale from the increased LNG carrier traffic from the CP2 LNG terminal, and marine traffic associated with other existing and proposed LNG projects and oil and gas development in the Gulf of Mexico.[183]  The final EIS concludes that although the project would contribute to a minor cumulative increase in vessel traffic which could incur a risk to whales in the Gulf of Mexico, the magnitude of the increase would not be significant.[184]  In addition, the cumulative impacts of the increased LNG carrier traffic associated with the CP2 LNG Project when considered with other projects would be permanent, but would not be significant.[185]  We agree.

95.     Finally, Sierra Club asserts that the Commission must initiate formal consultation with NMFS to consider NMFS's proposal to designate the Gulf's central and western-shelf break as critical habitat for the Rice's whale and the scientific evidence included in NMFS's proposal.[186]  We disagree.[187]  Should NMFS designate critical habitat for the

---

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] NMFS May 12, 2023 Letter (filed to the docket in CP2 LNG and CP2 Express May 31, 2023 Supplemental Filing at 327).

[183] Final EIS at 4-535.

[184] *Id.*

[185] *Id.* at 4-534.

[186] Sierra Club March 5, 2024 Comments at 7-8, 11-13.

[187] A proposal to designate critical habitat for a listed species does not trigger reinitiation of consultation under the ESA.  *See* 40 C.F.R. § 402.16 (2023).

Rice's whale, Commission staff will coordinate any necessary consultation with NMFS at that time.[188]

### c.    Mississippi Diamond-backed Terrapin

96.    Louisiana DWF comments that the Mississippi Diamond-backed Terrapin (*Malaclemys terrapin pileata*) may occur in the project area and is considered vulnerable in Louisiana.[189]  Louisiana DWF states that this species inhabits brackish water habitats, especially sandy coastal marshes and dunes, and that nest searches should be conducted if any project activities that involve mobilization or demobilization would occur in the sandy edges of marshes and dunes inhabited by the terrapin.[190]  In accordance with Louisiana's regulations,[191] the final EIS analyzes project impacts on state-designated threatened and endangered species.[192]  The Mississippi Diamond-backed Terrapin is listed as S3 (vulnerable; at moderate risk of extirpation in Louisiana), but not currently identified as a state-designated threatened or endangered species.

97.    The final EIS concludes that the construction and operation of the project facilities would not have a significant impact on wildlife resources.[193]  To minimize project impacts, CP2 LNG and CP Express would adhere to the project-specific *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan), *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures), and Spill Prevention, Control, and Countermeasure Plan (SPCC Plan).  The applicants' proposed mitigation measures, such as the use of erosion control devices where feasible, limiting the amount and duration of open trenches during construction, and restoring temporary workspace areas to as near pre-construction conditions as practicable, would minimize potential impacts on habitat and wildlife species.  Further, CP Express would use a horizontal directional drill to cross beneath several rivers, which would eliminate impacts on the bed and banks of waterbodies potentially inhabited by the Mississippi Diamond-backed Terrapin.  CP Express would also limit the extent and duration of disturbance to the remaining

---

[188] NMFS has proposed, but not finalized, a critical habitat designation for the Rice's Whale.  88 Fed. Reg. 47,453 (July 24, 2023).

[189] Louisiana DWF August 29, 2023 Comments at 2.

[190] *Id.*

[191] Louisiana Administrative Code Title 76, section I-317.

[192] Final EIS at 4-229.

[193] *Id.* at 4-152 to 4-162.

waterbody crossings, which would minimize impact on any potential terrapins.  With these measures, we conclude that the project is not likely to adversely impact the species.

### d.     Bird Nesting Colonies

98.     Louisiana DWF states that its Wildlife Diversity Program database "indicates the presence of bird nesting colonies within the project area," noting that entry into or disturbance of active breeding colonies and work within a certain radius of an active nesting colony is prohibited.[194]  Louisiana DWF further provides guidance on measures to be implemented during construction to mitigate potential impacts on bird nesting colonies.[195]

99.     The final EIS states that there is potentially suitable habitat for waterbird nesting rookeries within 1 mile of the CP Express Pipeline Project, but no nests or rookeries were observed during field surveys of the construction workspace and its vicinity.[196]  CP2 LNG and CP Express will conduct preconstruction nest surveys for both projects approximately four weeks prior to the migratory bird nesting window, which begins annually on March 1, and the nest surveys would be considered valid for 14 days.

100.     If nesting waterbirds are observed, Louisiana DWF guidelines state that all activities occurring within 1,000 feet of nesting wading birds (e.g., herons, egrets, ibis), should take place between September 1 and February 15, outside of the wading bird nesting season.  For colonies containing nesting gulls (*Laridae* spp.), terns, and/or black skimmers (*Rynchops niger*)*,* construction activities within 650 feet (or 2,000 feet for brown pelicans [*Pelecanus occidentalis*]) should take place between September 16 and April 1, outside of the nesting season for these species.  CP2 LNG and CP Express have committed to these spatial and time-of-year restrictions.  If construction within these spatial boundaries cannot be met, CP2 LNG and CP Express have committed to consult with the Louisiana DWF two weeks prior to the commencement of construction within those time-of-year restrictions.

### 3.     Water Quality Certification

101.     The final EIS's recommended condition 15 would require the applicants to file water quality certifications issued for the projects by the Railroad Commission of Texas (Railroad Commission) and the Louisiana Department of Environmental Quality (Louisiana DEQ) within 5 days of receipt.  On August 31, 2023, and September 5, 2023,

---

[194] Louisiana DWF August 29, 2023 Comments at 2-3.

[195] *Id.*

[196] Final EIS at 4-171.

the applicants filed the receipts of water quality certifications from Louisiana DEQ[197] and the Railroad Commission, respectively.[198]  Further, as required by 40 CFR § 121.12, Commission staff notified EPA on November 21, 2023, that the water quality certifications for the projects were received.[199]  We have revised the final EIS's recommended condition 15, included as environmental condition 15 in the appendix to this order, accordingly.[200]

102.    Environmental Integrity Project filed comments alleging deficiencies in Louisiana's and Texas's water quality certification processes and regulations, including copies of letters raising the same concerns filed with Louisiana DEQ and the Railroad Commission.[201]  The Clean Water Act (CWA) establishes the states as the primary authority for water quality certifications, and the Commission must defer to the final decision of the state.[202]  The Commission's role is limited to confirming that the state has "facially satisfied the express requirements of section 401."[203]  Here, in accordance with the CWA, Texas and Louisiana issued public notice of the applicants' water quality certification requests.[204]  Nothing more is required.

---

[197] CP2 LNG and CP Express August 31, 2023 Comments at 1-3.

[198] CP2 LNG and CP Express September 5, 2023 Comments at 1-4.

[199] Commission Staff November 21, 2023 Memorandum in Docket Nos. CP22-21-000 and CP22-22-000) (providing email communication with EPA).

[200] We also revised environmental condition 15 to reflect EPA's final *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, effective November 27, 2023, which limited the federal action agency's review of water quality certifications to verification of compliance with the requirements of Clean Water Act section 401. 88 Fed. Reg. 66,558 (Sept. 27, 2023).

[201] Environmental Integrity Project September 28, 2023 Comments.

[202] *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006).

[203] *Id.* at 68.  Further, the Commission is not required to "inquire into every nuance of the state law proceeding, especially to the extent doing so would place FERC in the position of applying state law standards." *Id.*

[204] Army Corps August 24, 2023 Public Notice, https://www.swg.usace.army.mil/Media/Public-Notices/Article/3504385/swg-2021-00499-venture-global-cp2-lng-llc-various-wetlands-and-waterbodies-in-l/.  The Galveston District of the Army Corps issues public notice regarding water quality

### 4. Hurricanes, Flooding, Relative Sea Level Rise, and Shoreline Erosion

103.    Wendy Ring notes concerns that the CP2 LNG Project would be vulnerable to hurricanes and located in an area with rapid rates of shoreline erosion and sea level rise, further noting that flooding and high winds may increase the risk of damage and leaks from the LNG terminal.[205]

104.    The final EIS discusses the resilience of the LNG terminal facilities with respect to hurricane winds and hurricane-induced flooding.[206]  The terminal would be designed for sustained wind speeds of 150 miles per hour (mph).[207]  The final EIS concludes that the use of a 150-mph sustained wind speed is adequate for the LNG storage tanks and other LNG facilities where both the wind and tornado load design procedures are followed as recommended during final design and construction.[208]  We agree.

105.    In addition, as recommended by staff in the final EIS, this order requires CP2 LNG to design the floodwall to a 500-year mean recurrence interval with consideration of wind-driven wave effects, local subsidence, site settlement, shoreline recession, erosion and scour effect, and sea level rise based on National Oceanic and Atmospheric Administration projections, and, given the uncertainties, that the floodwall be periodically monitored and maintained to no less than a minimum elevation of 500-year mean recurrence interval flood event.[209]  The final EIS concludes that the storm surge floodwalls would provide adequate protection for the CP2 LNG terminal.  We agree.

106.    The final EIS also discusses the resilience of the LNG terminal to extreme weather due to climate change.[210]  Based on CP2 LNG's proposed design, which meets or exceeds both PHMSA's minimum requirements and Commission staff recommendations for LNG facilities, as well as codes and standards for other essential infrastructure, the final EIS

---

certifications under an agreement with the Railroad Commission and Louisiana DEQ.  *Id.* at 4.

[205] Wendy Ring November 27, 2023 Comments at 1.

[206] Final EIS at 4-447 to 4-453.

[207] *Id.* at 4-447.  *See also* Appendix, Environmental Condition 32.

[208] *Id.* at 4-448.  *See also* Appendix, Environmental Condition 32.

[209] Appendix, Environmental Conditions 39 & 40.

[210] Final EIS at 4-451 to 4-453.

concludes that the project would be designed and maintained to withstand potential changes from climate change and any changes due to climate change would not present a significant impact to the safety of the LNG facilities.[211]  We agree.

## 5. Recreational and Commercial Fishing

107.    Adley and Judy Dyson and Fisherman Involved in Sustaining our Heritage (FISH) raise concerns regarding the potential impacts of the LNG terminal on the shrimping and fishing industries in and around the project area.[212]  The commenters state that the project threatens the viability of the fishing and shrimping industries as well as the historic culture that has arisen from those industries in the project area.[213]  Additionally, For a Better Bayou states that the LNG project threatens flora and fauna populations in the project area, that aquatic species such as shrimp would be killed or displaced, and that the project would limit the use of the few public fishing docks in the project area.[214]

108.    As discussed in the final EIS, construction of the LNG terminal could result in the mortality of less mobile species that are unable to escape the immediate construction area.[215]  Some wildlife would likely be permanently displaced as a result of habitat conversion to non-vegetated and/or impervious cover or maintained vegetation.[216]  Artificial lighting at the terminal could also affect aquatic species in the Calcasieu Ship Channel.[217]  In addition, construction-related noise could affect animal behavior, foraging, or breeding patterns, and cause wildlife and fishes to move away from the noise or relocate in order to avoid the disturbance.[218]

---

[211] *Id.* at 4-452 to 4-453.

[212] Adley and Judy Dyson October 19, 2023 Comments at 1-2; FISH April 18, 2024 Motion to Intervene.

[213] Adley and Judy Dyson October 19, 2023 Comments at 1-2; FISH April 18, 2024 Motion to Intervene at 1-2.

[214] For a Better Bayou October 16, 2023 Motion to Intervene at 2.

[215] Final EIS at 4-157.

[216] *Id.*

[217] *Id.*

[218] *Id.*

109.   As stated in the final EIS, CP2 LNG would adhere to the project-specific Plan and Procedures, which are specifically designed to avoid or minimize impacts on wildlife species and/or their habitats.[219]  Additionally, CP2 LNG would implement a training and awareness program for construction personnel to inform workers about resident wildlife and endangerment factors and to emphasize the responsibilities of the workers in preventing vehicular or vessel impacts (e.g., by adhering to speed limits and ensuring proper lighting).[220]  While these construction impacts would occur for an extended duration (e.g., 15 months for pile driving activities),[221] many of these impacts are already experienced within the project area (e.g., lighting, vehicle traffic, in-water noise, etc.), and common wildlife species that are not excluded by the fencing and are habituated to anthropogenic activities would likely return to the project area following construction.[222]  Additionally, while there would be permanent impacts associated with the removal of habitat and the area immediately surrounding the LNG terminal would be impacted by operational noise, lighting, and movement of operational personnel and vehicles, the final EIS concludes that construction and operation of the proposed LNG terminal would not have significant impacts on wildlife species due to the existence of similar habitats adjacent to the project area and CP2 LNG's proposed restoration and mitigation for project impacts on wetland habitat.[223]  We agree.

110.   Contrary to the dissent's assertion, the final EIS adequately analyzed the impacts from project construction and operation on the commercial fishing industry in the project area.  The final EIS explains that the primary commercial fisheries in the project area are shrimp and blue crab, and that Cameron and Calcasieu Parishes support a modest commercial fishing industry with approximately 55 vessels operating out of the town of Cameron.[224]  The final EIS analyzes the potential for increased disruptions to recreational and commercial fisherman at alternative site locations,[225] potential socioeconomic impacts on commercial fisheries and shrimping,[226] impacts to commercial fisheries and

---

[219] *Id.* at 4-158.

[220] *Id.*

[221] *Id.* at 4-316.

[222] *Id.* at 4-158.

[223] *Id.*

[224] *Id.* at 4-267.

[225] *Id.* at 3-56 to 3-59.

[226] *Id.* at 4-266 to 4-271.

fisherman in environmental justice communities,[227] and cumulative temporary and permanent impacts on commercial fishing.[228]

111.    As explained in the final EIS, recreational and commercial fishing could be impacted by construction activities associated with the LNG terminal.  Project construction is anticipated to occur during peak fishing and recreational seasons; however, due to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges.[229]  Temporary impacts on recreational and commercial users in the Calcasieu Ship Channel, who would likely include individuals from environmental justice communities, may occur in construction areas.[230]  Permanent impacts on recreational and commercial fisheries in the ship channel may occur due to the loss of available fishing areas from operation of the LNG terminal's marine facilities and LNG carrier traffic.

112.    Potential impacts on commercial fisheries from project operation include: disturbances in vessel traffic corridors which fishing and shrimping vessels may need to traverse; difficulty accessing fishing locations as a result of large vessels associated with the project; and impacts to the number of fish, shrimp, or crab a commercial vessel may be able to catch.[231]  As described in the final EIS, based on consultations between Commission staff and Louisiana DWF, impacts on shrimping vessels would be greatest near the terminal south of the Firing Line where shrimping occurs year-round and vessel traffic and dredging associated with the LNG terminal would occur.[232]  Although the final EIS finds that fish, crab, and shrimp species common to the bay could be present in the project area, the area in which project activities would occur does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel.[233]

---

[227] *Id.* at 4-321 and 4-328.

[228] *Id.* at 4-541 and 4-544 to 4-545.

[229] *Id.* at 4-321.

[230] *Id.*

[231] *Id.*

[232] *Id.* at 4-321.

[233] *Id.*

113.   Additionally, CP2 LNG committed to continuing to develop its Engagement Plan for Local Commercial Shrimp Fishery, and Venture Global created the Calcasieu Pass Community Advisory Group to ensure residents of Cameron Parish can communicate issues and concerns directly to Venture Global.[234]  CP2 LNG will provide updates on its engagement effort and on the Calcasieu Pass Community Advisory Group meetings within CP2 LNG's monthly construction reports.[235]  The final EIS concludes that construction and operation impacts on recreational and commercial fishing would be localized and less than significant.[236]  We agree.

## 6.  Air Quality

114.   EPA suggests that Commission staff provide reports, such as emissions calculations, as appendices to their NEPA documents to increase transparency of the NEPA process.[237]  As stated in the final EIS, FERC docket accession numbers and appendices or attachment locations for the construction and operational emissions estimates are referenced throughout the final EIS and all referenced documents are available for public access.[238]

115.   EPA recommends that the Commission analyze the project's potential construction Hazardous Air Pollutants (HAP) emission impacts based on relevant inhalation health-based risk for the pollutants.[239]  EPA notes that exposure may potentially be higher during the four-year construction period of the LNG terminal than during project operations due to the high emission intensity from mobile source construction equipment.[240]  Additionally, to minimize the likelihood of an exceedance of the National Ambient Air Quality Standards (NAAQS), EPA recommends that the

---

[234] *Id.* at 1-13.

[235] *Id.*

[236] The final EIS describes impacts to commercial fishing as "moderate, but not significant," final EIS at 4-270, and that the project would "contribute negligibly to overall temporary and minor cumulative impacts on commercial fisheries," *id.* at 4-541. We clarify here that the CP2 LNG Project would have less than significant impacts on commercial fishing.

[237] EPA September 1, 2023 Comments at 2.

[238] See final EIS at 4-346 to 4-376, n.128.

[239] EPA September 1, 2023 Comments at 2.

[240] *Id.*

Commission require CP2 LNG to develop measures to implement when air monitoring data indicates that ambient pollutant concentrations are approaching an NAAQS threshold (e.g., 75% of a NAAQS threshold), and additional construction air quality mitigation measures, such as requiring higher tier construction equipment or zero exhaust emissions equipment.[241]

116.     As described in the final EIS, the location and magnitude of the projects' construction emissions' effect on air quality will vary across the four-year construction period.[242]  There are numerous assumptions that have to be made to develop a dispersion model for an active and dynamic construction site with varying equipment, levels of use, and construction phases.  Accordingly, it is unlikely that a dispersion model would yield results reliable enough to serve as a basis for a human health risk assessment.

117.     As stated in the final EIS, Commission staff determined that emissions during project construction would result in localized impacts on air quality.[243]  CP2 LNG and CP Express have committed to a number of measures to reduce the air quality impacts from construction, including using construction equipment and vehicles that comply with EPA mobile and non-road emission regulations, minimizing engine idling, and maintaining construction-related equipment in accordance with the manufacturer's recommendations.[244]  CP2 LNG and CP Express have also committed to take measures to mitigate fugitive dust, such as applying water to the roadways and reducing vehicle speeds.

118.     Further, in coordination with Louisiana DEQ, CP2 LNG will develop and submit for Commission staff approval an Ambient Air Quality Mitigation and Monitoring Plan (Air Monitoring Plan) to measure and monitor ambient concentrations of inhalable particulate matter and nitrogen oxides ($NO_x$), and CP2 LNG will include protocols to manage any potential NAAQS exceedances during construction and commissioning of the CP2 LNG terminal.[245]  Staff will consider EPA's suggested mitigation measures, as well as requiring CP2 LNG to take measures where pollutant concentrations are approaching a NAAQS exceedance, during its review of the plan.  Under the Air Monitoring Plan, CP2 LNG will report any periods of elevated concentrations, as well as:

---

[241] *Id.*

[242] Final EIS at 1-14.

[243] *Id.* at 4-346 to 4-354.

[244] *Id.* at 3-355 to 3-356.

[245] *Id.* at 1-14.  CP2 LNG must submit the Air Quality Plan as part of the Implementation Plan required by environmental condition 6 in the appendix to this order.

(1) a description of the specific activities occurring at the time of the exceedance and any other information, such as weather conditions, that may have contributed to the exceedance; (2) a description of what minimization or mitigation measures CP2 LNG implemented to reduce ambient air pollutant levels; and, (3) documentation of a reduction in ambient pollutant concentration levels to at or below the NAAQS.  This information will be used to develop mitigation measures to minimize the potential for NAAQS exceedances.  We conclude that such measures would minimize construction emissions and the likelihood for an exceedance of the NAAQS.

## 7. **Environmental Justice**

119.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows the instruction of Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[246]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[247]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[248]

---

[246] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance.  *See* 18 C.F.R. § 380.12(g) (2023) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[247] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  *See* EPA, *EJ 2020 Glossary* (Jul. 31, 2023), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[248] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Aug. 16,

120.    Consistent with the Council on Environmental Quality (CEQ)[249] and EPA[250] guidance, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[251] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[252] Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50% or (2) the aggregate

---

2023).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

[249] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act, at* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-EJGuidance.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  There were opportunities for public involvement during the Commission's prefiling and environmental review processes.  Final EIS at 1-5.

[250] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[251] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994). Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[252] *See Promising Practices* at 21-25.

minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county/parish.[253]

121.   CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices*' low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county/parish.

122.   To identify potential environmental justice communities, and as discussed in the final EIS, Commission staff used 2020 U.S. Census American Community Survey data[254] for the race, ethnicity, and poverty data at the state, county/parish, and block group level.[255]  Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors.[256]

123.   Once staff collected the block group level data, as discussed in further detail below, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[257]  Commission staff assessed whether

---

[253] Here, Commission staff selected Calcasieu and Cameron Parishes in Louisiana and Jasper and Newton Counties in Texas as the comparable reference communities to ensure that affected environmental justice communities are properly identified.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.  Final EIS at 4-304.

[254] U.S. Census Bureau, American Community Survey 2020 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 *Hispanic or Latino Origin By Race*, https://data.census.gov/cedsci/table?q=b03002.

[255] *See* final EIS at table 4.10.10-1; figs. 4.10.10-1, 4.10.10-2, 4.10.10-3, & 4.10.10-4.

[256] *See id.* at 4-300.

[257] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning

impacts on an environmental justice communities were disproportionately high and adverse based on whether those impacts were predominantly borne by that community, consistent with EPA's recommendations in *Promising Practices*.[258]

124.    Commission staff identified 17 environmental justice community block groups[259] (out of 31 total block groups) that are within 15 miles[260] of the LNG terminal, within 1 mile of the pipeline project's aboveground facilities, and/or crossed by the CP Express Pipeline or Enable Gulf Run Lateral.[261] For the LNG terminal, 6 block groups out of 8 within the geographic scope are considered environmental justice block groups. For the CP Express Pipeline and Enable Gulf Run Lateral, 6 block groups out of 15 within the geographic scope are considered environmental justice block groups. For the contractor yards, 6 block groups out of 11 within the geographic scope are considered environmental justice block groups. The Moss Lake Compressor Station is within 1 mile of only 1 block group, which is not considered an environmental justice community. For

---

of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[258] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations"). We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[259] Several census block groups are crossed or within the radius of multiple project facility components. This represents only unique census block groups affected by the projects.

[260] Final EIS at 4-324. Based on the air quality impact analysis results for CP2 LNG, operation of the project would result at various locations in 1-hour nitrogen dioxide ($NO_2$) impacts that exceed the relevant significant impact level (SIL) out to about 15 miles from the Terminal Facilities. A review of the modeling results filed on June 3, 2024, (Accession no. 20240603-5211) indicated that the updated annual $PM_{2.5}$ SIL would not result in impacts above the SIL extending beyond the distance already analyzed for $NO_2$. Therefore, the Area of Impact for environmental justice review would not change.

[261] Final EIS at 4-304. For these projects, we determined that a 15-mile radius around the proposed LNG terminal and a 1-mile radius around the pipeline's aboveground facilities were the appropriate units of geographic analysis for assessing project impacts on the environmental justice communities. A 15-mile and 1-mile radius around the respective facilities represent the farthest extent of impacts on environmental justice communities.

the meter stations, 3 block groups out of 8 within the geographic scope are considered environmental justice block groups.  For the 3 park-and-ride locations, all 4 of the block groups within the geographic scope are considered environmental justice block groups.

125.   The final EIS determined that potential impacts on the identified environmental justice communities may include flooding, impacts to surface water resources, wetlands impacts, visual impacts, socioeconomic impacts, recreational and commercial fishing impacts, traffic impacts, and air and noise impacts from construction and operation.[262] Environmental justice concerns are not present for other resource areas such as geology, soils, wildlife, land use, or cultural resources due to the minimal overall impact the projects would have on these resources and/or the absence of any suggested connection between such resources and environmental justice communities.[263]

### a.     CP2 LNG Project

### i.     Flooding

126.   The LNG terminal is not anticipated to induce flooding, as all aboveground facilities and roads would be constructed in accordance with federal, state, and local regulations, including parish floodplain requirements.[264]  Additionally, the project is not anticipated to significantly displace flood storage capacity.  As described in the final EIS, the terminal site and CPX Meter Station, the only two aboveground facilities within environmental justice block groups and within the floodplain, would be within the proposed floodwall.[265]  Interior drainage ditches and detention ponds would be installed within the floodwall to manage stormwater, and stormwater discharges from the terminal site would be conveyed to the west, avoiding the nearby residences situated to the northeast and east.[266]  The final EIS finds that potential flooding impacts from the project on environmental justice communities would be less than significant.[267]  We agree.

---

[262] *Id.* at 4-317 to 4-327.

[263] *Id.* at 4-318.

[264] *Id.*

[265] *Id.*

[266] *Id.* at 4-124.

[267] *Id.* at 4-318.

ii.    **Surface Water**

127.    Regarding surface water, the final EIS finds that construction and operation of the LNG terminal would permanently impact two unnamed waterbodies (two drainage ditches) within the project area and would temporarily (during construction) and permanently (during operation) impact portions of the adjacent Calcasieu Ship Channel.[268]  As stated in the final EIS, these impacts would result from dredging activities, site construction, marine traffic, stormwater runoff, water use, and hydrostatic testing, and could occur from accidental spills or other releases of hazardous substances.[269]  Environmental justice communities in proximity to the project, particularly the community located in proximity to the LNG terminal (Census Tract 9702.02, Block Group 2 [CT 9702.02 - BG 2]), would be affected by dredging and resuspension of sediments.  CP2 LNG would adhere to all permit conditions and best management practices included in the project-specific Procedures to minimize waterbody impacts and promote the stability of the excavated shoreline during and after construction of the LNG berthing area.[270]  Further, CP2 LNG would minimize impacts on water quality by using a hydraulic suction dredge, where turbidity would be focused close to the river bottom and would equate to a storm event within a short distance of the cutterhead.[271]  The final EIS concludes impacts on environmental justice communities related to surface water impacts would not be significant.[272]  The final EIS further concludes environmental justice communities in the study area would experience cumulative impacts on surface water but that these impacts would be less than significant.[273]  We agree.

128.    As stated in the final EIS, construction and operation of the LNG terminal, as well as marine traffic to and from the LNG terminal, have the potential to adversely impact water quality in the event of an accidental release of hazardous substances such as fuel, lubricants, coolants, or other material.[274]  CP2 LNG would implement the measures outlined in the project-specific Plan and Procedures to minimize the likelihood of a spill

---

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.* at 4-544.

[274] *Id.* at 4-318.

and would implement its SPCC Plan in the event of a spill. If an accidental release were to occur, environmental justice communities along the ship channel, particularly the community in CT 9702.02 - BG 2, as well as individuals from these communities that use the channel, would be affected.[275] LNG carriers are required by the U.S. Coast Guard to develop and implement a Shipboard Oil Pollution Emergency Plan, which includes measures to be taken when an oil pollution incident occurs, or a ship is at risk of one.[276] With these mitigation measures, the final EIS concludes that environmental justice communities would not be significantly impacted by an accidental release.[277] We agree.

### iii.    Wetlands

129.    The final EIS finds that project impacts associated with the LNG terminal on wetlands would be short-term and temporary during construction, and permanent during operation.[278] Wetland impacts would occur within several identified environmental justice communities; therefore, the loss of wetland habitat and the subsequent decrease in wetland benefits could affect those environmental justice communities within and near the project. Potential wetland benefits include flood storage capacity, water filtration, and habitat for fish and wildlife. CP2 LNG will be required to obtain the applicable Army Corps and Louisiana Department of Natural Resources (Louisiana DNR)/Office of Coastal Management (OCM) permits for permanent loss of wetland habitat and implement any mitigation measures required by the Army Corps and Louisiana DNR/OCM for that loss. CP2 LNG will implement project-specific plans, as applicable, including its project-specific Procedures and SPCC Plan to minimize and/or avoid impacts on wetlands during project construction. The final EIS concludes that through implementation of the mitigation measures, impacts from the project on wetlands would not have a significant impact on environmental justice communities.[279] The final EIS also concludes that environmental justice communities in the study area would experience cumulative impacts on wetlands but that these impacts would not be significant.[280] We agree.

---

[275] *Id.* at 4-319.

[276] *Id.* at 4-318 to 4-319.

[277] *Id.* at 4-319.

[278] *Id.*

[279] *Id.*

[280] *Id.* at 4-544.

#### iv.    **Visual Resources**

130.    The final EIS concludes that the completed LNG terminal, which is within environmental justice community CT 9702.02 - BG 2, would result in permanent visual impacts associated with the existence and operation of the facilities.[281]  The tops of the LNG storage tanks and flare stack will create a vertical visual contrast across a relatively flat existing landscape for the nearby residences 330 feet north and 360 feet east of the project fence line.[282]  These same structures and the proposed floodwall surrounding the LNG terminal would be visible to users of the Calcasieu Ship Channel, visitors to nearby beaches, employees and operators of industrial facilities along Davis Road, motorists along the Creole Nature Trail (State Highway 27), and other areas surrounding the project site.[283]  While the perimeter berm and floodwall would help partially obscure the industrial facilities on the LNG terminal site from offsite views, including partial obstruction of the proposed tanks and flare stack, the nearby residences (and associated environmental justice populations) have a direct view of the LNG terminal.[284]  In response to Commission staff's recommendation in the draft EIS, CP2 LNG committed to install vegetative screening by planting native live oak trees and native groundsel bushes on the northeastern and eastern sides of the terminal site.[285]  While the vegetative screening would minimize the impact to the extent practicable, the final EIS concludes, and we agree, that the LNG terminal will permanently change the viewshed and have a significant adverse effect on residents and passerby of the environmental justice communities near the project.[286]

131.    The final EIS also analyzed the cumulative visual impacts along the Calcasieu Ship Channel (including impacts from the Commonwealth LNG Terminal, Calcasieu Pass LNG Terminal, and the CP2 LNG Terminal) and determined that the project would adversely contribute to visual impacts on users of the Calcasieu Ship Channel; users of the Jetty Pier Facility, Lighthouse Bend Park, and nearby beaches; residents in the town of Cameron; and motorists along the Creole Nature Trail.[287]  Visual impacts from

---

[281] *Id.* at 4-319.

[282] *See id.* at app. J.

[283] *Id.* at 4-319.

[284] *Id.*

[285] *See id.* at 4-319, 4-252 to 4-253, and app. J.

[286] *See id.* at 4-319.

[287] *Id.* at 4-546.

construction would include clearing of vegetation, grading, the presence of large construction equipment, lighting, and increased vehicle and vessel traffic. While the extent of impacts would vary depending on the proximity to the sites, environmental justice communities may experience significant visual changes from the construction and operation of additional sites, flares, lighting, and storage tanks for several miles. The final EIS concludes, and we agree, that the CP2 LNG terminal and other nearby LNG terminals will contribute to significant cumulative visual impacts on environmental justice communities in the project area.[288]

### v.      Socioeconomics

132.    Regarding socioeconomics, as stated in the final EIS, the temporary influx of workers/contractors into the area during construction and operation of the LNG terminal could increase the demand for community services, such as traffic, housing, police enforcement, and medical care.[289] The final EIS concludes, however, that sufficient housing units would be available and impacts on community services would not be significant.[290] Based on the foregoing, the final EIS concludes that the project's socioeconomic impacts on environmental justice communities would be less than significant.[291] As stated in the final EIS, several other projects have been proposed or approved that could have overlapping construction schedules with the proposed project, including the Driftwood LNG Project, Line 200 and Line 300 Project, Hackberry Storage Project, Cameron LNG Expansion Project, Lake Charles Liquefaction Project, Magnolia LNG, Delfin LNG, and Commonwealth LNG Project.[292] Combined, these additional projects could require a peak of more than 20,000 workers, a 10% increase in the current population.[293] The temporary flux of workers/contractors into the area from all of these projects would increase the demand for housing. Should other major industrial projects listed in table 4.14.1-1 of the final EIS be constructed at the same time as the LNG terminal, sufficient housing would still be available.[294] This cumulative increased demand for housing could drive costs up, increase property taxes, and adversely impact

---

[288] *See id.*

[289] *Id.* at 4-320.

[290] *Id.* at 4-266, 4-276 to 4-280.

[291] *Id.* at 4-320.

[292] *Id.* at 4-546.

[293] *Id.*

[294] *Id.* at 4-546 to 4-547.

low-income individuals.[295]  An increase in costs of material goods may also occur due to increased demand for these goods.  The final EIS concludes that environmental justice communities in the study area would experience cumulative impacts on socioeconomic resources but that these impacts would be less than significant.[296]  We agree with staff's conclusions.

### vi.    **Recreational and Commercial Fishing**

133.    Recreational and commercial fishing could be impacted by construction of the CP2 LNG terminal.  As stated in the final EIS, construction activities are anticipated to occur during peak fishing and recreational seasons; however, due to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges.[297]  Temporary impacts on recreational and commercial users in the Calcasieu Ship Channel, who would likely include individuals from environmental justice communities, may occur in construction areas.[298]

134.    Permanent impacts on recreational and commercial fisheries in the ship channel, as well as on individuals from environmental justice communities, may occur due to the loss of available fishing areas from operation of the terminal's marine facilities and LNG carrier traffic.[299]  Based on consultations between Commission staff and Louisiana DWF, impacts on shrimping vessels would be greatest near the terminal south of the Firing Line where shrimping occurs year-round and vessel traffic and dredging associated with the CP2 LNG terminal would occur.[300]  Although the final EIS finds that fish, crab, and shrimp species common to the bay could be present, the area in which project activities will occur does not have any unique features or habitat characteristics that will draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel.[301]

---

[295] *Id.* at 4-547.

[296] *Id.*

[297] *Id.* at 4-321.

[298] *Id.*

[299] *Id.*

[300] *Id.*

[301] Final EIS at 4-321.

135.    Venture Global created the Calcasieu Pass Community Advisory Group to ensure that residents from all parts of Cameron Parish are represented and can communicate promptly and directly with Venture Global to express any concerns they have or to communicate adverse impacts that they or their neighbors have seen related to Calcasieu Pass.[302]    Additionally, CP2 LNG has committed to continuing the development of its *Engagement Plan for Local Commercial Shrimp Fishery* and would provide updates on its engagement effort and on the Calcasieu Pass Community Advisory Group meetings within CP2 LNG's monthly construction reports.[303]    The final EIS concludes that environmental justice communities in the study area would experience cumulative impacts on recreational and commercial fishing resources; however, these impacts would be less than significant.[304]    We agree.

### vii.    **Road and Marine Traffic**

136.    The final EIS finds that area residents, including environmental justice communities near the LNG terminal, may be affected by traffic delays during construction of the LNG terminal.[305]    Construction of the CP2 LNG terminal would temporarily increase use of area roads by heavy construction equipment and associated trucks and vehicles.    CP2 LNG would implement its Terminal Facilities Traffic Management Plan, which includes mitigation measures such as the use of park and ride locations, busing, staggered shift start and stop times during expected times of peak site personnel, and utilization of flagger police vehicles or traffic signals.[306]    Once construction is complete, CP2 LNG estimates that impacts on road traffic would be primarily limited to the 250 permanent LNG terminal employees, and periodic deliveries to the site.    CP2 LNG predicts the level of service (LOS)[307] of the roadways within the

---

[302] *Id.* at 1-13.

[303] *Id.*

[304] Final EIS at 4-545.

[305] *Id.* at 4-321.

[306] *Id.* at 4-322.

[307] The term level of service (LOS) is used to describe the operating conditions of a roadway based on factors such as speed, travel time, delay, and safety.    LOS A denotes the best conditions (i.e., free flow), while LOS F denotes the worst conditions (i.e., forced or breakdown flow with frequent slowing required and more demand than capacity).    CP2 used the LOS concept outlined in the Transportation Research Board's Highway Capacity Manual, 6th Edition.    *See* CP2 LNG March 7, 2023 Supplemental Information on Workforce and Traffic.

project area would remain at an LOS D[308] or better throughout construction and would remain at an LOS C or better during operation.[309] With the proposed traffic mitigation measures as described above and in the final EIS, the final EIS concludes that traffic impacts from the project on environmental justice communities would be less than significant.[310] The final EIS further concludes that environmental justice communities in the study area would experience cumulative impacts associated with traffic but that these impacts would also be less than significant.[311] We agree.

137.   As stated in the final EIS, barge deliveries would occur at the LNG terminal site throughout the project's construction period, with an estimated 32 barges a week at the peak of Phase I construction.[312] During operations, up to 8 LNG carriers would call at the terminal's marine facilities per week.[313] Because of the existing traffic patterns and capacity of the Calcasieu Ship Channel, the final EIS concludes that the LNG carrier calls and barge deliveries associated with the project would not result in significant impacts on marine traffic.[314] In addition, the final EIS concludes that recreational boaters and fishers, which likely include individuals from environmental justice communities, would not experience significant changes in marine traffic.[315] We agree.

### viii.   Air Quality

138.   We received a comment on the final EIS expressing concern with project air quality impacts on environmental justice communities.[316] As explained in the final EIS, construction and operation of the LNG terminal would result in impacts on air quality.[317]

---

[308] LOS D denotes the approach of unstable flow, with speeds decreased and traffic volume slightly increased.

[309] Final EIS at 4-321 to 4-322.

[310] *Id.* at 4-322.

[311] *Id.* at 4-321 to 4-323.

[312] *Id.* at 4-323.

[313] *Id.* at 4-294.

[314] *Id.* at 4-323.

[315] *Id.*

[316] Kalama Reuter November 22, 2023 Comments at 1.

[317] Final EIS at 4-323.

CP2 LNG would implement measures to mitigate exhaust emissions during construction by using construction equipment and vehicles that comply with EPA's mobile and non-road emission regulations, and using commercial gasoline and diesel fuel products that meet specifications of applicable federal and state air pollution control regulations. Further, CP2 LNG would mitigate fugitive dust by applying water to the roadways and reducing vehicle speeds. The final EIS concludes that construction-related impacts of the LNG terminal on local air quality would not be significant.[318]

139.    The final EIS states that CP2 LNG conducted detailed air quality impact assessments for emissions of criteria pollutants (subject to Prevention of Significant Deterioration [PSD] review) from the operation of the LNG terminal to show compliance with the relevant National Ambient Air Quality Standards (NAAQS).[319] Based on the air quality impact analysis results for CP2 LNG, operation of the project would result in 1-hour nitrogen dioxide ($NO_2$) impacts at various locations out to about 15 miles from the LNG terminal that exceed the relevant Significant Impact Level (SIL).[320] However, a further refined assessment of the cumulative analysis results showed that predicted CP2 LNG impacts would not cause or contribute to an exceedance of the NAAQS for 1-hour $NO_2$.[321]

140.    Although the LNG terminal would be in compliance with the NAAQS and the NAAQS are designated to protect sensitive populations, the final EIS acknowledges that NAAQS attainment alone may not ensure there is no localized harm to such populations due to project emissions of volatile organic compounds, hazardous air pollutants (HAP), as well as the presence of non-project related pollution sources, local health risk factors, disease prevalence, and access (or lack thereof) to adequate health care.[322] According to EJScreen, the environmental justice community in which the LNG terminal is located (CT 9702.02 - BG 2) is within the 64th percentile for cancer prevalence among adults.[323]

---

[318] *Id.* 4-323 to 4-324.

[319] *Id.* at 4-324.

[320] For major source permitting under the Clean Air Act, the SIL is the point below which the impact of increased emissions from a new or modified major source on ambient air quality does not cause or contribute to a violation of the NAAQS.

[321] *Id.* at 4-324, app. K.

[322] *Id.* at 4-324.

[323] *Id.*

Thus, Commission staff followed EPA's *Human Health Risk Assessment Protocol*[324] in overseeing a  Human Health Risk Assessment[325] (Risk Assessment) for maximum HAP emissions from the LNG terminal (stationary and mobile marine sources) based on the highest model-predicted 1-hour and annual average ground-level concentrations of a total of 16 HAPs.[326]  The Risk Assessment estimated chronic (long-term) cancer risk and non-cancer hazard, as well as acute (short-term) non-cancer hazard via inhalation of HAP compounds potentially emitted from stationary and mobile marine sources at the LNG terminal.[327]  The Risk Assessment evaluated inhalation exposure of hypothetical adult and child residents for which Reasonable Maximum Exposure was assumed.[328]

141.    The results of the Risk Assessment showed that the estimated adult and child resident cancer risk for each HAP is at least an order of magnitude (i.e., 10-fold) below EPA's risk management objective of 1-in-1 million for individual HAPs.  Moreover, the total cancer risks summed across all HAPs are well below (by almost 100-fold) EPA's target of 1-in-100,000 for a single facility.  In other words, the CP2 LNG Terminal would represent up to a 0.0000002% (or 1.75E-07) increase in cancer risk as a conservative estimate for communities that live near to the terminal.[329]  The EPA's risk management objective of 1-in-100,000 for a single facility is ten times more stringent than the highest cancer risk that EPA deems acceptable, to account for potential exposure to background levels of air contaminants.  Therefore, this facility risk management objective addresses

---

[324] EPA, *Human Health Risk Assessment Protocol for Hazardous Waste Combustion Facilities*, EPA530-D-05-006 (2005).  The Human Health Risk Assessment Protocol incorporates risk assessment guidance and methods from the EPA, as well as the experience EPA has gained through conducting and reviewing combustion risk assessments, to provide a comprehensive method of assessing human health risk from combustion emissions.  It provides a standardized methodology for conducting combustion risk assessments and, therefore, was chosen as the most appropriate guidance to follow.

[325] Lucy Fraiser Toxicology Consulting LLC, *CP2 LNG Terminal and Mobile Sources Human Health Risk Assessment*. June 30, 2023. See Appendix O of the Final EIS.

[326] Final EIS at 4-324, 4-374 to 4-376. See also Appendix O of the Final EIS.

[327] *Id.*

[328] *Id.* at 4-324.

[329] See Table 6 of Appendix O in the Final EIS.

the potential for cumulative risk (i.e., risk associated with multiple HAPs and other sources in the area).

142.    The Hazard Quotient analysis from the Human Health Risk Assessment indicated that no chronic Hazard Quotient for any HAP is greater than the non-cancer risk management objective of 1 for individual HAPs.  In addition, all aggregated chronic Hazard Index values (derived by summing Hazard Quotient values for all HAPs with similar chronic effects) are well below 1 (by almost 100-fold).  Similarly, all acute Hazard Quotient and aggregated acute Hazard Index values are well below the acute risk management objective of 1 (by almost 100-fold).[330] The results of the HHRA indicated the estimated cancer and non-cancer risks for the environmental justice community located within the same block group as  the CP2 LNG terminal (CT 9702.02 - BG 2) would be below EPA's risk management objectives during operation of the CP2 LNG terminal.[331]

143.    Commission staff concluded in the final EIS that the construction and operational emissions from the LNG terminal would not have significant adverse air quality impacts on environmental justice communities in the project area.[332]  We agree.

### ix.    Noise

144.    As stated in the final EIS, noise levels above ambient conditions, attributable to construction activities at the LNG terminal, would vary over time and would depend upon the nature of the construction activity, the number and type of equipment operating, and the distance between sources and receptors.[333]  The closest noise sensitive area (NSA) within an environmental justice community (CT 9702.02 - BG 2) is about 330 feet northeast of the LNG terminal site (from the floodwall, where pile driving would occur during construction) and consists of a recreational vehicle park and residence.[334]  Peak construction noise (due to pile driving and civil works) would occur during the first 18 months of construction and would increase noise levels over ambient conditions by 9 to 10 decibels at the closest NSAs.  Project construction would last up to 4 years, however, construction of the floodwall near the affected NSAs would occur as early as possible during project construction and would be expected to reduce the noise levels at

---

[330] Final EIS at 4-325.

[331] Id. at 4-325.

[332] Id. at 4-323 to 4-325.

[333] Id. at 4-325.

[334] Id.

the NSAs by 5 to 10 dBA, depending on the location of construction activities.[335] Although project construction could occur 24 hours per day, pile driving would be limited to daytime hours (i.e., 7 a.m. to 7 p.m.).  As recommended in the final EIS,[336] environmental condition 25 in the appendix to this order requires that CP2 LNG monitor noise levels during construction of the LNG terminal between 7 p.m. to 7 a.m. to ensure noise levels during these hours are less than our criterion of 48.6 decibels on the A-weighted scale (dBA) at any nearby NSA.

145.    Operational noise associated with the LNG terminal would be persistent and would increase noise levels over ambient by about 5.7 decibels at the closest NSA.[337]  As recommended in the final EIS,[338] environmental conditions 26 and 27 in the appendix to this order require CP2 LNG to meet sound level requirements of 55 dBA day-night sound level ($L_{dn}$) at any nearby NSAs.  With implementation of these measures, the final EIS concludes that the project would not result in significant noise impacts on local residents and the surrounding communities, including environmental justice populations.[339]  The final EIS further concludes that environmental justice communities in the study area would experience cumulative impacts related to noise but that these impacts would be less than significant.[340]  We agree.

## x.    Safety

146.    Commission staff evaluated the potential impacts which could result from potential incidents identified for analysis, such as equipment failures or natural disasters, along the LNG marine vessel transit route and at the LNG terminal, including potential impacts to people with access and functional needs as defined in National Fire Protection Association (NFPA) 1600, Standard on Continuity, Emergency, and Crisis Management[341] and NFPA 1616, Standard on Mass Evacuation, Sheltering, and Re-Entry

---

[335] *Id.* at 4-326.

[336] *Id.* at 4-388.

[337] *Id.* at 4-326.

[338] *Id.* at 4-388 to 4-389.

[339] *Id.* at 4-327.

[340] *Id.* at 4-554 to 4-556.

[341] Freely and publicly accessible to view in English and Spanish at NFPA, https://www.nfpa.org/codes-and-standards/allcodes-and-standards/list-of-codes-andstandards/detail?code=1600, accessed January 2024.

Programs.[342]  The worst-case distances from these potential incidents would potentially impact three block groups, two of which are considered environmental justice communities.  The block groups located with environmental justice communities that exceed the thresholds for minority and low income would include CT 9702.02 - BG 2 (based on the low-income threshold); and CT 9701.02 - BG 1 (based on the minority threshold).[343]

147.    Commission staff determined that potential impacts on environmental justice communities may include safety concerns, however, staff determined that the risk of accidental or intentional events would be less than significant with implementation of the proposed safety and security measures recommended in the EIS.  The proposed measures rise above minimum federal requirements and will enhance the safety and security of the project.  We agree and adopt all of staff's safety recommendations herein as environmental conditions.  We encourage CP2 LNG to engage with the two potentially impacted environmental justice communities as it develops an Emergency Response Plan (ERP) in accordance with environmental condition 45.

### b.    CP Express Pipeline Project

### i.    Flooding

148.    The CP Express Pipeline Project is not anticipated to induce flooding.  As described in the final EIS, CP Express calculated that 52.5 acre-feet of floodplain storage capacity will be lost due to construction and operation of aboveground facilities associated with the CP Express Pipeline.[344]  Based on an estimated total floodplain storage volume of 136,000 acre-feet, this would represent an approximate 0.04 percent loss of total floodplain storage volume, which would be a minor loss.  Additionally, the only aboveground facility within an environmental justice block group that is also within a floodplain is the CPX Meter Station, which would be within the proposed floodwall of the LNG terminal.[345]  Therefore, because project facilities would be elevated above base

---

[342] Freely and publicly accessible to view in English only at NFPA, https://www.nfpa.org/codes-and-standards/all-codesand-standards/list-of-codes-andstandards/detail?code=1616, accessed January2024.

[343] Final EIS at 4-474.

[344] *Id.* at 4-98.  Acre-feet of floodplain storage capacity lost for the Terminal Site Gas Gate Station (i.e., CPX Meter Station), Pig Receiver, and MLV 7 is not included in this calculation as these facilities would be constructed entirely within the CP2 LNG Terminal Site.

[345] *Id.* at 4-318.

flood elevation ranges identified by the Federal Emergency Management Agency, and given CP Express's implementation of other measures detailed in its Floodplain Mitigation Plan, the final EIS finds that potential flooding impacts from the CP Express Pipeline Project on environmental justice communities would be less than significant.[346] We agree.

### ii.    <u>Surface Water</u>

149.    Construction of the CP Express Pipeline may result in potential impacts to surface waters due to clearing and grading activities; construction-related discharges (e.g., stormwater and hydrostatic test water); the use of horizontal directional drilling (HDD), open-cut, and push method for pipeline installation; dredging and dredge material placement; and potential spills or leaks of hazardous liquids from the refueling of construction vehicles or storage of fuel, oil, and other fluids.  In order to minimize the risk of a release impacting sensitive resources, CP Express would implement the project-specific plans, as applicable, including its project-specific Procedures, its HDD Monitoring and Contingency Plan, and its SPCC Plan to minimize and/or avoid impacts on water resources during construction.  These plans would minimize the risk of impacts on surface waterbodies.  With the mitigation measures, the final EIS concludes that environmental justice communities would not be significantly impacted by construction of the pipeline.[347]  We agree.

### iii.    <u>Wetlands</u>

150.    The final EIS finds that the impacts on wetlands from the CP Express Pipeline would primarily be short-term and temporary during construction.[348]  Permanent impacts to wetlands would consist of the permanent conversion of some forested wetlands for permanent pipeline easements and the loss of some wetlands for the aboveground facilities.[349]  Wetland impacts would occur within several identified environmental justice communities; therefore, the loss of wetland habitat and the subsequent decrease in wetland benefits, could affect those environmental justice communities within and near the pipeline.[350]

---

[346] *Id.*

[347] *Id.* at 4-318 to 4-319.

[348] *Id.* at 4-319.

[349] *Id.* at 4-139 to 4-140.

[350] *Id.* at 4-319.

151.    The majority of wetlands impacted by construction would be restored to pre-construction conditions, resulting in only short-term impacts.  CP Express is coordinating with the Louisiana DNR/OCM and the Army Corps to develop a Compensatory Mitigation Plan in accordance with the Mitigation Rule and CWA Section 404(b)(1) Guidelines to replace the loss of aquatic resource functions for permanent conversion and loss of wetlands.[351]  Further, CP Express would implement project-specific plans, as applicable, including its project-specific Procedures, its HDD Monitoring and Contingency Plan, and its SPCC Plan to minimize and/or avoid impacts on wetlands during pipeline construction.  The final EIS concludes that through implementation of the mitigation measures, impacts from the project on wetlands would not have a significant impact on environmental justice communities.[352]  The final EIS also concludes that environmental justice communities in the study area would experience cumulative impacts on wetlands but that these impacts would be less than significant.[353]  We agree.

### iv.    **Visual Resources**

152.    Temporary visual impacts would occur during construction of the pipeline and aboveground facilities.  These impacts would consist of vehicle and equipment movement, vegetation clearing and grading, trench and foundation excavation, pipe storage, and spoil piles.[354]  Permanent visual impacts may occur along the pipeline route from removal of forested vegetation and periodic vegetation clearing within the permanent right-of-way to allow for visual pipeline inspection.[355]  After construction, CP Express would restore disturbed areas associated with the pipeline rights-of-way to near pre-construction conditions to the extent practicable, with the exception of the permanent right-of-way that would be kept in a low, maintained herbaceous state through regular mowing and woody vegetation removal.[356]

153.    The proposed Florida Gas Transmission Meter Station is 0.6 mile northeast of an identified environmental justice block group (CT 35 - BG 1).[357]  The nearest sensitive

---

[351] *Id.* at 4-137.

[352] *Id.* at 4-319.

[353] *Id.* at 4-544.

[354] *Id.* at 4-319.

[355] *Id.*

[356] *Id.* at 4-319 to 4-320.

[357] *Id.* at 4-320.

receptor within CT 35 - BG 1 is a residence approximately 1 mile southwest of the meter station. The Florida Gas Transmission Meter Station would not be visible from the residence due to the presence of a wooded parcel of land west of the meter station.[358] The proposed Enable Interconnect Meter Station is within an identified environmental justice block group (CT 36.02 - BG 1).[359] The nearest residence is approximately 0.6 mile east of the meter station. The Enable Interconnect Meter Station would be constructed west of existing industrial facilities and a wooded lot; therefore, the meter station would not be visible to the nearest residence.[360] The proposed CPX Meter Station is also within an identified environmental justice block group (CT 9702.02 - BG 2); however, it would be within the proposed floodwall associated with the LNG terminal and, therefore, would not be visible.[361] The remaining meter stations and the Moss Lake Compressor Station are not in or within one mile of an environmental justice community. The final EIS concludes, and we agree, that visual impacts from construction and operation of the CP Express Pipeline are anticipated to have a permanent and minor effect on environmental justice communities.[362]

### v. Socioeconomics

154. Regarding socioeconomics, as stated in the final EIS, the temporary influx of workers/contractors into the area along the pipeline route could increase the demand for community services, such as traffic, housing, police enforcement, and medical care.[363] The final EIS concludes, however, that sufficient housing units would be available and impacts on community services would not be significant.[364] Based on the foregoing, the final EIS concludes that socioeconomic impacts on environmental justice communities would be less than significant.[365]

---

[358] *Id.*

[359] *Id.*

[360] *Id.*

[361] *Id.*

[362] *See id.*

[363] *Id.*

[364] *Id.* at 4-266, 4-276 to 4-280.

[365] *Id.* at 4-320.

155.    As stated in the final EIS, several other projects have been proposed or approved that could have overlapping construction schedules with CP Express Pipeline Project, including Driftwood LNG Project, Line 200 and Line 300 Project, Hackberry Storage Project, Cameron LNG Expansion Project, Lake Charles Liquefaction Project, Magnolia LNG, Delfin LNG, and Commonwealth LNG Project.[366]  Combined, these projects could require a peak of more than 20,000 workers, a 10% increase in the current population.[367] The temporary flux of workers/contractors into the area from all of these projects would increase the demand for housing.  Should other major industrial projects listed in table 4.14.1-1 of the final EIS be constructed at the same time as the CP Express Pipeline, sufficient housing would still be available.[368]  This cumulative increased demand for housing could drive costs up, increase property taxes, and adversely impact low-income individuals.[369]  An increase in costs of material goods may also occur due to increased demand for these goods.  The final EIS concludes that environmental justice communities in the study area would experience cumulative impacts on socioeconomic resources, but these impacts would be less than significant.[370]  We agree with staff's conclusions.

## vi.    Road Traffic

156.    The final EIS finds that area residents may be affected by traffic delays during construction of the CP Express Pipeline Project.[371]  Construction of the pipeline project would temporarily increase use of area roads by heavy construction equipment and associated trucks and vehicles.  Increased use of these roads would result in a higher volume of traffic, increased commute times, and greater risk of vehicle accidents.[372] During construction, public roads utilized in the immediate vicinity of the pipeline would be monitored by CP Express and maintained as necessary.  CP Express would implement its Traffic, Noxious Weed, and Fugitive Dust Control Plan to minimize impacts from pipeline construction on local traffic and transportation systems.[373]  During operation of

---

[366] *Id.* at 4-546.

[367] *Id.*

[368] *Id.* at 4-546 to 4-547.

[369] *Id.* at 4-547.

[370] *Id.*

[371] *Id.* at 4-322.

[372] *Id.*

[373] *Id.*

the pipeline, impacts on road traffic would be primarily limited to the ten employees based at the proposed Moss Lake Compressor Station (which is not within an environmental justice block group), and periodic deliveries to aboveground facilities. Therefore, the final EIS concludes that the road traffic impacts from the CP Express Pipeline on environmental justice communities are expected to be less than significant.[374] We agree.

### vii.  <u>Air Quality</u>

157.    Emissions during construction of the CP Express Pipeline Project would generally be associated with the use of on-road and off-road mobile equipment.  CP Express's construction equipment exhaust emissions would be minimized by using construction equipment and vehicles that are maintained in accordance with manufacturers' maintenance schedules; comply with EPA vehicle and non-road engine emissions regulations; and use commercial fuels (e.g., diesel) that meet specifications of applicable federal and state air pollution control regulations.[375]  Fugitive dust generation would be minimized, in part, by applying water in active construction areas (e.g., unpaved roads, material storage piles) and imposing speed limits for on-site vehicles in accordance with CP2 LNG and CP Express's Traffic, Noxious Weed, and Fugitive Dust Control Plan.[376] The final EIS concludes that impacts from pipeline construction on local air quality would not be significant.[377]

158.    The operation of the proposed Moss Lake Compressor Station would not cause or contribute to any cumulative significant impact level (SIL) exceedances for NAAQS, and it is not within 1 mile of an environmental justice community.[378]  Therefore, Commission staff concluded in the final EIS that the operational emissions from the pipeline would not have significant adverse air quality impacts on environmental justice communities.[379] We agree.

---

[374] *Id.*

[375] *Id.* at 4-323.

[376] *Id.*

[377] *Id.* at 4-323 to 4-324.

[378] *Id.* at n. 101, 4-324.

[379] *Id.* at 4-323 to 4-325.

### viii.    Noise

159.    As stated in the final EIS, noise levels above ambient conditions, attributable to pipeline construction activities, would vary over time and would depend upon the nature of the construction activity, the number and type of equipment operating, and the distance between sources and receptors.[380]  Construction noise at any given location, including locations within environmental justice block groups, would be temporary due to the assembly-line method of pipeline installation.[381]  However, noise associated with unmitigated HDD activities for pipeline construction would increase noise levels above ambient conditions at sensitive receptor sites in proximity to two HDD entry/exit locations (Marshall Street HDD Entry/Exit and Terminal Site Entry/Exit) in an identified environmental justice block group (CT 9702.02 - BG 2).[382]  The closest NSAs to the Marshall Street HDD are residences 990 feet southeast and 380 feet southeast of its entry/exit locations, respectively, and the closest NSAs to the Terminal Site HDD are residences 890 feet northeast and 430 feet southeast of its entry/exit location, respectively.[383]  CP Express will restrict HDD activities to daytime hours (i.e., 7 a.m. to 7 p.m.) with the exception of pipe pullback and hydrostatic testing, which would occur continuously during daytime and nighttime hours until the activity is complete; however, depending on site conditions, pullback and testing activities are generally completed within a day or two.[384]  Except for HDD locations, construction activities associated with the CP Express Pipeline Project would generally be limited to daytime hours; therefore, most construction noise would have no nighttime impacts on residents or other sensitive receptors near the pipeline.  Due to the temporary nature of construction, including HDD, no associated long-term impacts are anticipated for environmental justice populations.[385]

160.    Operation of the CP Express Pipeline would include an increase in noise levels at the proposed Florida Gas Transmission Meter Station, Enable Interconnect Meter Station, and CPX Meter Station; however, there are no NSAs within identified environmental justice block groups within 0.5 mile of the meter stations.  The final EIS concludes the

---

[380] *Id.* at 4-325.

[381] *Id.* at 4-326.

[382] *Id.*

[383] *Id.*

[384] *Id.*

[385] *Id.*

pipeline project would not result in significant noise impacts on local residents and the surrounding communities, including environmental justice communities.[386]  We agree.

### c.    Environmental Justice Conclusion

161.   In conclusion, 17 block groups out of 31 block groups within the geographic scope of the projects are considered environmental justice communities.[387]

162.   Temporary and permanent adverse impacts on environmental justice communities from construction and operation of the CP2 LNG Project include impacts associated with water resources, wetlands, socioeconomics, traffic, air quality, noise, and visual resources.  The construction and operation of the LNG terminal would have a disproportionately high and adverse impact on environmental justice communities because the impacts would be predominantly borne by those communities.  Visual impacts on environmental justice communities near the terminal would be significant.  In addition, the project would contribute to significant cumulative visual impacts on environmental justice communities.[388]  The remainder of the temporary and permanent adverse impacts on water resources, wetlands, socioeconomics, traffic, air quality, and noise in environmental justice communities from construction and operation of the LNG terminal would be less than significant.[389]

163.   Temporary adverse impacts on environmental justice communities from construction of the CP Express Pipeline Project include impacts associated with water resources, wetlands, socioeconomics, traffic, air quality, and construction noise.  Permanent adverse impacts on visual resources in environmental justice communities would occur as a result of pipeline operation, including removal of forested vegetation and periodic vegetation clearing within the permanent right-of-way.  The construction and operation of the pipeline (including meter stations, contractor yards, and park and ride locations) would have a disproportionately high and adverse impact on environmental justice communities because the impacts would be predominantly borne by those communities, but the impacts would be less than significant.[390]

---

[386] *Id.* at 4-326 to 4-327.

[387] *Id.* at table 4.10.10-1.

[388] *Id.* at 4-328 to 4-329, 4-546, app. J.

[389] *Id.* at 4-329.

[390] *Id.* at 4-328.

## 8. Greenhouse Gas Emissions and Climate Change

164.    NEPA requires agencies to include in NEPA documents reasonably foreseeable environmental effects of the proposed agency action.[391] CEQ defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[392] An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[393]

165.    For the CP2 LNG and CP Express Pipeline Projects, we find that the construction emissions, including commissioning, and direct operational emissions are reasonably foreseeable. The final EIS estimates that construction of the projects would result in 3,034,891 tons of carbon dioxide equivalent ($CO_2e$) emissions (equivalent to 2,753,207 metric tons of $CO_2e$) over the duration of construction and commissioning.[394] GHG emissions from the operation of the projects would result in an annual increase of $CO_2e$ emissions of about 9,380,776 tons per year (tpy) (equivalent to 8,510,099 metric tpy).[395]

166.    EPA argues that the Commission should disclose and evaluate the GHG emissions associated with upstream production and downstream use of the gas exported by the CP2 LNG Project due to the Commission's authorization role under NGA section 3 and to the reasonably close causal relationship between the projects and upstream and downstream

---

[391] See FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023).

[392] 40 C.F.R. § 1508.1(g) (2023).

[393] Id. § 1508.1(aa). See generally Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004) (explaining that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law'") (citation omitted); Food & Water Watch v. FERC, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); Sierra Club v. FERC, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (Sabal Trail) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[394] See final EIS at 4-353, 4-358, 4-365, and tbls. 4.12.1-9, 4.12.1-10, & 4.12.1-17.

[395] See id. at 4-368 and tbl. 4.12.1-19.

emissions.[396] EPA states that it is irrelevant whether downstream GHG emissions occur within or outside of the United States to assess their climate impacts given that GHG emissions have impacts that are global in scale, and that whether the project gas is used nationally or internationally does not impact the location of upstream GHG emissions.[397]

167.    As we have repeatedly held,[398] under D.C. Circuit precedent, the Commission need not consider the effects of upstream production or downstream transportation, consumption, or combustion of exported gas because the DOE's "independent decision to allow exports . . . breaks the NEPA causal chain and absolves the Commission of responsibility to include [these considerations] in its NEPA analysis."[399]

168.    The final EIS estimates that the social cost of GHGs from the projects is either $2,171,634,661 (assuming a discount rate of 5%), $8,163,209,390 (assuming a discount rate of 3%), $12,317,496,889 (assuming a discount rate of 2.5%) or $24,759,892,905 (using the 95th percentile of the social cost of GHGs with a discount rate of 3%).[400] The final EIS states that "construction and operation of the Project[s] would increase the atmospheric concentration of GHGs, in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."[401] We clarify that, assuming that the transported gas is not displacing equal-or higher-emitting sources, we recognize that the projects' contributions to GHG

---

[396] EPA September 1, 2023 Comments at 3; *see also* final EIS at 4-559.

[397] EPA September 1, 2023 Comments at 3.

[398] *See Commonwealth LNG*, 181 FERC ¶ 61,143 at P 77; *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 46, *order on reh'g*, 180 FERC ¶ 61,206, at P 78 (2022).

[399] 827 F.3d 36 (D.C. Cir. 2016) (*Freeport*); *see also Sierra Club v. FERC*, 827 F.3d 59, 68-69 (D.C. Cir. 2016); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir 2016) (same); *Sierra Club v. FERC*, 867 F.3d 1357, 1372 (D.C. Cir. 2017) (explaining *Freeport*).

[400] The Interagency Working Group draft guidance identifies costs in 2020 dollars. Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[401] Final EIS at 4-559.

emissions globally contribute incrementally to future climate change impacts,[402] including impacts in the region.[403]

169.    EPA recommends that the Commission detail the discount rates and methodology behind the social cost of GHG estimates in the Commission's order or other NEPA documents.[404]  For the calculations, the final EIS assumed discount rates of 5%, 3%, and 2.5%, and assumed that the project will begin service in 2026 and that the operational emissions would be at a constant rate throughout the life of a 20-year contract.[405]

170.    Additionally, EPA asserts that the social cost of GHG estimates in the final EIS underrepresent global impacts from GHG emissions because they do not include damages related to upstream or downstream emissions.[406]  As explained above, the upstream and downstream emissions are appropriately excluded from our NEPA analysis.[407]

171.    As we have done in prior orders, we place the project's GHG emissions in context by comparing them to the total GHG emissions of the United States as a whole and at the state level.  At a national level, 5,586.0 million metric tons (MMT) of $CO_2e$ were emitted in 2021 (inclusive of $CO_2e$ sources and sinks).[408]  The construction and commissioning emissions from the CP Express Pipeline Project and the CP2 LNG Project could potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.002 to 0.02%

---

[402] *Id.*

[403] *Id.* at 4-457 to 4-558 (discussing observations from the Fourth Assessment Report).

[404] EPA September 1, 2023 Comment at 3.

[405] Final EIS at 4-560 to 4-561.

[406] EPA September 1, 2023 Comment at 3.

[407] *See supra* P 167.

[408] Final EIS at 4-559; EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021 at tbl. 2-1 (April 2022), https://www.epa.gov/system/files/documents/2023-04/US-GHG-Inventory-2023-Main-Text.pdf.

in any one year;[409] in subsequent years, operation of the projects could potentially increase emissions nationally by 0.17%.[410]

172.    At the state level, we compare the project's GHG emissions to the total $CO_2$ emissions for the State of Louisiana alone.[411]  For Louisiana, 183.3 MMT of $CO_2$ were emitted in 2020.[412]  The total construction and commissioning emissions from the projects would temporarily increase $CO_2e$ emissions in Louisiana, based on the state 2020 level, by 0.05 to 0.57% in any one year of construction/commissioning; in subsequent years, the operation of both projects could potentially increase annual GHG emissions in Louisiana by 5.13%.[413]

173.    When states have GHG emissions reduction targets, a project's GHG emissions are compared to those state goals to provide additional context.[414]  The state of Louisiana established executive targets in 2020 to reduce net GHG emissions 26% to 28% by 2025 and 40% to 50% by 2030, compared to 2005 levels.  The targets also aim for net-zero GHG emissions by 2050.  Statewide GHG emissions were 215 MMT $CO_2e$ in 2005; therefore, the goals are to have emission levels in Louisiana at about 157 MMT $CO_2e$ in 2025 (based on a 27% reduction) and between 108 and 129 MMT $CO_2e$ in 2030.  Based

---

[409] Construction and commissioning are estimated to take a total of 48 months, but may occur over 5 calendar years.  Final EIS at 2-18,4-349, and 4-358.

[410] This estimate was incorrectly stated in the Final EIS and has been corrected here.  Final EIS at 4-559.

[411] In Texas, the pipeline and two meter stations would have only minor construction-related emissions and operational fugitive emissions.  Given that the vast majority of project-related emissions would occur in Louisiana, we compare both projects' GHG emissions to State of Louisiana emissions.

[412] Final EIS at 4-560.

[413] Mathematical *Id.* at 4-560.

[414] *See, e.g.*, *Tex. E. Transmission, LP*, 180 FERC ¶ 61,186, at P 28 (2022); *Golden Pass Pipeline, LLC*, 180 FERC ¶ 61,058, at P 21 (2022).

on operational emissions (9.38 MMT $CO_2e$)[415], the projects would contribute approximately 7.98% of the $CO_2e$ emissions level goal (midpoint of range) in 2030.[416]

174.    EPA recommends that the Commission avoid expressing project-level emissions as a percentage of national or state emissions or reduction targets as it "trivializes substantial project-scale GHG emissions and is also misleading given the nature of the climate policy challenge to reduce GHG emissions from a multitude of sources."[417]  We disagree.  The D.C. Circuit has repeatedly upheld the Commission's analysis of a project's estimated GHG emissions by comparison to national and state inventories.[418]

175.    EPA recommends that the Commission provide updated estimates of global warming potentials (GWP) for GHGs using the latest scientific information from the Intergovernmental Panel on Climate Change 6th Assessment Report.[419]  As stated in the final EIS, Commission staff chose to use GWPs that EPA itself established for reporting of GHG emissions and air permitting requirements, allowing for a consistent comparison with these regulatory requirements.[420]

176.    EPA also recommends that the Commission condition its approval of the projects on CP2 LNG and CP Express's commitment to adopt all practicable GHG mitigation measures.[421]  EPA further recommends that any mitigation or best management practices be included as conditions of the authorization order, in a Memorandum of Understanding

---

[415] Final EIS at 4-368.

[416] Because the projects are not projected to begin operations until 2026, we only compare to Louisiana's 2030 goal.

[417] EPA September 1, 2023 Comment at 3.

[418] *Ala. Mun. Distributors Grp. v. FERC*, 100 F.4th 207, 214 (D.C. Cir. 2024) (*Evangeline Pass*); *Alaska LNG*, 67 F.4th at 1183-84.

[419] EPA September 1, 2023 Comments at 2.

[420] Commission staff chose EPA-developed GWPs outlined in 40 C.F.R. pt. 98, subpt. A, tbl.A-1 (2023), rather than other published GWPs.  Final EIS at 4-335; *see also Gas Transmission Northwest LLC*, 181 FERC ¶ 61,234, at P 39 (2022)  (finding staff appropriately selected EPA's GWP for methane in its environmental analysis).

[421] EPA September 1, 2023 Comments at 2-3.

with CP2 LNG and CP Express, or in a state or local permit to ensure the measures are real and verifiable.[422]

177.    As described in the final EIS, CP2 LNG and CP Express have committed to various methods, measures, and best management practices, which Commission staff determined would help to reduce GHG emissions.[423] Additionally, CP2 LNG plans to capture, compress, and sequester approximately 500,000 tons of $CO_2$ from feed gas entering the CP2 LNG Project through its CCS facilities.[424] We are satisfied that these measures sufficiently address EPA's recommendation.

178.    Some commenters oppose the projects, citing concern regarding the projects' contribution to climate change and the importance of domestic and global GHG emissions reductions targets.[425] The Commission has disclosed the GHG emissions associated with construction and operation of the projects.[426] Additionally, as stated above, we recognize that the projects' contributions to GHG emissions globally contribute incrementally to future climate change impacts, assuming that the transported gas is not displacing equal-or higher-emitting sources.[427]

179.    We clarify that, for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[428] While we have recognized in some past orders that the social cost of GHGs may have utility in certain contexts such as rulemakings,[429] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions

---

[422] *Id.* at 3.

[423] Final EIS at 4-365 to 4-367.

[424] *See supra* P 9.

[425] *See, e.g.*, Pam Elders October 17, 2023 Comments; Karen Uhlenhuth October 19, 2023 Comments; Rebecca Liberman October 20, 2023 Comments.

[426] *See supra* P 165; *see also* final EIS at 4-353, 4-358, 4-365, 4-368, and tbls. 4.12.1-9, 4.12.1-10, 4.12.1-17, and 4.12.1-19.

[427] *See supra* P 168.

[428] Final EIS at 4-560 to 4-561. "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs." *Id.* at 4-559.

[429] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

associated with a project are significant or not significant in terms of their impact on global climate change.[430]  Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[431]  Nor are we aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[432]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.[433]  In fact, the D.C. Circuit recently affirmed the

---

[430] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper Network v. FERC*, 45 F.th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[431] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051, at P 37 (2022); *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *see, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 91 (2022).

[432] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.").

[433] *See, e.g.*, *Food & Water Watch v. FERC*, Nos. 22-1214, 22-1315, 2024 WL 2983833, at *6-7 (D.C. Cir. June 14, 2024) (*Tenn. East 300*) (noting that "NEPA regulations [do not] require an agency to clarify every environmental impact as significant or insignificant," and upholding the Commission's decision not to assess "significance" despite having done so in the past); *Alaska LNG*, 67 F.4th at 1184 (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2)

Commission's decision to not analyze the social cost of carbon in its NEPA analysis,[434] rejected the suggestion that it was required to do so, found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[435]

180.    We note that there currently are no accepted tools or methods for the Commission to use to determine significance; therefore, the Commission is not herein characterizing these emissions as significant or insignificant.[436]  Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

---

that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis . . . previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports v. FERC*, 848 F.3d 949, 956 (D.C. Cir. 2016) (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper Network v. FERC*, 45 F.4th 104 (D.C. Cir. 2022) (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (same).

[434] *Tenn East 300*, 2024 WL 2983833, at *6 ("FERC need not attempt to monetize those emissions through a Social Cost of Carbon model which FERC views as unreliable for analyzing individual projects."); *Evangeline Pass*, 100 F.4th 207, 214-15 (D.C. Cir. 2024) (upholding the Commission's decision not to rely on the social cost of carbon tool where, as in the instant proceeding, Commission staff estimated the social cost of carbon, publicly disclosed those estimates, and shared them in the NEPA document); *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions. It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

[435] *Alaska LNG*, 67 F.4th at 1184.

[436] The February 18, 2022 Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022), which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended, and opened to further public comment.  Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2.

## 9.  Alternatives

181.    In the final EIS, Commission staff determined that electric-driven turbines at the LNG terminal and electric motor-driven compression at the Moss Lake Compressor Station would not provide a significant environmental advantage over or equivalent reliability to the proposed gas-powered turbines and compression, in part due to the unpredictable reliability of electric power transmission during severe weather events, including hurricanes.[437]  EPA acknowledges these reliability issues, but recommends the Commission consider these alternative energy sources over the life of the projects, during which the availability of renewable energy may increase.[438]

182.    As stated in the final EIS, electric power transmission can be unreliable in the project area due to the susceptibility of overhead electric transmission lines to damage, and power outages lasting days or weeks are not uncommon in southern Louisiana after major weather events.[439]  Renewable energy provided through the electrical grid would be subject to the same reliability concerns.  We agree.

## 10.  Cumulative Impacts

### a.    Mobile Source Emissions

183.    Sierra Club comments that the final EIS fails to consider cumulative air quality impacts from mobile source emissions, particularly from marine vessels.[440]  It notes that the final EIS for the CP2 LNG and CP Express Projects, as well as EISs for other Commission-jurisdictional projects considered in the cumulative impacts analysis,[441] estimates large volumes of mobile source emissions during both project construction and operation.[442]  Sierra Club asserts that including mobile source emissions in the

---

[437] *Id.* at 3-85 to 3-86.

[438] EPA September 1, 2023 Comments at 1-2.

[439] Final EIS at 3-86.

[440] Sierra Club October 16, 2023 Comments at 1.

[441] Commission-jurisdictional LNG projects considered in the cumulative effects analysis are:  the Calcasieu Pass LNG Project; Driftwood LNG Project; Lake Charles Liquefaction Project; Cameron LNG Project; Cameron LNG Expansion Project; Commonwealth LNG Project; Delfin LNG Project; and, Magnolia LNG Project.  Final EIS at 4-518 to 4-520.

[442] Sierra Club October 16, 2023 Comments at 2-3.

cumulative impacts analysis may result in a predicted NAAQS exceedance, thereby undermining the final EIS's conclusion that there would be no significant individual or cumulative air quality impacts from the projects because, even where project emissions would exceed the Significant Impact Level (SIL) for a given pollutant, the ambient pollution levels would remain below the relevant NAAQS threshold.[443]  It further states that given the magnitude of cumulative mobile source emissions, this possibility cannot be dismissed as speculative.[444]

184.    The Commission's analysis of cumulative air quality impacts satisfied our responsibility under NEPA.  The cumulative air dispersion modeling in the final EIS was conducted in accordance with EPA's 40 CFR Part 51, Appendix W.[445]  CP2 LNG conducted a cumulative impact analysis for the terminal facilities for each pollutant that exceeded the SIL.  The terminal facilities sources, including marine vessels (LNG carriers and tugboats), were modeled along with additional offsite sources obtained from the Louisiana DEQ Emissions Reporting and Inventory Center.  The Area of Impact (AOI) for each pollutant and averaging period was established as the distance from the terminal facilities to the farthest receptor that showed a model-predicted impact greater than the SIL in the Significance Analysis.  The offsite source inventory for the cumulative analysis included all sources within the AOI plus 15 kilometers and all major sources within the AOI plus 20 kilometers.[446]

185.    The cumulative air dispersion modeling for the CP2 LNG and CP Express Projects included both stationary sources and mobile sources (LNG vessels and tugs) associated with the operation of the CP2 LNG terminal,[447] as well as the stationary and mobile sources associated with the Calcasieu Pass LNG terminal.[448]  The emissions inventory provided by the Louisiana DEQ does not include mobile emissions associated with the other LNG terminals, and thus, those emissions were not included in the cumulative

---

[443] *Id.* at 4-5.

[444] *Id.* at 5.

[445] Final EIS at 4-369 to 4-373.

[446] *Id.* at 4-299.

[447] *Id.* at 4-296 to 4-301.

[448]  See Appendix E of CP2 LNG's August 1, 2022 *Supplemental Response to Environmental Information Request No 3*, which lists the Louisiana DEQ offsite sources.

impacts modeling.[449]  Per 40 CFR part 51, Appendix W – Guideline on Air Quality Models, this is consistent with the Prevention of Significant Deterioration requirements of the Clean Air Act.[450]

186.    Further, the final EIS describes a cause-and-contribute analysis that determined that the projects would not cause or contribute to the anticipated exceedances of the 1-hour NAAQS for nitrogen dioxide ($NO_2$) or the 24-hour NAAQS for particulate matter ($PM_{2.5}$) predicted by the modeling.[451]  This analysis indicates that existing, permitted off-site sources, such as existing marine vessels operating in the nearby Calcasieu Ship Channel, are the primary drivers of NAAQS exceedances in the project area because, where the modeling predicted an exceedance of a NAAQS threshold, that exceedance would occur even in the absence of the projects' emissions.[452]  Based on this modeling, the final EIS concludes that the CP2 LNG terminal would not cause or contribute to a potential NAAQS exceedance.[453]  We agree.

187.    The addition of nearby mobile source emissions, including those from the nearest facilities, such as Commonwealth LNG terminal, would not change the conclusion that the CP2 LNG and CP Express Projects do not cause or contribute to potential NAAQS exceedances.[454]  As detailed in Appendix K of the final EIS, the highest project contribution to any potential NAAQS exceedance location for the 1-hour $NO_2$ standard is

---

[449]  *See id.*; *see also* Louisiana DEQ, Air Emissions Inventory, https://deq.louisiana.gov/index.cfm?md=pagebuilder&tmp=home&pid=EmissionsInventory (last updated Mar. 2, 2023).

[450] Where there is no simultaneous exceedance of the NAAQS and the significant impact level by the project sources, the modeling analysis is deemed to demonstrate that the proposed source would not cause or contribute to the potential NAAQS exceedance. 40 C.F.R. part 51, app. W (Guideline on Air Quality Models), § 8.1.2 a (2023) states: "For a NAAQS or [Prevention of Significant Deterioration] increments assessment, the modeling domain or project's impact area shall include all locations where the emissions of a pollutant from the new or modifying source(s) may cause a significant ambient impact."  Further, per Section 9.2.3 c.: "The receptors that indicate the location of significant ambient impacts should be used to define the modeling domain for use in the cumulative impact analysis."

[451] Final EIS at 4-553.

[452] *Id.*

[453] *Id.* at 4-552 to 4-553.

[454] *Id.* at 4-552 to 4-553.

3.7 micrograms per cubic meter, which is about half of the SIL for the 1-hour $NO_2$ standard.[455]

188.    Based on the cumulative air quality dispersion modeling and cause-and-contribute analysis summarized in the final EIS, as well as the extent of the project's contribution to the potential exceedances of the NAAQS analyzed in the final EIS, our conclusion remains the same—the CP2 LNG terminal does not cause or contribute to potential NAAQS exceedances.[456]

189.    In addition, Sierra Club states that the information used to support the air quality modeling, as well as Louisiana DEQ's emission inventory data, were not provided in the final EIS.  Sierra Club questions why this information is not available to the public.[457] We note that the dispersion modeling assumptions are stated generally throughout the body text of the EIS, and footnotes in the EIS refer to CP2 LNG and CP Express's detailed modeling reports (including the modeling files and Louisiana DEQ offsite emissions inventory) in CP2 LNG's application as well.[458]

### b.    Particulate Matter

190.    On March 6, 2024, EPA revised the National Ambient Air Quality Standards (NAAQS) for particulate matter with an aerodynamic diameter less than 2.5 micrometers ($PM_{2.5}$), lowering the primary annual standard from 12.0 micrograms per cubic meter ($\mu g/m^3$) to 9.0 $\mu g/m^3$.[459]  The revised NAAQS became effective on May 6, 2024.

191.    As described in the final EIS, CP2 LNG's modeling estimated that the maximum impacts from the LNG terminal would be 9.4 $\mu g/m^3$ for the annual $PM_{2.5}$ NAAQS.[460]  To confirm that the operations of the LNG terminal would not result in $PM_{2.5}$ air quality impacts greater than the revised annual $PM_{2.5}$ NAAQS in the surrounding communities,

---

[455] *Id.* at app. K.

[456] *See id.* at 4-552 to 4-553.

[457] Sierra Club October 16, 2023 Comments at 5.

[458] Final EIS at 4-296 to 4-303 and n. 138.  *See also* Appendix E of CP2 LNG's August 1, 2022 *Supplemental Response to Environmental Information Request No 3*.

[459] 89 Fed. Reg. 16,202 (Mar. 6, 2024).

[460] Final EIS at tbl. 4.12.1-22.

Commission staff issued Environmental Information Requests (EIRs) to the applicant on March 26, 2024, and May 29, 2024, requesting revised air quality analysis.[461]

192.    On April 4 and June 3, 2024, CP2 LNG submitted revised air quality impacts analysis to demonstrate compliance with the revised annual $PM_{2.5}$ NAAQS in the project area. Specifically, CP2 LNG updated its air dispersion modeling to use the PM2.5 design value derived from ambient air data collected at an air quality monitoring station in Vinton, Louisiana.[462] CP2 LNG states that the ambient air conditions at the Vinton, Louisiana station are more representative of the project area than the ambient air conditions at the West Orange, Texas monitoring station used in its initial modeling. CP2 LNG states that it originally used the design value from the West Orange station because, at that time, the data from the Vinton station was considered incomplete due to a 2021 hurricane; however, in early 2024, CP2 LNG states that EPA concluded that the Vinton station's data from 2020 to 2022 is valid and acceptable for use.[463] With the Vinton station $PM_{2.5}$ value, air dispersion modeling estimates that the total cumulative concentration of annual $PM_{2.5}$ will be 8.2 ug/m$^3$ once the LNG facilities are in operation, in compliance with the EPA's revised standard.[464]

193.    We disagree with the dissent's assertion that the revised $PM_{2.5}$ annual NAAQS triggered the Commission's duty to prepare a supplemental EIS.[465] An agency need not supplement an EIS every time new information comes to light after an EIS is finalized, for to do so "would render agency decision making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[466] Rather, a supplemental EIS is required where "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

---

[461] CP2 LNG submitted revised air quality analysis in response to Commission staff's March 26, 2024 EIR on April 4, 2024.

[462] CP2 LNG April 4, 2024 Response to Environmental Information Request.

[463] *Id.*

[464] *Id.*

[465] Dissent at PP 12-16 (stating that a supplemental EIS is required "where 'might' be 'any' significant environmental impacts").

[466] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989); *see also Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017).

impacts."[467]   The D.C. Circuit has explained that a supplemental EIS "must only be prepared where new information provides a *seriously* different picture of the environmental landscape."[468]

194.   Commission staff requested additional air quality analysis from the applicant to determine whether the LNG terminal would have a significant impact on air quality. Staff reviewed and replicated the cumulative air quality model filed on June 3, 2024, and determined that the increase in emissions from the CP1 LNG facility as well as the change in the annual $PM_{2.5}$ SIL did not result in additional locations where cumulative impacts would exceed the NAAQS.  Furthermore, staff confirmed that, consistent with the determination in the final EIS, the impacts attributable to the CP2 facility would not cause or contribute to an exceedance of any the NAAQS.  The cumulative area of impact is not affected by the change in the annual $PM_{2.5}$ SIL as the cumulative air quality AOI is based upon the much larger area where the 1-hour $NO_2$ SIL is exceeded.  Thus, the increase in area where the annual $PM_{2.5}$ SIL is exceeded is much smaller than the 1-hour $NO_2$ AOI.  For the reasons explained herein, we are satisfied that the applicant's revised modeling demonstrates compliance with the revised annual $PM_{2.5}$ NAAQS in the project area and that the project will not significantly impact air quality.[469]

195.   The dissent further states that the analysis "inexplicably excluded mobile emissions from the Driftwood LNG, Lake Charles Liquefaction, Commonwealth LNG, and Magnolia LNG projects."[470]  We note that EPA's modeling guidance under Appendix W[471] does not require modeling of mobile sources under clean air permitting PSD or Title V requirements.[472]  CP1 LNG and CP2 LNG are owned/controlled by the same company, so to ensure we took a "hard look" at the totality of the emission impacts under NEPA,

---

[467] 40 C.F.R. § 1502.9(d)(1)(ii) (emphasis added); *see also Tenn. Gas Pipeline Co., L.L.C.*, 187 FERC ¶ 61,136, at P 50 (2004) ("…the decision to prepare a supplemental EIS is left to agency discretion under a 'rule of reason.'").

[468] *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (internal quotation marks omitted)).

[469] *See supra* P 192; *see infra* PP 196-197.

[470] Dissent at P 15.

[471] *See supra* P 184.

[472] *See supra* P 185.

we conservatively included the mobile emissions from both CP1 LNG and CP2 LNG in the cumulative air quality model.

### c.     CP1 LNG Terminal Emissions

196.    In comments filed April 24, 2024, Sierra Club argued that CP2 LNG's cumulative air impact modeling was flawed because it did not include anticipated increases in operational emissions from the neighboring CP1 LNG terminal as described in CP1 LNG's application to modify its Title V/PSD Permit filed with LDEQ on March 17, 2023.  CP2 LNG responded on May 15, 2024, that its modeling did include CP1 LNG's increased emissions and provided its application materials for the CP1 LNG permit modification.  After reviewing the revised analysis, Commission staff determined that the modeling reflected the increase in CP1 LNG's operational emissions, but did not include the associated LNG ship and support vessel emissions.  Commission staff issued an EIR on May 29, 2024, requiring that CP2 LNG include CP1 LNG's marine emissions in its air quality analysis.

197.    CP2 LNG filed an updated air quality analysis that included the marine emissions associated with the CP1 LNG terminal on June 3, 2024.  The updated air quality modeling indicates that the increase in CP1 LNG emissions results in increases in overall cumulative impacts from $NO_2$ and $PM2.5$.  However, the updated air quality analysis demonstrates that operation of the CP2 LNG terminal would not result in air quality impacts that would cause or contribute to an exceedance of any NAAQS in the surrounding communities.

### 11.  Environmental Impacts Conclusion

198.    We have reviewed the information and analysis contained in the final EIS, as well as other information in the record, regarding the potential environmental effects of the projects.  We accept the environmental recommendations in the final EIS, as modified herein, and we are including them as conditions in the appendix to this order.  Based on our consideration of this information, as supplemented or clarified herein,[473] we agree with the conclusions presented in the final EIS and find that the projects, if implemented as described in the applications and in compliance with the environmental conditions to this order, are environmentally acceptable actions.

---

[473] Although the analysis in the EIS provides substantial evidence for our conclusions in this order, it is the order itself that serves as our record of decision.  The order supersedes any inconsistent discussion in the EIS.

## IV.   Conclusion

199.    For the reasons discussed above, we find that the CP2 LNG Project is not inconsistent with the public interest, and we will grant CP2 LNG's application for authorization under section 3 of the NGA to site, construct, and operate the project.

200.    The CP Express Pipeline Project will enable CP Express to transport domestically sourced natural gas to the CP2 LNG terminal for export.  We find that CP Express has demonstrated a need for the project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project will have minimal impacts on the interests of landowners and surrounding communities.  Additionally, as noted above, the project is an environmentally acceptable action.  Based on the discussion above, we conclude under section 7 of the NGA that the public convenience and necessity requires approval of the CP Express Pipeline Project, subject to the conditions in this order.

201.    Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of life, health, property, and environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

202.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[474]

---

[474]  *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal

203.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments.

The Commission orders:

(A)    In Docket No. CP22-21-000, CP2 LNG is authorized under section 3 of the NGA to site, construct, and operate the CP2 LNG Project, as described and conditioned herein, and as more fully described in CP2 LNG's application and subsequent filings by the applicant, including any commitments made therein.

(B)    The authorizations in Ordering Paragraph (A) are conditioned on:

(1)    CP2 LNG's facilities being fully constructed and made available for service within seven years of the date of this order; and

(2)    CP2 LNG's compliance with the environmental conditions contained in the appendix to this order.

(C)    In Docket No. CP22-22-000, a certificate of public convenience and necessity under section 7(c) of the NGA is issued to CP Express authorizing it to construct and operate the CP Express Pipeline Project, as described and conditioned herein, and as more fully described in CP Express's application and subsequent filings by the applicant, including any commitments made therein.

(D)    The certificate authorized in Ordering Paragraph (C) is conditioned on:

(1)    CP Express's facilities being constructed and made available for service within seven years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)    CP Express's compliance with all applicable Commission regulations under the NGA, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3)    CP Express's compliance with the environmental conditions contain in the appendix of this order.

_____

regulation, or would delay the construction and operation of facilities approved by the Commission).

(E)      A blanket transportation certificate is issued to CP Express under Subpart G of Part 284 of the Commission's regulations.

(F)      A blanket construction certificate is issued to CP Express under Subpart F of Part 157 of the Commission's regulations.

(G)      CP Express shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in the signed precedent agreements, prior to commencing construction.

(H)      CP2 LNG and CP Express shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies CP2 LNG or CP Express.  CP2 LNG and CP Express shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

(I)      CP Express's initial recourse rates, fuel and lost and unaccounted for gas reimbursement percentages, and *pro forma* tariff are approved, as conditioned and modified above.

(J)      CP Express is required to file actual tariff records reflecting revised initial rates and tariff language that comply with the requirements contained in the body of this order prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.  CP Express may file the revised initial rates for Phase II service in this filing or in a separate filing prior to the commencement of Phase II service.

(K)      The untimely motion to intervene filed by Fisherman Involved in Sustaining our Heritage on April 18, 2024, is denied.

(L)      Within three months after its first three years of actual operation of its entire system including Phase II service, as discussed herein, CP Express must make a filing to justify its existing cost-based firm and interruptible recourse rates.  CP Express's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, CP Express is advised to include as part of the eFiling description, a reference to Docket Nos. CP22-21-000 and CP22-22-000 in the cost and revenue study.  To the extent CP Express has not begun construction of the Phase II facilities within two years of the in-service date of Phase I, CP Express is directed to file a cost and revenue study three years after the in-service date of the Phase I facilities.

By the Commission.  Commissioner Clements is dissenting with a separate statement
                    attached.
                    Commissioner Rosner is not participating.

( S E A L )


                              Debbie-Anne Reese,
                               Acting Secretary.

**Appendix**

**Environmental Conditions**

As recommended in the final environmental impact statement (EIS) and otherwise amended herein, this authorization includes the following conditions.

1.  Venture Global CP2 LNG, LLC (CP2 LNG) and Venture Global CP Express, LLC (CP Express) shall follow the construction procedures and mitigation measures described in its application and supplements, including responses to staff data requests and as identified in the EIS, unless modified by the Order.  CP2 LNG and CP Express must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of life, health, property, and the environment during construction and operation of the CP2 LNG and CP Express Project (project).  This authority shall allow:

    a.  the modification of conditions of the Order;

    b.  stop-work authority and authority to cease operation; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

3.  **Prior to any construction,** CP2 LNG and CP Express shall file an affirmative statement with the Secretary, certified by senior company officials, that all

company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4. The authorized facility locations shall be as shown in the EIS, as supplemented by filed plot plans, alignment sheets, and facility diagrams. **As soon as they are available, and before the start of construction,** CP2 LNG and CP Express shall file with the Secretary any revised detailed plans, diagrams, and alignment sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must specify locations designated on these plans, diagrams, and alignment sheets.

   CP Express' exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the Order must be consistent with the authorized Pipeline System facilities and locations. CP Express' right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5. CP2 LNG and CP Express shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed that have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use or cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps, or aerial photographs. Use of each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area.**

   This requirement does not apply to extra workspace allowed by the Federal Energy Regulatory Commission's (FERC or Commission) *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

   Examples of alterations requiring approval include all route alignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;

b.    implementation of endangered, threatened, or special concern mitigation measures;

c.    recommendations by state regulatory authorities; and

d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **At least 60 days before construction begins,** CP2 LNG and CP Express shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee. CP2 LNG and CP Express must file revisions to the plan as schedules change. The plan shall identify:

a.    how CP2 LNG and CP Express will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

b.    how CP2 LNG and CP Express will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c.    the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d.    company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e.    the location and dates of the environmental compliance training and instructions CP2 LNG and CP Express will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change); (with the opportunity for OEP staff to participate in the training sessions(s));

f.    the company personnel (if known) and specific portion of CP2 LNG and CP Express' organization having responsibility for compliance;

g.    the procedures (including use of contract penalties) CP2 LNG and CP Express will follow if noncompliance occurs; and

      h.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

          i.     the completion of all required surveys and reports;

         ii.     the environmental compliance training of onsite personnel;

       iii.     the start of construction; and

       iv.     the start and completion of restoration.

7.     CP2 LNG shall employ at least one EI and CP Express shall employ at least one EI per construction spread.  The EI(s) shall be:

      a.     responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

      b.     responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

      c.     empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

      d.     a full-time position, separate from all other activity inspectors;

      e.     responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

      f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, CP2 LNG shall file updated status reports with the Secretary on a **monthly** basis and CP Express shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.  Problems of a significant magnitude shall be reported to the FERC **within 24 hours**.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities.  Status reports shall include:

      a.     an update on CP2 LNG and CP Express' efforts to obtain the necessary federal authorizations;

      b.     project schedule, including current construction status of the project and work planned for the following reporting period;

    c.    a listing of all problems encountered, contractor nonconformance/deficiency logs, and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.    a description of the corrective and remedial actions implemented in response to all instances of noncompliance, nonconformance, or deficiency;

    e.    the effectiveness of all corrective and remedial actions implemented;

    f.    a description of any landowner/resident complaints which may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

    g.    copies of any correspondence received by CP2 LNG and CP Express from other federal, state, or local permitting agencies concerning instances of noncompliance, and CP2 LNG and CP Express response.

9.    CP2 LNG and CP Express shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way. **Prior to construction**, CP2 LNG and CP Express shall mail the complaint procedures to each landowner whose property will be crossed by the project.

    a.    In its letter to affected landowners, CP2 LNG and CP Express shall:

        (1)    provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

        (2)    instruct the landowners that if they are not satisfied with the response, they should call CP2 LNG and CP Express Hotline; the letter should indicate how soon to expect a response; and

        (3)    instruct the landowners that if they are still not satisfied with the response from CP2 LNG and CP Express Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

    b.    In addition, CP2 LNG and CP Express shall include in its status report a copy of a table that contains the following information for each

problem/concern:

(1)     the identity of the caller and date of the call;

(2)     the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

(3)     a description of the problem/concern; and

(4)     an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.    CP2 LNG and CP Express must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction** of any project facilities.  To obtain such authorization, CP2 LNG and CP Express must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    CP2 LNG must receive written authorization from the Director of OEP, or the Director's designee, **prior to introducing hazardous fluids into the Terminal Facilities**.  Instrumentation and controls, hazard detection, hazard control, and security components/systems necessary for the safe introduction of such fluids shall be installed and functional.

12.    CP2 LNG must receive written authorization from the Director of OEP, or the Director's designee, **before placing into service the Terminal Facilities.**  Such authorization will only be granted following a determination that the facilities have been constructed in accordance with FERC approval, can be expected to operate safely as designed, and the rehabilitation and restoration of areas affected by the project are proceeding satisfactorily.

13.    CP Express must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Pipeline System into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

14.    **Within 30 days of placing the authorized facilities in service**, CP2 LNG and CP Express shall file an affirmative statement with the Secretary, certified by a senior company official:

a.     that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

b. identifying which of the conditions in the Order CP2 LNG and CP Express has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

15. All conditions attached to the water quality certification issued by the Railroad Commission of Texas and/or the Louisiana Department of Environmental Quality constitute mandatory conditions of the Order. **Prior to construction activities**, CP2 LNG and CP Express shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

16. **Prior to construction,** CP Express shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee:

a. the Interstate 10, Energy Corridor, and Houston River horizontal directional drills (HDD) alignment plan and profile that incorporates site-specific geotechnical information; and

b. for each proposed HDD, a description of any subsurface conditions that were identified during geotechnical investigations that may increase the risk of HDD complications (e.g., loss of drilling fluids; drill transition between overburden/bedrock, drill hole collapse, existing groundwater and/or soil contamination) as well as the measures that CP Express would implement to minimize these risks.

17. **Prior to construction**, CP2 LNG shall file with the Secretary, for review and written approval by the Director of the OEP, or the Director's designee, for the six proposed Calcasieu Pass HDDs:

a. an HDD monitoring, inadvertent return response, and contingency plan which describes drilling fluid composition and management, monitoring procedures during drilling operations, and response procedures for an inadvertent return of drilling fluid to the ground surface;

b. an alignment plan and profile that incorporates site-specific geotechnical information; and

c. a description of any subsurface conditions that were identified during geotechnical investigations that may increase the risk of HDD complications (e.g., loss of drilling fluids; drill transition between overburden/bedrock, drill hole collapse, existing groundwater and/or soil contamination) as well as the measures that CP2 LNG would implement to

minimize these risks.

18. **Prior to construction**, CP2 LNG shall provide a plan for review and written approval by the Director of the OEP, or the Director's designee, to maintain an intake velocity of less than 0.5 feet per second at the hydrostatic test water intake structure screen.

19. **Prior to construction**, CP2 LNG shall consult with the National Marine Fisheries Service Marine Mammal Branch to confirm that an Incidental Take Authorization is not required for the project. CP2 LNG shall file the documentation of the consultation with the Secretary.

20. CP2 LNG and CP Express shall **not begin** construction of the project **until** they file with the Secretary a copy of the determination of consistency with the Coastal Zone Management Plan issued by the Louisiana Department of Natural Resource/Office of Coastal Management.

21. CP Express shall **not begin** construction of the facilities and/or use of staging, storage, or temporary workspace areas and new or to-be improved access roads **until**:

    a.   CP Express files with the Secretary:

         i.    any remaining cultural resources survey report(s);

         ii.   site evaluation report(s) and avoidance/treatment plan(s), as required; and

         iii.  comments on the cultural resources reports and plans from the Texas and Louisiana State Historic Preservation Officers and/or any interested Indian tribes.

    b.   the Advisory Council on Historic Preservation is afforded the opportunity to comment if historic properties would be adversely affected; and

    c.   the FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies CP Express in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

    All material filed with the Commission containing **location, character, and ownership** information about cultural resources much as the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI/PRIV – DO NOT RELEASE."**

23. **Prior to construction**, CP2 LNG shall file a nighttime noise mitigation plan with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, that includes the measures it will implement to reduce the projected nighttime (7:00 p.m. to 7:00 a.m.) construction noise levels to at or below 48.6 A-weighted decibel (dBA) equivalent sound level ($L_{eq}$) at noise sensitive areas (NSA)/noise evaluation locations (NEL), and how it will monitor the noise levels during construction activities.

24. **Prior to construction**, CP2 LNG shall file a pile driving noise mitigation plan with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, that includes the measures it will implement to reduce the projected maximum sound level ($L_{max}$) pile driving noise levels to at or below 70 dBA $L_{max}$ at NSAs/NELs, and how it will monitor the noise levels during pile driving activities.  The mitigation plan shall include mitigation measures, such as temporary barriers or shrouds.

25. **During construction activities at the Terminal Facilities between 7:00 p.m. and 7:00 a.m.**, CP2 LNG shall monitor noise levels, document the noise levels in the construction status reports, and restrict the noise attributable to construction activities to no more than 55 dBA day-night sound level ($L_{dn}$) (48.6 dBA $L_{eq}$) at any nearby NSAs.

26. CP2 LNG shall file with the Secretary, a full power load noise survey for the Terminal **no later than 60 days** after each phase of liquefaction blocks are placed into service.  If the noise attributable to operation of the equipment at the Terminal exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, **within 60 days** CP2 LNG shall modify operation of the liquefaction facilities or install additional noise controls until a noise level below an $L_{dn}$ of 55 dBA at the NSA is achieved.  CP2 LNG shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

27. CP2 LNG shall file a noise survey with the Secretary, **no later than 60 days** after placing the entire Terminal into service.  If a full load condition noise survey is not possible, CP2 LNG shall provide an interim survey at the maximum possible horsepower load **within 60 days** of placing the Terminal into service and provide the full load survey **within 6 months**.  If the noise attributable to operation of the equipment at the Terminal exceeds an $L_{dn}$ of 55 dBA at any nearby NSA under interim or full horsepower load conditions, CP2 LNG shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  CP2 LNG shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

28.   CP Express shall file a noise survey for the Moss Lake Compressor Station with the Secretary **no later than 60 days** after placing the station into service.  If a full power load conditions are not possible, CP Express shall file an interim survey at the maximum possible horsepower load **within 60 days** of placing the station into service and file the full load survey **within 6 months**.  If the noise attributable to operation of the equipment at the Moss Lake Compressor Station exceeds an $L_{dn}$ of 55 dBA at any nearby NSA under interim or full horsepower load conditions, CP Express shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  CP Express shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

29.   CP Express shall file a noise survey for the TETCO & Boardwalk Interconnect and Florida Gas Meter Stations with the Secretary **no later than 60 days** after placing the stations into service.  If full power load conditions are not possible, CP Express shall file an interim survey at the maximum possible horsepower load **within 60 days** of placing the station into service and file the full load survey **within 6 months**.  If the noise attributable to operation of the equipment at the meter stations exceeds an $L_{dn}$ of 55 dBA at any nearby NSAs under interim or full horsepower load conditions, CP Express shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  CP Express shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

30.   **Prior to initial site preparation**, CP2 LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana:

      a.     the erosion control and prevention plan for the dock area; and

      b.     the finalized foundation design criteria for the project; and the associated quality assurance and quality control procedures.

31.   **Prior to initial site preparation,** CP2 LNG shall file with the Secretary the finalized pile load test program (e.g., pile load test procedure, locations, configuration, quality assurance, and quality control, etc.), which shall comply with American Society for Testing and Materials (ASTM) D1143, ASTM 3689, ASTM 3966, or approved equivalent.  The filing shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

32.   **Prior to initial site preparation**, CP2 LNG shall file with the Secretary the finalized wind design basis for the project facility, which shall include the tornado

loads determination and consideration for the design loads combination cases as required by American Society of Civil Engineers (ASCE)/Structural Engineering Institute (SEI) (2022).

33. **Prior to construction of final design**, CP2 LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana:

   a.   the corrosion control and prevention plan for any underground piping, structure, foundations, equipment, and components;

   b.   the finalized site settlement analysis for the project site, which shall include total settlement, differential settlement, subsidence, sea level rise, potential soil liquefaction;

   c.   the total and differential settlement of final designed structures, systems, and components foundations for the project site;

   d.   the finalized settlement monitoring program and procedures for the project site; and

   e.   the total and differential settlement monitoring system of liquified natural gas (LNG) storage tank foundation design shall comply with applicable LNG industrial code/standards, including but not limited to American Petroleum Institute (API) 620 (12th edition), API 625 (1st edition), API 650 (13th edition), API 653 (5th edition), and American Concrete Institute (ACI) 376 (2011 edition) or approved equivalents.

34. **Prior to construction of final design**, CP2 LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana:

   a.   site preparation drawings and specifications;

   b.   finalized civil and structural design basis, criteria, specifications;

   c.   LNG terminal structures, LNG storage tank, and foundation design drawings and calculations (including prefabricated and field constructed structures);

   d.   seismic design specifications for procured Seismic Category I equipment;

   e.   quality control procedures to be used for civil/structural design and construction; and

    f.    a determination of whether soil improvement is necessary to counteract soil liquefaction.

In addition, CP2 LNG shall file, in its Implementation Plan, the schedule for producing this information.

35.    **Prior to construction of the final design**, CP2 LNG shall file with the Secretary the finalized projectile/missile impact analysis to demonstrate that the outer concrete container wall of the full containment LNG storage tank could withstand projectile/missile impact. The analysis shall detail the projectile/missile speeds and characteristics and methods used to determine penetration resistance and perforation depths. The finalized projectile/missile impact analysis shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

36.    **Prior to construction of final design**, CP2 LNG shall file with the Secretary a final design basis of the structure, system, and components in consideration of flood loads, erosion and scour and hydrostatic loads; and final maintenance program of inspection of hydrographic survey of the submerged slope conducted with enough frequency to detect any erosion in the areas vulnerable to bow thrusters and propellers. The filing shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

**Information pertaining to the following specific conditions, shall be filed with the Secretary for review and written approval by the Director of OEP, or the Director's designee, within the timeframe indicated by each condition. Specific engineering, vulnerability, or detailed design information meeting the criteria specified in Order No. 833 (Docket No. RM16-15-000), including security information, shall be submitted as critical energy infrastructure information pursuant to 18 CFR §388.113. See Critical Electric Infrastructure Security and Amending Critical Energy Infrastructure Information, Order No. 833, 81 Fed. Reg. 93,732 (December 21, 2016), FERC Stats. & Regs. 31,389 (2016). Information pertaining to items such as offsite emergency response, procedures for public notification and evacuation, and construction and operating reporting requirements will be subject to public disclosure. All information shall be filed <u>a minimum of 30 days</u> before approval to proceed is requested.**

37.    **Prior to initial site preparation**, CP2 LNG shall file the finalized geotechnical investigation report that includes the performance of boreholes and cone penetration test (CPT) soundings on the route from LNG storage tank area to dock area; the performance of the boreholes and CPT soundings for each LNG storage tank foundation area in accordance with the provisions of ACI 376 (2011 edition) or approved equivalent; and details on the number, location, and depth of

boreholes and CPT soundings.  The finalized geotechnical investigation report shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

38. **Prior to initial site preparation,** CP2 LNG shall file the finalized civil plot plan with slopes and elevation contour lines for the project site.  The finalized civil plot plan shall demonstrate that the CP2 LNG site would not be flooded during mean higher high water (MHHW) after accounting for sea level rise and subsidence using intermediate values over 30 years.  The MHHW shall be based upon tidal datum from station 8768094 recorded by National Oceanic and Atmospheric Administration or approved equivalent.  The sea level rise and vertical land movement shall be in accordance with a minimum intermediate curve corresponding to the design life of the facility in Global and Regional Sea Level Rise Scenarios for the United States, U.S. Department of Commerce, National Ocean and Atmospheric Administration, National Ocean Service Center for Operational Oceanographic Products and Services, February 2022 or approved equivalent.

39. **Prior to initial site preparation,** CP2 LNG shall file the final design of floodwalls (storm surge protection barriers) to comply with applicable code/standards requirements including but not limited to National Fire Protection Association (NFPA) 59A (2019 edition) as incorporated by 33 CFR 127, and NFPA 59A (2001 edition) in 49 CFR 193. In addition, the floodwalls shall be designed and maintained in accordance with ASCE/SEI 7 (2022 edition) or approved equivalent and ASCE/SEI 24 (2014 edition) or approved equivalent to withstand a minimum of a 500-year mean occurrence interval in consideration of relative sea level rise, local subsidence, site settlement, shoreline recession, erosion and scour effect, and wind-driven wave effects. The sea level rise and vertical land movement shall be in accordance with a minimum intermediate curve corresponding to the design life of the facility in Global and Regional Sea Level Rise Scenarios for the United States, U.S. Department of Commerce, National Ocean and Atmospheric Administration, National Ocean Service Center for Operational Oceanographic Products and Services, February 2022 or approved equivalent.

40. **Prior to construction of final design**, CP2 LNG shall file the settlement monitoring and maintenance plan, which ensures the storm surge floodwalls to be no less than a minimum elevation of 500-year mean recurrence interval flood event; and facilities are protected for the life of the LNG terminal considering settlement, subsidence, and sea level rise.

41. **Prior to initial site preparation**, CP2 LNG shall file an overall project schedule, which includes the proposed stages of initial site preparation, construction, commissioning, and in-service plan relative to notice to proceed requests and

related conditions.

42. **Prior to initial site preparation**, CP2 LNG shall file procedures for controlling access during construction.

43. **Prior to initial site preparation**, CP2 LNG shall file quality assurance and quality control procedures for construction activities, including initial equipment laydown receipt and preservation.

44. **Prior to initial site preparation**, CP2 LNG shall file its design wind speed criteria for all other facilities not covered by Pipeline and Hazardous Materials Safety Administration's Letter of Determination to be designed to withstand wind speeds commensurate with the risk and reliability associated with the facilities in accordance with ASCE/SEI 7 (2022) or approved equivalent.

45. **Prior to initial site preparation**, CP2 LNG shall develop an Emergency Response Plan (including evacuation and any sheltering and re-entry) and coordinate procedures with the U.S. Coast Guard; state, county, and local emergency planning groups; fire departments; state and local law enforcement; and other appropriate federal agencies. This plan shall be consistent with recommended and good engineering practices, as defined in NFPA 1600, NFPA 1616, NPFA 1620, NFPA 470, NFPA 475, or approved equivalents and based on potential impacts and onsets of hazards from accidental and intentional events along the LNG marine vessel route and potential impacts and onset of hazards from accidental and intentional events at the LNG terminal, including but not limited to a catastrophic failure of the largest LNG tank. This plan shall address any special considerations and pre-incident planning for infrastructure and public with access and functional needs and shall include at a minimum:

    a. materials and plans for periodic dissemination of public education and training materials for evacuation and/or shelter in place of the public within any transient hazard areas along the LNG marine vessel route and within LNG terminal hazard areas;

    b. plans to competently train emergency responders required to effectively and safely respond to hazardous material incidents including, but not limited to, LNG fires and dispersion;

    c. plans to competently train emergency responders to effectively and safely evacuate or shelter public within transient hazard areas along the LNG marine vessel route and within hazard areas from LNG terminal;

    d. designated contacts with federal, state and local emergency response agencies responsible for emergency management and response within any

transient hazard areas along the LNG marine vessel route and within hazard areas from the LNG terminal;

e.    scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;

f.    scalable procedures for mobilizing response and establishing a unified command, including identification, location, and design of any emergency operations centers and emergency response equipment required to effectively and safely respond to hazardous material incidents and evacuate or shelter public within transient hazard areas along the LNG marine vessel route and within LNG terminal hazard areas;

g.    scalable procedures for notifying public, including identification, location, design, and use of any permanent sirens or other warning devices required to effectively communicate and warn the public prior to onset of debilitating hazards within any transient hazard areas along the LNG marine vessel route and within hazard areas from the LNG terminal;

h.    scalable procedures for evacuating the public, including identification, location, design, and use of evacuation routes/methods and any mustering locations required to effectively and safely evacuate the public within any transient hazard areas along the LNG marine transit route and within hazard areas from the LNG terminal; and

i.    scalable procedures for sheltering the public, including identification, location, design, and use of any shelters demonstrated to be needed and demonstrated to effectively and safely shelter the public prior to onset of debilitating hazards within transient hazard areas that may better benefit from sheltering in place (i.e., those within Zones of Concern 1 and 2), along the route of the LNG marine vessel and within hazard areas of the LNG terminal that may benefit from sheltering in place (i.e., those within areas of 1,600 British thermal units per square foot per hour [BTU/ft$^2$-hr] and 10,000 BTU/ft$^2$-hr radiant heats from fires with the farthest impacts, including from a catastrophic failure of the largest LNG tank).

CP2 LNG shall notify the FERC staff of all planning meetings in advance and shall report progress on the development of its ERP **at 3-month intervals**. CP2 LNG shall file public versions of offsite emergency response procedures for public notification, evacuation, and shelter in place.

46.   **Prior to initial site preparation**, CP2 LNG shall file a Cost-Sharing Plan identifying the mechanisms for funding all project-specific security/emergency

management costs that would be imposed on state and local agencies. This comprehensive plan shall include funding mechanisms for the capital costs associated with any necessary security/emergency management equipment and personnel base. This plan shall include sustained funding of any requirement or resource gap analysis identified to effectively and safely evacuate and shelter the public and to effectively and safely respond to hazardous material incidents consistent with recommended and good engineering practices. CP2 LNG shall notify FERC staff of all planning meetings in advance and shall report progress on the development of its Cost Sharing Plan **at 3-month intervals**.

47. **Prior to initial site preparation**, CP2 LNG shall file calculations demonstrating the loads on buried pipelines and utilities at temporary road crossings would be adequately distributed. The analysis shall be based on API Recommended Practices (RP) 1102 or other approved methodology.

48. **Prior to initial site preparation**, CP2 LNG shall file pipeline and utility damage prevention procedures for personnel and contractors. The procedures shall include provisions to mark buried pipelines and utilities prior to any site work and subsurface activities.

49. **Prior to construction of final design**, CP2 LNG shall file change logs that list and explain any changes made from the front-end-engineering-design (FEED) provided in CP2 LNG's application and filings. A list of all changes with an explanation for the design alteration shall be provided, and all changes shall be clearly indicated on all diagrams and drawings.

50. **Prior to construction of final design**, CP2 LNG shall file information/revisions pertaining to CP2 LNG's response numbers 37, 50, 60, 75b, 175, 176 of its June 10, 2022 filing; numbers 35, 86, 195, 197 of its July 7, 2022 filing; numbers 55, 59, 184, 191, 206 of its July 19, 2022 filing; number 15 of its August 2, 2022 filing; numbers 196, 205 of its August 4, 2022 filing; number 87 of its September 14, 2022 filing; numbers 13, 18 and 24 of its October 28, 2022 filing; number 22 of its November 3, 2022 filing; number 6 of its November 28, 2022 filing; number 11 of its May 19, 2023 filing; and numbers 1, 6, 7, 8, 9, 10 of its May 26, 2023 filing, which indicated features to be included or considered in the final design.

51. **Prior to construction of final design**, CP2 LNG shall file drawings and specifications for crash rated vehicle barriers in accordance with ASTM F2656 (2015) or approved equivalent at each facility entrance for access control. The crash rating vehicle type shall be supported by a security vulnerability assessment that takes into account the potential target attractiveness, threats, vulnerabilities, consequences, and mitigation effectiveness consistent with American Institute of Chemical Engineers, *Guidelines for Analyzing and Managing the Security Vulnerabilities of Fixed Chemical Sites*, or equivalent. The crash rating speed

shall be supported by an analysis of the maximum attainable vehicle velocity based on vehicle type acceleration and road characteristics (e.g., straight length, radius of curvature, sloped/banked, coefficient of friction, etc.).

52. **Prior to construction of final design**, CP2 LNG shall file drawings of vehicle protections internal to the plant, such as guard rails, barriers, and bollards to protect transfer piping, pumps, compressors, hydrants, and monitors to ensure that the facilities would be protected from inadvertent damage from vehicles, unless the facilities are located sufficiently away from in-plant roadways and areas accessed by vehicle.

53. **Prior to construction of final design**, CP2 LNG shall file drawings of the security fence. The fencing drawings shall provide details of fencing that demonstrate it is in accordance with National Fire Protection Association (NFPA) 59A (2019 edition) and would restrict and deter access around the entire facility and have a setback from exterior features (e.g., power lines, trees, etc.) and from interior features (e.g., piping, equipment, buildings, etc.) by at least 10 feet and that would not allow the fence to be overcome.

54. **Prior to construction of final design,** CP2 LNG shall file security camera and intrusion detection drawings. The security camera drawings shall show the locations, mounting elevation, areas covered, and features of each camera (e.g., fixed, tilt/pan/zoom, motion detection alerts, low light,  etc.) and shall provide camera coverage at access points and along the entire perimeter of the terminal with redundancies and camera coverage of the interior of the terminal to enable rapid monitoring of the terminal, including a camera at the top of each LNG storage tank, and coverage within pretreatment areas, within liquefaction areas, within truck transfer areas, within marine transfer areas, and within buildings. Drawings shall also show or note the location and type of the intrusion detection and shall cover the entire perimeter of the facility.

55. **Prior to construction of final design**, CP2 LNG shall file photometric analyses or equivalent and associated lighting drawings. The lighting drawings shall show the location, elevation, type of light fixture, and lux levels of the lighting system and shall depict illumination coverage along the perimeter of the terminal, process equipment, mooring points, and along paths/roads of access and egress to facilitate security monitoring and emergency response operations in accordance with federal regulations (e.g., 49 CFR 193, 29 CFR 1910, and 29 CFR 1926) and API 540 or approved equivalent.

56. **Prior to construction of final design**, CP2 LNG shall file a plan to implement the security risk analysis countermeasure recommendations and provide justification for any that would not be implemented as recommended.

57.    **Prior to construction of final design**, CP2 LNG shall file a plot plan of the final design showing all major equipment, structures, buildings, and impoundment systems.

58.    **Prior to construction of the final design**, CP2 LNG shall file an evaluation of the final design that quantitatively confirms the congestion levels used in overpressure modeling, considering the volume blockage ratios with all of the equipment, structural components, and piping included.  In addition, CP2 LNG shall file details for mitigation of overpressures onto the emergency diesel generators and any other significant components, unless final overpressure calculations demonstrate this is not necessary.

59.    **Prior to construction of final design**, CP2 LNG shall file three-dimensional plant drawings to confirm plant layout for maintenance, access, egress, and the extent and density of congested areas used in overpressure modeling.

60.    **Prior to construction of final design**, CP2 LNG shall file up-to-date process flow diagrams (PFDs), heat and material balances (HMBs), and piping and instrument diagrams (P&IDs) including vendor P&IDs.  The HMBs shall demonstrate a peak export rate of 28 million metric tonnes per annum.  The P&IDs shall include the following information:

      a.    equipment tag number, name, size, duty, capacity, and design conditions;

      b.    equipment insulation type and thickness;

      c.    storage tank pipe penetration size and nozzle schedule;

      d.    valve high pressure side and internal and external vent locations;

      e.    piping with line number, piping class specification, size, and insulation type and thickness;

      f.    piping specification breaks and insulation limits;

      g.    all control and manual valves numbered;

      h.    relief valves with size and set points; and

      i.    drawing revision number and date.

61.    **Prior to construction of final design**, CP2 LNG shall file P&IDs, specifications, and procedures that clearly show and specify the tie-in details required to safely connect subsequently constructed facilities with the operational facilities.

62.    **Prior to construction of final design**, CP2 LNG shall file a car seal and lock

philosophy and car seal and lock program, including a list of all car-sealed and locked valves consistent with the P&IDs. The car seal and lock program shall include monitoring and periodically reviewing correct car seal and lock placement and valve position.

63. **Prior to construction of final design**, CP2 LNG shall file information to verify how the EPC contractor has addressed all FEED hazard identification (HAZID) study recommendations.

64. **Prior to construction of final design**, CP2 LNG shall file a hazard and operability review of the final design P&IDs, a list of the resulting recommendations, and actions taken on the recommendations. The issued for construction P&IDs shall incorporate the hazard and operability review recommendations and justification shall be provided for any recommendations that are not implemented.

65. **Prior to construction of final design**, CP2 LNG shall file information to demonstrate adherence to NFPA 59A (2019) Chapter 10 or approved equivalent, and, or including, the following information for the final design of the LNG transfer pipe-in-pipe systems:

   a. the detailed design, materials of construction, and a plot plan layout of the pipe-in-pipe system, including identification of all conventional process lines extending from or attached to the pipe-in-pipe, as well as the locations of any reliefs, instrumentation or other connections along the inner or outer pipes;

   b. an assessment of the vapor production and vapor handling capacities within the annular space during a full inner pipe rupture or smaller release into the outer pipe;

   c. stress analysis (thermal, mechanical, seismic, etc.) for the pipe-in-pipe systems, including the differential stresses between the inner pipe and outer pipe for a full inner pipe rupture, or any smaller release, at any location along the system;

   d. an evaluation demonstrating that pressure surge events will not exceed the design pressures;

   e. leak testing details, including pressures, for the outer pipe, consistent with American Society of Mechanical Engineers (ASME) B31.3;

   f. details of the maintenance procedures that will be followed over the life of the facility to determine that the outer pipe will be continuing to adequately serve as spill containment;

g.      procedures for purging or draining LNG from the outer pipe;

h.      details of loading and any external features that will protect against external common cause failures of the inner and outer pipes, including resulting stresses during horizontal directional drilling and fabrication processes;

i.      drawings and calculations for the sizing and configuration of any pressure relief for the annular space of the pipe-in-pipe and for the inner pipe in case of isolation while containing LNG; and

j.      plans to detect and monitor the LNG transfer line for leak monitoring.

66.    **Prior to construction of final design**, CP2 LNG shall provide a check valve upstream of the acid gas removal column to prevent backflow or provide a dynamic simulation that shows that upon plant shutdown, the vertical piping segment would be sufficient for this purpose.

67.    **Prior to construction of final design**, CP2 LNG shall include LNG tank fill flow measurement with high flow alarm.

68.    **Prior to construction of final design**, CP2 LNG shall specify the discretionary vent valve be operable through the Distributed Control System (DCS).  In addition, car sealed open manual block valves shall be provided upstream and downstream of the discretionary vent valve.  CP2 LNG shall also specify a discretionary vent valve on each LNG storage tank to safely vent pressure when the tank is isolated from the common boil-off gas (BOG) system.

69.    **Prior to construction of final design**, CP2 LNG shall file the safe operating limits (upper and lower), alarm and shutdown set points for all instrumentation (e.g., temperatures, pressures, flows, and compositions).

70.    **Prior to construction of final design**, CP2 LNG shall file cause-and-effect matrices for the process instrumentation, fire and gas detection system, and emergency shutdown system.  The cause-and-effect matrices shall include alarms and shutdown functions, details of the voting and shutdown logic, and set points.

71.    **Prior to construction of final design**, CP2 LNG shall specify that all emergency shutdown (ESD) valves are to be equipped with open and closed position switches connected to the DCS/safety instrument system (SIS).

72.    **Prior to construction of final design**, CP2 LNG shall file an up-to-date equipment list, process and mechanical data sheets, and specifications.  The specifications shall include:

a.      building specifications (e.g., control buildings, electrical buildings,

compressor buildings, storage buildings, pressurized buildings, ventilated buildings, blast resistant buildings);

b.      mechanical specifications (e.g., piping, valve, insulation, rotating equipment, heat exchanger, storage tank and vessel, other specialized equipment);

c.      electrical and instrumentation specifications (e.g., power system, control system, SIS, cable, other electrical and instrumentation); and

d.      security and fire safety specifications (e.g., security, passive protection, hazard detection, hazard control, firewater).

73.     **Prior to construction of final design**, CP2 LNG shall file a list of all codes and standards and the final specification document number where they are referenced.

74.     **Prior to construction of final design**, CP2 LNG shall file complete specifications and drawings of the proposed LNG tank design and installation.

75.     **Prior to construction of final design**, CP2 LNG shall file an evaluation of emergency shutdown valve closure times.  The evaluation shall account for the time to detect an upset or hazardous condition, notify plant personnel, and close the emergency shutdown valve(s).

76.     **Prior to construction of final design**, CP2 LNG shall file an evaluation of dynamic pressure surge effects from valve opening and closure times and pump operations that demonstrate that the surge effects do not exceed the design pressures.

77.     **Prior to construction of final design**, CP2 LNG shall file a pipe stress analysis for critical or potential higher consequence lines that evaluates all loads in ASME B31.3 (2016 edition and after), including but not limited to consideration of hazardous fluid lines that are cryogenic, high temperature, subject to slug flow, and that include 2-phase flow.  CP2 LNG shall also demonstrate, for hazardous fluids, piping and piping nipples 2 inches or less in diameter are designed to withstand external loads, including vibrational loads in the vicinity of rotating equipment and operator live loads in areas accessible by operators.

78.     **Prior to construction of final design**, CP2 LNG shall clearly specify the responsibilities of the LNG tank contractor and the Engineering Procurement and Construction (EPC) contractor for the piping associated with the LNG storage tank.

79.     **Prior to construction of final design**, CP2 LNG shall file the sizing basis and capacity for the final design of the flares and/or vent stacks as well as the pressure

and vacuum relief valves for major process equipment, vessels, and storage tanks.

80.   **Prior to construction of final design**, CP2 LNG shall specify that the common, non-spared process vessels are installed with spare pressure relief valves to ensure overpressure protection during relief valve testing or maintenance.

81.   **Prior to construction of final design**, CP2 LNG shall file an updated fire protection evaluation of the proposed facilities. A copy of the evaluation, a list of recommendations and supporting justifications, and actions taken on the recommendations shall be filed. The evaluation shall justify the type, quantity, and location of hazard detection and hazard control, passive fire protection, emergency shutdown and depressurizing systems, firewater, and emergency response equipment, training, and qualifications in accordance with NFPA 59A (2001). The justification for the flammable and combustible gas detection and flame and heat detection systems shall be in accordance with International Society of Automation (ISA) 84.00.07 or approved equivalent methodologies and would need to demonstrate 90 % or more of releases (unignited and ignited) that could result in an off-site or cascading impact would be detected by two or more detectors and result in isolation and de-inventory within 10 minutes. The analysis shall take into account the set points, voting logic, wind speeds, and wind directions. The justification for firewater shall provide calculations for all firewater demands based on design densities, surface area, and throw distance as well as specifications for the corresponding hydrant and monitors needed to reach and cool equipment.

82.   **Prior to construction of final design**, CP2 LNG shall file spill containment system drawings with dimensions and slopes of curbing, trenches, impoundments, tertiary containment and capacity calculations considering any foundations and equipment within impoundments, as well as the sizing and design of the down-comers. The spill containment drawings shall show containment for all hazardous fluids including all liquids handled above their flashpoint, from the largest flow from a single line for 10 minutes, including de-inventory, or the maximum liquid from the largest vessel (or total of impounded vessels) or otherwise demonstrate that providing spill containment would not significantly reduce the flammable vapor dispersion or radiant heat consequences of a spill. Any elevated stainless steel that would convey spills of cold liquefied gases shall be demonstrated suitable to handle the thermal shock combined with any applicable jetting forces of a pressurized release.

83.   **Prior to construction of final design**, CP2 LNG shall file an analysis that demonstrates the flammable vapor dispersion from design spills will be prevented from dispersing underneath the elevated jetty control room, or the control room will be able to withstand an overpressure due to ignition of the flammable vapor that disperses underneath the elevated jetty control room.

84.   **Prior to construction of final design**, CP2 LNG shall file electrical area classification drawings, including cross sectional drawings. The drawings shall demonstrate compliance with NFPA 59A, NFPA 70, NFPA 497, and API RP 500, or approved equivalents. In addition, the drawings shall include revisions to the electrical area classification design or provide technical justification that supports the electrical area classification using most applicable API RP 500 figures (i.e., figures 20 and 21) or hazard modeling of various release rates from equivalent hole sizes and wind speeds (see NFPA 497 release rate of 1 lb-mole/minute).

85.   **Prior to construction of final design**, CP2 LNG shall file analysis of the buildings containing hazardous fluids and the ventilation calculations that limit concentrations below the lower flammable limits (LFL) (e.g., 25% LFL), including an analysis of off gassing of hydrogen in battery rooms, and shall also provide hydrogen detectors that alarm (e.g., 20 to 25% LFL) and initiate mitigative actions (e.g., 40 to 50% LFL) or alarms in the event the ventilation is not functioning as designed, in accordance with NFPA 59A and NFPA 70, or approved equivalents.

86.   **Prior to construction of final design**, CP2 LNG shall file drawings and details of how process seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system meet the requirements of NFPA 59A (2001) and NFPA 70 (1999 or 2020, as applicable).

87.   **Prior to construction of final design**, CP2 LNG shall file details of an air gap or vent installed downstream of process seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system. Each air gap shall vent to a safe location and be equipped with a leak detection device that shall continuously monitor for the presence of a flammable fluid, alarm the hazardous condition, and shut down the appropriate systems. Alternatively, CP2 LNG shall file details on a system providing an approved equivalent protection, in accordance with NFPA 59A (2023 edition), from the migration of flammable fluid through the electrical conduit or wiring.

88.   **Prior to construction of final design**, CP2 LNG shall file complete drawings and a list of the hazard detection equipment. The drawings shall clearly show the location and elevation of all detection equipment as well as their coverage area. The list shall include the instrument tag number, type, manufacturer, model, location, alarm indication locations, and shutdown functions of the hazard detection equipment.

89.   **Prior to construction of final design**, CP2 LNG shall file a technical review of facility design that:

        a.      identifies all combustion/ventilation air intake equipment; and

b.  demonstrates that these areas are adequately covered by flammable gas detection devices and applicable toxic gas detection devices, and indicates how these devices would isolate or shutdown any combustion or ventilation air intake equipment whose continued operation could add to or sustain an emergency.

90.  **Prior to construction of final design**, CP2 LNG shall file a design that includes hazard detection suitable to detect high temperatures and smoldering combustion products in electrical buildings and control room buildings.

91.  **Prior to construction of final design**, CP2 LNG shall file an evaluation of the voting logic and voting degradation for hazard detectors.

92.  **Prior to construction of final design**, CP2 LNG shall file a list of alarm and shutdown set points for all hazard detectors that account for the calibration gas of the hazard detectors when determining the lower flammable limit set points for methane, ethylene, propane, isopentane, and condensate.

93.  **Prior to construction of final design**, CP2 LNG shall file a list of alarm and shutdown set points for all hazard detectors that account for the calibration gas of hazard detectors when determining the set points for toxic components such as condensate and hydrogen sulfide.

94.  **Prior to construction of final design**, CP2 LNG shall file a drawing showing the location of the emergency shutdown buttons, including but not limited to the refrigerant storage, LNG storage areas and area/unit emergency isolation and equipment shutdown.  Emergency shutdown buttons shall be easily accessible, conspicuously labeled, and located in an area which would be accessible during an emergency.

95.  **Prior to construction of final design**, CP2 LNG shall file facility plan drawings and a list of the fixed and wheeled dry-chemical, hand-held fire extinguishers, and other hazard control equipment.  Plan drawings shall clearly show the location by tag number of all fixed, wheeled, and hand-held extinguishers and shall demonstrate the spacing of extinguishers meet prescribed NFPA 10 travel distances.  The list shall include the equipment tag number, type, manufacturer and model, capacity, equipment covered, discharge rate, and automatic and manual remote signals initiating discharge of the units and shall demonstrate they meet NFPA 59A.

96.  **Prior to construction of final design**, CP2 LNG shall file drawings and specifications for the structural passive protection systems to protect equipment and supports from low temperature releases below minimum design metal temperatures.

97.     **Prior to construction of final design**, CP2 LNG shall file calculations or test results for the structural passive protection systems to protect equipment and supports from low temperature releases below minimum design metal temperatures.

98.     **Prior to construction of final design**, CP2 LNG shall file drawings and specifications for the structural passive protection systems to protect equipment and supports from pool fires and from jet fires of design spills that may exacerbate the initial hazard, as well as for electrical and control equipment that activate emergency systems to protect this equipment from a minimum 20-minute Underwrites Laboratories Inc. (UL) 1709 fire exposure.

99.     **Prior to construction of final design**, CP2 LNG shall file a detailed quantitative analysis to demonstrate that adequate mitigation would be provided for each pressure vessel that could fail within the 4,000 BTU/ft$^2$-hr zone from pool or jet fires; each critical structural component (including the LNG marine vessel) and emergency equipment item that could fail within the 4,900 BTU/ft$^2$-hr zone from a pool or jet fire; and each occupied building that could expose unprotected personnel within the 1,600 BTU/ft$^2$-hr zone from a pool or jet fire. Trucks at truck transfer stations shall be included in the analysis of potential pressure vessel failures, as well as measures needed to prevent cascading impact due to the 10-minute sizing spill at the marine area. A combination of passive and active protection for pool fires and passive and/or active protection for jet fires shall be provided and demonstrate the effectiveness and reliability. Effectiveness of passive mitigation shall be supported by calculations or test results for the thickness limiting temperature rise over the fire duration, and active mitigation shall be supported by reliability information by calculations or test results, such as demonstrating flow rates and durations of any cooling water would mitigate the heat absorbed by the component. The total firewater demand shall account for all components that could fail due to a pool or jet fire.

100.    **Prior to construction of final design**, CP2 LNG shall file an evaluation and associated specifications, drawings, and datasheets for transformers and transformer fluid demonstrating prevention of cascading damage of transformers (e.g., fire walls or spacing) in accordance with NFPA 850 or approved equivalent.

101.    **Prior to construction of final design**, CP2 LNG shall provide additional information on final design for any blast walls, hardened structures, and blast resistant design, including supporting hazard analysis and building risk assessment studies, in order to prevent cascading damage.

102.    **Prior to construction of final design**, CP2 LNG shall file facility plan drawings showing the proposed location of the firewater systems. Plan drawings shall clearly show the location of firewater piping, post indicator and sectional valves,

and the location and area covered by each monitor, hydrant, hose, water curtain, deluge system, water-mist system, and sprinkler.  The drawings shall demonstrate that each process area, fire zone, or other sections of piping with several users can be isolated with post indicator or sectional valves in accordance with NFPA 24 (2013 or thereafter) or approved equivalent, and that firewater coverage is provided by at least two monitors or hydrants with sufficient firewater flow to cool exposed surfaces subjected to a fire.  The drawings shall also include piping and instrumentation diagrams of the firewater systems.  Drawings of the sprinkler system design shall show coverage in applicable buildings per NFPA 850 and in applicable closed roofed buildings around the site, per NFPA 13.

103.  **Prior to construction of final design**, CP2 LNG shall specify that the firewater pump shelter is designed to remove the largest firewater pump or other component for maintenance with an overhead or external crane.

104.  **Prior to construction of final design**, CP2 LNG shall demonstrate that the firewater storage tank is in compliance with NFPA 22 or approved equivalent.

105.  **Prior to construction of final design**, CP2 LNG shall specify that the firewater flow test meter is equipped with a transmitter and that a pressure transmitter is installed upstream of the flow transmitter.  The flow transmitter and pressure transmitter shall be connected to the DCS and recorded.

106.  **Prior to construction of the final design**, CP2 shall file the finalized seismic monitoring program for the project site.  The seismic monitoring program shall comply with NFPA 59A (2019 edition) sections 8.4.14.10, 8.4.14.12, 8.4.14.12.1, 8.4.14.12.2, and 8.4.14.13; ACI 376 (2011 edition) sections 10.7.5 and 10.8.4; U.S. Nuclear Regulatory Commission Regulatory Guide Regulatory Guide (RG) 1.12 (Revision 3) sections 1 and 3 through 9 and all subsections, or approved equivalents.  A free-field seismic monitoring device shall be included in the seismic monitoring program for the project site. The seismic monitoring program information must include installation location plot plan; description of the triaxial strong motion recorders or other seismic instrumentation; the proposed alarm set points and operating procedures (including emergency operating procedures) for control room operators in response to such alarms/data obtained from seismic instrumentation; and testing and maintenance procedures.

107.  **Prior to construction of final design**, CP2 LNG shall file drawings of the storage tank piping support structure and support of horizontal piping at grade including pump columns, relief valves, pipe penetrations, instrumentation, and appurtenances.

108.  **Prior to construction of final design**, CP2 LNG shall file the structural analysis of the LNG storage tank and outer containment demonstrating they are designed to

withstand all loads and combinations.

109. **Prior to construction of final design**, CP2 LNG shall file an analysis of the structural integrity of the outer containment of the full containment LNG storage tank demonstrating it can withstand the radiant heat from an adjacent external pipeline fire or from an adjacent tank roof fire modeled using LNGFIRE3 or a similarly approved and validated pool fire model with application of uncertainty factors commensurate with its validation results including consideration of extrapolation.  If the LNG storage tank walls will not be designed to withstand the predicted radiant heat for the maximum duration, CP2 LNG shall demonstrate firewater coverage, or other mitigation that can be remotely or automatically activated or manually activated from a safe accessible distance based on appropriate Personal Protective Equipment ratings, for the LNG storage tank walls in addition to any other firewater coverage needs.

110. **Prior to construction of final design**, CP2 LNG shall file an analysis of the structural integrity of the outer containment of the full containment LNG storage tank demonstrating it can withstand the thermal shock caused by a failure of the inner tank, including specification of the leakage rate.

111. **Prior to construction of final design**, CP2 LNG shall file the final wheel load evaluations for underground hazardous fluid lines, including feed gas lines within the plant, in accordance with API RP 1102 or approved equivalent, and address any recommendations.

112. **Prior to commissioning**, CP2 LNG shall file a detailed schedule for commissioning through equipment startup.  The schedule shall include milestones for all procedures and tests to be completed:  prior to introduction of hazardous fluids and during commissioning and startup.  CP2 LNG shall file documentation certifying that each of these milestones has been completed before authorization to commence the next phase of commissioning and startup will be issued.

113. **Prior to commissioning**, CP2 LNG shall file detailed plans and procedures for: testing the integrity of onsite mechanical installation; functional tests; introduction of hazardous fluids; operational tests; and placing the equipment into service.

114. **Prior to commissioning**, CP2 LNG shall file settlement results during the hydrostatic tests of the LNG storage containers and shall file a plan to periodically thereafter to verify settlement is as expected and does not exceed the applicable criteria set forth in API 620 (12th edition), API 625 (1st edition), API 650 (13th edition), API 653 (5th edition), and ACI 376 (2011 edition) or approved equivalents.  The program shall also specify what actions would be taken after various levels of seismic events.

115. **Prior to commissioning**, CP2 LNG shall file the operation and maintenance procedures and manuals, as well as safety procedures, hot work procedures and permits, abnormal operating conditions procedures, simultaneous operations procedures, and management of change procedures and forms. The operational maintenance and testing procedures for fire protection components shall be in accordance with the current versions of the applicable standards listed in NPFA 59A (2019) or equivalent.

116. **Prior to commissioning**, CP2 LNG shall file a plan for clean-out, dry-out, purging, and tightness testing. This plan shall address the requirements of the American Gas Association's Purging Principles and Practice, and shall provide justification if not using an inert or non-flammable gas for clean-out, dry-out, purging, and tightness testing.

117. **Prior to commissioning**, CP2 LNG shall tag all equipment, instrumentation, and valves in the field, including drain valves, vent valves, main valves, and car-sealed or locked valves.

118. **Prior to commissioning**, CP2 LNG shall file a plan to maintain a detailed training log to demonstrate that operating, maintenance, and emergency response staff have completed the required training. In addition, CP2 LNG shall file signed documentation that demonstrates training has been conducted, including ESD and response procedures, prior to the respective operation.

119. **Prior to commissioning**, CP2 LNG shall file the procedures for pressure/leak tests which address the requirements of ASME Boiler and Pressure Vessel Code (BPVC) Section VIII and ASME B31.3. In addition, CP2 LNG shall file a line list of pneumatic and hydrostatic test pressures.

120. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document a pre-startup safety review to ensure that installed equipment meets the design and operating intent of the facility. The pre-startup safety review shall include any changes since the last hazard review, operating procedures, and operator training. A copy of the review with a list of recommendations, and actions taken on each recommendation, shall be filed.

121. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document all pertinent tests (Factory Acceptance Tests, Site Acceptance Tests, Site Integration Tests) associated with the DCS and SIS that demonstrates full functionality and operability of the system.

122. **Prior to introduction of hazardous fluids**, CP2 LNG shall develop and implement an alarm management program consistent with ISA 18.2 (2016 edition) or approved equivalent to reduce alarm complacency and maximize the

effectiveness of operator response to alarms.

123. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document clean agent acceptance tests.

124. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document a firewater pump acceptance test and firewater monitor and hydrant coverage test.  The actual coverage area from each monitor and hydrant shall be shown on facility plot plan(s).

125. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document sprinkler system acceptance tests.

126. CP2 LNG shall file a request for written authorization from the Director of OEP **prior to unloading or loading the first LNG commissioning cargo**.  After production of first LNG, CP2 LNG shall file weekly reports on the commissioning of the proposed systems that detail the progress toward demonstrating the facilities can safely and reliably operate at or near the design production rate.  The reports shall include a summary of activities, problems encountered, and remedial actions taken.  The weekly reports shall also include the latest commissioning schedule, including projected and actual LNG production by each liquefaction train, LNG storage inventories in each storage tank, and the number of anticipated and actual LNG commissioning cargoes, along with the associated volumes loaded or unloaded.  Further, the weekly reports shall include a status and list of all planned and completed safety and reliability tests, work authorizations, and punch list items.  Problems of significant magnitude shall be reported to the FERC within 24 hours.

127. **Prior to commencement of service**, CP2 LNG shall file a request for written authorization from the Director of OEP.  Such authorization would only be granted following a determination by the U.S. Coast Guard, under its authorities under the Ports and Waterways Safety Act, the Magnuson Act, the MTSA of 2002, and the Security and Accountability For Every Port Act, that appropriate measures to ensure the safety and security of the facility and the waterway have been put into place by CP2 LNG or other appropriate parties.

128. **Prior to commencement of service**, CP2 LNG shall notify the FERC staff of any proposed revisions to the security plan and physical security of the plant.

129. **Prior to commencement of service**, CP2 LNG shall label piping with fluid service and direction of flow in the field consistent with ASME A13.1 (2020 edition) or approved equivalent, in addition to the pipe labeling requirements of NFPA 59A (2001).

130. **Prior to commencement of service**, CP2 LNG shall provide plans for any preventative and predictive maintenance program that performs periodic or continuous equipment condition monitoring.

131. **Prior to commencement of service**, CP2 LNG shall develop procedures for offsite contractors' responsibilities, restrictions, monitoring, training, and limitations and for supervision of these contractors and their tasks by CP2 LNG staff.  Specifically, the procedures shall address:

    a.    selecting a contractor, including obtaining and evaluating information regarding the contract employer's safety performance and programs;

    b.    informing contractors of the known potential hazards, including flammable and toxic release, explosion, and fire, related to the contractor's work and systems they are working on;

    c.    developing and implementing provisions to control and monitor the entrance, presence, and exit of contract employers and contract employees from process areas, buildings, and the plant;

    d.    developing and implementing safe work practices for control of personnel safety hazards, including lockout/tagout, confined space entry, work permits, hot work, and opening process equipment or piping;

    e.    developing and implementing safe work practices for control of process safety hazards, including identification of layers of protection in systems being worked on, recognizing abnormal conditions on systems they are working on, and re-instatement of layers of protection, including ensuring bypass, isolation valve, and car-seal programs and procedures are being followed;

    f.    developing and implementing provisions to ensure contractors are trained on the emergency action plans and that they are accounted for in the event of an emergency; and

    g.    monitoring and periodically evaluating the performance of contract employers in fulfilling their obligations above, including successful and safe completion of work and re-instatement of all layers of protection.

**In addition, we recommend that the following measures shall apply <u>throughout the life</u> of the CP2 LNG project.**

132. The facility shall be subject to regular FERC staff technical reviews and site inspections on at least an **annual** basis or more frequently as circumstances indicate.  Prior to each FERC staff technical review and site inspection, CP2 LNG

shall respond to a specific data request including information relating to possible design and operating conditions that may have been imposed by other agencies or organizations. Up-to-date detailed P&IDs reflecting facility modifications and provision of other pertinent information not included in the semi-annual reports described below, including facility events that have taken place since the previously submitted semi-annual report, shall be submitted.

133. **Semi-annual** operational reports shall be filed with the Secretary to identify changes in facility design and operating conditions; abnormal operating experiences; activities (e.g., ship arrivals, quantity and composition of imported and exported LNG, liquefied and vaporized quantities, boil off/flash gas); and plant modifications, including future plans and progress thereof. Abnormalities shall include, but not be limited to, unloading/loading/shipping problems, potential hazardous conditions from offsite vessels, storage tank stratification or rollover, geysering, storage tank pressure excursions, cold spots on the storage tank, storage tank vibrations and/or vibrations in associated cryogenic piping, storage tank settlement, significant equipment or instrumentation malfunctions or failures, non-scheduled maintenance or repair (and reasons therefore), relative movement of storage tank inner vessels, hazardous fluids releases, fires involving hazardous fluids and/or from other sources, negative pressure (vacuum) within a storage tank, and higher than predicted boil off rates. Adverse weather conditions and the effect on the facility also shall be reported. Reports shall be submitted **within 45 days after each period ending June 30 and December 31**. In addition to the above items, a section entitled "Significant Plant Modifications Proposed for the Next 12 Months (dates)" shall be included in the semi-annual operational reports. Such information would provide the FERC staff with early notice of anticipated future construction/maintenance at the LNG facilities.

134. In the event the temperature of any region of the LNG storage container, including any secondary containment and imbedded pipe supports, becomes less than the minimum specified operating temperature for the material, the Commission shall be notified **within 24 hours** and procedures for corrective action shall be specified.

135. Significant non-scheduled events, including safety-related incidents (e.g., LNG, condensate, refrigerant, or natural gas releases; fires; explosions; mechanical failures; unusual over pressurization; and major injuries) and security-related incidents (e.g., attempts to enter site, suspicious activities) shall be reported to the FERC staff. In the event that an abnormality is of significant magnitude to threaten public or employee safety, cause significant property damage, or interrupt service, notification shall be made **immediately**, without unduly interfering with any necessary or appropriate emergency repair, alarm, or other emergency procedure. In all instances, notification shall be made to the FERC staff **within 24**

**hours**.  This notification practice shall be incorporated into the liquefaction facility's emergency plan.  Examples of reportable hazardous fluids-related incidents include:

a.      fire;

b.      explosion;

c.      estimated property damage of $50,000 or more;

d.      death or personal injury necessitating in-patient hospitalization;

e.      release of hazardous fluids for 5 minutes or more;

f.      unintended movement or abnormal loading by environmental causes, such as an earthquake, landslide, or flood, that impairs the serviceability, structural integrity, or reliability of an LNG facility that contains, controls, or processes hazardous fluids;

g.      any crack or other material defect that impairs the structural integrity or reliability of an LNG facility that contains, controls, or processes hazardous fluids;

h.      any malfunction or operating error that causes the pressure of a pipeline or LNG facility that contains or processes hazardous fluids to rise above its maximum allowable operating pressure (or working pressure for LNG facilities) plus the build-up allowed for operation of pressure-limiting or control devices;

i.      a leak in an LNG facility that contains or processes hazardous fluids that constitutes an emergency;

j.      inner tank leakage, ineffective insulation, or frost heave that impairs the structural integrity of an LNG storage tank;

k.      any safety-related condition that could lead to an imminent hazard and cause (either directly or indirectly by remedial action of the operator), for purposes other than abandonment, a 20 % reduction in operating pressure or shutdown of operation of a pipeline or an LNG facility that contains or processes hazardous fluids;

l.      safety-related incidents from hazardous fluids transportation occurring at or en route to and from the LNG facility; or

m.      an event that is significant in the judgment of the operator and/or

management even though it did not meet the above criteria or the guidelines set forth in an LNG facility's incident management plan.

In the event of an incident, the Director of OEP has delegated authority to take whatever steps are necessary to ensure operational reliability and to protect human life, health, property, or the environment, including authority to direct the LNG facility to cease operations. Following the initial company notification, the FERC staff would determine the need for a separate follow-up report or follow up in the upcoming semi-annual operational report. All company follow-up reports shall include investigation results and recommendations to minimize a reoccurrence of the incident.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Venture Global CP2 LNG, LLC                    Docket Nos.  CP22-21-000
Venture Global CP Express, LLC                              CP22-22-000

(Issued June 27, 2024)

CLEMENTS, Commissioner, *dissenting*:

1.      I dissent from today's Order[1] because it contravenes sections 3 and 7 of the
Natural Gas Act (NGA),[2] the National Environmental Policy Act (NEPA),[3] and the
Administrative Procedure Act (APA).[4]  The Order's conclusions that the CP2 LNG
Project is not inconsistent with the public interest[5] and that the CP Express Pipeline
Project is required by the public convenience and necessity[6] cannot be sustained for
several reasons.[7]  First, the Order fails to meaningfully assess these Projects' enormous

---

[1] *Venture Global CP2 LNG, LLC*, 187 FERC ¶ 61,199 (2024) (Order).

[2] 15 U.S.C. §§ 717b, 717f.

[3] 42 U.S.C. § 4321 *et seq*.

[4] 5 U.S.C. § 551 *et seq*.

[5] Order, 187 FERC ¶ 61,199 at PP 32, 199.  I agree with commenters that the
bifurcation of authority between the Commission and the Department of Energy (DOE)
with respect to authorizations under section 3 of the Natural Gas Act leaves us no clear
standard for making our public interest determination.  *See, e.g.*, Better Bayou et al.
March 13, 2023 Comments on Draft Environmental Impact Statement (DEIS) at 1-3;
NRDC March 13, 2023 Comments on DEIS at 2-3; Niskanen Center March 13, 2023
Comments on DEIS at 7-9.  We have no record on the economic or other benefits from
LNG exports and therefore cannot weigh them against the adverse impacts from
construction and operation of the CP2 LNG Project.  I reiterate my call for Congressional
clarification of how the Commission is to make its public interest determination.  *See
Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 (2022) (Clements, Comm'r, concurring
at P 5).  However, in this case, the CP2 LNG Project's adverse environmental and
socioeconomic impacts are so great that I am compelled to find that approving the project
is inconsistent with the public interest.

[6] Order, 187 FERC ¶ 61,199 at P 200.

[7] The CP2 LNG Project and CP Express Pipeline Project are collectively referred

greenhouse gas (GHG) emissions and does not explain whether or how the Commission factored them into its public interest determinations.[8]  Second, the Commission's analysis of cumulative air pollutant emissions is deficient, both procedurally and substantively.  The public has had no access to critical new air impacts modeling information, which should have been addressed in a supplemental environmental impact statement (SEIS) with full opportunity for public review and comment.  Third, the Order improperly discounts impacts to commercial fishing businesses, which will likely be significant.  Finally, the Commission failed to adequately consider how the full range of adverse project impacts will affect Environmental Justice (EJ) communities.

<u>Failure to Assess and Consider GHG Impacts</u>

2.      At the outset, it is helpful to summarize the Commission's legal obligations under the NGA, NEPA, and the APA with respect to the consideration of a proposed project's GHG emissions.  A number of cases have recognized that the Commission must consider the impacts of GHG emissions in its public interest determinations under the NGA.[9]  Those cases are consistent with the many precedents holding that environmental impacts are relevant to the Commission's public interest determinations under the statute.[10]

---

to below as the Projects.

[8] Order, 187 FERC ¶ 61,199 at PP 178-80.

[9] *See Vecinos Para el Bienstar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329, 1331 (D.C. Cir. 2021) (*Vecinos*) (finding the Commission's analysis of climate change impacts deficient under *both* the NGA and NEPA and directing the Commission to revisit its public interest determination after correcting deficiencies); *see also Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109, 115 (D.C. Cir. 2022) (finding "the Commission's NGA section 7 balancing of public benefits and adverse consequences reasonably accounted for potential environmental impacts" and noting that in some circumstances "[g]reenhouse gas emissions are a reasonably foreseeable effect of a pipeline project" that must be studied under NEPA); *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) (recognizing the NGA section 7 certificate process incorporates environmental review under NEPA, which includes analysis of downstream GHG emissions); *Birckhead v. FERC*, 925 F.3d 510, 518-19 (D.C. Cir. 2019) (affirming previous holdings that the Commission is the "legally relevant cause of the direct and indirect environmental effects of pipelines it approves," including reasonably foreseeable GHG emissions (cleaned up)); *Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) (addressing Commission's treatment of GHG emissions and explaining that the Commission's public convenience and necessity determination must weigh a project's environmental effects).

[10] *See, e.g.*, *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (holding that the Commission makes an appropriate NGA public interest

Indeed, more than sixty years ago, the Supreme Court held that our predecessor, the Federal Power Commission, properly factored air pollution impacts into its public interest determination under section 7.[11]  In *NAACP*, the Supreme Court held that environmental protection is one purpose of the NGA.[12]

3.      NEPA also requires the Commission to consider climate and other environmental impacts in deciding whether to approve a project application.  As the Supreme Court has explained, NEPA's EIS requirement "ensures that the agency, *in reaching its decision*, will have available, and will carefully *consider*, detailed information concerning significant environmental impacts . . ."[13]  The Commission's obligations under the NGA and NEPA are intertwined.  NEPA directs federal agencies "to the fullest extent possible" to interpret and administer their organic statutes in accordance with the environmental protection objectives set forth in NEPA.[14]  In requiring the Commission to consider environmental impacts in its substantive decision-making, NEPA gives content to the NGA's broad "public interest" standard.[15]

---

determination when it finds that a project has "substantial economic and commercial benefits" that are "not outweighed by the projected environmental impacts"); *Sierra Club v. FERC*, 827 F.3d 36, 42 (D.C. Cir. 2016) ("As required by the Natural Gas Act and NEPA, the Commission undertook an extensive review of the Freeport Projects."); *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019) (holding that *"[a]s part of the Section 7 certificating process* . . . the Commission must complete an environmental review of the proposed project under the National Environmental Policy Act" (emphasis added)); *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 106–11 (D.C. Cir. 2014) (stating that FERC is obligated to consider alternatives to a proposed project that might better serve the public interest, including on the basis of their environmental impact, when issuing a certificate under section 7).

[11] *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 5 (1961).

[12] *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 n.6 (1976).

[13] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (*Methow Valley*) (emphasis added).

[14] 42 U.S.C. § 4332; *see also* 42 U.S.C. § 4331 (setting forth NEPA's environmental protection objectives).

[15] *Cf. Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665-66 (D.C. Cir. 2011) (upholding agency's interpretation of "public interest" in its organic statute to include environmental considerations given NEPA's language and goals).

4.     Of course, the Commission must do more than consider GHG impacts in its decision-making.  The APA requires the Commission to provide a reasoned *explanation* of how it factored the GHG impacts into its substantive decision.[16]

5.     Today's order meets none of these statutory obligations.  The Order does not and cannot meaningfully explain how the Commission factored the Projects' GHG emissions into its decision, as the APA required it to do, because the Commission failed its duties under NEPA and the NGA to assess and weigh the impacts of those emissions.[17]

6.     The Commission's legal errors begin with its deficient NEPA analysis.  NEPA regulations and case law require the Commission to assess GHG-related environmental impacts.  The Council on Environmental Quality's (CEQ) regulations state that an EIS must discuss "[t]he environmental impacts of the proposed action and reasonable alternatives to the proposed action and the *significance* of those impacts."[18]  The D.C. Circuit Court of Appeals recently held that the regulation does not require the Commission to label GHG emissions as significant or insignificant.[19]  However, NEPA nevertheless requires more than a mere recitation of general facts about climate change and quantification of emissions; the statute requires *evaluation* and *analysis* of

---

[16] *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) ("[A]n agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.'" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (*State Farm*))).

[17] In *Vecinos*, the D.C. Circuit Court of Appeals found the Commission must reconsider its NGA public interest determinations because they rested on a deficient EIS.  *See Vecinos*, 6 F.4th at 1331.

[18] 40 C.F.R. § 1502.16(a)(1) (2024); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (*Sabal Trail*) (recognizing CEQ regulations requires an EIS to discuss the significance of environmental impacts).  The Commission's regulations implementing NEPA provide that the Commission will comply with CEQ's regulations under the statute.  18 C.F.R. § 380.1 (2024).

[19] *See Food and Water Watch v. FERC*, No. 22-1214, 2024 WL 2983833, at *6 (D.C. Cir. 2024) (*East 300*).

environmental impacts.[20]  Both the EIS for the Projects[21] and today's Order[22] violate NEPA and CEQ's regulations by failing to assess the nature and severity of environmental impacts that project-related GHG emissions will cause.

7.    Beyond failing its duties under NEPA, the Commission has not met its APA obligations because it nowhere explains whether or how the information on GHG emissions factored into its decision.  For example, the Order compares project emissions to national and state emissions inventories and emission reduction goals but says nothing about how, if at all, the Commission assessed this information in deciding to authorize the Projects.[23]  The public—and a reviewing court—are left to guess what connection there might be between the information the EIS and Order provide on GHG emissions and the Commission's public interest determinations under the NGA.  In failing to articulate that connection, the Commission violated fundamental APA requirements.[24]

8.    The Commission cannot excuse its non-compliance by claiming, as it does here, that there are no "accepted tools or methods for the Commission to use to determine significance" of the impacts of GHG emissions.[25]  That statement contradicts the

---

[20] *See, e.g.*, 40 C.F.R. § 1502.1 (2024) ("Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental *analyses*.") (emphasis added); *Reed v. Salazar*, 744 F. Supp. 2d 98, 100 (D.D.C. 2009) ("NEPA 'requires that agencies *assess* the environmental consequences of federal projects by following certain procedures during the decision-making process.'") (emphasis added) (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999))); 40 C.F.R. § 1502.15 (2024) ("The environmental impact statement may combine the *description* with *evaluation* of the environmental consequences.") (emphasis added). The court in *East 300* did not consider these requirements.

[21] Final EIS at 4-557 to 4-561.

[22] Order, 187 FERC ¶ 61,199 at PP 178-80.

[23] *See id.* at PP 171-73.

[24] *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine *the relevant data* and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (emphasis added) (quoting *Burlington Truck Lines, Inc*. *v. United States*, 371 U.S. 156, 168 (1962))).

[25] Order, 187 FERC ¶ 61,199 at P 180.  In addition to the reasons explained in the text of my dissent, I dissent from paragraphs 179-80 of the Order because they (1) reflect a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket (Docket No. PL21-3) addressing methods for doing so; and (2) depart

from previous Commission precedent without reasoned explanation, thereby violating the APA.  In my concurrence in *Transcon. Gas Pipe Line Co.*, 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring, at PP 2-3), I explained the history of the language, which the majority suddenly adopted in *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).  I dissented from this language in *Driftwood* and every subsequent order in which it has appeared.  *See Driftwood*, 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting in part at PP 2-3 & n.5); *see also Gas Transmission Nw. LLC*, 187 FERC ¶ 61,177 (2024) (Clements, Comm'r, dissenting at P 3); *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 (2004) (Clements, Comm'r, dissenting in part at P 2) *Port Arthur LNG, LLC*, 187 FERC ¶ 61,058 (2024) (Clements, Comm'r, dissenting in part at P 1); *Great Basin Gas Transmission Co.*, 187 FERC ¶ 61,043 (2024) (Clements, Comm'r, dissenting in part at P 1); *Fla. Gas Transmission Co.*, 187 FERC ¶ 61,042 (2024) (Clements, Comm'r, dissenting in part at P 1); *El Paso Nat. Gas Co.*, 187 FERC ¶ 61,041 (2024) (Clements, Comm'r, dissenting in part at P 1); *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 (2024) (Clements, Comm'r, dissenting at P 1) (*Transco*); *Gas Transmission Nw., LLC,* 187 FERC ¶ 61,023 (2024) (Clements, Comm'r, dissenting at P 28); *E. Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,209 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *N. Nat. Gas Co.*, 186 FERC ¶ 61,064 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,113 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,063 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Columbia Gas Transmission, LLC*, 186 FERC ¶ 61,048 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047 (2024) (Clements, Comm'r, dissenting at PP 8-9); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046 (2024) (Clements, Comm'r, dissenting in part at PP 1-2); *ANR Pipeline Co.*, 185 FERC ¶ 61,191 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Gas Transmission Nw., LLC,* 185 FERC ¶ 61,035 (2023) (Clements, Comm'r, concurring in part and dissenting in part at PP 7-8); *WBI Energy Transmission, Inc.*, 185 FERC ¶ 61,036 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Glob. Plaquemines LNG, LLC*, 185 FERC ¶ 61,037 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Trailblazer Pipeline Co.*, 185 FERC ¶ 61,039 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 185 FERC ¶ 61,040 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3);

Commission's own precedent. In *Northern Natural,* the Commission found that it *can* determine the significance of GHG-related impacts by applying its "experience, judgment, and expertise," just as it does for other types of environmental impacts.[26] Citing Supreme Court precedent, the Commission explained that the significance determination furthers NEPA's purposes by "disclosing to the public and the relevant decisionmakers the extent of a project's adverse environmental impacts."[27]

9.      I agree with parties in this docket who have stated that the Commission should have used the SC-GHG Protocol to assess the severity of the environmental impacts caused by the Projects' GHG emissions.[28] In another recent dissent, I explained in detail that the Commission's continued refusal to use the SC-GHG Protocol in its substantive decision-making (rather than simply for general "informational purposes") rests on outmoded reasoning that ignores important recent policy and scientific developments.[29] All of the points I made in that dissent apply here and I incorporate them by reference.

10.     The Order's treatment of GHG impacts is especially objectionable because of the sheer scale of the Projects' GHG emissions. The Projects' annual emissions equate to

---

*Venture Glob. Calcasieu Pass, LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, LP*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

   [26] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at P 32 (2021) (*Northern Natural*).

   [27] *Id.* at P 31 & n.47 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004)).

   [28] For a Better Bayou March 13, 2023 Comments on DEIS at 18-19; Niskanen Center March 13, 2023 Comments on DEIS at 39-42; NRDC March 13, 2023 Comments on DEIS at 10-12.

   [29] *Transco*, 187 FERC ¶ 61,024 (Clements, Comm'r, dissenting at PP 9-17). While some courts have found that the Commission is not required to use the SC-GHG Protocol, the parties in those cases did not raise, nor did the courts consider, the points made in my dissent regarding recent policy and scientific developments supporting the protocol's use.

putting more than 1,850,000 additional gas-fueled automobiles on the road each year.[30] Under any common sense understanding of the word, the Projects' GHG emissions would have to be considered far more than "significant." Yet the EIS and the Order fail to provide any analysis of the Projects' incremental or cumulative climate impacts.[31] As explained above, NEPA requires real analysis, not rote recitation of general facts about climate change. Moreover, the depth of the analysis must be commensurate with the magnitude of the impact.[32] Here, both the EIS and the Order are silent as to the degree or severity of the expected climate impacts[33] and bereft of *any analysis* of climate impacts the Projects will cause. Consequently, the Commission simply has failed to take the "hard look" at climate impacts that NEPA requires.[34]

11.     In summary, without assessing the Projects' climate impacts, the Commission cannot credibly claim to have considered them in its substantive decision-making, as both NEPA and the NGA required it to do. And it is beyond dispute that the Commission nowhere explains whether or how it factored the Projects' climate impacts into its public interest determinations, in violation of the APA. These fundamental legal errors render the Order unsustainable.

<u>Deficiencies in the Cumulative Air Pollution Impacts Analysis Undermine the Order</u>

---

[30] The Projects are estimated to emit approximately 8,510,099 metric tons per year of $CO_2e$. Order, 187 FERC ¶ 61,199 at P 165. That is equivalent to putting more than 1,850,000 additional gas-fueled automobiles on the road. EPA, *Greenhouse Gas Emissions from a Typical Passenger Vehicle* (Aug. 28, 2023), https://www.epa.gov/greenvehicles/greenhouse-gas-emissions-typical-passenger-vehicle ("A typical passenger vehicle emits about 4.6 metric tons of $CO_2$ per year.").

[31] *See supra* P 6 & n.20 (discussing agency obligations under NEPA to engage in substantive analysis of environmental impacts).

[32] *See* 40 C.F.R. § 1502.2(b) (2024) (stating EISs "shall discuss impacts in proportion to their significance"); 40 C.F.R. § 1502.15 (2024) ("Data and analyses in a statement shall be commensurate with the importance of the impact . . .").

[33] *See Methow Valley*, 490 U.S. at 352 (stating that an EIS must allow "the agency [or] other interested groups and individuals [to] properly evaluate the severity of the adverse effects [of an agency action]").

[34] *Id.* at 350 ("The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences.") (cleaned up).

12.    The Commission's analysis of cumulative air quality impacts associated with the CP2 LNG Project was deficient, both procedurally and substantively, thereby undermining the Order's conclusion that the project is "environmentally acceptable."[35] CEQ regulations require that an agency publish an SEIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[36]  After the EIS for the Projects was published, critically important new information became available:  EPA updated the National Ambient Air Quality Standard (NAAQS) for annual PM2.5 emissions.  Based on the air emissions analysis in the EIS, cumulative PM2.5 emissions would exceed the new NAAQS.[37]  The Commission treats NAAQS exceedances as significant environmental impacts because the standards are designed to protect human health.[38]  Consequently, with publication of the new NAAQS, the EIS's conclusions that PM 2.5 emissions would be insignificant could not be sustained.  Staff therefore required Venture Global to conduct new air modeling.  Venture Global submitted the results of additional modeling purporting to show the new PM2.5 NAAQS would not be exceeded.  But, as Sierra Club informed the Commission, the modeling did not account for planned increased PM2.5 emissions[39] at the company's existing Calcasieu Pass LNG terminal (CP1).[40]  These increased emissions are reflected in an air permit application that Venture Global filed with the state regulator but failed to share with the Commission.  Commission staff then requested that Venture Global update the modeling to reflect these increased emissions.[41]  This time, Venture Global's response did not include mobile emissions associated with CP1, and staff

---

[35] Order, 187 FERC ¶ 61,199 at P 198.

[36] 40 C.F.R. § 1502.9(d)(1)(ii) (2024).

[37] *See* EIS at 4-372, table 4.12.1-22 (showing expected annual PM2.5 concentrations at 9.4 $\mu g/m^3$, exceeding the new NAAQS of 9.0 $\mu g/m^3$).

[38] *See* 42 U.S.C. § 7409(b)(1) ("National primary ambient air quality standards . . . shall be ambient air quality standards the attainment and maintenance of which . . . are requisite to protect the public health."); EIS at 4-376 ("[W]e find that the Project would not cause or contribute to an exceedance of the NAAQS, which are established to be protective of human health, including sensitive populations such as children, the elderly, and those with compromised respiratory function, i.e. asthmatics.").

[39] Sierra Club April 22, 2024 Comments at 2.

[40] On February 21, 2019, the Commission granted Venture Global authorization to site, construct, and operate its Calcasieu Pass LNG export terminal.  *Venture Global Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019).

[41] May 15, 2024 Environmental Information Request (EIR) No. 15 at 1.

requested a third round of modeling, which it received June 14, 2024. The data underlying that modeling has not been made public, so the basis for the Order's conclusions on PM2.5 air pollutant impacts cannot be reviewed or verified by Sierra Club or other members of the public.

13.    The Commission should have published an SEIS presenting and analyzing the new PM2.5 modeling data. NEPA requires that an agency prepare an EIS where there "might" be "any" significant environmental impacts,[42] and "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance."[43] Since the EIS indicated that there would be significant PM2.5 air pollution impacts associated with the CP2 terminal, the Commission was required to prepare an SEIS to account for the new data.

14.    While the Order includes a truncated discussion of the updated modeling,[44] that is insufficient. Failure to prepare an SEIS is more than a technical error. CEQ's regulations provide that an agency "shall prepare, publish, and file a supplement to a[n EIS] . . . as a draft and final statement."[45] Although the regulation does not say so explicitly, the only purpose for publishing a draft would be for the public to comment on it. Consistent with the regulation, the Commission regularly provides for public comment on draft supplemental EISs.[46] Public input ensures the Commission has a solid foundation for its environmental analysis and substantive decision-making. By failing to publish an SEIS regarding the new modeling, the Commission not only violated CEQ regulations but also compromised the Order itself.

---

[42] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting *Grand Canyon Tr. V. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002)); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

[43] *Stand Up for Cal.! v. DOI*, 994 F.3d 616, 628 (D.C. Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)) (internal quotation marks omitted).

[44] Order, 187 FERC ¶ 61,199 at PP 192, 194, 197.

[45] 40 C.F.R. § 1502.9(d)(3) (2024).

[46] Consistent with the regulation, the Commission regularly provides for public comment on draft supplemental EIS's. *See, e.g., Magnolia LNC, LLC; Notice of Availability of the Draft Environmental Impact Statement for the Proposed Magnolia Production Capacity Amendment*, 84 Fed. Reg. 52,881 (Oct. 3, 2019); *Fla. Se. Connection, LLC; Transcon. Gas Pipe Line Co., LLC; Sabal Trail Transmission, LLC; Notice of Availability of the Draft Supplemental Environmental Impact Statement for the Se. Mkt. Pipelines Project*, 82 Fed. Reg. 46,233 (Oct. 4, 2017).

15.     There is a second reason for the Commission to prepare an SEIS addressing air pollution impacts.  As Sierra Club repeatedly argued, the EIS improperly failed to consider mobile emissions from other LNG projects in the analysis of cumulative air pollution impacts.[47]  The Order suggests, with no explanation or citation to legal authority, that the Commission need not analyze the emissions from other LNG terminals if they are not included in the Louisiana Department of Environmental Quality Emissions Reporting Inventory (LDEQ Inventory).  But nowhere does the Order address why the Commission chose to consider only the mobile emissions from the CP2 LNG Project and CP1, but not emissions from other Commission-authorized projects.  Specifically, the analysis inexplicably excluded mobile emissions from the Driftwood LNG, Lake Charles Liquefaction, Commonwealth LNG, and Magnolia LNG projects.[48]  The LDEQ Inventory does not include the mobile emissions associated with the CP1 or CP2 LNG projects, yet the Commission included these emissions in its cumulative impacts modeling.[49]  As Sierra Club notes, the mobile emissions associated with all Commission-jurisdictional LNG facilities are clearly foreseeable as they have already been quantified in prior Commission EISs.[50]  NEPA requires that the Commission assess all reasonably foreseeable effects of the Projects.[51]  Contrary to the Order's assertions,[52] it is this foreseeability standard under NEPA, not the requirements for Clean Air Act permitting,

_____

[47] Sierra Club October 16, 2023 Comments on FEIS at 3-4; Sierra Club May 30, 2024 Comments at 2.

[48] Sierra Club October 16, 2023 Comments on FEIS at 3-4.  Driftwood LNG, Lake Charles Liquefaction, Commonwealth LNG, and Magnolia LNG operations all contribute or will contribute to cumulative air quality impacts in the project area.  EIS at 4-511 to 4-512.

[49] In fact, the Commission rejected Venture Global's air modeling as insufficient because it only included LDEQ Inventory sources and not CP1 mobile emissions.  May 29 EIR No. 16 at 3 (rejecting the May 15 modeling which was derived from modeling submitted to LDEQ because "it does not include the LNG ship and support vessel emissions from CP1").

[50] Sierra Club October 16, 2023 Comments on FEIS at 3.

[51] *See* 40 C.F.R. § 1508.1(g)(3) (2024) (describing cumulative effects as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions"); *Sabal Trail*, 867 F.3d at 1371 ("Effects are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'") (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)).

[52] Order, 187 FERC ¶ 61,199 at P 195.

that determines the required scope of the Commission's review. The Commission's inconsistent treatment of mobile emissions, along with its failure to explain that inconsistency, violates both NEPA and the APA.[53] The Commission should rectify these deficiencies by publishing an SEIS that includes a cumulative impacts analysis incorporating all relevant mobile source emissions.

16. The Order's claim that modeling additional mobile sources would not change the "cause and contribute" analysis is simply unsupported.[54] Factoring in additional emissions would likely identify new locations where the NAAQS will be exceeded, with the Projects deemed to cause or contribute to the exceedances.[55] Without properly modeling all foreseeable mobile source emissions, the Commission risks failing to account for how the Projects might contribute to NAAQS violations and the consequent significant health risks. That risk is especially high in the case of these Projects, which are located in areas where NAAQS violations are already predicted.[56]

17. The improper modeling of mobile source emissions highlights why the Commission should have made public all the modeling inputs upon which it relied. NEPA plays an information forcing role by requiring agencies both to assess the environmental impacts of their actions and to inform the public of its analysis.[57] By

---

[53] *State Farm*, 463 U.S. at 43 ("[T]he agency must examine *the relevant data* and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (emphasis added) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. at 168)).

[54] *See* Order, 187 FERC ¶ 61,199 at PP 186-88.

[55] The record confirms that including additional emissions sources will likely change the cause and contribute analysis. In Appendix K of the EIS, the highest project contribution to any potential NAAQS exceedance location for the 1-hour $NO_2$ standard is 3.7 $\mu g/m^3$. EIS at Appendix K. But in updated modeling reflecting greater $NO_2$ emissions from CP1, new NAAQS exceedances were found, including a location where CP2 contributed 6.36 $\mu g/m^3$ to the $NO_2$ exceedance. *See* CP2 LNG June 3, 2024 Response to EIR No. 16 at 3. Thus, the Order relies on outdated information in stating that "the highest project contribution to any potential NAAQS exceedance location for the 1-hour $NO_2$ standard is 3.7 micrograms per cubic meter." Order, 187 FERC ¶ 61,199 at P 187.

[56] Order, 187 FERC ¶ 61,199 at P 186.

[57] *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) ("NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its

explaining its reasoning and the data on which it relies, the agency enables the public to identify informational gaps or errors for the agency to correct.[58]  Sierra Club did just that in this case, identifying the EIS's failure to account for sources of mobile emissions in the EIS's cumulative impacts analysis, as well as the increased PM2.5 emissions reflected in Venture Global's state permit application.  Shielding this information from the public limited the public's ability to identify additional errors in the cumulative air impacts modeling and how they should be corrected.[59]  By limiting the information made available to the public, the Commission limited its ability to satisfy its own legal obligations.[60]

---

decisionmaking process.") (internal citations omitted).

[58] *See Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981) ("Through the disclosure of an EIS, the public is made aware that the agency has taken environmental considerations into account."); *see also Methow Valley*, 490 U.S. at 349 ("Publication of an EIS . . . provides a springboard for public comment.").

[59] *See* Sierra Club October 16, 2023 Comments on FEIS at 5-6 (explaining Sierra Club's inability to provide a complete analysis of air modeling without modeling inputs). The majority's claims that modeling information was provided is incorrect.  *See* Order, 187 FERC ¶ 61,199 at P 189.  Venture Global did not make public *any* of the modeling data supporting the results submitted on June 3, 2024.  This is the modeling supporting the ultimate conclusions in the Order with respect to air impacts.  As to the earlier modeling, the Order mischaracterizes what information Venture Global made public. The "modeling files" are not included in Venture Global's EIR, as the page referencing them is blank and has no link or embedded files.  *See* Appendix E of CP2 LNG August 1, 2022 Supplemental Response to EIR No. 3 at 951.  While the public might be able to request the modeling files from the Commission, the Commission's failure to affirmatively notify participants in the docket that they may request the modeling files means that the public *functionally* had no access.  Of course, even if the data had been made public, there would have been too little time before issuance of this Order for any real evaluation of such highly technical information.

[60] *See, e.g., Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072-74 (1st Cir. 1980) (failure to present data and analysis supporting agency's decision in EIS improperly hampers public comment, "mut[ing] those most likely to identify problems and criticize decisions"); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974) ("An EIS is in compliance with NEPA when its form, content, and preparation substantially . . .  make available to the public, information of the proposed project's environmental impact and *encourage public participation in the development of that information*.") (emphasis added).

Inadequate Review of Impacts to Commercial Fishing

18.     NEPA requires that when "economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment."[61]  Here, the Commission recognized that it must assess impacts on commercial fishing interests.  Ultimately however, the EIS did not fully consider impacts on commercial fishing and the people who rely on it for their livelihoods.[62]  The EIS found that dredging associated with construction of the CP2 LNG Project "would likely result in the direct mortality of benthic organisms, including less mobile life stages of managed species such as shrimp and benthic invertebrates, which are an important food source for many species of fish."[63]  The EIS found that these impacts would not be significant because the "losses would be short term and the benthic community is expected to rebound within a few seasons."[64]  While the EIS concludes that shrimp populations will eventually recover, it fails to consider how this would impact commercial fishing.  Comments from FISH,[65] For a Better Bayou, and affected individuals indicate that a single season of decreased shrimp catch threatens to irrevocably end shrimping business ventures in the area.[66]  Yet, despite these comments, the EIS ignores the risk that temporary impacts on fisheries might permanently adversely affect commercial fishing businesses.  Consequently, the

---

[61] 40 C.F.R. § 1502.16(b).

[62] I distinguish between the fisheries, the fish population and ecosystem in a given area, and businesses and individuals engaged in commercial fishing businesses, who make their livelihood catching fish in the fishery.

[63] EIS at 4-206.

[64] *Id.*

[65] Fishermen Involved in Sustaining our Heritage (FISH) is a coalition of commercial fishermen in Southwestern Louisiana.  *See* FISH April 18, 2024 Motion to Intervene at 1.

[66] Comments of Mr. Eustis at the March 1, 2023 Public Comment Meeting, pg. 24 at lines 19-23 (noting that with regards to shrimping impacts "discontinuity of one season can be the difference between -- can bankrupt the family."); FISH June 14, 2024 Comments at 6 ("Mr. Theriot is unsure whether his commercial fishing business will survive through 2024 and he is worried that he may not be able to continue to make payments on his home.");  *Id.* at Exhibit 4, Theriot Declaration (describing how Mr. Theriot has experienced decreased catch volume since 2022, and declaring that "[i]f my shrimp catch does not recover this year, I am concerned that I will be forced out of business.").

Commission failed to take the legally required "hard look" at commercial fishing impacts.

19.    The Commission's analysis of fishing impacts is flawed in other ways as well. The EIS recognizes that project construction would cause impacts to nearby fisheries due to marine traffic from LNG carriers.[67]  But the EIS is inconsistent in predicting the extent of the marine traffic impact commercial fishing businesses,[68] likely because the Commission has not fully considered marine traffic impacts.  The EIS suggests that impacts on shrimping boats are minimal because "[t]ypically, shrimp are most active at night when few vessels are using the Calcasieu Ship Channel."[69]  But the assertion that few ships use the channel at night conflicts with the 2019 Port of Lake Charles Calcasieu Ship Channel Traffic Study (Marine Traffic Study),[70] which the EIS relied on to assess expected traffic impacts.[70]  The Marine Traffic Study assumed that "[a]ll vessels were able to transit the channel at night, with no further restrictions and no preference given to either day or night transits."[71]  Either the EIS is incorrect in its assertion that few vessels use the Calcasieu Ship Channel at night, and thus the impact on shrimpers is larger than the EIS contemplated, or the Marine Traffic Study does not paint a representative picture of traffic by assuming no preferences for channel transit time, in which case daytime fishers will face greater impacts than the EIS considered.  Either way, the Commission's analysis of marine traffic impacts on commercial fishing is flawed.

20.    In addition, the EIS ignores the features of the areas of the channel near the project terminal that make it a popular shrimping spot. The Order finds that there would be less than significant impacts on fishers who are members of EJ communities because the area near the terminal facilities "does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other

---

[67] EIS at 4-270 (finding that an "increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing").

[68] Contrast the EIS finding that the CP2 terminal in isolation would have a "moderate, but not significant impact on commercial fishing," *id.*, with later findings that "the Project would contribute negligibly to overall temporary and minor cumulative impacts on commercial fisheries in the Calcasieu Ship Channel." *Id.* at 4-541.  It is clearly inconsistent to find that the cumulative impacts of all ship traffic in the channel would be minor when the impacts of ship traffic from the ships servicing CP2 alone would be moderate.

[69] EIS at 4-270.

[70] EIS at 4-295; EIS at 4-543 to 4-544.

[71] Marine Traffic Study at 20.

locations within the Calcasieu Ship Channel."[72]  But the ship channel, particularly the narrow area of the channel at the firing line,[73] *is* a special habitat.  The ship channel at the firing line represents an especially popular shrimping location in part because it acts as a unique geographic bottleneck where shrimp migrate.[74]  While the proposed LNG terminal is south of the firing line and so will not directly impact traffic in this unique location, the EIS fails to consider how "[t]he moving security zone around LNG carriers [which] has the potential to close the channel to traffic" would impact access to the area around the firing line.[75]

21.     In short, there are significant contradictions and omissions in the Commission's analysis of project impacts on commercial fishing businesses.  These errors in the Commission's environmental analysis join the others in rendering the Order unsustainable.

<u>Inadequate Consideration of Totality of Impacts on EJ Communities</u>

22.     Although the EIS and Order purport to consider the Projects' cumulative impacts on EJ communities, neither fully considered the interrelationship of the multiple adverse impacts the Projects would have on these communities.  The EIS found that "the addition of the Terminal Facilities at this location would represent a significant impact on the viewshed of boaters, beachgoers, tourists, and local residents, as it would detract from the overall quality of the scenic views of this portion of the region."[76]  These impacts would

---

[72] Order, 187 FERC ¶ 61,199 at P 112.

[73] The firing line represents the boundary between waters open for commercial fishing year round and those only open for seasonal commercial fishing.  *See* EIS at 4-267 to 4-268.

[74] *See* EIS at 4-541. The EIS states that the migration occurs for "approximately two weeks," although the length of migration is characterized as "generally… much longer than two weeks" by LDWF.  Memo of May 23, 2023 Telephone Conversation with NMFW and LDWF at 1.  It is not clear why the Commission disagreed with the LDWF assessment, or if a longer migration period would have changed the Commission's assessment of the significance of impacts on shrimpers.

[75] EIS at 4-538.  The Terminal facilities are approximately 1.5 miles from the firing line, and thus the shrimping location at the firing line would be impacted by any moving security zone, which extends for 2 miles ahead of applicable ships. 33 C.F.R. § 165.805(a)(2) (2024) ("The following areas are moving security zones: . . . 2 miles ahead and 1 mile astern of certain designated vessels while in transit.").

[76] EIS at 4-546.  Notably, although the EIS recognizes that the terminal represents a significant impact on the viewshed of tourists, it does not examine how such an impact

not be felt equally, however. Rather, "permanent changes in the viewshed would have a significant adverse effect on residents and passersby of those environmental justice communities near the Project,"[77] resulting in "disproportionately high and adverse impact[s]"[78] on EJ communities.

23.     Members of EJ communities would also suffer from the LNG terminal's adverse impacts on commercial fishing businesses. As discussed above, the EIS and Order provide a deficient analysis of the project's impacts on commercial fishing businesses.[79] The EIS acknowledges that "commercial users in the Calcasieu Ship Channel . . . would likely include individuals from environmental justice communities."[80] Thus, the deficiencies in the analysis of adverse impacts on fishing blind the Commission to the adverse impacts on members of EJ communities. EJ communities are especially vulnerable to those impacts since one bad season can significantly disrupt fishing businesses,[81] and low-income fishers without significant savings likely would be among those least likely to recover from that disruption.

24.     The Commission has also failed to fully consider climate change impacts on EJ communities. The EIS found that "the impacts of compounded extreme events . . . *may* exacerbate preexisting community vulnerabilities and have a cumulative adverse impact on environmental justice communities." [82] But we *know* that climate change will have adverse impacts on EJ communities. Commission Staff found "local mean sea level rise . . . [would be] 2.1 feet . . . between 2050 and 2060 (relative to year 2000) at the proposed project site area."[83] These rising sea levels can "accelerate coastal erosion and wetland loss, exacerbate flooding, and increase storm impacts."[84] Indeed, with the 2.1 feet of sea level rise some homes in identified impacted EJ communities will be permanently

---

would affect tourism in the region.

[77] *Id.* at 4-319.

[78] *Id.* at 4-328.

[79] *See supra* PP 18-21.

[80] EIS at 4-545.

[81] *See supra* P 18.

[82] EIS at 4-549 (emphasis added).

[83] *Id.* at 4-453.

[84] *Id.* at 4-90.

underwater.[85]  Surely this is an adverse impact on EJ communities, but it is one the Commission completely failed to consider.  Marginalized communities face additional barriers to moving when climate change makes their homes unlivable,[86] highlighting why it is important for the Commission to fully consider impacts to EJ communities in its NEPA reviews.

25.    Finally, the Order fails to adequately assess the impact of cumulative air pollutant emissions on EJ communities.  As discussed above, the Commission failed to properly assess cumulative emissions impacts by omitting foreseeable mobile sources that might well lead to NAAQS violations.[87]  This is especially disturbing given that "[p]eople in low socioeconomic neighborhoods and communities may be more vulnerable to air pollution,"[88] making the health impacts even more severe.

26.    The Order's failure to fully assess the totality of impacts on EJ communities, like its deficient analysis of GHG impacts, falls short of the Commission's legal obligations under NEPA, the NGA, and the APA.  It is also difficult to square with the Commission's commitment to "better integrate environmental justice and equity considerations in its decision-making processes,"[89] and to address barriers to "adequate and consistent review of all potential project impacts to environmental justice communities, including cumulative impacts and impacts to health and safety."[90]  Today's approval of the Projects will compound the cumulative impacts of existing LNG projects on nearby EJ communities, and is a key reason the Projects will not serve the public interest.

---

[85] For example, some of the homes on Mildred street are at an elevation of just 1.72 feet above current sea levels, leaving them underwater with 2.1 feet of additional sea level rise.  *See* U.S. Geological Surv., *The National Map*, https://apps.nationalmap.gov/viewer/ (showing a 1.72 ft elevation at lat. 29.78469, long. 93.29007 using the spot elevation tool).

[86] *See, e.g.,* Bergan et al., *Creating Moves to Opportunity: Experimental Evidence on Barriers to Neighborhood Choice*, 114 Am. Econ. Rev. 2181 (2024).

[87] *See supra* P 15.

[88] EPA, *Research on Health Effects from Air Pollution* (May 28, 2024), https://www.epa.gov/air-research/research-health-effects-air-pollution.

[89] FERC, *2023 Equity Action Plan* at 2 (Apr. 15, 2022), https://www.ferc.gov/equity.

[90] FERC, *2024 Equity Action Plan* at 14 (June 6, 2024), https://www.ferc.gov/equity.

Docket Nos. CP22-21-000 and CP22-22-000                                    - 19 -

For these reasons, I respectfully dissent.

_____
Allison Clements
Commissioner

189 FERC ¶ 61,148
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                       Mark C. Christie, David Rosner and
                       Lindsay S. See

| | |
|---|---|
| Venture Global CP2 LNG, LLC | Docket Nos.  CP22-21-001 |
| Venture Global CP Express, LLC | CP22-22-001 |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING AND SETTING
ASIDE PRIOR ORDER, IN PART

(Issued November 27, 2024)

1.      On June 27, 2024, the Commission issued an order (1) authorizing Venture Global
CP2 LNG, LLC (CP2 LNG) to site, construct, and operate a new liquefied natural gas
(LNG) export terminal and associated facilities on the east side of the Calcasieu Ship
Channel in Cameron Parish, Louisiana (CP2 LNG Project); and (2) issuing Venture
Global CP Express, LLC (CP Express) a certificate of public convenience and necessity
to construct and operate a new interstate natural gas pipeline system to connect the CP2
LNG to the existing natural gas pipeline grid in east Texas and southwest Louisiana (CP
Express Pipeline Project).[1]  On July 29, 2024, a coalition of petitioners (Petitioners)[2] filed
a timely request for rehearing and motion for stay[3] of the Authorization Order.

---

[1] *Venture Glob. CP2 LNG, LLC*, 187 FERC ¶ 61,199 (2024) (Authorization
Order).  CP2 LNG and CP Express will be referred to jointly herein as Venture Global.
The CP2 LNG Project and CP Express Pipeline Project will be referred to jointly herein
as Projects.

[2] Petitioners include: A Better Bayou, Fishermen Involved in Sustaining our
Heritage (FISH), Nicole Dardar, Travis Dardar, Kent Duhon, Mary Alice Nash, Jerryd
Tassin, Anthony Theriot, Healthy Gulf, Louisiana Bucket Brigade, Natural Resources
Defense Council, Port Arthur Community Action Network, Public Citizen, Sierra Club,
Texas Campaign for the Environment, and Turtle Island Restoration Network.  We note
that, in the Authorization Order, the Commission denied FISH's late motion to intervene,
*see id.* P 17, which is further discussed in section II.A., *infra*.

[3] On October 1, 2024, the Commission issued a separate order denying Petitioners'
motion for stay.  *See Venture Glob. CP2 LNG, LLC*, 189 FERC ¶ 61,005 (2024) (Order

2.      Pursuant to *Allegheny Defense Project v. FERC*,[4] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 19(a) of the Natural Gas Act (NGA),[5] we are modifying the discussion in the Authorization Order, and setting aside the prior order, in part, as discussed below.[6]

I.      **Background**

A.      **CP2 LNG Project**

3.      On December 2, 2021, CP2 LNG filed an application, in Docket No. CP22-21-000, under NGA section 3[7] and Part 153 of the Commission's regulations[8] for authorization to site, construct, and operate the CP2 LNG Project, with 20 million metric tons per annum (MTPA) of nameplate liquefaction capacity and a peak achievable capacity of 28 MTPA under optimal operating conditions.[9]  The project would be constructed in two phases[10] and include a liquefaction plant consisting of eighteen liquefaction blocks, four aboveground full containment LNG storage tanks, and two

---

Denying Stay).

[4] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[5] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[6] *Allegheny Def. Project*, 964 F.3d at 16-17.

[7] 15 U.S.C. § 717b.

[8] 18 C.F.R. pt. 153 (2024).

[9] Authorization Order, 187 FERC ¶ 61,199 at PP 1, 5.

[10] Each phase is designed with a nameplate liquefaction and export capacity of 10 MTPA, and a peak achievable capacity of 14 MTPA.  *Id.* P 6.

marine LNG loading docks.[11]  The CP2 LNG Project will receive natural gas via the CP Express Pipeline Project.[12]

4.      CP2 LNG received authorization from the Department of Energy (DOE), Office of Fossil Energy (DOE/FE) to export annually up to approximately 28 MTPA of natural gas in the form of LNG to countries with which the United States has a Free Trade Agreement (FTA).[13]  In addition, CP2 LNG currently has pending before DOE/FE an application to export LNG to nations with which the U.S. permits such trade, but has not entered into an FTA (non-FTA).[14]

5.      CP2 LNG also stated that it intends to construct and operate carbon capture and sequestration (CCS) facilities that will capture, compress, and sequester approximately 500,000 tons of carbon dioxide ($CO_2$) from feed gas entering the CP2 LNG Project.[15]

### B.      CP Express Pipeline Project

6.      In the same application, CP Express filed a request, in Docket No. CP22-22-000, under NGA section 7(c)[16] and Parts 157 and 284 of the Commission's regulations,[17] for a certificate of public convenience and necessity to construct and operate the CP Express Pipeline Project.[18]  The CP Express Pipeline Project would originate at interconnections with Transcontinental Gas Pipe Line's interstate system and Midcoast Energy's CJ Express pipeline in Jasper County, Texas, extend through Newton County, Texas, and

---

[11] *Id.* P 1.  For more specific information regarding the CP2 LNG Project, *see id.* PP 5-9.

[12] *Id.* P 2.

[13] *Id.* P 8 (citing *Venture Glob. CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (Apr. 22, 2022)).

[14] *Id.* (citing Venture Global CP2 LNG, LLC, December 2, 2021 Application, FE Docket No. 21-131-LNG).

[15] *Id.* P 9.

[16] 15 U.S.C. § 717f(c).

[17] 18 C.F.R. pts. 157, 284 (2024).

[18] Authorization Order, 187 FERC ¶ 61,199 at P 1.  For more specific information regarding the CP Express Pipeline Project, *see id.* PP 10-14.

Calcasieu and Cameron Parishes, Louisiana, and terminate at the CP2 LNG Project.[19]
The CP Express Pipeline would provide up to 4,400,000 dekatherms per day (Dth/day) of
firm natural gas transportation service.[20]

7.     As with the CP2 LNG Project, CP Express Pipeline would be constructed and
operated in two phases.[21]  Facilities constructed during Phase I would provide 2,200,000
Dth/day of firm transportation service, transporting enough feed gas for the nine
liquefaction blocks to be constructed in Phase I of the CP2 LNG Project.[22]  Phase II
would provide an additional 2,200,000 Dth/day of firm transportation service,
transporting feed gas for the nine additional liquefaction blocks constructed in Phase II of
the CP2 LNG Project.[23]

8.     CP Express held a binding open season and, as a result, it executed a binding
precedent agreement with CP2 LNG for 100% of the firm transportation service provided
by Phases I and II of the CP Express Pipeline for a term of twenty years at negotiated
rates.[24]  CP Express received no other bids or expressions of interest during the open
season.[25]

9.     In the Authorization Order, the Commission found that the CP2 LNG Project was
not inconsistent with the public interest,[26] and that the CP Express Pipeline was required
by the public convenience and necessity.[27]  After considering the environmental effects
of the Projects, the Commission agreed with the conclusions presented in the final
Environmental Impact Statement (EIS) and found that the Projects, if implemented as

---

[19] *Id.*

[20] *Id.* P 10.

[21] *Id.* P 11.

[22] *Id.* (discussing, in detail, the nature of the proposed facilities in Phase I).

[23] *Id.* P 12 (discussing, in detail, the nature of the proposed facilities in Phase II).

[24] *Id.* P 14.

[25] *Id.*

[26] *Id.* P 199.

[27] *Id.* P 200.

described in the applications and in compliance with the environmental conditions in the Authorization Order, were environmentally acceptable actions.[28]

## II.     Procedural Issues

### A.     Party Status

10.     FISH argues that the Commission erred by denying its late motion to intervene because FISH demonstrated good cause for late intervention.[29]  FISH further argues that the Commission departed from prior practice of granting late motions to intervene prior to issuance of the Commission's order without adequate explanation, particularly because FISH's motion was unopposed and it will be directly impacted by the proposed action.[30]

11.     We disagree.  Under the Commission's regulations, a movant seeking late intervention must establish that there is good cause for its late filing.[31]  The Commission may also consider whether granting late intervention will delay the proceeding or prejudice the other participants and whether the movant is adequately represented by existing parties,[32] but in the absence of a showing of good cause the Commission need not consider these additional factors.[33]

12.     In 2018, the Commission expressed concern "with the increasing degree to which participants in natural gas certificate proceedings have come to file late motions to intervene without adequately addressing the factors set forth in our regulations."[34] Noting that "going forward [the Commission] will be less lenient in the grant of late interventions," the Commission reiterated that a movant seeking out-of-time intervention would be "required to 'show good cause why the time limitation should be waived,'" in

---

[28] *Id.* P 198.

[29] Rehearing Request 92, 108.

[30] *Id.* at 92-93.

[31] 18 C.F.R. § 385.214(b)(3) (2024); *see also id.* § 385.214(d)(1)(i) (identifying "good cause" as one of the criteria for the Commission to consider when determining whether to grant a late motion to intervene).

[32] 18 C.F.R. § 385.214(d)(1)(ii)-(iv).

[33] *See Broadview Solar LLC*, 174 FERC ¶ 61,199, at P 16 (2021).

[34] *Tenn. Gas Pipeline Co.*, 162 FERC ¶ 61,167, at P 49 (2018) (*Tennessee Gas*).

addition to satisfying the other late intervention criteria under Rule 214(d).[35] Importantly, the decision of whether to grant a late motion to intervene is committed to the Commission's discretion; "Rule 214 affords movants no right to late intervention."[36]

13.     Against that backdrop, we continue to deny FISH's late motion to intervene because we find that it failed to show good cause under Rule 214(d).[37] FISH's only attempt to demonstrate good cause comes from its explanation that it was not formed until November 2023.[38] This argument is undermined, however, by the fact that it did not seek to intervene until April 2024 despite being able to file joint comments on the Projects with other parties in January 2024. In other words, FISH's argument is predicated on the claim that it needed until April 2024 to recruit community representatives,[39] but it nonetheless was able to substantively participate in the proceeding in January 2024. Moreover, FISH's cooperation with other parties on joint comments supports the conclusion that its interests are adequately represented by other parties to the proceeding.[40] We thus continue to find that FISH has failed to establish that good cause exists for its late intervention and that denying its motion is consistent with Commission regulations and policy.

14.     FISH suggests that the Commission follow the approach taken in *Mountain Valley Pipeline, LLC*[41] which allowed late-filed intervention nearly two years after the deadline for intervention because the movant "demonstrated a sufficient interest in the proceeding."[42] While, as FISH notes, this order was never overturned, the *Tennessee Gas* decision was issued a short time later and represents current Commission policy.

---

[35] *Id.* P 50.

[36] *Panhandle E. Pipe Line Co.*, 170 FERC ¶ 63,011, at P 2 (2020) (citing *Alaska Power & Tel. Co.*, 98 FERC ¶ 61,092, at 61,278 (2002) ("In short, there is no right to late intervention in Commission proceedings under Rule 214. Rather, the rule affords the Commission the discretion to grant late intervention based on a showing of good cause, as well as consideration of other relevant factors.")).

[37] *See* Authorization Order, 187 FERC ¶ 61,199 at P 17.

[38] Rehearing Request at 100.

[39] *See id.*

[40] *See* Authorization Order, 187 FERC ¶ 61,199 at P 17.

[41] 161 FERC ¶ 61,043, at P 22 (2017).

[42] Rehearing Request at 95.

Moreover, even in *Mountain Valley Pipeline, LLC,* the Commission noted that the lateness of the motion "push[ed the] practice" of granting intervention requests filed prior to the issuance of the certificate.[43]  Further, FISH maintains that the Commission has not consistently applied the standard set forth in *Tennessee Gas*.[44]  In support, it cites a number of Commission decisions in matters where the initial intervention deadline passed prior to issuance of the decision in *Tennessee Gas*.[45]  FISH's assertion, however, ignores that the 2018 *Tennessee Gas* decision applies only to "any new Natural Gas Act section 3 or section 7 proceeding and any pending section 3 or section 7 proceeding in which the deadline for filing timely interventions has not yet passed," and so the *Tennessee Gas* holding would not have been applied to these proceedings.[46]

15.     We also disagree that by failing to grant its motion for late intervention, the Commission singled out FISH for inconsistent treatment.[47]  On the contrary, the Commission's consideration of FISH's late intervention is consistent with its post-*Tennessee Gas* practice.  While the Commission has on occasion granted such motions— including those raising non-environmental concerns—filed prior to or immediately following the second deadline to intervene based on the comment period for an EIS,[48] for motions for late intervention filed at later dates in proceedings, the Commission has

---

[43] *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 22.

[44] Rehearing Request at 94-97.

[45] *Id.* n.476 (citing *Tex. Brownsville LLC*, 169 FERC ¶ 61,130 (2019); *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 (2020); *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 (2020); *Venture Glob. Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019); *Driftwood LNG LLC,* 167 FERC ¶ 61,054 (2019); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019); *Spire STL Pipeline LLC,* 164 FERC ¶ 61,085 (2018); *High Point Gas Transmission, LLC*, 163 FERC ¶ 61,135, at P 9 (2018)).

[46] *Tenn. Gas Pipeline Co.*, 162 FERC ¶ 61,167 at P 51.  We note that for the same reasons, *Tennessee Gas* similarly would not have been applied to *Mountain Valley, LLC*., 161 FERC ¶ 61,043 at P 22 (explaining that the intervention deadline was November 17, 2015).

[47] Rehearing Request at 94-97.

[48] 18 C.F.R. §§ 157.10(a)(2), 380.10(a)(1)(i) (2024) (motions to intervene based on environmental grounds are deemed timely if they are filed within the comment period on a draft EIS); *see, e.g.*, *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114, at P 5 (2024) (motions for late intervention received shortly after deadline and prior to issuance of environmental documents granted).

weighed the requirements of Rule 214, focusing on whether good cause has been shown for the late filing.[49]

16.    Although the Commission granted other late-filed intervention motions in these proceedings, those motions differ from FISH's motion.[50]  The Commission granted intervention requests from one group of parties that filed their intervention requests prior to the availability of the draft EIS, which opened a new intervention period, and from

---

[49] *Double E Pipeline, LLC*, 173 FERC ¶ 61,074, at PP 17-23 (2020) (finding that good cause not demonstrated due to new additional data on ambient air quality and the effects of the COVID-19 pandemic); *Transcon. Gas Pipe Line Co.*, 172 FERC ¶ 61,281, at P 6 (2020) (claim of "administrative error" insufficient to show good cause); *Nat. Gas Pipeline Co. of Am., LLC*, 171 FERC ¶ 61,157, at P 8 (2020) (finding good cause for late intervention when Commission staff provided incorrect guidance).  FISH also relied on the Commission's decision in *N. Nat. Gas Co.*, 175 FERC ¶ 61,052 (2021) where the Commission granted late intervention without addressing good cause or the other factors in Rule 214.  Because the Commission's voted order does not address the basis for allowing late intervention, while *Tennessee Gas* and other subsequent decisions reflect consistent application of the good cause standard and Rule 214, we are unable to rely on *Northern Natural Gas Company* and decline to give it controlling weight.  Moreover, a prior motion for late intervention in the same proceeding had been rejected for failure to show good cause.  *N. Nat. Gas Co.*, Notice, Docket No. CP20-487-000 (Aug. 31, 2020). In addition, the present circumstances are more analogous to *Broadview Solar, LLC*, where the Commission distinguished *Northern Natural Gas Company* and noted that, unlike the late intervenors in *Northern Natural Gas Company* who were responding to a potential shift in Commission-wide policy that was not apparent at the opening of the proceeding, the movants in *Broadview Solar, LLC* had clear notice that their interests might be affected at an early stage in the proceeding.  175 FERC ¶ 61,228, at P 10 (2021).

[50] *See* Secretary's Notices dated November 13, 2023 (granting the unopposed motions for late intervention filed by Golden Pass LNG Terminal LLC and Golden Pass Pipeline LLC, Commonwealth LNG, LLC, Niskanen Center, and Bernard and Georgia Webb and Jerryd Tassin, and Mary Alice Nash because "allowing interventions filed before the Commission issued the draft Environmental Impact Statement, which opened a new intervention period, will not disrupt the proceedings or cause any prejudice to or additional burdens upon the existing parties" and granting the opposed motions for late intervention filed by For a Better Bayou and Adley and Judy Dyson because the movants "have a direct interest in the proceeding that may not be adequately represented by other parties, and allowing the interventions will not disrupt the proceedings or cause any prejudice to or additional burdens upon the existing parties.")

another group of parties that, unlike FISH, the Commission found had a direct interest in the proceeding that might not be adequately represented by other parties.

17.     Under NGA section 19(a) and Rule 713(b) of the Commission's Rules of Practice and Procedure, only a party to a proceeding is eligible to request rehearing of a final Commission decision.[51]  Because FISH is not a party to this proceeding it is not eligible to seek rehearing of the Authorization Order.[52]  We note, in any event, that FISH's concerns are generally addressed in response to arguments properly raised by Petitioners on rehearing.

### B.     Answers

18.     On August 13, 2024, Venture Global filed a motion for leave to answer and answer to Petitioners' request for rehearing and motion for stay.  The Commission's Rules of Practice and Procedure prohibit answers to a request for rehearing.[53]  Accordingly, we deny Venture Global's motion to answer and reject its answer.

### C.     Comments

19.     Between March 27, 2024, and May 1, 2024, various commenters filed form letters containing identical content and arguments in favor of authorization of the Projects.  On June 14, 2024, Petitioners[54] filed a response to the letters.[55]  In their request for rehearing, Petitioners assert that the Commission failed to acknowledge or reference this filing yet made "passing reference to 'comments in support of the project, citing an increase in job opportunities and local economic investment.'"[56]  The Commission, however, did not cite the letters referenced by Petitioners.  We note that these filings were made after the time

---

[51] 15 U.S.C. § 717f(a); 18 C.F.R. § 385.713(b) (2024).

[52] *See Pac. Gas and Elec. Co.*, 187 FERC ¶ 61,167, at P 13 (2024).

[53] 18 C.F.R. § 385.713(d)(1); 18 C.F.R. § 385.213(a)(2) (2024).

[54] We note that, as discussed above, *see supra* section II.A., FISH is not a party to this proceeding.

[55] Petitioners June 14, 2024 Comments in Response to Form Letters (Response to Form Letters).

[56] Rehearing Request at 69, n.354 (citing Authorization Order, 187 FERC ¶ 61,199 at P 19).

for comments had closed and were thus untimely.[57]  "Generally an agency is not under an obligation to consider comments submitted after the close of the comment period."[58] Moreover, the Commission has not relied on these filings to support its decisions in these proceedings.  Nevertheless, Petitioners' rehearing arguments that rely on their June 14, 2024 filing are addressed below.

## III.  **Discussion**

20.    Petitioners allege that the Commission, through its Authorization Order: (1) violated the NGA and Administrative Procedure Act (APA) by authorizing the Projects (including arguments related to jurisdiction,[59] public interest,[60] need,[61] and project benefits[62]); (2) violated the National Environmental Policy Act (NEPA) and related APA responsibilities (including arguments related to alternatives,[63] greenhouse gases (GHG),[64] impacts to commercial and recreational fishing and local communities,[65] safety,[66] the CCS system,[67] socioeconomics,[68] impacts to the Rice's whale,[69] wetlands

---

[57] *See, e.g.*, *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042, at P 76 & n.111 (2017) (rejecting comment as untimely).

[58] *Montrose Chem. Corp. of Cal. v. E.P.A.*, 172 F.3d 920 (D.C. Cir. 1999) (citations omitted).

[59] Rehearing Request at 34-46.

[60] *Id.* at 87-92.

[61] *Id.* at 47-62.

[62] *Id.* at 62-75.

[63] *Id.* at 109-16, 165-66.

[64] *Id.* at 116-25.

[65] *Id.* at 75-85, 125-28.

[66] *Id.* at 128-35.

[67] *Id.* at 162-66.

[68] *Id.* at 64-69.

[69] *Id.* at 166-87.

impacts,[70] environmental justice,[71] and air impacts[72]), and (3) failed to properly balance the benefits and adverse impacts of the Projects.[73]  Except for air impacts, we conclude that each of these arguments lacks merit, as discussed below.

## A.    NGA Jurisdiction

21.    Petitioners argue that because the CP Express Pipeline Project will only transport natural gas destined for export it is not engaged in interstate commerce and cannot be approved under NGA section 7.[74]  Petitioners maintain that interstate commerce does not include foreign commerce and that the Commission failed to explain its finding that the CP Express Pipeline Project would transport gas in interstate commerce or that CP Express will become a natural gas company upon commencing operation of the CP Express Pipeline Project.[75]  Petitioners assert that Congress's grant of eminent domain authority to projects authorized under NGA section 7 and not under NGA section 3 represents a deliberate choice to grant eminent domain to interstate gas pipelines and not export projects, and that the Commission must honor the NGA's two distinct regimes.[76]

22.    We disagree with these assertions.  NGA section 7 confers jurisdiction to the Commission over the transportation and the sale for resale of natural gas in interstate commerce, and the construction and operation of facilities for that purpose.[77]  NGA section 2(7) defines interstate commerce as "commerce between any point in a State and any point outside thereof, or between points within the same State but through any place

---

[70] *Id.* at 188-91.

[71] *Id.* at 85-87.

[72] *Id.* at 135-62.

[73] *Id.* at 75-92.

[74] *Id.* at 34-36 (citing *City of Oberlin, Ohio v. FERC*, 937 F.3d 599 (D.C. Cir. 2019) (*Oberlin I*)); *see also id.* at 41 (citing *Border Pipe Line Co. v. FPC*, 171 F.2d 149, 150 (D.C. Cir. 1948) (*Border Pipe Line*) (arguing that the natural gas is destined for ultimate sale and consumption in foreign commerce and thus, ineligible for NGA section 7).

[75] *Id.* at 34 (citing *Ala. Mun. Distrib. Grp. v. FERC*, 100 F.4th 207, 213 (D.C. Cir. 2024) (*Evangeline Pass*)); *id.* at 35-39.

[76] *Id.* at 36-37.

[77] 15 U.S.C. § 717(b); *Yukon Pac. Corp.*, 39 FERC ¶ 61,216, at 61,757 (1987).

outside thereof, but only insofar as such commerce takes place within the United States."[78]  While it is true that "interstate commerce" does not include foreign commerce,[79] gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey.[80]  In circumstances such as the instant case, where natural gas is being transported in both interstate commerce (i.e., by transporting it across state lines) and foreign commerce (i.e., through exportation), "the Commission has [NGA] section 3 jurisdiction over the point of export/importation and [NGA] section 7 jurisdiction over the facilities up to or from the point of export/importation."[81]  Accordingly, a pipeline transporting natural gas destined for export into foreign commerce that crosses state lines or otherwise engages in interstate transactions is engaged in interstate commerce subject to the Commission's NGA section 7 jurisdiction.[82]

23.    Here, the CP Express Pipeline Project would, in part, comprise an approximately 85.4-mile-long mainline pipeline from Jasper County, Texas, for delivery to the CP2 LNG Project in Cameron Parish, Louisiana.[83]  The CP Express Pipeline Project is designed to connect the CP2 LNG Project to the existing natural gas pipeline grid in east Texas and southwest Louisiana.[84]  Accordingly, because at least some natural gas transported by the pipeline will cross the Texas/Louisiana state line and, therefore, travel in interstate commerce, the CP Express Pipeline will be an interstate pipeline subject to

---

[78] 15 U.S.C. § 717a(7); *Yukon Pac. Corp.*, 39 FERC at 61,757.

[79] *Comanche Trail Pipeline, LLC*, 155 FERC ¶ 61,182, at P 18 (2016) (citing *Border Pipe Line*, 171 F.2d at 150-51).

[80] *Md. v. La.*, 451 U.S. 725, 728 (1981).

[81] *W. Gas Interstate Co.*, 59 FERC ¶ 61,022, at 61,048-49 (1992); *accord Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61,084, at n.26 (2017).

[82] *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205, at P 11 (2022) (sustaining authorization of a pipeline under NGA section 7 that transports natural gas across state lines for delivery to LNG facility for ultimate consumption in foreign commerce); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 11 (2022); *see Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at PP 47-48, *vacated on other grounds*, 177 FERC ¶ 61,198 (2021) (finding transportation service by pipeline within a single state of gas that otherwise crosses state lines for delivery to LNG facility subject to NGA section 7 jurisdiction).

[83] Authorization Order, 187 FERC ¶ 61,199 at P 2.

[84] *Id.*

our jurisdiction under NGA section 7. Despite Petitioners' contentions, the Commission has previously explained that "[w]hether some, or even all, of the gas carried by the [] pipeline is consumed in [foreign commerce] is immaterial to its status as an interstate—i.e., an NGA section 7—pipeline, since '[g]as crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey.'"[85] Thus, the question whether all of the gas transported by the CP Express Pipeline Project will be consumed in foreign commerce has no bearing on its status as an interstate pipeline.[86] Based on the foregoing, because CP Express will be engaged in the transportation of natural gas in interstate commerce, it will be a "natural-gas company" under the NGA.[87]

---

[85] *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199, at P 16 & n.39 (2020) (quoting *Md. v. La.*, 451 U.S. at 728); *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at PP 48-51; *see also W. Gas Interstate Co.*, 59 FERC at 61,050 ("It is clear that Western will be receiving gas that comes from the domestic sources outside the State of Texas. Therefore, that gas already will have been transported in interstate commerce. Western's continued transportation of that gas through the Del Norte pipeline laterals from its point of receipt with El Paso to the point of exportation at the Mexico border is also transportation in interstate commerce. Consequently, Western's transportation is subject to our jurisdiction under section 7 of the NGA. It is immaterial that Western individually will receive the gas in Texas solely to transport it across the border.").

[86] In any event, we note that if the CP2 LNG Project uses a small percentage of gas from the CP Express Pipeline Project for on-site liquefaction and other purposes as Petitioners suggest, *see* Rehearing Request at 41-42, we find that such consumption, even if *de minimis*, supports the Commission's exercise of its NGA section 7 authority over the CP Express Pipeline Project. Application at 12 ("[t]he [CP2 LNG Project] will be powered by two combined cycle gas turbine power generating plants with up to 1,440 megawatts (MW) of collective generating capacity"); *see id.* Resource Report 13, Volume I, sections 13.19.1.3 and 13.19.1.4. (describing the quantities of fuel gas needed to supply the combined cycle gas turbine generators); *Ga. Strait Crossing Pipeline LP*, 100 FERC ¶ 61,280, at 62,197 (2002) ("Because NGA section 7 does not grant the Commission jurisdiction by degree, no matter how small this interstate aspect of [the pipeline's] business is when compared to the pipeline's foreign commerce transactions, this movement of gas between states subjects the entire project to our regulatory oversight under NGA section 7").

[87] 15 U.S.C. § 717a(6) (defining "natural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale").

24.    Next, Petitioners argue that the mere fact that the natural gas crosses state lines, by itself, does not render it subject to NGA section 7 jurisdiction.[88]  Petitioners cite to the NGA's exemption for Hinshaw pipelines as an example and assert that because Congress excluded foreign commerce from interstate commerce, only commerce taking place in the United States may be regulated under NGA section 7.[89]  That there are exemptions to the Commission's NGA jurisdiction in certain situations has no bearing on the instant proceeding.  We note that CP Express has not claimed and does not qualify for a Hinshaw exemption.[90]  Moreover, the transportation of natural gas in interstate commerce is separate and distinct from the subsequent liquefaction and sale of LNG in foreign commerce.  CP Express will transport natural gas in interstate commerce for delivery to and use by CP2 LNG pursuant to a precedent agreement.  Any gas transported by CP Express that ultimately enters foreign commerce will only do so after having been delivered by CP Express to CP2 LNG.  The CP2 LNG Project and any exports therefrom are authorized under NGA section 3.[91]  The CP Express Pipeline Project will only transport natural gas in interstate commerce—CP2 LNG, not CP Express is authorized to export LNG.  Accordingly, the CP Express Pipeline Project is properly under our NGA section 7 jurisdiction.

25.    Petitioners next argue that, according to *Maryland v. Louisiana*,[92] the Commission must consider the entire flow of gas, from production to consumption, when determining what type of commerce is at issue (and not solely whether the natural gas crosses state lines).[93]  They assert that the ultimate consumer under the NGA is the final end-user of the natural gas.[94]  But that case stands for the proposition that "gas crossing a state line at

---

[88] Rehearing Request at 42.

[89] *Id.*

[90] NGA section 1(c), 15 U.S.C. § 717(c), known as the Hinshaw Amendment, "exempted from [Commission] regulation intrastate pipelines that receive natural gas at their state boundary that is consumed within the state and subject to state commission regulation."  *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 898 & n.2 (D.C. Cir. 1995).  In contrast, the CP Express Pipeline Project will traverse state lines and thus would not qualify for a Hinshaw exemption.

[91] *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 11.

[92] 451 U.S. at 755.

[93] Rehearing Request at 37-39, 41.

[94] *Id.* at 38 (citing 15 U.S.C. § 3301 ("'local distribution company' means any person, other than any interstate pipeline or any intrastate pipeline, engaged in the transportation, or local distribution, of natural gas and the sale of natural gas for ultimate

any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey."[95]  It does not address foreign commerce and thus is inapposite here.

26.     Petitioners also rely on *Oberlin I*[96] and *Oberlin II*[97] to argue that the CP Express Pipeline does not fall within the Commission's NGA section 7 authority because the pipeline will be engaged in foreign, not interstate, commerce.  Specifically, Petitioners argue that, although in *Oberlin II* the court found that the pipeline at issue there was "indisputably" transporting gas in interstate commerce[98] and that the Commission could rely on precedent agreements with foreign shippers, it nevertheless reserved judgment on whether the Commission could grant an NGA section 7 certificate for a pipeline that crosses state lines but exclusively transports gas ultimately bound for export.[99]  Here, in contrast, Petitioners maintain that the CP Express Pipeline Project will not transport gas across state lines for sale within the United States.[100]  We disagree.  The Commission has explained in proceedings involving natural gas destined for export that once the natural gas leaves a pipeline company's system, it is immaterial where that gas is ultimately consumed because any gas that ultimately enters foreign commerce will only do so after delivery to the LNG facility and solely at the direction of the owner of the LNG facility pursuant to DOE's NGA section 3 authority.[101]  In other words, "[a]ny actual export does

---

consumption.") and 15 U.S.C. § 3202(2) (defining a "local distribution company" as an entity engaged in the "the local distribution of natural gas, and the sale of natural gas to any ultimate consumer of natural gas.")).

[95] *Md. v. La.*, 451 U.S. at 755.

[96] 937 F.3d 599.

[97] *City of Oberlin, Ohio v. FERC*, 39 F.4th 719 (D.C. Cir. 2022) (*Oberlin II*).

[98] The court in *Oberlin II* found that the pipeline was transporting interstate gas primarily because the natural gas would cross state lines and approximately 17% of gas bound for export was commingled with gas bound for domestic, interstate use.  *Oberlin II*, 39 F.4th at 726.

[99] Rehearing Request at 36, 40 (citing *Oberlin II*, 39 F.4th at 726 & n.3) (stating that whether a pipeline like the CP Express Pipeline which crosses state lines but exclusively transports gas for export engages in interstate commerce is an open question of statutory construction).

[100] *Id.* at 40-41.

[101] *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 17-18 (2022), *order on reh'g*, 180 FERC ¶ 61,206 at PP 11-12.

not occur until the gas leaves interstate commerce and enters export facilities subject to NGA section 3."[102]  We note that since the U.S. Court of Appeals for the District of Columbia Circuit's (D.C. Circuit) opinion in *Oberlin II*, the Commission has approved pipelines under NGA section 7 carrying interstate gas for export.[103]

27.      Petitioners next argue that the CP Express Pipeline should be regulated under NGA section 3 rather than section 7, similar to the Commission's approach in *Alaska Gasline Development Corporation*[104] where the Commission asserted NGA section 3 jurisdiction over pipeline feeding natural gas to an export LNG terminal.[105]

28.      In *Alaska Gasline Development Corporation*, the Commission acknowledged that the physical footprint of the Alaska LNG project diverged significantly from that of any LNG facility previously considered by the Commission.[106]  The project included a gas treatment plant and liquefaction facilities that were connected by an approximately 806.9-mile-long pipeline.[107]  Although the Commission recognized that it had previously authorized remotely-located gas treatment facilities and shorter pipeline segments as part of an LNG terminal,[108] it also recognized that it had never asserted NGA section 3

---

[102] *Tenn. Gas Pipeline Co.*, 163 FERC ¶ 61,190, at P 9 (2018); *see also Comanche Trail Pipeline, LLC*, 155 FERC ¶ 61,182 at P 19 ("When a company constructs a pipeline to import or export volumes of natural gas, only a small segment of the pipeline close to the border is deemed to be the import or export facility for which section 3 authorization is necessary; the rest of the pipeline may be jurisdictional under section 7, if it will be used to transport gas in interstate commerce, or it may be NGA-exempt, if it will be used to gather gas or for intrastate transportation service.").  *Cameron LNG, LLC*, 147 FERC ¶ 61,230, at P 2 (2014) (approving 21 miles of 42-inch-diameter pipeline under NGA section 7 that will "enable [the pipeline] to transport domestically-sourced gas . . . to the LNG terminal where the gas will be liquefied for export").

[103] *Tenn. Gas Pipeline Co.*, 178 FERC ¶ 61,199, at PP 31-33 (2022), *order on reh'g*, 180 FERC ¶ 61,205 at PP 15-16.

[104] 171 FERC ¶ 61,134.

[105] Rehearing Request at 42-43.

[106] *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 at P 9.

[107] *Id.*

[108] *Id.* (citing *Freeport LNG Dev., L.P.*, 107 FERC ¶ 61,278 (2004), *order granting reh'g and clarification*, 108 FERC ¶ 61,253 (2004) (authorizing a 9.6-mile-long pipeline under section 3 of the NGA)).

jurisdiction over a project of that size.[109]  The Commission determined that there were no existing interstate pipelines in Alaska, that the project would involve no interstate transportation subject to NGA section 7 jurisdiction, and that there is no intrastate transmission system linking in-state production areas to in-state markets or to the LNG terminal; thus, the statutory definition of "LNG terminal" in NGA section 2(11)[110] encompassed the 806.9-mile-long pipeline in that particular situation.[111]  In contrast to *Alaska Gasline Development Corporation*, the CP Express Pipeline will be engaged in interstate transportation and will not connect gas treatment facilities to the CP2 LNG Project as was the case in *Alaska Gasline Development Corporation*.  Accordingly, we find *Alaska Gasline Development Corporation* inapplicable to the facts here.[112]

29.    We also disagree with Petitioners' assertion that the Commission never explained why it is lawful to credit demand for export capacity in issuing NGA section 7 certificates and that doing so should not be authorized under NGA section 7 because the primary purpose of exporting is to serve foreign demand in foreign markets.[113]  As the D.C. Circuit has held, "nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis."[114]  The Commission may "lawfully consider the export precedent agreements" because a public convenience and necessity determination requires consideration of "all the factors that might bear on the public interest."[115]  The court in *Oberlin II* affirmed the Commission's decision to credit contracts for firm transportation of gas bound for Canada as evidence of need in the Commission's section 7 analysis, given Congress's "clear statutory directive" that natural gas exports to countries with which the United States has a free trade agreement for natural gas "shall be deemed to be consistent with the public interest."[116]  Here, CP2

---

[109] *Id.*

[110] 15 U.S.C. § 717a(11).

[111] *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 at PP 9-10.

[112] *See also Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at P 50 (finding neither reasonable nor appropriate to consider the entire 229-mile-long pipeline part of the NGA section 3 export facility given the limited authority delegated by DOE).

[113] Rehearing Request at 43.

[114] *Oberlin II*, 39 F.4th at 725-26.

[115] *Id.*; *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at P 29 (2023).

[116] *Oberlin II*, 39 F.4th at 726-27; *see Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 15.

LNG is authorized to export to countries with which the United States has a free trade agreement.[117] Accordingly, the Commission properly credited the precedent agreement with CP2 LNG as evidence of need under NGA section 7 even though the natural gas is destined for ultimate consumption in foreign commerce. We note that exports, whether to FTA or non-FTA nations, can only occur once DOE has determined that they are in the public interest.[118]

## B.    Takings Clause

30.    Petitioners argue that the CP Express Pipeline Project cannot be approved under the NGA because it satisfies neither the types of benefits contemplated under the NGA (i.e., that the pipeline transport natural gas "for ultimate distribution to the public") nor the public use requirement of the United States Constitution's Fifth Amendment (i.e., Takings Clause).[119]

31.    We disagree. Although Petitioners argue that delivering gas for export falls outside Congress's declaration in NGA section 1 that "transporting and selling natural gas for ultimate distribution to the public is affected with a public interest," that sentence goes on to say that "Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."[120] Moreover, the Fifth Amendment to the Constitution provides that private property may not be taken for public use without just compensation.[121] As Petitioners recognize, the Supreme Court has a longstanding policy of deference to legislative judgments as to what public needs justify the use of the takings power.[122] The

---

[117] Authorization Order, 187 FERC ¶ 61,199 at P 8; *Venture Glob. CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (Apr. 22, 2022).

[118] *Sierra Club v. United States Dep't of Energy*, 107 F.4th 1012, 1014 (D.C. Cir. 2024) (citing 15 U.S.C. §§ 717b(c)-(a)).

[119] Rehearing Request at 35, 43-44 (citing 15 U.S.C. § 717(a) and U.S. Const. Amend. V).

[120] 15 U.S.C. § 717(a); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 12.

[121] U.S. Const. amend. V.

[122] *See Kelo v. City of New London*, 545 U.S. 469, 480 (2005) (*Kelo*); *see also Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 244 (1984) ("Thus, if a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.").

Commission having appropriately determined that the CP Express Pipeline Project serves the public convenience and necessity, it is not required to make a separate finding that the project serves a "public use" in order for a certificate holder to pursue condemnation proceedings in a U.S. District Court or state court pursuant to NGA section 7(h).[123] Congress articulated in the NGA that the transportation of natural gas and the sale thereof in interstate and foreign commerce is in the public interest.[124] Congress did not suggest that there was a further test beyond the Commission's determination under NGA section 7(e) that a proposed pipeline is required by the public convenience and necessity and is thus entitled to use eminent domain.[125] So long as the Commission's determination that a project is required by the public convenience and necessity complies with the NGA, a certificate-holder's exercise of Congressionally-delegated eminent domain authority satisfies the Fifth Amendment's public-use requirement.[126]

---

[123] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136, at P 55 (2020); *PennEast Pipeline Co.*, 164 FERC ¶ 61,098, at P 29 (2018); *see, e.g., N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 470-71 (7th Cir. 1998) (under the NGA, "issuance of the certificate [of public convenience and necessity] to [pipeline] carries with it the power of eminent domain to acquire the necessary land when other attempts at acquisition prove unavailing"); *Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (noting that once a section 7 certificate authorization is issued, and the pipeline is unable to acquire the needed land by contract or agreement with the owner, the only issue before the district court in the ensuing eminent domain proceeding is just compensation for the taking); *Rockies Express Pipeline LLC v. 4.895 Acres of Land, More or Less*, 734 F.3d 424, 431 (6th Cir. 2013) (rejecting landowner's claim for damages from eminent domain taking by pipeline as it was an impermissible collateral attack on the essential fact findings made by the Commission in issuing the certificate order authorizing the pipeline); *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) (affirming district court's determination that Commission's issuance of a certificate of public convenience and necessity gave the pipeline the right to exercise eminent domain and thus an interest in the landowners' property).

[124] 15 U.S.C. § 717(a); *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 55.

[125] *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 29.

[126] *See Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000) (holding the Commission's determination that pipeline "serve[d] the public convenience and necessity" demonstrated that it served a "public purpose" for Fifth Amendment purposes).

32.    Petitioners also assert that there must be more than mere economic benefits for a pipeline project to be considered as providing a public benefit under the Takings Clause.[127]  Petitioners cite to *Kelo*[128] and *Puntenney v. Iowa Utilities Board* (*Puntenney*)[129] to support their argument that CP Express plans to take private property in order to build a project that only benefits CP Express.[130]  They claim that the public purpose of the CP Express Pipeline Project is a "mere pretext" for conferring a private benefit on a private party, as discussed in *Kelo*,[131] and that the CP Express Pipeline Project fails to meet the public use requirement under the Takings Clause.[132]

33.    We disagree with this characterization of those cases and of the Commission's analysis in the Authorization Order.  Neither the Takings Clause nor governing precedent preclude the conferral of eminent domain authority where, in addition to the requisite public benefit, there may also be a private benefit.[133]  And, "[n]either Congress nor a court has stated that in order to constitute a public use, the taking may only provide a domestic benefit."[134]  The Commission's ultimate conclusion under NGA section 7(e) that the public interest (i.e., public convenience and necessity) is served by the construction of a proposed project reflects its findings that the benefits of a project will outweigh its adverse effects.[135]  Under NGA section 7(h), once a natural gas company obtains a certificate of public convenience and necessity it may exercise the right of

---

[127] Rehearing Request at 45-46.

[128] 545 U.S. at 477, 483-84.

[129] 928 N.W.2d 829, 848 & n.4 (Iowa 2019).

[130] Rehearing Request at 45-46.

[131] 545 U.S. at 477.

[132] Rehearing Request at 46.

[133] *Kelo*, 545 U.S. at 485 ("[T]he government's pursuit of a public purpose will often benefit individual private parties.").

[134] *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 23; *Transcon. Gas Pipe Line Co.*, 161 FERC ¶ 61,250, at P 32 (2017); *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 61,747-49, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

[135] *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 30.

eminent domain in a U.S. District Court or a state court.[136]  As we explain above, in enacting the NGA, Congress clearly articulated that the transportation and sale of natural gas in interstate commerce for ultimate distribution to the public is in the public interest.[137]  Congress also clearly articulated that import and export to FTA nations shall be deemed to be consistent with the public interest.[138]  The congressional recognition that interstate transportation as well as import and export further the public interest is consistent with the Supreme Court's emphasis on legislative declarations of public purpose in upholding the power of eminent domain.[139]  For these reasons, and because neither of the cases cited by Petitioners had occasion to consider the legislative declarations in the NGA, we find Petitioners reliance on *Kelo*[140] and *Puntenney*[141] misplaced.

### C.    Public Interest

### 1.    CP2 LNG Project

34.    Petitioners aver that the Commission's authority under NGA section 3 is undefined and lacks a clear legal standard, rendering the Authorization Order arbitrary.[142]

---

[136] 15 U.S.C. § 717f(h).

[137] *Id.* § 717(a) (declaring that the "business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest").  *See also Thatcher v. Tenn. Gas Transmission Co.*, 180 F.2d 644, 647 (5th Cir. 1950), *cert. denied*, 340 U.S. 829 (1950) (explaining that Congress, in enacting the NGA, recognized that "vast reserves of natural gas are located in States of our nation distant from other States which have no similar supply, but do have a vital need of the product; and that the only way this natural gas can be feasibly transported from one State to another is by means of a pipe line.").

[138] 15 U.S.C. § 717b(c).

[139] *Transcon. Gas Pipe Line Co.*, 161 FERC ¶ 61,250 at P 33 (citing *Kelo*, 545 U.S. at 479-80).

[140] 545 U.S. at 477, 483-84.

[141] 928 N.W.2d at 848 & n.4.

[142] Rehearing Request at 87-88 (citing 15 U.S.C. 717b(e)); *see also id.* (stating that NGA section 3 contains no legal standard governing the exercise of that power); *id.* at 89 (citing Authorization Order, 187 FERC ¶ 61,199 at P 23) (stating that the

They maintain that the Commission failed to articulate a clear standard for making its NGA section 3 finding that the project was not inconsistent with the public interest despite record evidence of harms and impacts emanating from the CP2 LNG Project.[143] Thus, Petitioners argue that the Commission's failure to engage in or state a policy for its decision-making and balancing under NGA section 3 is a violation of the NGA and APA.[144]

35.     NGA section 3(a) provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."[145]  The Department of Energy Organization Act transferred the regulatory functions of NGA section 3 to the Secretary of Energy.[146]  The Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The Commission does not authorize importation or exportation of the commodity itself.[147]  Rather, applications for authorization to import or export natural gas

_____

Commission merely asserts that it has a coherent standard and failed to articulate or identify one).

[143] *Id.* at 91-92 (listing impacts as including harm to fishermen, resources, and landowners).

[144] *Id.* at 92.

[145] 15 U.S.C. § 717b(a).

[146] In 1977, Congress transferred the regulatory functions of NGA section 3 to the Secretary of DOE in 1977 pursuant to section 301(b) of the Department of Energy Organization Act, Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq.*  The Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The most recent delegation is in DOE Delegation Order No. S1-DEL-FERC-2006, effective May 16, 2006.

[147] *Freeport LNG Dev., L.P.*, 148 FERC ¶ 61,076, *reh'g denied*, 149 FERC ¶ 61,119 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016) (*Freeport*) (finding that because DOE, not the Commission, has sole authority to license the export of any natural gas through LNG facilities, the Commission is not required to address the indirect effects of the anticipated export of natural gas in its NEPA analysis); *Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117 (2014), *reh'g denied*, 148 FERC ¶ 61,200 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 59, 69 (D.C. Cir. 2016) (*Sabine Pass*).

must be submitted to DOE.[148]  Thus, the Commission's authority under NGA section 3 applies "only to the siting and the operation of the facilities necessary to accomplish an export[,]"[149] while "export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse."[150]

36.     As the D.C. Circuit has explained, the NGA section 3 standard that a proposal "shall" be authorized unless it "will not be consistent with the public interest[,]"[151] "sets out a general presumption favoring such authorizations."[152]  To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an

---

[148] *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (*EarthReports*) (detailing how regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and DOE).

[149] *Trunkline Gas Co.*, 155 FERC ¶ 61,328, at P 18 (2016).  With respect to border-crossing projects, the Commission has consistently interpreted its section 3 authority to extend only to the "small segment of . . . pipeline close to the border . . . deemed to be the import or export facility . . .."  *E.g.*, *Trans-Pecos Pipeline, LLC*, 155 FERC ¶ 61,140, at P 31 & n.33 (2016) (citing *S. LNG, Inc.*, 131 FERC ¶ 61,155, at P 15 & n.17 (2010)), *order on reh'g*, 157 FERC ¶ 61,081 (2016), *aff'd sub nom. Big Bend Conservation All. v. FERC*, 896 F.3d 418 (D.C. Cir. 2018) (*Big Bend*).

[150] *Freeport*, 827 F.3d at 46; *see Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023) (*Alaska LNG*) (". . .[T]he Department of Energy has exclusive jurisdiction over whether to approve natural gas exports . . ..").

[151] 15 U.S.C. § 717b(a).

[152] *Alaska LNG*, 67 F.4th at 1188 (quoting *W. Va. Pub. Serv. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982) (*W. Va. Pub. Serv. Comm'n*)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017) (*Freeport II*).

"affirmative showing of inconsistency with the public interest."[153] This same standard applies to the Commission's consideration of the siting and operation of facilities.[154]

37.     Accordingly, we disagree that the Commission has failed to articulate a standard. As the Commission has done in prior NGA section 3 proceedings, it noted the overall benefits, evaluated the environmental impacts, and concluded that construction and operation of the CP2 LNG Project is not inconsistent with the public interest.[155] Those objecting to such a project bear the burden of producing credible, contrary evidence that the project is inconsistent with the public interest, and the record in this proceeding does not contain such contrary evidence sufficient to overcome the presumption.[156]

38.     Petitioners also maintain that the Commission conflates its role under NGA section 3 with the DOE's jurisdiction under NGA section 3 for exports as a commodity.[157] They assert that the Commission's reliance on the designation of FTA exports being deemed to be in the public interest has replaced any meaningful inquiry or development of the record that could rebut the presumption.[158] Petitioners maintain that the Commission then disclaims the authority to evaluate evidence of adverse economic impacts and, instead, relies on the fact that the land has been acquired through easements

---

[153] *See, e.g.*, *Jordan Cove Energy Project, L.P.*, 157 FERC ¶ 61,194, at P 30 (2016) (explaining that "the issue of whether the export of LNG will cause economic harm or benefit is beyond the Commission's purview and the [authorization order] was not required to consider these factors"); *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 48 ("While the Commission acknowledged the economic benefits of the proposal, the Commission's determination examined other factors, including the prior use of the site, the mitigation of environmental impacts, as well as [the Pipeline and Hazardous Materials Safety Administration's (PHMSA)] Letter of Determination that the siting of the LNG terminal would comply with federal safety standards.").

[154] *Alaska LNG*, 67 F.4th at 1188 (upholding the Commission's application of NGA section 3).

[155] Authorization Order, 187 FERC ¶ 61,199 at PP 22-32, 199; *see also Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029, at P 16 (2024).

[156] Authorization Order, 187 FERC ¶ 61,199 at P 13 ("Those objecting to a project thus bear the burden of showing inconsistency with the public interest.").

[157] Rehearing Request at 88 (citing 15 U.S.C. 717b(a)).

[158] *Id.* at 89.

with landowners and there would be no significant environmental effects to conclude that the CP2 LNG Project is not inconsistent with the public interest.[159]

39.    NGA section 3 explicitly provides that the "exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such . . . exportation shall be granted without modification or delay."[160]  Thus, any disagreement with the NGA's treatment of natural gas trade with FTA nations is better addressed to Congress.  To the extent the Commission addressed the limited impacts to landowners and the environment, such considerations do not change this clear statutory directive.  As discussed above, the Commission does not examine economic claims relating to the exportation of natural gas as a commodity; that task is within the purview of DOE.  Instead, the Commission examines the siting and the operation of the facilities.  Thus, despite Petitioners' assertions, the Commission's consideration of landowner and environmental impacts from LNG facilities are precisely the type of issues relevant to the Commission's jurisdiction under NGA section 3.

40.    Petitioners next assert that, even if the Commission could use the NGA's "not inconsistent with the public interest" standard, the Commission has failed to articulate a policy explaining what it considers in its public interest balancing or how such a policy is implemented.[161]

41.    Petitioners appear to conflate the Commission's obligations under NGA section 7 and section 3.  "Section 7 requires that an affirmative finding of public necessity be made before authorization may be granted, while section 3 requires a finding of detriment to the public interest be made before authorization may be denied."[162]  As explained above, NGA section 3 "'sets out a general presumption favoring' authorizations . . . ; accordingly, section 3 of the NGA does not charge the Commission with demonstrating that the benefits of a proposal outweigh its potential harms."[163]  Petitioners

---

[159] *Id.* at 89-90 (citing Authorization Order, 187 FERC ¶ 61,199 at PP 24, 27).

[160] 15 U.S.C. § 717b(c).

[161] Rehearing Request at 90.

[162] *Atl. Richfield Co.*, 50 FERC ¶ 61,210, at 61,667 (1990).

[163] *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214, at P 16 (2020) (noting that section 3 is a "decidedly different standard than exists under section 7 of the NGA") (quoting *EarthReports*, 828 F.3d at 953).

characterization of the Commission's obligation under NGA section 3 as a "balancing" is misplaced.

42.    Petitioners argue that in *KeySpan LNG, L.P.*[164] the Commission asserted its NGA section 3 authority to deny an application for an import terminal due to safety concerns and the terminal not being in the public interest.[165]  We find this case inapposite.  There, KeySpan LNG, L.P. (KeySpan) proposed to convert an existing LNG storage facility into an import terminal.[166]  KeySpan argued that it was not required to make modifications to the facilities, which did not meet Department of Transportation (DOT) safety standards for new LNG import facilities, because it was "grandfathered" in under the Natural Gas Pipeline Safety Act (NGPSA).[167]  The Commission determined that it was not in the public interest under NGA section 3 to authorize the construction of a new import terminal, where the components do not meet the current federal safety standards required of all other new LNG import facilities.[168]  Contrary to *KeySpan LNG, L.P.*, here, there are no similar safety concerns.  Indeed, the CP2 LNG Project will be designed, constructed, operated, and maintained in accordance with numerous cooperating agencies' regulations, including PHMSA.[169]

43.    Petitioners also assert that the argument that increased LNG exports are needed to bolster U.S. national security by supplying LNG to strategic allies because of the ongoing war in Ukraine is neither substantiated by the market data or geopolitical realities.[170]  Petitioners aver that European energy needs are a pretext to expand U.S. LNG exports and that LNG contracts are contrary to Germany's climate targets which has a sufficient

---

[164] 114 FERC ¶ 61,054 (2006).

[165] Rehearing Request at 90 (noting that the Commission denied the application under its NGA authority and not under safety statutes or regulations).

[166] *KeySpan LNG, L.P.*, 114 FERC ¶ 61,054 at P 4.

[167] *Id.*

[168] *Id.* P 20.

[169] Final EIS at 1-4 to 1-8; Authorization Order, 187 FERC ¶ 61,199 at env't. condition 10.

[170] Rehearing Request at 69-70 (citing Response to Form Letter at 16-19).

supply of natural gas.[171]  In Asia, Petitioners argue that there is no increased need for LNG exports[172] and that Japan and South Korea have seen gas demand reductions and are either over-contracted[173] or will see further natural gas demand reductions due to increased renewables.[174]  Thus, Petitioners assert that there may not be any unmet demand and that there could be an oversupply within two years.[175]  Based on the foregoing, Petitioners argue that the Commission failed to discuss foreign market conditions in its evaluation of project benefits and should reevaluate the public interest.[176]

44.     As we explained above, "the [DOE] has exclusive jurisdiction over whether to approve natural gas exports."[177]  DOE has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself.[178]  The Commission's authority under NGA section 3 applies "only to the siting and the operation of the facilities necessary to accomplish an export."[179]  The Commission "does not examine economic claims relating to the exportation of the commodity of natural gas,

---

[171] *Id.* at 70 (citing Response to Form Letters at Ex. 19; Kathrin Henneberger, German Member of Parliament, January 15, 2024 Comment at 1; German Civil Society January 16, 2024 Comment at 2).

[172] *Id.* at 70-74.  Petitioners note that the manufacturing sectors in Asian emerging markets compete with American manufacturing and that providing U.S. LNG to improve those nations may cause harm to the U.S. economy.  *Id.* at 72.

[173] *Id.* at 70-71 (citing Response to Form Letters at Ex. 26).

[174] *Id.* at 71-72 (citing Response to Form Letters at Ex. 27 & 28); *see also id.* at 72-73 (asserting that gas demand projections in emerging economies may be overblown and that the International Energy Administration (IEA) has revised Asia demand growth downward every year since 2018).

[175] *Id.* at 73-74 (citing Response to Form Letters at Ex. 27, 29); *see also id.* at 74 & Ex. 29 (stating that the Institute for Energy Economics and Financial Analysis (IEEFA) estimates global capacity to reach 666.5 MTPA by 2028 while the International Energy Agency (IEA) projects total LNG demand in 2050 to reach a maximum of 482 MTPA).

[176] *Id.* at 75.

[177] *Alaska LNG*, 67 F.4th at 1185.

[178] Authorization Order, 187 FERC ¶ 61,199 at P 27 & n.57.

[179] *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, at P 13 (2022) (citing *Trunkline Gas Co.*, 155 FERC ¶ 61,328 at P 18).

which are within DOE's exclusive jurisdiction, nor [does] the Commission rely on these claims in determining that the siting, construction, and operation of the [export facility] [is] not inconsistent with the public interest."[180]  Accordingly, as discussed in the Authorization Order, we continue to decline to address claims regarding market demand for LNG, which are relevant only to the exportation of the commodity of natural gas, a matter within DOE's exclusive jurisdiction, and not implicated by our separate role reviewing proposed terminal sites and facilities.[181]

45.    Petitioners next assert that global gas markets are saturated and are unlikely to become more favorable in the future.[182]  They assert that approximately 73% of the LNG terminals authorized by the Commission have yet to be constructed and become operational, representing an additional 35.93 billion cubic feet per day (Bcf/d) of export capacity and that, even prior to DOE's temporary pause and operation on LNG export approvals to non-FTA countries, DOE had already authorized 48 Bcf/d of U.S. natural gas, representing over 45% of current domestic production.[183]  Petitioners also argue that Venture Global's parent corporation and/or affiliates currently have two other facilities that are operating at less than nameplate capacity, including one next to the proposed CP2 LNG Project site, and that they have not been a reliable or trustworthy market actor due to their failure to perform under long-term contracts.[184]  Petitioners maintain that Venture Global's parent corporation and/or affiliates could increase market share and bolster fossil fuel export markets by constructing or reconfiguring existing facilities, including their own facilities.[185]

46.    We find Petitioners' arguments regarding excess capacity outside the scope of the Commission's jurisdiction.  Issues related to the impacts of natural gas development and production are related to DOE's authorization of the export and not the Commission's

---

[180] *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 20; *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 48.

[181] Authorization Order, 187 FERC ¶ 61,199 at P 27; *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 at P 13; *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at P 32.

[182] Rehearing Request at 59.

[183] *Id.* at 60.

[184] *Id.* at 60-61.

[185] *Id.* at 61.

siting of the facilities.[186]  Each of the proposed and approved projects identified by Petitioners is either authorized, or has applied to DOE, to export to FTA countries.[187] Because the NGA has deemed FTA exports to be in the public interest, we will not consider speculative assertions that excess capacity is available from these projects to substitute for the CP2 LNG Project.  In any event, the willingness of companies to build facilities, and customers to sign contracts for capacity are appropriate indicators for forecasting future demand for increased service 188 and, as we discussed above, although it is outside of the Commission's NGA section 3 authority to assess market demand for LNG exports, we view DOE's approval of applications to export LNG to FTA nations as sufficient evidence of market demand.[189]

## 2.  CP Express Pipeline Project

### a.  Project Need

#### i.  Precedent Agreement

47.    Petitioners argue that the Commission's reliance on a single affiliate precedent agreement, the lack of market need, and the fact that all of the capacity is destined for export are insufficient to demonstrate market need for the CP Express Pipeline Project under NGA section 7.[190]  Petitioners assert that a pipeline that the public cannot use or benefit from cannot be required by the public convenience and necessity and that landowners should not be subject to eminent domain.[191]  Petitioners maintain that the Commission ignored contrary evidence in the record that more than half of the CP2 LNG

---

[186] Authorization Order, 187 FERC ¶ 61,199 at P 27; *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 at P 13 (citing *Freeport*, 827 F.3d at 46).

[187] *See* final EIS at 3-39 to 3-40, tbl. 3.3.1-1 (detailing planned, proposed, or approved LNG export terminals and expansions projects within the CP2 LNG Project area and their capacity).

[188] *See generally Twp. of Bordentown, New Jersey v. FERC*, 903 F.3d 234, 262 (3d Cir. 2018) ("If there were no objective market demand for the additional gas, no rational company would spend money to secure the excess capacity."); *Trunkline Gas Co.*, 147 FERC ¶ 61,041, at P 20 (2014).

[189] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 47.

[190] Rehearing Request at 47-50, 52.

[191] *Id.* at 49.

Project may never be built, and that CP2 LNG has less than fifty percent of its offtake contracted for on a conditional basis.[192]

48.     Precedent agreements are significant evidence of demand for a project.[193]  A shipper's affiliation with a project sponsor does not lessen the shipper's need for capacity or its contractual obligation to pay for its subscribed service, absent plausible evidence of self-dealing or of exploitation of captive end use customers.[194]  When considering applications for new certificates, the Commission's primary concern regarding affiliates of the pipeline as shippers is whether there may have been undue discrimination against a non-affiliate shipper.[195]  Here, there is no evidence of impropriety or self-dealing to

---

[192] *Id.* at 50.  As explained below, LNG terminals have no captive customers to whom they can pass the costs associated with their transportation contract and, therefore, we find this argument unavailing.

[193] *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 110 n.10 (D.C. Cir. 2014) (*Minisink*); *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017) (*Sabal Trail*) (affirming Commission reliance on preconstruction contracts for 93% of project capacity to demonstrate market need)); Certificate Policy Statement, 88 FERC at 61,748 (precedent agreements, though no longer required, "constitute significant evidence of demand for the project")); *Twp. of Bordentown v. FERC*, 903 F.3d at 263 ("As numerous courts have reiterated, FERC need not 'look[] beyond the market need reflected by the applicant's existing contracts with shippers.'") (quoting *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 183 F.3d 1291, 1301, 1311 (D.C. Cir. 2015) (*Myersville*)); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at *1 (D.C. Cir. Feb. 19, 2019) (*Appalachian Voices*) (unpublished) (precedent agreements are substantial evidence of market need); *see also Midship Pipeline Co.*, 164 FERC ¶ 61,103, at P 22 (2018) (long-term precedent agreements for 64% of the system's capacity is substantial demonstration of market demand); *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 16 (affirming that the Commission is not required to look behind precedent agreements to evaluate project need); *NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022, at P 41 (2017), *order on reh'g*, 164 FERC ¶ 61,054 (2018), *aff'd in relevant part, Oberlin I*, 937 F.3d at 605 (finding need for a new pipeline system that was 59% subscribed).

[194] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 45, *order on reh'g*, 163 FERC ¶ 61,197, at P 90 (2018), *aff'd, Appalachian Voices*, 2019 WL 847199 at *3; *see also, e.g., Greenbrier Pipeline Co.*, 101 FERC ¶ 61,122, at P 59 (2002), *reh'g denied*, 103 FERC ¶ 61,024 (2003).

[195] *See* 18 C.F.R. § 284.7(b) (2024) (requiring transportation service to be provided on a non-discriminatory basis).

indicate anti-competitive behavior or affiliate abuse. Accordingly, it is appropriate for the Commission to give credit to the precedent agreement in this case for transportation of gas that the shipper intends to liquefy for export.[196]

49.    Petitioners argue that this proceeding is analogous to *Environmental Defense Fund v. FERC*[197] because there is no evidence that the CP2 LNG Project will serve new load demand since all of the LNG is destined for overseas markets, there is evidence that global demand for LNG is decreasing, the CP2 LNG Project will not decrease costs paid by consumers and may actually increase costs, and there is only one affiliate precedent agreement.[198]

50.    Petitioners' reliance on *EDF* is misplaced. The Commission frequently approves NGA section 7 applications in circumstances substantially similar to the instant proceeding, and "it is not an uncommon model for entities developing LNG terminals to construct and operate, through an affiliate, an associated pipeline to provide transportation and ensure delivery of the natural gas which will serve as feedstock for the liquefaction process."[199] Unlike affiliated local distribution companies (such as those at issue in *EDF*), LNG terminals have no captive customers to whom they can pass the costs associated with their transportation contracts.[200] Thus here, absent evidence of self-dealing or other anti-competitive behavior, the Commission views precedent agreements with affiliates like those with any other shipper for purposes of assessing the demand for capacity[201]—an affiliated shipper's need for new capacity and its obligation to pay for

---

[196] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 38.

[197] 2 F.4th 953 (D.C. Cir. 2021) (*EDF*).

[198] Rehearing Request at 50-51.

[199] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24 & n.39 (citing *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135 (2019), *order on reh'g*, 181 FERC ¶ 61,033 (2022); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, *order on reh'g*, 170 FERC ¶ 61,046 (2020); *Venture Glob. Plaquemines LNG, LLC*, 168 FERC ¶ 61,204 (2019); *Port Arthur LNG, LLC*, 167 FERC ¶ 61,052 (2019); *Venture Glob. Calcasieu Pass, LLC*, 166 FERC ¶ 61,144).

[200] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24.

[201] *See EDF*, 2 F.4th at 975 (acknowledging that the Commission can "put precedent agreements with affiliates on the same footing as non-affiliate precedent agreements" so long as the Commission finds no evidence of self-dealing); *NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022 at P 47; *see also E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233, at PP 15-16 (2022) (finding no evidence of self-dealing where

such service under a binding contract are not lessened simply because it is affiliated with the project sponsor.[202] Petitioners have presented no evidence of self-dealing or other anti-competitive behavior and, in the absence of such evidence, we find no occasion to look behind the precedent agreements.[203]

51.    Petitioners also attempt to distinguish the D.C. Circuit's recent holding in *Food & Water Watch v. FERC*[204] by explaining that there the Commission relied on more than a precedent agreement to support its finding of need, the precedent agreement was with a non-affiliate, and the Commission relied on well-documented gas shortages.[205]

---

affiliate local distribution company contracted for 100% of the firm transportation service created by construction of new compressor station).

[202] *Oberlin I*, 937 F.3d at 606 (citing *Appalachian Voices*, 2019 WL 847199 at *1); Certificate Policy Statement, 88 FERC at 61,748-49 ("[a]s long as the project is built without subsidies from existing ratepayers, the fact that it would be used by affiliated shippers is unlikely to create a rate impact on existing ratepayers"); *see id.* (stating that the focus will be on the impact of the project on the relevant interests balanced against the benefits to be gained from the project); *see also Millennium Pipeline Co.*, 100 FERC ¶ 61,277, at P 57 (2002) ("as long as the precedent agreements are long term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing market need for a proposed project.") (citing *Tex. E. Transmission Corp.*, 84 FERC ¶ 61,044 (1998)).

[203] *See EDF*, 2 F.4th at 975 ("FERC can put precedent agreements with affiliates on the same footing as non-affiliate precedent agreements (*i.e.*, it may 'fully credit[ ]' them), but only so long as FERC finds 'no evidence of self-dealing' or affiliate abuse and the pipeline operator 'bears the risk for any unsubscribed capacity.'") (citing *Oberlin I*, 937 F.3d at 605); *Nw. Alaskan Pipeline Co.*, 7 FERC ¶ 61,071, at 61,111 (1979) ("the applicants have the burden of demonstrating that their applications, as filed, meet the requirements of the [NGA] and the Alaska Natural Gas Transportation Act. As a corollary, any party in opposition to the applications, as filed, has the burden of filing evidence to the contrary if such opposition depends upon facts to be established of record"); Certificate Policy Statement, 88 FERC ¶ at 61,744 ("the Commission gives equal weight to contracts between an applicant and its affiliates and an applicant and unrelated third parties and does not look behind the contracts to determine whether the customer commitments represent genuine growth in market demand").

[204] 104 F.4th 336 (D.C. Cir. 2024) (*East 300*).

[205] Rehearing Request at 51-52.

Petitioners also distinguish *Delaware Riverkeeper Network v. FERC*[206] and assert that there the applicant held an open season that resulted in precedent agreements with four shippers for most of the capacity, and most of the project consisted of the existing pipeline changing ownership.[207]  As discussed above, Petitioners' reliance on these cases ignores the Certificate Policy Statement and court precedent that absent plausible evidence of self-dealing, precedent agreements with affiliates will be considered on equal footing as precedent agreements with non-affiliates.[208]  Consistent with the Certificate Policy Statement, pipeline companies rely on a variety of indicators to demonstrate need, including precedent agreements with affiliates, precedent agreements with non-affiliates, and market studies to name a few.[209]  Accordingly, Petitioners' reference to past decisions involving a demonstration of need using any one or a combination of these factors that are different than those presented here is inapposite and ignores other past decisions to the contrary.[210]

## ii.    **Export Considerations**

52.    Next, Petitioners assert that the Commission conflates the standards under NGA sections 3 and 7 by crediting export agreements associated with the CP2 LNG Project toward a finding that the CP Express Pipeline Project is required by the public convenience and necessity and that the Commission fails to present any public use or

---

[206] 45 F.4th 104 (D.C. Cir. 2022) (*Adelphia*).

[207] Rehearing Request at 52.  We note that CP Express held an open season that resulted in CP2 LNG executing a binding precedent agreement with CP2 LNG for 100% of the firm transportation service provided by Phases I and II of the CP Express Pipeline Project.  Authorization Order, 187 FERC ¶ 61,199 at P 14.

[208] Certificate Policy Statement, 88 FERC at 61,748 (stating that the Commission, when it ended its policy of requiring pipelines to demonstrate a specific subscription rate, was reducing the significance of whether the precedent agreements are with affiliated or unaffiliated shippers); *Oberlin I*, 937 F.3d at 605-6 (upholding the Commission's treatment of affiliate precedent agreements as on par with non-affiliate agreements); *EDF*, 2 F.4th at 975 (requiring the Commission to look behind precedent agreements when presented with "plausible evidence of self-dealing").

[209] Certificate Policy Statement, 88 FERC at 61,747.

[210] *See, e.g., Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24 (citing *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, *order on reh'g*, 181 FERC ¶ 61,033; *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, *order on reh'g*, 170 FERC ¶ 61,046; *Venture Glob. Plaquemines LNG, LLC*, 168 FERC ¶ 61,204; *Port Arthur LNG, LLC*, 167 FERC ¶ 61,052; and *Venture Glob. Calcasieu Pass, LLC*, 166 FERC ¶ 61,144).

benefits that suggest that the CP Express Pipeline meets the Takings Clause's public use requirement.[211]  Additionally, Petitioners maintain that, unlike *Oberlin II*,  there are not myriad domestic benefits from the CP Express Pipeline and there is no increased likelihood that the natural gas will be re-imported to the United States.[212]  Petitioners argue that the Commission's obligation to consider market need under NGA section 7 is independent of DOE's NGA section 3 authority over exports and that the Commission failed to engage with arguments and evidence challenging the probative value of the precedent agreement.[213]  Petitioners assert that nothing in NGA section 3 divests the Commission of its obligation to determine market need when it considers an NGA section 7 pipeline and that the power of eminent domain conveyed by section 7 requires a more thorough analysis.[214]  Petitioners disagree with the Commission's assessment that it lacks authority to consider import and export market demand and asserts that DOE's approval or disapproval of gas exports under NGA section 3 is not dispositive of the Commission's approval or disapproval of the CP Express Pipeline Project under the more exacting NGA section 7 standard.[215]

53.    We find our analysis consistent with *Oberlin II*.  There, the court explained that "nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis."[216]  The court affirmed the Commission's decision to credit contracts for firm transportation of gas bound for Canada as evidence of need in the Commission's NGA section 7 analysis, given Congress's "clear statutory directive" that natural gas exports to FTA nations "shall be deemed to be consistent with the public interest."[217]  The court concluded that the Commission adequately explained that the

---

[211] Rehearing Request at 35, 44-45 (citing *Oberlin I*, 937 F.3d at 607 and *Oberlin II*, 39 F.4th at 727-29).

[212] *Id.* at 44.

[213] *Id.* at 52-53.

[214] *Id.* at 53.

[215] *Id.* at 53-54.

[216] *Oberlin II*, 39 F.4th at 726.

[217] *Id.* at 726-27 (approving the Commission's reliance on DOE's finding that exporting gas was "not inconsistent with the public interest" under NGA section 3, not as a substitute for the Commission's own finding under NGA section 7's "public convenience and necessity" standard but as a justification for giving precedent agreements for the transportation of gas destined for export the same weight that the Commission gives to other precedent agreements).

project would yield domestic benefits from increasing transportation services for gas shippers regardless of where the gas is ultimately consumed.[218]

54.    In the Authorization Order, the Commission found that CP Express had demonstrated a need for the project through a precedent agreement for 100% of the CP Express Pipeline Project's capacity with CP2 LNG.[219]  The Commission also explained that "it is not an uncommon model for entities developing LNG terminals to construct and operate, through an affiliate, an associated pipeline to provide transportation and ensure delivery of the natural gas which will serve as feedstock for the liquefaction process."[220]  Further, the Commission averred that "affiliated LNG terminals, unlike affiliated local distribution companies, have no captive customers to whom they can pass the costs associated with their transportation contracts." [221]  Additionally, the Commission noted that DOE authorized CP2 LNG to export domestically produced LNG from its CP2 LNG Project to FTA countries.[222]  As we have expressed in related proceedings, "[i]f the Commission were precluded from considering the benefits represented by precedent agreements with shippers transporting gas for export in determining whether the interstate facilities are required by the public convenience and necessity, Congress' directive and intent, as expressed in [NGA] section 3 and various trade agreements, would be thwarted."[223]  Moreover, as we have found for other projects that may transport gas for export, benefits of the CP Express Pipeline Project include adding new transportation options for producers and shippers; strengthening the domestic economy[224] and the international trade balance; and supporting domestic jobs in gas production and transportation.[225]  We continue to find that the Commission appropriately

---

[218] *Id.* at 727.

[219] Authorization Order, 187 FERC ¶ 61,199 at PP 37-38.

[220] *Id.* P 38 & n.74.

[221] *Id.* P 38 (citing *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24).

[222] *Id.* P 8.

[223] *Tenn. Gas Pipeline Co.*, 178 FERC ¶ 61,199 at P 33; *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 15.

[224] *See* final EIS at 4-257 to 4-299 (describing benefits, including to the local economy, employment, tourism, and tax revenue streams).

[225] *See NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 17, *aff'd*, *Oberlin II*, 39 F.4th at 727; *see also Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 15 ("Looking at the situation broadly, gas imports and exports benefit domestic markets; thus, contracts for the transportation of gas that will be imported or exported are

relied on the precedent agreement with CP2 LNG, the shipper and owner of an LNG terminal, as evidence of need in its NGA section 7 determination.[226]

55.    Petitioners disagree with the Commission's reliance on *Alaska Gasline Development Corporation*,[227] *Freeport*,[228] and *Sabine Pass*[229] to support its position that determinations related to the import and export of natural gas are strictly within DOE's purview.[230]  Petitioners assert that each of the cited cases concerned the Commission's review of facilities under NGA section 3 and that those decisions do not limit the Commission's obligation to consider market need under NGA section 7.[231]  But the Commission never asserted that the decisions referenced by Petitioners limited the Commission obligation to consider market need under NGA section 7.  Instead, the paragraph of the Authorization Order cited by Petitioners generally discusses the Commission's and DOE's separate obligations under NGA section 3.[232]  We find Petitioners' arguments unavailing.  Despite Petitioners' assertions, we note that the court in *Oberlin II*, addressing the Commission's review of pipeline facilities under NGA

---

appropriately viewed as indicative of a domestic public benefit.  The North American gas market has numerous points of export and import, with volumes changing constantly in response to changes in supply and demand, both on a local scale, as local distribution companies' and other users' demand changes, and on a regional or national scale, as the market shifts in response to weather and economic patterns.  Any constraint on the transportation of domestic gas to points of export risks negating the efficiency and economy the international trade in gas provides to domestic consumers.") (citation omitted).

[226] Authorization Order, 187 FERC ¶ 61,199 at P 38.

[227] 171 FERC ¶ 61,134 at P 15.

[228] 827 F.3d 36.

[229] 827 F.3d 59.

[230] Rehearing Request at 54-56 (citing Authorization Order, 187 FERC ¶ 61,199 at P 27).

[231] *Id.* at 54-55.

[232] Authorization Order, 187 FERC ¶ 61,199 at P 27.

section 7, recognized that the import and export of natural gas are strictly within DOE's purview.[233]

56.    Petitioners next state that *Evangeline Pass*'s holding that the Commission need not review indirect effects of exported gas because DOE has exclusive authority over exports does not absolve the Commission of its statutory obligation to consider evidence of market need under NGA section 7.[234]  Specifically, they assert that *Evangeline Pass* was limited to the Commission's environmental review under NEPA and not its evaluation of market need under NGA section 7.[235]  On the contrary, the D.C. Circuit in *Evangeline Pass* explained:

> [The Commission] and [DOE] share regulatory authority over natural gas.  Section 7 of the [NGA] allows [the Commission] to issue "a certificate of public convenience and necessity" to any entity that seeks to construct, operate, or expand an interstate natural gas pipeline.  However, Section 7 does not reach foreign commerce.  Foreign commerce instead falls under Section 3 of the [NGA].  That section grants [the Commission] regulatory authority over the construction, operation, and expansion of export facilities.  But no section of the [NGA] gives [the Commission] authority over the exported gas itself.  Instead, the "exclusive authority" over exported gas belongs to [DOE].[236]

Indeed, the court includes a helpful table explaining the "distinct scopes of authority mandated by Congress."[237]  In any event, there is ample precedent supporting the Commission's use of precedent agreements to transport natural gas bound for export as evidence of market need and, therefore, we find Petitioners' argument without merit.[238]

---

[233] *Oberlin II*, 39 F.4th at 723.

[234] Rehearing Request at 55.

[235] *Id.*

[236] *Evangeline Pass*, 100 F.4th at 210 (citations omitted).

[237] *Id.*

[238] *See, e.g.*, *Oberlin II*, 39 F.4th at 726 ("Nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis."); *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 29 ("We believe that when considering a proposed project under section 7, it is appropriate to credit precedent agreements for transportation of gas volumes to facilities exporting LNG to countries

### iii.    **Additional Arguments**

57.    Petitioners assert that, had the Commission looked beyond the precedent agreement, there is unrebutted evidence showing no market need or public use for the CP Express Pipeline Project.[239]    They claim that the project will not serve domestic load growth, will increase domestic consumer costs, will harm domestic manufacturing competitiveness, and that the public cannot use or benefit from it.[240]    Petitioners also argue that, although DOE has approved exports to FTA countries, that approval did not entail any determination of the strength of the market for exports and that approval of Venture Global's pending non-FTA remains uncertain.[241]    Petitioners argue that the Commission's certification of the CP Express Pipeline Project under NGA section 7, amidst such market uncertainties and without a sufficient inquiry into the LNG market, was arbitrary and capricious.[242]

58.    The Commission takes a broad look in assessing actions that may accomplish Congress's goal to encourage orderly development of reasonably-priced supplies of natural gas.[243]    Congress directed, in NGA section 3(c), that the importation or exportation of natural gas from or to FTA nations "shall be deemed to be consistent with the public interest," and that such applications "shall be granted without modification or

---

with an FTA as supporting a public convenience and necessity finding."); *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198 at P 17 ("The Commission may rely on a pipeline sponsor's precedent agreements with an LNG export facility as evidence of need in its Section 7 finding."); *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 16 ("we continue to find that the Commission appropriately relied on a precedent agreement with Venture Global, the shipper and owner of an LNG terminal, as evidence of need in its NGA section 7 finding"); *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at PP 15-17 (finding that the Commission may "consider precedent agreements with shippers that plan to transport domestic gas for export to be evidence of the need for a proposed project, and hence a basis for a public convenience and necessity finding").

[239] Rehearing Request at 56, 61-62.

[240] *Id.* at 56.

[241] *Id.* at 58-59 (discussing DOE's temporary pause on approval of new LNG exports to non-FTA countries).

[242] *Id.* at 59.

[243] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 15-16; *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976) (noting this principal purpose in the NGA alongside subsidiary purposes like addressing conservation, environmental, and antitrust questions).

delay."[244]  As we explained above, this standard sets out a general presumption favoring such authorizations.[245]  While these provisions of the NGA are not directly implicated by CP Express's application under NGA section 7(c), as we have previously explained, they do inform our determination that the proposed pipeline is in the public convenience and necessity because the pipeline will support the public interest of exporting natural gas to FTA countries.[246]  Given these congressional mandates, DOE's authorization for exports to FTA nations is sufficient regardless of any uncertainty at this time about proposed exports to non-FTA nations.  We therefore find, as we have done in similar instances, that it is permissible for the Commission to consider precedent agreements with LNG export facilities as one of the factors bearing on the public interest in its public convenience and necessity determination.[247]

59.     Petitioners next state that there is not sufficient market need because the CP Express Pipeline Project will potentially be commercially inoperable and, if operating only under Phase I, will be operating at less than 50% capacity.[248]  Specifically, Petitioners argue that the CP Express Pipeline Project's capacity will only be used if LNG is purchased from the CP2 LNG Project and that the commercial operability of both Projects is uncertain because of the contingent nature of Phase II of the CP2 LNG Project and the conditions placed on the LNG offtake agreements.[249]  Petitioners assert that the Commission's refusal to confront evidence bearing on market need or whether the CP Express Pipeline Project will provide benefits runs counter to the NGA.[250]

60.     We disagree.  The fact that the CP Express Pipeline will be built in two phases and initially operate at less than 50% capacity does not undermine our market need analysis.  As an initial matter, it is not uncommon for projects to be built in phases for a number of

---

[244] 15 U.S.C. § 717b(c) (emphasis added); *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 39.

[245] *Alaska LNG*, 67 F.4th at 1188 (quoting *W. Va. Pub. Servs. Comm'n*, 681 F.2d at 856); *Freeport II*, 867 F.3d at 203; *EarthReports*, 828 F.3d at 953.

[246] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 39.

[247] *See, e.g.*, *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 16; *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 39; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 10-20.

[248] Rehearing Request at 57.

[249] *Id.* at 57-58.

[250] *Id.* at 61-62.

reasons unrelated to market need.[251]  In any event, as we explained in the Authorization
Order and here on rehearing, CP2 LNG has already received authorization from DOE to
export annually up to approximately 28 MTPA of LNG to FTA countries, i.e., the peak
achievable capacity of Phases I and II.[252]  The CP Express Pipeline Project will supply
feed gas to the CP2 LNG Project, providing up to 4,400,000 Dth/day of firm natural gas
transportation service, built in corresponding phases.[253]  Nevertheless, CP Express
executed a binding precedent agreement with CP2 LNG for 100% of the firm
transportation service provided by Phases I and II of the CP Express Pipeline Project for
a term of twenty years at negotiated rates.[254]  This precedent agreement represents
significant evidence of market need and is not undermined by Petitioners' contentions.
Petitioners' suggestion that CP2 LNG will not have sufficient offtake agreements in the
future to handle 100% of CP Express Pipeline's capacity is speculative, unsupported, and
belied by the evidence in the record.[255]  In any event, CP2 LNG has no captive customers
to whom they can pass the costs associated with their transportation contracts[256] and CP
Express is at risk for underutilization of the facilities if it does not contract for their full

---

[251] *See, e.g.*, *Port Arthur LNG, LLC*, 187 FERC ¶ 61,058, at P 3 (2024)
(construction to occur in three phases);; *Driftwood LNG LLC*, 167 FERC ¶ 61,054 at P 13
(construction of pipeline to occur in three phases to match corresponding construction
schedule of LNG facility).  We note that a project sponsor may choose to phase the
development of its projects for ease of construction, physical route complexity,
permitting timeline constraints, or completion of environmental studies and mitigation.

[252] Authorization Order, 187 FERC ¶ 61,199 at P 8 (citing *Venture Global CP2
LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (Apr. 22, 2022)).

[253] *Id.* P 10.

[254] *Id.* P 14.  CP Express is required to affirm that it has executed firm contracts for
the capacity levels and terms of service represented in the signed precedent agreements,
prior to commencing construction.  *Id.* at ordering para. (G).

[255] *See* Rehearing Request at 58 (listing firm offtake agreements for 9.25 MTPA,
approximately half of the total nameplate capacity of both phases); *see also* Venture
Global August 13, 2024 Answer to Motion for Stay at 18 (identifying offtake agreement
for an additional 2 MTPA, thus exceeding the nameplate capacity of Phase I).  It is
speculative to assume CP2 LNG will not have sufficient offtake agreements when its
facility is operational, particularly since it already has sufficient offtake agreements for at
least Phase I prior to construction activities even taking place.

[256] Authorization Order, 187 FERC ¶ 61,199 at P 38.

capacity.[257]  Accordingly, the evidence in this proceeding supports the market demand for both phases of the CP Express Pipeline Project.[258]

## b.    Impacts on Landowners

61.    Petitioners also argue that landowners face harms from signing easement agreements under the threat of eminent domain, reduced property values, noise and ground disturbance, financial losses and damage to their local businesses, and increased air pollution.[259]  Petitioners disagree with the Commission's conclusion that the CP Express Pipeline Project is not expected to have more than a negligible effect on property values and claim that the Commission failed to account for safety concerns, increased insurance costs, and financial damage to local businesses.[260]

62.    As the Commission has previously explained, we encourage companies to address all of the potential impacts raised by Petitioners through landowner negotiations.[261]  The landowner easement agreement process provides an opportunity for landowners to express their concerns to the pipeline company and to negotiate site-specific plans to

---

[257] *Id.* P 55.  We note that if future circumstances require modifications to CP Express's certificate, it may seek an amendment.  *Transcon. Gas Pipe Line Co.*, 141 FERC ¶ 61,091, at P 84 (2012) ("Transco subsequently filed to downsize its originally-proposed Market Link Expansion Project and to construct it in two phases (Phase I and II) over two years to meet a revised market need.").

[258] Under NGA section 7(e), the Commission considers whether a project is required by the present or *future* public convenience and necessity.  *See Oberlin II*, 39 F.4th at 728 (emphasizing that NGA section 7(e) "allow[s] FERC to grant a certificate when the facility 'is *or will be* required by the present *or future* public convenience and necessity'") (emphasis added in original) (citing 15 U.S.C. § 717f(e).

[259] Rehearing Request at 82.

[260] *Id.* (citing Authorization Order, 187 FERC ¶ 61,199 at P 41); *see also id.* at 82-83 (citing, as an example, impacts to Jerryd Tassin's property and business).

[261] *Cheyenne Connector, LLC*, 168 FERC ¶ 61,180, at P 111 (2019) ("The Commission encourages applicants to obtain easements from landowners through mutually negotiated agreements.").  *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182, at P 142 (2006) (stating that the Commission encourages applicants and landowners to discuss environmental, construction, and right-of-way issues within the easement agreement negotiations to ensure that property owners' interests are considered).

meet their needs.[262] Typically, the landowners themselves are in the best position to determine the sufficient level of compensation and method of payment that would best suit their situation.[263] The Commission's general policy is to encourage applicants to negotiate for the use of a right-of-way or workspace as opposed to using eminent domain.[264] The Commission also encourages pipeline companies to engage with project stakeholders throughout the life of the project, and provide all stakeholders and potentially impacted residents with informational materials, and hold community meetings to enable stakeholders to learn about the project, and educate project developers about local concerns.[265]

63.    Here, we agree with the findings in the Authorization Order that CP Express has taken appropriate steps to minimize adverse economic impacts on landowners and surrounding communities.[266] The CP Express Pipeline Project's location and design were selected to minimize impacts to landowners, and CP Express revised its pipeline route based on conversations with landowners during the pre-filing process to reduce those impacts to the extent practicable.[267] Addressing substantially similar arguments to those raised by Petitioners, the Commission responded that the CP Express Pipeline Project is not expected to have more than negligible effects on property values, that the final EIS included protective conditions, adopted in the Authorization Order, to mitigate construction impacts on landowner property,[268] and further noted that as of June 2022, CP Express had secured purchase/lease agreements for 94% of the project's aboveground facilities and anticipated that it would be able to secure agreements for the remaining

---

[262] *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232, at P 138 (2020).

[263] *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182 at P 61.

[264] *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 241 (2016); *see also Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182 at P 142 (stating that the Commission encourages applicants and landowners to discuss environmental, construction, and right-of-way issues within the easement agreement negotiations to ensure that property owners' interests are considered).

[265] *PennEast Pipeline Co.*, 162 FERC ¶ 61,053, at P 39 (2018), *vacated on other grounds*, 177 FERC ¶ 61,197 (2021) (citing FERC, *Suggested Best Practices for Industry Outreach Programs to Stakeholders* at 11-17 (2015)).

[266] Authorization Order, 187 FERC ¶ 61,199 at P 40.

[267] *Id.* (citing final EIS at 3-37).

[268] *Id.* P 41 (citing final EIS at 4-298).

aboveground tracts.[269]  We note that, to the extent CP Express has not reached an agreement with landowners, the issues and effects raised by Petitioners will be resolved through the eminent domain process.[270]  Accordingly, we find that the Commission adequately addressed landowner concerns regarding the economic impact of the project on the use and value of their land.

### D.    **Public Benefits**

64.    Petitioners assert that the Commission failed to articulate any public benefits to justify authorization of the CP Express Pipeline Project under NGA section 7.[271]  Petitioners argue that the need for the CP Express Pipeline Project comes from the affiliate precedent agreement with CP2 LNG, and that there is no nexus with domestic usage, sale, or consumption, and thus, no public benefit.[272]  They argue that the need analysis must center on how the project benefits U.S. consumers since the purpose of the NGA is to protect U.S. consumers from corporate abuse and "encourage the orderly development of gas infrastructure at reasonable prices."[273]  Petitioners claim that export pipelines and affiliate precedent agreements do not provide any of the benefits outlined in the Certificate Policy Statement.[274]  They contend that the Commission failed to articulate benefits related to the CP Express Pipeline Project, other than noting in its NGA section 3 analysis that the CP2 LNG Project will contribute to energy security in Japan, Germany, and globally, and failed to explain whether or how these international benefits informed its NGA section 7 analysis or how global benefits will benefit the U.S domestic public

---

[269]  *Id.* (citing final EIS at 4-299).

[270]  *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182 at P 65 ("In an eminent domain proceeding, the court will require the pipeline to compensate the landowner for the economic value of the right-of-way, as well as for any damages incurred during construction.  The level of compensation paid in a condemnation proceeding would be determined by the court.").

[271]  Rehearing Request at 62.

[272]  *Id.*

[273]  *Id.*

[274]  *Id.* (describing public benefits as including meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives) (citing Certificate Policy Statement, 88 FERC at 61,744).

interest.[275]  Specifically, Petitioners assert that the Commission failed to appropriately weigh and consider investments and employment,[276] tax incentives and indirect benefits,[277] global demand and national security,[278] and benefits to natural gas producers and other public interest benefits.[279]

65.    As an initial matter, we note that, in describing the public benefits, Petitioners largely cite to the Commission's socioeconomic discussion regarding the CP2 LNG Project and assert that the Commission failed to appropriately consider these benefits, or lack of benefits, in its NGA section 7 analysis.[280]  Petitioners appear to conflate the Commission's evaluation of the socioeconomic impacts under NEPA with the Commission's determination of project need under the public convenience and necessity standard of NGA section 7.[281]  Petitioners also appear to conflate the Commission's consideration of the public benefits and the potential harms from the CP Express Pipeline Project under NGA section 7 with the Commission's approval of the CP2 LNG Project under NGA section 3 and its consideration of evidence on the issue of whether the project is inconsistent with the public interest.[282]  In NGA section 7 proceedings, the environmental analysis under NEPA, including socioeconomic impacts, is one part of the Commission's analysis used to decide whether and under what terms to authorize construction.[283]  NGA section 3's public interest standard is distinct from NGA section

---

[275] *Id.* at 63.

[276] *Id.* at 64-67.

[277] *Id.* at 67-69.

[278] *Id.* at 69-74.  As noted above, the Commission does not authorize the importation or exportation of the commodity itself.  Therefore, impacts and effects of global demand are outside the scope of this proceeding.  *See supra* P 35.

[279] Rehearing Request at 74-75.

[280] *Id.* at 64-67 (investments and employment); *id.* at 67-69 (tax incentives and indirect benefits); *id.* at 69-74 (global demand and national security); *id.* at 74-75 (benefits to natural gas producers and other public interest benefits).

[281] 15 U.S.C. § 717f(e).

[282] *See Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132, at P 18 (2019), *order on reh'g*, 170 FERC ¶ 61,139 (2020).

[283] Certificate Policy Statement, 88 FERC ¶ at 61,749.

7's public convenience and necessity standard.[284]  As explained above, NGA section 3 sets out a general presumption favoring authorizations; it does not charge the Commission with demonstrating that the benefits of a proposal outweigh its potential harms.[285]  As discussed below, the Commission adequately evaluated community investment, employment, and tax incentives.[286]

66.    With regard to NGA section 7, and consistent with the Certificate Policy Statement, the Commission determined that there is no potential for subsidization on the CP Express Pipeline Project,[287] that CP Express's precedent agreement with CP2 LNG for 100% of the CP Express Pipeline Project's capacity constituted significant evidence of project need,[288] that the CP Express Pipeline Project will not have adverse impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.[289]  The Commission then analyzed the environmental impacts, including socioeconomic impacts,[290] of the project.  Accordingly, the Commission satisfied the required analysis under the NGA, which is informed by but differs from the required analysis under NEPA.[291]

67.    Finally, Petitioners assert that, although the Commission did not allege any benefits to gas producers, production, or enhanced supply diversity, to the extent the Commission tries to do so on rehearing, Petitioners argue that there will be no domestic

---

[284] *See Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132 at P 18; *Cameron LNG, LLC*, 104 FERC ¶ 61,269, at P 12 (2003); *see also Atl. Richfield Co.*, 50 FERC at 61,667 ("Section 7 requires that an affirmative finding of public necessity be made before authorization may be granted, while section 3 requires a finding of detriment to the public interest be made before authorization may be denied.").

[285] *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 16; *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214 at P 16 (noting that section 3 is "decidedly different standard than exists under section 7 of the NGA").

[286] *See infra* section III.E.7.

[287] Authorization Order, 187 FERC ¶ 61,199 at P 36.

[288] *Id.* P 37.

[289] *Id.* P 42

[290] Final EIS at 4-257 to 4-329.

[291] *See Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,200, at P 32 (2024).

benefits from the CP Express Pipeline Project and that the Commission has disclaimed any ability or authority to rely on such benefits or related impacts based on the D.C. Circuit's finding that DOE, not the Commission, has exclusive authority over the effects of LNG exports on gas production and use.[292]

68.     As we explained above, given the NGA has deemed FTA exports to be in the public interest, we need not rely on the benefits put forth by Petitioners. Nevertheless, we view transportation service for all shippers as providing domestic public benefits, and do not weigh various prospective end uses differently for the purpose of determining need.[293] This includes shippers transporting gas in interstate commerce for eventual export, since such transportation will provide domestic public benefits, including: adding new transportation options for producers and shippers; boosting the domestic economy[294] and the balance of international trade; and supporting domestic jobs in gas production and transportation.[295]

69.     Nevertheless, upstream natural gas producers will benefit from the project by being able to access additional markets for their product.[296]  And, as already determined by DOE, exportation of the natural gas to FTA countries is not inconsistent with the public interest.  The final EIS found that the Projects would result in an increase in the local population,[297] increased employment opportunities, increased demand for housing and public services, and an increase in state and local government revenues.[298]  The final EIS concluded that construction of the Projects would result in minor positive economic

---

[292] Rehearing Request at 74 (citing Authorization Order, 187 FERC ¶ 61,199 at PP 27, 166 and *Freeport*, 827 F.3d at 47-48).

[293] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 40; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 18.

[294] *See* final EIS at 4-257 to 4-299 (describing benefits, including to the local economy, employment, tourism, and tax revenue streams).

[295] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 40; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 18.

[296] *Oberlin II*, 39 F.4th at 727 (concluding that the Commission adequately explained that the project would yield domestic benefits from increasing transportation services for gas shippers regardless of where the gas is ultimately consumed); *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 15.

[297] Final EIS at 4-258 to 4-260.

[298] *Id.* at 4-257 to 4-258.

impacts[299] and would not have a significant adverse impact on local populations, employment, provision of community services, housing, or property values.[300]  The final EIS also concluded that operation of the Projects would have a minor positive effect on the local governments' tax revenues due to the increase in property taxes that would be collected.[301]  Accordingly, we find that there is a net positive benefit to the domestic economy.  Any public benefit, no matter how small, in addition to the significant evidence of need as demonstrated by the long-term, binding precedent agreement executed with CP2 LNG, furthers the Commission's finding that the CP Express Pipeline Project is required by the present or future public convenience and necessity.  And, despite Petitioners' assertions, the fact that the Commission noted these benefits does not charge the Commission with considering potential downstream or upstream effects.[302]  Therefore, we continue to find that the CP Express Pipeline Project is required by the public convenience and necessity and that the purportedly conflicting evidence in the record[303] does not outweigh the significant evidence of market need as demonstrated by the long-term, binding precedent agreement.

### E.    NEPA

#### 1.    Purpose and Need

70.    Petitioners assert that, contrary to NEPA, the Commission adopted Venture Global's statements of purpose and need without modification and failed to engage in an independent inquiry on the issue, despite comments stating that the purpose and need

---

[299] These minor positive impacts would be due to increases in construction jobs, payroll taxes, purchases made by the workforce, and expenses associated with the acquisition of material goods and equipment.  *Id.* at 1-12.

[300] *Id.*

[301] *Id.* at 1-13.

[302] *See Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1478 (D.C. Cir. 1990) (*NWF*) (stating that the Commission's consideration of a particular benefit as one factor in its evaluation of the project did not bind it to consider harms and benefits); *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 16.

[303] *See* Rehearing Request at 56-62 (asserting that that the CP Express Pipeline Project will only operate at 50% capacity and is contingent on the CP2 LNG Project, that it will not serve domestic load growth, and that DOE's approval of exports to FTA nations did not entail an examination of foreign market strength).  As discussed herein, we dispute these unsupported contentions.

statements were too narrow.[304]  Petitioners maintain that the Commission's approach fell below standards set by Council on Environmental Quality's (CEQ) regulations that agencies summarize the underlying purpose and need rather than adopt Venture Global's statement, limiting the Commission's analysis of alternatives.[305]

71.    NEPA provides that agencies include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."[306]  An agency uses the purpose and need statement to define the objectives of a proposed action and then to identify and consider reasonable alternatives.[307]  Courts have upheld federal agencies' incorporation of applicants' project purpose and need in environmental documents and as a basis for evaluating alternatives.[308]  When an agency is asked to consider a specific proposal, the needs and goals of the applicant should be taken into account.[309]

72.    We recognize that a project's purpose and need may not be so narrowly defined as to preclude consideration of reasonable alternatives.  Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays

---

[304] Rehearing Request at 111-14.

[305] *Id.* at 114.

[306] 42 U.S.C. § 4332(c)(iii) (stating that agencies must include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."); *see* 40 C.F.R § 1502.13 (2022).

[307] *See Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999).

[308] *E.g.*, *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (*City of Grapevine*); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (*Citizens Against Burlington*) (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process").

[309] *Citizens Against Burlington*, 938 F.2d at 196; *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047, at P 48 (2024).

in the decisional process."[310]  Moreover, because the alternatives considered under NEPA are informed both by "the project sponsor's goals,"[311] as well as "the goals that Congress has set for the agency,"[312] i.e., the goals set in enacting the NGA, the Commission's consideration of alternatives includes the no-action alternative and reasonable alternatives that achieve the purpose of the project.

73.    The Commission does not plan, design, build, or operate natural gas transmission infrastructure.[313]  As an independent regulatory commission, the Commission reviews proposals to construct and operate LNG and certain pipeline facilities.[314]  Accordingly, the project proponent may appropriately be a source for identifying the purpose for developing, constructing, and operating a project.[315]

74.    As explained in the final EIS, the purpose of the CP2 LNG Project "is to liquefy, store, and export a nameplate liquefaction capacity of 20 MTPA of liquefied LNG, with approximately 28.0 MTPA capacity possible under optimal conditions, to overseas markets via marine transport by ocean-going vessels," and to "promote a global natural gas trade and greater diversification of global supplies."[316]  This purpose and need statement is consistent with court and Commission precedent and we find that the final EIS appropriately relied on CP2 LNG's stated purpose and need for the CP2 LNG Project.[317]  The purpose of the CP Express Pipeline "is to create the firm transportation capacity needed to transport 4.4 billion cubic feet per day (Bcf/d) of feed gas required for the proposed LNG export operations from natural gas supply points in east Texas and southwest Louisiana to the Terminal Facilities."[318]  Courts have found that a statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that

---

[310] *Citizens Against Burlington*, 938 F.2d at 199.

[311] *Id.* at 196.

[312] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018).

[313] Final EIS at 1-3.

[314] *Id.*

[315] *Id.*

[316] *Id.*

[317] *City of Grapevine*, 17 F.3d at 1506; *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214 at P 37.

[318] Final EIS at 1-3.

explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives.[319]  We find the Commission's articulation of the purpose and need for the Projects to be consistent with court precedent.[320]

### 2.    Alternatives

#### a.    No-Action Alternative

75.    Petitioners also disagree with the Commission's no-action alternative analysis,[321] asserting that it does not comply with CEQ guidance.[322]  They maintain that the Commission's no-action alternative analysis is not a genuine no-action alternative because the Commission's purpose and need statement and view of energy sources available to end-users were too narrow.[323]  Therefore, Petitioners assert that the no-action alternative fails to serve as an appropriate "measuring stick" to compare the benefits of the proposed action with the environmental impacts.[324]

---

[319] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d at 598-99.

[320] *Id.* at 598 ("We have explained, 'The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable.' . . . . We further explained that we should consider 'the nature of the proposed federal action' informed by 'the project sponsor's goals,' as well as 'the goals that Congress has set for the agency.'") (quoting *All. for Legal Action v. F.A.A.*, 69 F. App'x 617, 622 (4th Cir. 2003)) (internal citations omitted); *see Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 84.

[321] Rehearing Request at 114-15 (citing final EIS at 3-37).

[322] *Id.* at 115 (citing CEQ, *Forty Most Asked Questions Concerning CEQ's Nat'l Env't Pol'y Act Reguls.*, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981) (defining "no action" in instances involving federal decisions on proposals for projects and reminding all federal decision makers not to "simply assume that if the federal action does not take place, another action will perfectly substitute for it and generate identical emissions, such that the action's net emissions relative to the baseline are zero.")).

[323] *Id.*

[324] *Id.* at 114-15.

76.    An agency may eliminate alternatives that will not achieve a project's goals or are otherwise unreasonable.[325]  "Agencies may reject unreasonable alternatives after only brief discussion" when those alternatives are impractical or fail to further the proposed action's purpose.[326]  It is well-settled that NEPA does not mandate particular results, including the selection of the least environmentally damaging alternative, so long as each alternative is adequately discussed and a brief explanation is provided for why an alternative is rejected.[327]

77.    Here, the final EIS concluded that, under the no-action alternative, "the Project would not be developed and CP2 LNG's and CP Express's objective of liquefying and exporting natural gas to foreign markets would not be realized" and, thus, the potential environmental impacts discussed in the final EIS would not occur.[328]  The final EIS provided a sufficient "measuring stick" for comparison of the impacts of the proposed action.[329]  Indeed, "courts have upheld similarly brief descriptions of no action alternatives, noting that 'merely because a no action proposal is given a brief discussion does not suggest that it has been insufficiently addressed.'"[330]  An agency does "not act unreasonably in rejecting the no-action alternative on the ground that it would not meet

---

[325] *Alaska LNG*, 67 F.4th at 1182.

[326] *Id*. ("An alternative is reasonable if it is 'technically and economically practical or feasible and meet[s] the purpose and need of the proposed action.' 43 C.F.R. § 46.420(b) (2019). . . . 'NEPA's injunction that agencies consider the environmental impacts of "all reasonable alternatives" does not substantively constrain an agency's choice of objectives.'. . . . '[S]ome alternatives will be impractical or fail to further the proposed action's purpose") (citation omitted).

[327] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 352 (1989) (*Methow Valley*); 40 C.F.R. § 1502.14(a) (2022) (stating that agencies shall"[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination"); *see also Alaska LNG*, 67 F.4th at 1182 ("Because some alternatives will be impractical or fail to further the proposed action's purpose, agencies may reject unreasonable alternatives after only brief discussion.").

[328] Final EIS at 3-37.

[329] *See El Paso Nat. Gas Co.*, 136 FERC ¶ 61,175, at PP 11-12 (2011) (concluding that substantially similar language was sufficient).

[330] *Id*. PP 11-12 (quoting *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998) (*Morrison*)).

the purpose and need of the proposed project."[331]  Here, the final EIS observed that, although it would be speculative to predict what actions may occur, "if the no-action alternative is selected, it is possible that renewable energy sources (e.g., solar power), traditional energy sources (e.g., coal or fuel oil), or traditional long-term energy sources (e.g., nuclear power) could be used in lieu of the Projects.[332]  It also noted that "the location of the facility and use of the fuel (electricity, heating, industrial feed stock, etc.) would also be speculative" and that "alternative energy sources would not meet the Project[s] objective of liquefying natural gas for export and are beyond the scope of [the final EIS]."[333]  Based on the foregoing, we find that the final EIS sufficiently defined and considered the no-action alternative and appropriately determined that the no-action alterative outcome, although speculative, would not meet the Projects' stated purpose and need.[334]

### b.    CCS System Alternatives

78.    Petitioners also argue that the Commission failed to explore other, more extensive CCS alternatives.[335]  Petitioners maintain that CP2 LNG only proposes to capture emissions from the pipeline gas pretreatment process, amounting to only 5% of total GHG emissions, and that the Commission should have considered alternatives such as post-combustion CCS which would avoid or mitigate larger amounts of GHG emissions.[336]  They argue that the Commission failed to address multiple comments requesting such alternatives.[337]  Petitioners assert that, contrary to NEPA, the Commission failed to meaningfully respond to comments requesting consideration of

---

[331] *Morrison*, 153 F.3d at 1067; *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005) ("Alternatives that do not advance the purpose of the [project] will not be considered reasonable or appropriate.").

[332] Final EIS at 3-37.

[333] *Id.*

[334] *Id.*

[335] Rehearing Request at 165.

[336] *Id.* at 165-66.

[337] *Id.* at 166 (citing For a Better Bayou March 13, 2023 Comments to DEIS at 19-20; NRDC March 13, 2023 Comments to DEIS at 9-10)

such alternatives and also disagree with the Commission's assessment that the use of CCS beyond what is proposed is outside the scope of the final EIS.[338]

79.    As we explained above, NEPA requires the Commission "to evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to the proposal, but . . . NEPA does not require a detailed analysis of every alternative proposed."[339]  The Commission may reject alternatives when the alternatives are deemed only remote and speculative possibilities, or where the alternatives will be impractical or fail to further the proposed action's purpose.[340]  Moreover, an agency's consideration of alternatives under NEPA is "shaped by the application at issue and by the function that the agency plays in the decisional process."[341]  Courts review both an agency's stated project purpose and its selection of alternatives under the "rule of reason," where an agency must reasonably define its goals for the proposed action, and an alternative is reasonable if it can feasibly achieve those goals.[342]  Where, as here, a federal agency is not the sponsor of a project, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor *in the siting and design of the project*."[343]

80.    Here, each alternative was evaluated to determine whether it would:  (1) meet the stated purpose of the project; (2) be technically and economically feasible and practical; and (3) offer a significant environmental advantage over the proposed action.[344]  Although Petitioners assert that the Commission should have considered more extensive CCS alternatives, such as post-combustion CCS, Petitioners fail to explain whether such an alternative is technically and economically feasible and practical, or how such an

---

[338] *Id*. (citing final EIS at 4-561, app'x N-61 & N-21).

[339] *Weaver's Cove Energy, LLC*, 114 FERC ¶ 61,058, at P 68 (2006).

[340] *Ala. v. U.S. Army Corps of Eng'rs*, 704 F. Supp. 3d 20, 133 (D.D.C. 2023) (D.D.C. Nov. 9, 2023) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) (*Vt. Yankee*) and *Alaska LNG*, 67 F.4th at 1182).

[341] *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038, at P 37 (2023) (citing *Citizens Against Burlington*, 938 F.2d at 199).

[342] *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133, at P 115 (2023).

[343] *City of Grapevine*, 17 F.3d at 1506 (quoting *Citizens Against Burlington*, 938 F.2d at 197) (emphasis added); *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 104; *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 at P 115.

[344] Final EIS at 3-36.

alternative would offer a significant environmental advantage. In particular, although Petitioners argue that the Commission failed to address specific comments, we note that the referenced comments only contained generalized assertions that the Commission should consider more "aggressive," "ambitious," or "robust" CCS facilities without providing specific alternatives for the Commission to address.[345] As we have stated in prior proceedings, "a broad analysis, based on generalized assumptions rather than reasonably specific information, will not meaningfully help the Commission make decisions, e.g., evaluating potential alternatives."[346] The Commission "need not 'undertake exhausting inquiries, probing for every possible alternative, if no viable alternatives have been suggested by the parties, or suggest themselves to the agency.'"[347] The burden was on Petitioners to develop such contentions.[348] In any event, as stated below, the CCS facilities outside of the CP2 LNG Project fence-line are outside of the Commission's jurisdiction, and the Commission is not required to include reasonable alternatives not within the jurisdiction of the lead agency.[349]

### 3. GHGs

81. Petitioners raise two arguments in support of their contention that the Commission failed to properly consider GHG emissions: (1) the Commission erred by not determining whether the Projects' GHG emissions were significant;[350] and (2) the Commission erred by not evaluating the "effects" and "significance" of the GHG emissions.[351] Petitioners assert several variations of the same essential argument, that the Commission is required by regulations, both the Commission's and CEQ's, and by

---

[345] For a Better Bayou March 13, 2023 Comments to DEIS at 19-20; NRDC March 13, 2023 Comments to DEIS at 9-10; *see also* Rehearing Request at 166 (citing Commission staff responses to comments in final EIS at 4-561 and final EIS, app'x N-61, N-21).

[346] *Dominion Transmission, Inc.*, 155 FERC ¶ 61,234, at P 24 (2016).

[347] *Minisink*, 762 F.3d at 111 & n.9 (quoting *Citizens for Allegan Cnty., Inc. v. FPC*, 414 F.2d 1125, 1133 (D.C. Cir. 1969)).

[348] *Fla. Gas Transmission Co.*, 8 FERC ¶ 61,039, at 61,115 (1979) (citing *Sierra Club* v. *Calloway*, 499 F.2d 982 (5th Cir. 1974)).

[349] *Infra* section III.E.6.

[350] Rehearing Request at 117-20.

[351] *Id.* at 120-25.

Commission practice to make a binary, case-specific determination of the significance of the Projects' GHG emissions.[352]

82.    We disagree.  The Commission has fulfilled its responsibilities under NEPA to consider reasonably foreseeable GHG emissions attributable to the project.  As discussed below, we are not obligated to make a binary determination of the significance of the climate impacts based on those emissions, nor are we required to do so for impacts for which the significance is unknown.

### a.    The Commission is not required to make a significance determination when an EIS is prepared.

83.    The D.C. Circuit's recent decision in *East 300* affirmed that neither NEPA, nor CEQ's NEPA-implementing regulations, nor circuit precedent require that the Commission formally label a project's reasonably foreseeable GHG emissions as "significant or insignificant."[353]  The court held that the Commission "amply discussed the 'significance' of . . . emissions—by estimating the amount of increased emissions, comparing them to national and statewide totals, setting forth downstream harms in qualitative terms, and even giving monetary, present-value estimates of the harms."[354]

84.    NEPA requires the Commission to discuss the environmental effect of any action "significantly" affecting the quality of the human environment.[355]  As the

---

[352] *See generally id.* at 116-25.

[353] 104 F.4th at 346.

[354] *Id.*; *see also Evangeline Pass*, 100 F.4th at 214 (affirming use of this analysis); *Alaska LNG*, 67 F.4th at 1183-84 (same).  *C.f. N.J. Conservation Found. v. FERC*, 111 F.4th 42, 55-56 (D.C. Cir. 2024) (*N.J. Conservation Found.*) (finding *East 300* inapplicable based on Court's finding that the Commission did not dispute in the present proceeding, that "it is generally obligated to make a significance determination for each category of emissions.").

[355] 42 U.S.C. §4332(2)(C); *Env't Health Tr. v. FCC*, 9 F.4th 893, 900 (D.C. Cir. 2021) (explaining that agency must prepare an environmental impact statement "if the agency proposes a major Federal action that stands to significantly affect the quality of the human environment") (quoting 42 U.S.C. § 4332(C) (cleaned up)).

*East 300* court recognized, a definitive finding of significance "is immaterial where the agency simply prepares the EIS."[356]  Petitioners point to no statutory provision or other authority that contradicts the court's holding.

85.    We also disagree with Petitioners claim[357] that section 1502.16(a)(1) of CEQ's regulations[358] obligates the Commission to make a binary "significance" determination regarding the Projects' GHG emissions.  This regulation provides that an EIS shall discuss "the environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts."[359]  CEQ's regulations do not specifically define significance but state in section 1501.3(b) that, for purposes of determining the appropriate level of NEPA review,  agencies are to consider the potentially affected environment and degree of the effects of the action including short- and long-term effects and effects on public health and safety.[360]  Neither section 1502.16(a)(1) nor 1501.3(b) directs an agency, in developing an EIS, to make a binary decision on the significance of any environmental effect.  In this proceeding, the final EIS's qualitative discussion of the potential adverse impacts in the Projects' region from climate change,[361] which are triggered by increased atmospheric concentrations of GHGs,

---

[356] *East 300*, 104 F.4th at 346 (citing 40 C.F.R. § 1508.9(a)(1)) (2024).  *See also* 42 U.S.C. § 4336(b)(2) (2024) ("An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown . . .").

[357] Rehearing Request at 120, 124.

[358] 40 C.F.R. §1502.16(a)(1) (2024).  On May 1, 2024, CEQ issued updated regulations that went into effect for new NEPA processes begun after July 1, 2024. 40 C.F.R. § 1506.12 (2024).  This action is subject to CEQ's previous regulations; thus, citations throughout this order will refer to the 2022 regulations.  *See* 18 C.F.R. § 380.1 (stating that the Commission will comply CEQ regulations); *but see Marin Audubon Soc'y v. FAA*, No. 23-1067, 2024 WL 4745044, slip op. at 20 (D.C. Cir. 2024) (holding that CEQ had no lawful authority to promulgate binding regulations and questioning but not deciding whether another agency could permissibly adopt CEQ's regulation or incorporate them by reference).

[359] 40 C.F.R. § 1502.16(a)(1).

[360] *Id.* § 1501.3(b) (determining the appropriate level of NEPA review).

[361] Final EIS at 4-557 to 4-561.

satisfied these CEQ requirements to discuss the significance of the impacts.[362]  CEQ's January 2023 Interim Guidance on the consideration of GHGs lends further support for the position that CEQ's regulations do not require a binary significance determination. The CEQ Interim Guidance explicitly "does not establish any particular quantity of GHG emissions as 'significantly' affecting the quality of the human environment."[363]  While CEQ guidance is not binding on the Commission as a general matter, this guidance underscores the fact that agencies are not obligated to make a significance determination regarding GHGs, and illustrates the lack of metrics for determining significance in this context.

86.    We also disagree with Petitioners' assertion that the Commission's regulation, 18 C.F.R. § 380.7 (2024), and Commission practice require it to identify in an EIS whether each environmental impact is "significant."[364]  Section 380.7 requires, in relevant part, that "the staff conclusion section will include summaries of . . . (a) The significant environmental impacts of the proposed action," among other items.[365]  This regulation is not a general mandate that the Commission's environmental review include a binary determination that each environmental impact is either significant or insignificant.  Rather, our regulation merely specifies that, in addition to the content requirements for EISs prescribed by CEQ's regulations, specifically 40 C.F.R. § 1502.10 (2024),[366] that Commission EISs also include a conclusion section that summarizes just those environmental impacts that were identified as significant.  Where, as here, the significance of the projects' reasonably foreseeable GHG emissions' impacts on climate

---

[362] *East 300*, 104 F.4th at 346 (affirming the Commission's qualitative discussion of GHG emissions as satisfying NEPA); *see also Sabal Trail*, 867 F.3d at 1374 (noting that under 40 C.F.R. § 1502.16(b), the Commission's EIS "needed to include a *discussion* of the 'significance'" of the GHG emissions attributable to the project) (emphasis added).

[363] *See* CEQ, *Nat'l Env't Pol'y Act Guidance on Consideration of Greenhouse Gas Emissions & Climate Change*, 88 Fed. Reg. 1196, 1198 (Jan. 9, 2023) (CEQ Interim Guidance).

[364] Rehearing Request at 117-18.

[365] 18 C.F.R. § 380.7(a).

[366] Section 1502.10 of CEQ's regulations sets a standard format for EISs that requires a:  cover; summary; table of contents; purpose and need for action; alternatives; affected environment and environmental consequences; submitted alternatives information, and analyses; and a list of preparers.

change is unknown,[367] consistent with section 380.7, a summary of those impacts would not be included the EIS's conclusion section.

87.    We also affirm that, notwithstanding *Northern Natural Gas Company* (*Northern Natural*),[368] it is the Commission's practice to not make a binary significance determination for GHG emissions and to instead rely on a qualitative discussion of the potential adverse effects, as upheld by the D.C. Circuit in *East 300*.[369]  To the extent the Authorization Order was not clear, we confirm, consistent with the holding in *East 300* and as discussed below, that we are unable to determine whether GHG emissions are significant or insignificant.  Further, we conclude that the Commission's significance determination in *Northern Natural* does not represent Commission policy or practice and, for the reasons discussed below, is hereby overruled.[370]

88.    In *Northern Natural*, the Commission compared the project's reasonably foreseeable GHG emissions to the total of GHG emissions in the United States as well as to state inventories, finding that the project's contribution to climate change would not be significant.[371]  The Commission's significance determination in *Northern Natural* was sui generis, and did not provide a threshold or numerical limit or establish a methodology that the Commission could use to determine the significance of GHG emissions in future cases.[372]  The fact that the Commission felt itself able to determine that the particular amount of GHG emissions in that proceeding were insignificant did not imply that the Commission could likewise determine what level of GHG emissions would be significant or insignificant in any other case.  In fact, the Commission in *Northern Natural* cited to

---

[367] *See* Authorization Order, 187 FERC ¶ 61,199 at PP 179-180; final EIS 4-559.

[368] 174 FERC ¶ 61,189 (2021).

[369] *See supra* P 83 (citing *East 300*, 104 F.4th at 346).

[370] The Commission may abandon prior precedent provided that the change is permitted under the relevant statutes and that we acknowledge the departure and explain that we believe the new position is better.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (when an agency makes a change in policy, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates").  *See also Grace Petroleum Corp. v. FERC*, 815 F.2d 589, 591 (D.C. Cir. 1987) (recognizing the Commission's "well-settled right" to "overrule established precedent" provided that it offers a reasoned explanation for doing so).

[371] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189 at PP 34-36.

[372] *Id.* PP 33-36.

the Commission's then-pending 2021 Notice of Inquiry, which sought information on options to assess significance of the effects of GHG emissions, to bolster the idea that the Commission would have the ability to assess significance in the future.[373]  Since *Northern Natural* was decided, the Commission has spent several years further developing its understanding of issues surrounding GHG emissions, going as far as to issue an Interim GHG Policy Statement, which the Commission subsequently converted to draft form (draft GHG Policy Statement).[374]  Despite the record established in the draft GHG Policy Statement proceeding, without exception, the Commission has concluded that it is unable to make significance determinations in cases where the issue has arisen, as explained in detail in a number of orders.[375]  For this reason, and because the basis upon which the Commission determined significance in *Northern Natural* was unsupported by any identified tool or method,[376] we find that we cannot rely on that case as precedent for evaluating significance, even as a *de minimis* floor.[377]  Accordingly, as discussed herein, we will continue to consider and contextualize adverse GHG impacts on a case-by-case basis in accordance with our responsibilities under the NGA and NEPA.[378]

89.    Further, nothing about the pendency of the draft GHG Policy Statement has affected the Commission's ability to consider all evidence submitted into the record for an individual project.[379]  As explained below, the Commission has not identified criteria

---

[373] *Id.* PP 33, 36.

[374] *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022)*; Order on Draft Policy Statements*, 178 FERC ¶ 61,197 at P 2 (stating the Commission would not apply the draft GHG Policy Statement to pending or new projects until the Commission issued any final guidance after public comment).

[375] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047, at PP 95-105 (2024), *order on reh'g*, 187 FERC ¶ 61,200, *dismissed sub nom. Sierra Club v. FERC*, No. 24-1138, 2024 WL 3764462 (D.C. Cir. 2024); *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at PP 56-63, *reh'g denied*, 183 FERC ¶ 62,153 (2023); *ANR Pipeline Co.*, 179 FERC ¶ 61,122, at PP 34-44 (2022).

[376] *Id.*

[377] *See supra* note 372-373.

[378] *See supra* section III.E.3.

[379] The D.C. Circuit has held that the Commission is not required to apply the GHG Draft Policy Statement.  *See Healthy Gulf v. FERC*, 107 F.4th 1033, 1040-41

or a scientifically accepted tool or method that would enable the Commission to
determine the significance of reasonably foreseeable GHG emissions. That remains the
case.

**b.**  **The Commission cannot characterize the Projects' GHG emissions as significant or insignificant.**

90.    The D.C. Circuit explained in *New Jersey Conservation Foundation* that "even if
[the Commission] is not required to make a significance determination," it must explain
its inability to do so to avoid running afoul of APA requirements.[380]  We clarify that we
cannot characterize any project's GHG emissions as significant or insignificant because
we are unable to identify any accepted tool or method, including use of the social cost of
GHGs, that would allow us to determine what level of GHG emissions' contribution to
adverse climate change impacts is significant under NEPA.[381]  We note that to date, no
other Federal agency, including the U.S. Environmental Protection Agency (EPA) and
CEQ, has established either an accepted tool or method or a threshold for determining
significance that the Commission could adopt.[382]

91.    To date, the only tool or method that petitioners purport enables the Commission
to determine significance is the social cost of GHG calculator.  The social cost of GHG is
not a specific technical tool, but rather refers to estimates of the social costs, expressed as
a dollar value, associated with the impacts from emitting an additional metric ton of
either carbon dioxide, methane, or nitrous oxide.  The tool was designed to help
policymakers understand the social impact of emissions when undertaking a cost-benefit

---

(D.C. Cir. 2024) (*Healthy Gulf*) (upholding the Commission's decision not to apply the
GHG Draft Policy Statement); *Evangeline Pass*, 100 F.4th at 214-15 (same).

[380] *N.J. Conservation Found.*, 111 F.4th at 56.

[381] *See, e.g.*, *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051, at P 34 (2022) ("[T]he
Commission did not characterize [GHG] emissions as significant or insignificant because
we currently have no methodology for doing so."), *aff'd sub nom. East 300*, 104 F.4th
336; *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 75 ("[W]e note that there are
currently no criteria to identify what monetized values are significant for NEPA
purposes, and we are currently unable to identify any such appropriate criteria."), *aff'd
sub nom. Evangeline Pass*, 100 F.4th 207; CEQ Interim Guidance, 88 Fed. Reg. 1196,
1200 (Jan. 9, 2023) ("This guidance does not establish any particular quantity of GHG
emissions as 'significantly' affecting the quality of the human environment.").

[382] For this reason, we reject Petitioners' allegation that other agencies have used
the social cost of GHG for project-level review.  Rehearing Request at 123.

analyses associated with rulemaking proceedings.[383]  With respect to the utility of the social cost of GHGs, the final EIS disclosed an estimate of these costs.[384]  However, consistent with the Commission's past statements, we are currently unable to identify any criteria to determine what monetized values are significant for NEPA purposes.[385]  Therefore, we do not view calculating the social cost of GHGs as a means to determine whether any project's GHG emissions are significant or insignificant, a conclusion that the D.C. Circuit has now upheld many times.[386]  Rather, we intend to continue to

---

[383] *See ANR Pipeline Co.*, 188 FERC ¶ 61,063, at P 50 (2024) (citing *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at P 35 (2018)); *see also* EPA July 26, 2018 Comments in PL18-1-000 ("Further, with regard to the discussion of the social cost of carbon, EPA notes that tool was developed to aid the monetary cost-benefit analysis of rulemakings.  It was not designed for, and may not be appropriate for, analysis of project-level decision-making.").

[384] Final EIS at 4-180; *see also* Authorization Order, 187 FERC ¶ 61,199 at P 168. The social cost of GHGs tool converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a tool or method for judging significance.

[385] *E.g., Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 at P 37, *aff'd sub nom. East 300*, 104 F.4th 336; *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 75, *aff'd sub nom. Evangeline Pass*, 100 F.4th 207.

[386] *See, e.g., East 300*, 104 F.4th at 346 ("FERC need not attempt to monetize those emissions through a Social Cost of Carbon model which FERC views as unreliable for analyzing individual projects."); *Evangeline Pass*, 100 F.4th at 214 (upholding the Commission's decision to estimate and publicly disclose the social cost of carbon values but not to rely on the social cost of carbon tool because of pending litigation challenging it and because, in the Commission's words, it had "not determined which, if any, modifications were needed to render that tool useful for project-level analyses"); *Alaska LNG*, 67 F.4th at 1184 (upholding as reasonable the Commission's decision to compare the Project's direct emissions with existing Alaskan and nationwide emissions but not to apply the social cost of carbon for reasons the court had previously accepted:  (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"); *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool for the same three reasons); *Adelphia*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices*, 2019 WL 847199 (unpublished) (same).

calculate and publish the social cost of GHGs for reasonably foreseeable GHG emissions, as one means to fulfill NEPA's purpose to inform the public.[387]

92.    We recognize that where, as here, there are reasonably foreseeable incremental GHG emissions attributable to a proposed project, the project will increase the atmospheric concentration of GHGs and will contribute cumulatively to climate change.[388]  We also acknowledge that, while climate change impacts taken individually may be manageable for certain communities, the impacts of compound events can be greater than the sum of their parts[389] and acknowledge that climate change impacts may be more prevalent in and could pose particular risks to environmental justice communities.[390]

93.    Petitioners allege that the social cost of GHGs tool can be used to assess significance and that the Commission can be required under 40 C.F.R. § 1502.21(c) to use the tool if it is considered a method generally accepted in the scientific community.[391] Petitioners argue that the cases cited in the Authorization Order holding that the Commission is not required to use the social cost of GHGs tool either did not consider section 1502.21(c) or held that arguments based on this regulation had been waived.[392]

94.    We disagree that section 1502.21(c) requires the Commission to use the social cost of GHGs.  Section 1502.21(c) provides that if the means to obtain information relevant to reasonably foreseeable significant adverse impacts are not known or if the costs of obtaining it are unreasonable, an agency must include an "evaluation of such impacts

---

[387] *See Methow Valley*, 490 U.S. at 349 (explaining that NEPA's EIS requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision); *Sabal Trail*, 867 F.3d at 1367 ("[The] environmental impact statement . . . ensures that [the] environmental consequences [of the agency's action], and the agency's consideration of them, are disclosed to the public.").

[388] Final EIS at 4-559.

[389] *Id.* at 4-558.

[390] The Commission's environmental justice analysis for this project discussed the block groups that are considered to be environmental justice communities.  Authorization Order, 187 FERC ¶ 61,199, at P 124.

[391] *Id.* at 122 (citing *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021) (*Vecinos I*)).

[392] *Id.* at 122-23 (citing *Alaska LNG*, 67 F.4th at 1184; *Adelphia*, 45 F.4th at 112).

based upon theoretical approaches or research methods generally accepted in the scientific community."[393] As discussed above, Commission staff disclosed an estimate of the social cost of GHGs. The issue, therefore, is not one of incomplete or unknown information, but rather that the information provided by the social cost of GHG tool does not provide a basis for a significance determination.[394] Moreover, we note that the Commission has thoroughly addressed the applicability of 40 C.F.R. § 1502.21(c) (2024)in other proceedings and we adopt those conclusions here.[395] Further, we disagree with Petitioner's conclusions of waiver in *Alaska LNG* and *Adelphia*. In *Alaska LNG*, the court touched on that jurisdictional question only after explicitly holding that use of the social cost of GHGs tool is not required.[396] Similarly, in *Adelphia*, the D.C. Circuit found that petitioners failed to raise the argument that section 1502.21(c) required the Commission to use the social cost of GHG tool, but nevertheless upheld the Commission's decision not to use the social cost of carbon.[397]

95.    Petitioners recognize that, in *Healthy Gulf*, the D.C. Circuit upheld the Commission's decision to not use the social cost of GHGs tool because it "has not yet identified criteria that would allow it to non-arbitrarily determine when identified social costs become significant under NEPA,"[398] but argue that the court did not address using

---

[393] 40 C.F.R. § 1502.21(c)(4). While Petitioners cite to § 1502.21(c), their argument relies only on § 1502.21(c)(4).

[394] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136, at P 32 (2024); *Gas Transmission Nw. LLC*, 187 FERC ¶ 61,023, at P 118 (2024).

[395] *N. Nat. Gas Co.*, 186 FERC ¶ 61,064, at P 23 & n.77 (2024); *see also Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at PP 90-101, *order on reh'g*, 185 FERC ¶ 61,080, at PP 53-61 (2023), *vacated on other grounds*, *City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024) (*City of Port Isabel*) (concluding that "because the social cost of GHGs tool was not developed for project level review and . . . does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the CEQ regulations does not require its use in this proceeding"); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047, at PP 18-25, *order on reh'g*, 185 FERC ¶ 61,079, at PP 38-45 (2023) (same).

[396] *See Alaska LNG*, 67 F.4th at 1184 (holding that the Commission's decision to compare the project emissions with state and nationwide emissions rather than using the social cost of carbon was reasonable, and subsequently stating that, "in any event," the petitioner waived its ability to make the argument).

[397] *Adelphia*, 45 F.4th at 112.

[398] *Healthy Gulf*, 107 F.4th at 1042.

the social cost of GHGs in the context of open-ended inquiries and that the court did not address section 1502.21(c).[399]  Petitioners note that, in *East 300*, the D.C. Circuit held that the Commission had satisfied its obligation to discuss the significance of GHG emissions by estimating the social cost of carbon, alongside comparing emissions with state and national totals, but the court did not address how the social cost of GHGs estimates could satisfy this obligation where the Commission concurrently disclaimed its use of the social cost estimates.[400]  Accordingly, Petitioners claim that the Commission should use the social cost of GHG estimates to discuss the significance of the GHG emissions attributable to the Projects.[401]

96.    We disagree.  The D.C. Circuit in *Healthy Gulf*, citing *Alaska LNG* and *EarthReports*, explicitly upheld the Commission's decision not to use the Social Cost of GHGs for the very same reason articulated in this proceeding.[402]  As discussed above, section 1502.21(c) involves a separate issue—lack of information—which we explained is not the reason we cannot assess significance.[403]  We reject Petitioners' assertion that the Commission should engage in an "open-ended"[404] discussion of the "significance" of GHGs using the monetized results from staff's calculation of the social cost of GHGs. We do so because the same reasons that undermine the tool's utility for making a binary significance determination also undermine its value as information to support the Commission's meaningful consideration of the Projects' cumulative impact on climate change.[405]

---

[399] Rehearing Request at 124.

[400] *Id*. (citing *East 300*, 104 F.4th at 346).

[401] *Id.*

[402] *See Healthy Gulf*, 107 F.4th at 1041 (citing *Alaska LNG*, 67 F.4th at 1183-84 and *EarthReports*, 828 F.3d at 956); *see also* Authorization Order, 187 FERC ¶ 61,199 at PP 179-180 (explaining why the Commission is unable to determine the significance of reasonably foreseeable GHG emissions).

[403] *See supra* P 94.

[404] To the extent Petitioners suggest that the Commission should engage in a qualitative discussion of GHG emissions, we note that the Commission has done so in the Authorization Order and here on rehearing.  *See* Authorization Order, 187 FERC ¶ 61,199 at PP 164-180; *see supra* section III.E.3.

[405] *Supra* P 91 & note 386.

97.    NEPA ensures that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[406]  Here, consistent with the purposes of NEPA and for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[407]  The Commission included this analysis in the Authorization Order.[408]  The Commission also placed the Projects' GHG emissions in context by comparing them to the total GHG emissions of the United States as a whole and at the state level.[409]  Accordingly, the Commission has fulfilled its responsibilities under NEPA.

98.    Petitioners dispute the sufficiency of the Commission placing the Projects' GHG emissions in context by comparing them to the total GHG emissions of the United States and at the state level.[410]  Petitioners argue this does not provide analysis of the emissions' effects and therefore does not satisfy 40 C.F.R. § 1508.1(i)(4) (2024).[411]  Petitioners also note that various sources have found that comparison to emissions inventories is not an adequate way to discuss GHG emissions.[412]

99.    We find Petitioners' arguments unavailing.  The Commission did not indicate that GHG comparisons with national and state inventories are intended to indicate the significance of the emissions or that such comparison was intended to fall within the

_____

[406] *Methow Valley*, 490 U.S. at 349.

[407] Authorization Order, 187 FERC ¶ 61,199 at P 179 (citing final EIS at 4-560 to 4-561).  "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs."  *Id.* n.428 (citing final EIS at 4-559).

[408] *Id.* PP 165-180.

[409] *Id.* PP 171-172.

[410] Rehearing Request at 121.

[411] *Id.*

[412] *Id.* at 122.  We note that Petitioners rely on *Diné Citizens Against Ruining our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) (*Diné Citizens*) to support its argument that comparisons with emission inventories is not an adequate way to discuss GHG emissions, *see* Rehearing Request at 122; however, we find petitioners argument unavailing because this proceeding does not include a carbon budget as did *Diné Citizens*. 59 F.4th at 1042, n.11 (rejecting agency's comparison of GHGs to regional, national, and global levels, but in the context of failing to consider arguments raised in comments that the agency should have applied the "carbon budget" or explained why it did not).

definition of "effects" or "impacts" under section 1508.1(i)(4).[413]  Instead, as we explained in the Authorization Order, the comparison "allows us to place project emissions in context."[414]  The D.C. Circuit, addressing substantially similar arguments, has explicitly held that the Commission acts reasonably by comparing a project's emissions with nationwide and state inventories.[415]  The fact that EPA and CEQ might not recommend this methodology in every instance does not preclude its utilization by the Commission.[416]

### 4.    Impacts to Commercial and Recreational Fishing and Local Communities

100.    Petitioners argue that the Commission failed to take a "hard look" at the impacts of the project on the commercial fishing industry.  Specifically, Petitioners argue that the Commission failed to fully evaluate two impacts from the project to the commercial fishing industry:  (1) impacts to fish, shrimp, and oyster habitat and populations; and (2) impacts to the ability of commercial fisherman to safely access fishing locations due to marine traffic.[417]

101.    According to Petitioners, the Commission has ignored the risk that temporary impacts on shrimp and fish populations will result in permanent adverse effects on the commercial fishing business and has dismissed the concerns of commercial fishermen

---

[413] 40 C.F.R. § 1508.1(i)(4).

[414] Authorization Order, 187 FERC ¶ 61,199 at PP 171-172.

[415] *Alaska LNG*, 67 F.4th at 1184 (discussing *EarthReports*, 828 F.3d 949) ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions …. [the Commission's] approach was reasonable and mirrors analysis we have previously upheld.").

[416] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024, at P 37 (2024); *see also Citizens Against Burlington*, 938 F.2d at 201 (stating that, under the rule of reason, a lead agency does not have to follow other agencies' comments, it just has to take them seriously).

[417] Rehearing Request at 125.

in the area.[418]  Similarly, the Petitioners allege that the Commission did not adequately consider impacts on marine traffic.[419]

102.    On the contrary, the Commission considered the impacts from project construction and operation on the commercial fishing industry in the project area, including the potential for increased disruptions to recreational and commercial fisherman at alternative site locations, potential socioeconomic impacts on commercial fisheries and shrimping, impacts to commercial fisheries and fisherman in environmental justice communities, and cumulative temporary and permanent impacts on commercial fishing.[420]  While the analysis found some serious and potentially long-term impacts to wildlife, including aquatic species, both directly and as a result of habitat conversion,[421] it also took into account the project-specific plans and procedures designed to minimize or avoid impacts on wildlife species and habitats.[422]  Similarly, while the final EIS and Authorization Order found potential impacts on commercial fisheries,[423] it also noted continuing commitments to communication with the local fishing community.[424]

103.    Petitioners also disagree with the Commission's assessment that the impacts on recreational and commercial fishing would be localized and less than significant, with only temporary and minor cumulative impacts.[425]  They maintain that fishermen have

---

[418] *Id.* at 125-126.  Among the evidence of impacts cited to by the Petitioners is the Response to Form Letters.  However, as discussed above, these filings were untimely and the Commission was not compelled to rely upon them.  *See supra* section II.C.

[419] Rehearing Request at 126 to 128.  The Petitioners also take issue with the fact that Venture Global's Community Advisory Group does not include any commercial fisherman among its members.  *Id*. at 128.  While the Commission did consider the reports of the Advisory Group, among other information in the EIS, the Commission cannot dictate the membership of a group that Venture Global formed voluntarily.

[420] *See* Authorization Order, 187 FERC ¶ 61,199 at P 110.

[421] *Id.* P 108.

[422] *Id.* P 109.

[423] *Id.* P 112.

[424] *Id.* P 113.

[425] Rehearing Request at 77 (citing Authorization Order, 187 FERC ¶ 61,199 at P 113).

already noticed a decline of up to 50% in their annual catch due to existing facilities.[426] Petitioners insist that the Commission did not address these and other impacts and further argue that the Commission's reliance on Venture Global's Community Advisory Group for identifying concerns is insufficient, that Venture Global has historically failed to address fishermen's concerns, and that fishermen have not had adequate input or been given sufficient consideration by regulators.[427]

104. We find that the Commission adequately considered these effects for both Projects. As an initial matter, we note that fish and shrimp catches are highly individualized and may be affected by a variety of factors. One such example is the fact that shrimp harvest seasons, which are managed by the Louisiana Department of Wildlife and Fisheries (Louisiana DWF), may be different from year-to-year.[428] Accordingly, it is not clear that this decline of up to 50% in annual catch is attributable to LNG facilities. Regardless, the Commission fully responded to Petitioners' arguments in the Authorization Order.[429] Petitioners fail to identify specific shortcomings of the Commission's analysis, other than to disagree with the conclusions reached.

105. Petitioners next argue that the addition of another terminal will increase ship traffic by 17%, add seven to eight carrier visits per week, require commercial and recreational vessels to exit the channel 4-5 times per day due to security zone requirements, increase turbidity, and cause powerful wakes that may cause safety concerns and damage property.[430] They argue that the increase in ship traffic will make it more difficult for fishers and shrimpers to make a living and decrease economic output.[431] Petitioners maintain that the CP2 LNG Project is below a bottleneck in the ship channel known as the "firing line" where shrimp migrate and that the final EIS fails

---

[426] *Id.* at 78 (citing Response to Form Letters at Ex. 5); *see id.* at Ex. 4 at ¶¶ 22-23.

[427] *Id.* at 78-79 (citing final EIS at 4-270 and Authorization Order, 187 FERC ¶ 61,199 at PP 113, 137); *see also id.* at 79 (citing the Commission's denial of FISH's late motion to intervene as an example of lack of consideration by regulators). We address Petitioners' assertions regarding FISH's motion to intervene above, *see supra* section II.A.

[428] Final EIS at 4-267 to 4-268.

[429] Authorization Order, 187 FERC ¶ 61,199 at PP 107-113 (discussing impacts and mitigation measures and concluding that construction and operation impacts on recreational and commercial fishing would be localized and less than significant).

[430] Rehearing Request at 79-80.

[431] *Id.* at 80.

to account for how marine traffic may impact access to this area.[432]  Petitioners also aver that the final EIS minimizes the impact of marine traffic on commercial fishing vessels and that the Commission's conclusion that only a few vessels use the Calcasieu Ship Channel at night is contrary to evidence in the record.[433]

106.    We disagree and find that the Commission appropriately considered the impacts of increased ship traffic on commercial and recreational fishing.  As an initial matter, we note that concerns regarding marine traffic and waterways are within the jurisdiction of the U.S. Coast Guard (Coast Guard).[434]  The marine facilities would include two LNG loading docks and a shared berthing area on Monkey Island.[435]  Marine deliveries during construction would use barges to deliver equipment and bulk material for site preparation.[436]  At the Phase 1 construction peak, 32 barges a week are anticipated.[437]  Based on the Calcasieu Shipping Channel's existing traffic patterns and capacity, the final EIS concluded that additional marine traffic during construction is not expected to result in waterway congestion or significantly impact other waterway users such as fishermen and recreational users.[438]  The Commission also found that, although Project construction is anticipated to occur during peak fishing and recreational seasons, due to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges.[439]

107.    During operation of the CP2 LNG Project and after completion of Phase 2, seven to eight LNG carrier visits are anticipated per week.[440]  During operations, LNG carriers in transit could impact commercial and recreational fishing vessels within the Calcasieu Ship Channel because they would be required to give way while the LNG carrier

---

[432] *Id.*

[433] *Id.* at 80-81.

[434] Final EIS at 1-6; *Freeport LNG Dev., L.P.*, 116 FERC ¶ 61,290, at P 14 (2006).

[435] Final EIS at 4-294.

[436] *Id.*

[437] *Id.*

[438] *Id.*

[439] Authorization Order, 187 FERC ¶ 61,199 at P 111 (citing final EIS at 4-321).

[440] Final EIS at 4-294.

passes.[441]  After the LNG transit is complete, fishing vessels could resume fishing activities throughout the Calcasieu Ship Channel.[442]  Typically, shrimp are most active at night when few vessels are using the Calcasieu Ship Channel.[443]  Petitioners cite the dissent for its assertion that this finding contradicts the 2019 Port of Lake Charles Calcasieu Ship Channel Traffic Study (Marine Traffic Study), which concluded that all vessels were able to transit the channel at night with no further restrictions and no preference to either day or night transits.[444]  The study does not undermine the Commission's findings, but stands for an independent point. It can be true, as the study indicates, that the rules and restrictions of the Calcasieu Ship Channel require no nighttime restrictions.[445]  It can also be true, as the final EIS suggests, that fewer vessels actually use the Calcasieu Ship Channel at night.[446]  In any event, the final EIS recognized that the increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing.[447]  Upon review of CP2 LNG's Letter of Intent and Waterway Suitability Assessment, the Coast Guard, which has jurisdiction over marine traffic, issued a Letter of Recommendation recommending that the Calcasieu River Ship Channel be considered suitable in its current state for accommodating the type and frequency of LNG marine traffic associated with the CP2 LNG Project.[448]  Thus, we disagree that the Commission's statements are contradictory with regard to marine traffic.

108.    Accordingly, we recognized that potential impacts on commercial fisheries from operation of the CP2 LNG Project include:  disturbances in vessel traffic corridors which fishing and shrimping vessels may need to traverse; difficulty accessing fishing locations as a result of large vessels associated with the project; and impacts to the number of fish,

---

[441] *Id.* at 4-270 (approximately 20 to 25 minutes while the vessel passes and approximately 1 hour during maneuvering in the turning basin).

[442] *Id.* at 4-270, 4-295.

[443] *Id.* at 4-270.

[444] Rehearing Request at 127.

[445] *See* Marine Traffic Study at 16, 20.

[446] *See, e.g.,* final EIS at 4-270, 4-284 to 4-285, Table 4.10.8-2 (showing number of nightshift personnel significantly below dayshift personnel).

[447] *Id.* at 4-270.

[448] *Id.* at 4-295.

shrimp, or crab a commercial vessel may be able to catch.[449]  The Commission recognized that permanent impacts on recreational and commercial fisheries in the Calcasieu Ship Channel may occur due to the loss of available fishing areas from operation of the LNG terminal's marine facilities and LNG carrier traffic.[450] Nevertheless, the final EIS concluded and we agree that, given the CP2 LNG Project's proximity to the mouth of the Calcasieu River (about 1 mile) and the year-round use of the area by commercial fishing vessels, the increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing.[451]

109.  The Commission also found that, based on consultation between Commission staff and Louisiana DWF, impacts on shrimping vessels would be greatest near the terminal south of the Firing Line where shrimping occurs year-round and where vessel traffic and dredging associated with the LNG terminal would occur.[452]  The final EIS, however, determined that the area in which project activities would occur does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel.[453]

110.  Based on the foregoing, and as explained in the final EIS, we find that the Commission fully addressed the impacts from project construction and operation, including from marine vessel traffic, on the commercial and recreational fishing industry in the project area.[454]

111.  Petitioners next argue that construction and dredging activities will displace aquatic species and critical habitats important to fishermen's livelihoods.[455]  They disagree with the findings in the final EIS that marine species are unlikely to be impacted any differently than the current dredging activities, despite increases in

---

[449] Authorization Order, 187 FERC ¶ 61,199 at P 111 (citing final EIS at 4-321).

[450] Id.

[451] Final EIS at 4-270.

[452] Authorization Order, 187 FERC ¶ 61,199 at P 112 (citing final EIS at 4-321).

[453] Id.

[454] Id. PP 107-113.

[455] Rehearing Request at 81.

dredging activities,[456] and further assert that impacts from artificial lighting, habitat conversion, and construction noise are dismissed by the Authorization Order.[457] Petitioners also maintain that Venture Global has not consulted with fisherman when dredging and has previously done so just before the summer shrimping season, and that dredging during the fishing season is expected to continue.[458]

112.    As explained in the final EIS, CP2 LNG proposes dredging to occur 6 days per week for 12 to 18 consecutive months.[459] CP2 LNG would adhere to all Corps and Louisiana Department of Natural Resources (Louisiana DNR) permit conditions to minimize impacts associated with dredging activities.[460] The Calcasieu Ship Channel adjacent to the marine facilities is open for shrimp harvesting year-round (outside waters).[461] The area immediately surrounding the dredge activities would likely not be suitable for shrimp harvesting.[462] This impact would be limited to the extent of the sediment plume and be temporary during dredge activities.[463] Moreover, because shrimp and crabs are mobile, some of the populations would be expected to disperse during construction or maintenance activities, but it is also likely that some could also be harmed or killed by equipment.[464] As the Commission noted in the Authorization Order, CP2 LNG would minimize impacts on water quality by using a hydraulic suction dredge, where turbidity would be focused close to the river bottom and would equate to a storm event within a short distance of the cutterhead.[465] The final EIS also concluded that construction and operation impacts on fish, shrimp, and blue crabs would be localized

---

[456] *Id.* (citing final EIS at 2-25 and 4-178) (explaining that dredging will occur six days a week for 12-18 months and displace 6.4 million cubic yards of material).

[457] *Id.* (citing Authorization Order, 187 FERC ¶ 61,199 at P 110).

[458] *Id.* at 81-82 (citing Response to Form Letters at Ex. 4 and Authorization Order, 187 FERC ¶ 61,199 at P 125).

[459] Final EIS at 4-270.

[460] *Id.*

[461] *Id.*

[462] *Id.*

[463] *Id.*

[464] *Id.* at 4-271.

[465] Authorization Order, 187 FERC ¶ 61,199 at P 127 (citing final EIS at 4-318).

and are not expected to have a significant impact on commercial fisheries.[466]  The final EIS also concluded that the Project is expected to have a temporary but not significant impact on commercial harvest activities.[467]  We find that the Commission fully responded to Petitioners' dredging arguments.

113.    Petitioners also argue that the CP2 LNG Project will limit the use of the remaining public docks, which are increasingly becoming privatized, and further inhibit the ability for fishermen to conduct their business.[468]  Petitioners argue that the Commission failed to seriously consider or quantify these impacts.[469]

114.    We disagree.  The final EIS did not find construction and operation impacts on recreational and commercial fishing to be significant.[470]  In particular, and as noted above, the final EIS found that the area in which project activities would occur does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel and, thus, determined that there would not be significant impacts.[471]  The CP2 LNG Project will be located about 1 mile from the mouth of the Calcasieu River, leaving approximately 25 river miles upstream (which includes the Calcasieu Ship Channel and Calcasieu Pass) containing the same fish common to the lower estuarine area.[472]  Petitioners fail to identify any unique features or characteristics of the area to be affected by the Projects or explain whether or why other fishing docks may or may not be available.

---

[466] Final EIS at 4-271.

[467] *Id.* at 4-270.

[468] Rehearing Request at 82.

[469] *Id.*

[470] Authorization Order, 187 FERC ¶ 61,199 at P 113; *see* final EIS at 4-271 ("construction and operation impacts on fish, shrimp, and blue crabs would be localized and are not expected to have a significant impact on commercial fisheries."); *see id.* at 4-274 ("we anticipate Project construction and operation would not negatively impact any recreational fishing, given the fact that these activities are not restricted to the relatively small sections of the Project footprint that could provide potential fishing opportunities").

[471] Final EIS at 4-321; Authorization Order, 187 FERC ¶ 61,199 at P 113.

[472] Final EIS at 4-273 to 4-274 ("spotted sea trout, southern flounder, and red drum (redfish) are commonly found in the lower portion of the river").

115.    Petitioners also argue that the CP2 LNG Project will increase noise, light, and air pollution,[473] as well as visual and land use impacts, which will affect the local community and recreation.[474]  The Commission sufficiently addressed increases in noise,[475] light,[476] visual resources,[477] and land use impacts.[478]  The final EIS found that construction and operation of the Projects would result in limited adverse environmental impacts, except for significant impacts on visual resources, including within environmental justice communities, and the Projects' contribution to significant cumulative visual impacts.[479] Most adverse environmental impacts would be temporary or short-term during construction and operation, but long-term and permanent environmental impacts would also occur as part of the Projects.[480]  The final EIS recommended specific mitigation measures for the construction and operation of the Projects to avoid or reduce impacts, which the Commission adopted.[481]

116.    NEPA requires agencies to take a "hard look" at environmental impacts of a proposed action.[482]  We continue to find that we have done so with respect to the consideration of impacts on commercial fisheries by considering all potential impacts. While the Petitioners argue that different conclusions could be drawn, NEPA guarantees the process of considering potential impacts, "not specific outcomes."[483]  Our analysis of the impacts fulfilled our responsibilities under the statute.

---

[473] *See infra* section III.E.11.

[474] Rehearing Request at 83.

[475] Final EIS at 4-376 to 4-397.

[476] *Id.* at 4-251 to 4-255.

[477] *Id.* at 4-251 to 4-255.

[478] *Id.* at 4-237 to 4-245.

[479] *Id.* at 5-1.

[480] *Id.*

[481] Authorization Order, 187 FERC ¶ 61,199 at P 198.

[482] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (*Marsh*).

[483] *Mass. v. NRC*, 708 F.3d 63, 37 (1st Cir. 2013) (citing *Town of Winthrop v. FAA*, 535 F.3d 1, 4 (1st Cir. 2008)).

### 5.    Safety

#### a.    Weather Events and Flooding

117.    Petitioners argue that climate change will make hurricanes, flooding, and extreme heat more severe and frequent, posing a greater risk to coastal infrastructure, yet the Commission relies on historic meteorological and climate hazards.[484]  They aver that the Commission's forward-looking analysis in the final EIS contains flaws regarding the Projects' ability to withstand climate-driven extreme weather hazards.[485]  Petitioners maintain that pipeline and terminal infrastructure, including LNG loading infrastructure, will be outside the proposed 31.5-foot storm wall and that the Commission failed to consider impacts to extreme weather events.[486]

118.    We disagree.[487]  As explained in the final EIS, outside of the storm wall, the Projects would involve the construction of two marine LNG loading docks and accompanying turning basins and three cryogenic pipelines for LNG transfer from the storage tanks to the docks (Marine Facilities).  CP2 LNG would install two approximately 1.1-mile-long LNG transfer lines as well as a spare third LNG transfer line, a vapor return transfer line, and associated utilities between the CP2 LNG Project and Marine Facilities.[488]  The final EIS discussed hurricanes and other meteorological events that could cause flooding, including climate change impacts to meteorological events, and made three recommendations to ensure the facilities would be resilient to flooding events, which were adopted in the Authorization Order.[489]  The Authorization Order also discussed hurricanes, flooding, relative sea level rise, and shoreline erosion.[490]  Environmental Condition 39 requires CP2 LNG to design the floodwall to a 500-year

---

[484] Rehearing Request at 128-29.

[485] *Id.* at 129.

[486] *Id.* at 129-30.

[487] Petitioners' fault the Commission for relying on historic evaluations of meteorological and climate hazards, yet they also fault the Commission for conducting forward-looking analyses in response to comments to the draft EIS requesting such analyses.  *Id.* at 129-30.  As discussed herein, we find no fault in the Commission's analysis, and find that the Commission complied with its NEPA obligations.

[488] Final EIS at 4-416.

[489] *Id.* at 4-448 to 4-453.

[490] Authorization Order, 187 FERC ¶ 61,199 at PP 103-106.

mean recurrence interval with consideration of wind-driven wave effects, local
subsidence, site settlement, shoreline recession, erosion and scour effect, and sea level
rise based on National Oceanic and Atmospheric Administration (NOAA) projections.[491]
Environmental Condition 40 requires that the floodwall be periodically monitored and
maintained to no less than a minimum elevation of 500-year mean recurrence interval
flood event and that facilities are protected for the life of the LNG terminal considering
settlement, subsidence, and sea level rise.[492]

119.    As discussed in the final EIS, the marine transfer lines outside the stormwall
enclosure would be horizontally directionally drilled under the waterway.[493] This would
protect those portions of the marine transfer line from flood loads.  In addition, the
marine facilities outside of the enclosure are primarily located on platforms elevated 30
feet or more above the North American Vertical Datum of 1988.[494]  The marine transfer
piping and other marine facilities would be located atop the marine platforms.  Therefore,
the marine transfer piping and facilities would be located at a similar elevation and
provide similar protection as the stormwall enclosure.  Moreover, the marine transfer
lines that transition from belowground to the 30-foot elevated height would not be used to
load marine vessels during flooding events, which would minimize any risk to the public.
Therefore, we agree with the Authorization Order that the storm surge floodwalls would
provide adequate protection for the CP2 LNG Project and that the project would be
designed and maintained to withstand potential changes from climate change and any
changes due to climate change would not present a significant impact to the safety of the
LNG facilities.[495]  Based on the foregoing, we find that the Marine Facilities would be
similarly protected.

120.    The CP Express Pipeline Project would be buried with a minimum of 3 feet of
cover in upland and wetland areas and a minimum of 4 feet of cover in open water areas,
which would protect the pipelines from the direct physical forces of storm surges and
floodwater.[496]  The pipelines would have a concrete coating or other anti-buoyancy

---

[491] *Id.* at env't. cond. 39.

[492] *Id.* at env't. cond. 40.

[493] Final EIS at 4-416.

[494] *See* Application at Resource Report 13, Volume I, Section 13.2.1.

[495] Authorization Order, 187 FERC ¶ 61,199 at P 106.

[496] Final EIS at 4-96.

measures to prevent the pipelines from floating.[497]  In compliance with PHMSA regulations at 49 C.F.R. § 192, *et. seq.*, CP Express would monitor for pipeline exposure and potential third-party intrusions onto its permanent easement to determine if there have been any changes in the pipeline cover over time.[498]  CP Express would conduct additional inspections after significant storm events.[499]  The determination of the geographic extent of any such inspection would be made on a case-by-case basis and would depend on the geographic extent and severity of the storm event.[500]  If the pipeline were to become exposed, CP Express would add soils or lower the pipeline to adjust the depth of cover.[501]  Based on the proposed measures to protect the facilities from coastal erosion and long-term sea level rise, we agree with the conclusions in the final EIS that the Projects would not be significantly affected by coastal processes.[502]

121.    Petitioners also argue that the CP2 LNG Project will be vulnerable to flooding during a Category 4 hurricane, despite contrary conclusions contained in the final EIS.[503]  Petitioners combine the Commission's storm surge and wave height estimates with the addition of forecasted 2055 sea level rise of 2.1 feet and assert that a Category 4 hurricane could produce storm water levels up to 31.9 feet which would overtop the 31.5-foot storm wall, and with a Category 5 hurricane under a similar analysis, overtopping the storm wall by nearly 10 feet.[504]  Petitioners argue that the Commission failed to discuss risks associated with water overtopping the storm wall.[505]

122.    In addition to the Marine Facilities discussed above, the CP2 LNG Project will be enclosed for flood protection by construction of storm surge protection walls.[506]  The

---

[497] *Id.*

[498] *Id.*

[499] *Id.*

[500] *Id.*

[501] *Id.*

[502] *Id.*

[503] Rehearing Request at 130.

[504] *Id.*

[505] *Id.* at 131.

[506] Final EIS at 4-449.

Commission generally evaluates the design of LNG facilities against a 500-year Stillwater Flood Elevation (SWEL).[507]  The final EIS used the maximum envelope of water (MEOW) storm surge inundation maps generated from the Sea, Lake, and Overland Surge from Hurricanes (SLOSH) model developed by the National Oceanic and Atmospheric Administration (NOAA) National Hurricane Center.[508]  The final EIS concluded that the relative sea level rise could be expected to increase 1 foot 3 inches (1.26 feet) based on the difference between NOAA 2017 intermediate projection of approximately 0.84 foot for relative sea level rise in 2025 and approximately 2.1 feet for sea level rise in 2055.[509]  There are a range of figures, inputs, and assumptions in our analysis of the potential flood levels at and near the CP2 LNG Project site.[510]  Upon consideration of these inputs, the final EIS stated that the 31.5-foot above mean sea level storm surge wall would be well above the 17.9-22.3 feet total height from the 10-12 feet projected 500 year SWEL based on NOAA SLOSH MEOWs.[511]  Indeed, the storm surge wall would be higher than a strong Category 4 hurricane with an approximate 18.7 foot MEOW, 10.0 feet mean wave height, 1.26 foot sea level rise, the 0.67-1.0 foot expected settlement, and 0.525 foot of local subsidence yielding over 30 years.[512]

123.  Here, Petitioners use the estimated 2055, 2.1-foot sea level rise in order to come up with a figure above the 31.5-foot storm surge wall elevation.  However, the Petitioners' use of 2.1 feet sea level rise did not consider approximately 0.84-foot relative sea level rise that has already occurred since 2000.  For the 30-year design life of the CP2 LNG Project (from 2025 through 2055), the projected additional relative sea level rise would be 1.26 feet.[513]  In addition, the cited study in Environmental Condition 39 states that "knowing whether adaptation actions are required within the next 30 years or afterwards informs decisions about initial designs, the adaptations required, and the

---

[507] SWEL refers to the elevated water level at the coast during a flood event, not including the effects of waves.

[508] Final EIS at 4-450.

[509] *Id.*

[510] *Id.* at 4-449 to 4-451.

[511] *Id.* at 4-450.

[512] *Id.*

[513] *See id.* at 4-450.

metrics that would trigger adaptation."[514]  The requirement for the design to be based upon sea level rise for a 30-year span is consistent with that report.  In addition, the Petitioners neglect the requirements of Environmental Condition 40 that requires CP2 LNG to file a monitoring and maintenance plan, which ensures the storm surge floodwalls be maintained to no less than a minimum elevation of 500-year mean recurrence interval flood event; and that the facilities be protected for the life of the LNG terminal considering settlement, subsidence, and sea level rise.  This would ensure the continued protection from flooding.  Therefore, we find no reason to dispute or change the conclusions in the Authorization Order.

124.     Petitioners next assert that the Commission improperly dismissed concerns regarding the risk associated with the impacts from a Category 5 hurricane.[515]  Petitioners disagree with the Commission's evaluation of historical records through 2020 and argue that the Commission fails to account for recent years that they claim shows increasing risks.[516]  Petitioners also disagree with the Commission's application of an historical assessment that there is no known Category 5 hurricane that has made direct landfall within 60 nautical miles of the Project site and instead argues that based on a forward-looking evaluation, the Project site will be subject to increasingly frequent storms.[517]  Petitioners also argue that the Commission's evaluation of the 500-year flood event is flawed for looking at historical analysis instead of forward-looking risks.[518]

125.     Courts have recognized that "NEPA analysis necessarily involves some 'reasonable forecasting,' and that agencies may sometimes need to make educated assumptions about an uncertain future."[519]  As the final EIS explained "there is no known

---

[514] NOAA, *Global and Regional Sea Level Rise Scenarios for the United States* at 9 (February 2022).

[515] Rehearing Request at 131.

[516] *Id.* (arguing that 2021 had 21 names storms and four major hurricanes, 2022 had 14 named storms and two major hurricanes, and 2023 had 20 names storms and three major hurricanes).  We note that the number of hurricanes in any given year may be influenced by any number of factors and predicting them is difficult.  Final EIS at 4-89.  In fact, "most modeling studies project a decrease (or little change) in the global frequency of hurricanes."  *Id.* at 4-452.

[517] Rehearing Request at 131-32 (citing final EIS at 4-449 and Ex. 50).

[518] *Id.* at 132.

[519] *Sabal Trail*, 867 F.3d at 1374 (citing *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (*Del. Riverkeeper*)).

historic Category 5 Hurricane, which has made direct landfall within 60 nautical miles of Project site."[520]  As explained in the final EIS, CP2 LNG would meet or exceed the minimum federal requirements for LNG facilities in the U.S. that then meet or exceed design requirements in codes and standards for other essential infrastructure in the U.S. These more resilient design requirements make these facilities more resilient against projected increases due to climate change.[521]  In addition, the final EIS explains hurricane intensities (i.e., wind) are projected to increase on average by 1 to 10 percent, however most modeling studies project a decrease (or little change) in the global frequency of hurricanes.  For CP2 LNG, a 10,000 year return period would equate to 171 mph 3-second gust wind speed, which would be approximately 9 percent higher than the wind speed that would be required in the American Society of Civil Engineers (ASCE)/Structural Engineering Institute (SEI) 7, *Minimum Design Loads and Associated Criteria for Buildings and Other Structures*, for the most essential facilities in the U.S. and would be higher than the projected 1 to 10 percent (5 percent average) increase in hurricane intensity projected by studies evaluating impacts of climate change on future hurricane intensities.[522]  In addition, while ASCE/SEI 7 and DOT PHMSA federal regulations require only a 100-year flood event, the Authorization Order requires the storm surge barrier to withstand a more stringent 500 year event consistent with more current codes and standards, such as National Fire Protection Association (NFPA) 59A (2019 and later editions), *Standard for the Production, Storage, and Handling of Liquefied Natural Gas,* and ASCE/SEI 24 (2014) edition, *Flood Resistant Design and Construction*, adopted in the International Code Council, *International Building Code* (2015 and later editions).  Thus, we find the design of the CP2 LNG Project reasonable; and Petitioners' claims amount to "nothing more than hypotheticals with no evident basis in fact or experience."[523]  Although courts have held that NEPA requires reasonable forecasting, NEPA does not require a "crystal ball" inquiry.[524]  An agency "is not

---

[520] Final EIS at 4-449.

[521] *Id*. at 4-452.

[522] We note that data suggests that the CP2 LNG Project site can withstand Category 5 hurricane storm surge SWEL, without waves, equivalent to more than 10,000 year mean return intervals.  *Id.* at 4-450.  The site could also withstand a Category 4 hurricane equivalent or exceeding an approximate 183 mph 3-second gust wind speed and equivalent or exceeding an approximate 10,000-year mean return interval.  *Id.*

[523] *Mich. Pub. Power Agency v. FERC*, 963 F.2d 1574, 1580 (D.C. Cir. 1992) (*Mich. Pub. Power Agency*); *see also id.* ("Administrative agencies are afforded wide deference in predicting the likelihood of future events.").

[524] *Vt. Yankee*, 435 U.S. at 534.

required to engage in speculative analysis"[525] or "to do the impractical, if not enough information is available to permit meaningful consideration,"[526] or to "foresee the unforeseeable."[527]

126.    Nevertheless, as explained above, the final EIS evaluated the design against a 500-year event utilizing forward-looking data[528] and accounted for increases in precipitation, hurricane intensity, and sea level rise.[529]  The Commission took historical meteorological and climatological trends and events and extrapolated that data into the future using these predicted increases.  Thus, to the extent the Commission utilized historical data as one factor to inform its forward-looking predictions, we find such approach reasonable[530] and, thus, we disagree that the Commission's evaluation of the 500-year flood event is flawed for looking at historical analysis instead of forward-looking risks.

127.    We acknowledge that any prediction of future weather patterns, behaviors, or events involves some reasonable speculation.  Here, however, we find the CP2 LNG Project design appropriately accounts for both historical tropical activity and future environmental changes and effects.[531]  Accordingly, we agree that "the project would be designed and maintained to withstand potential changes from climate change and any

---

[525] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011) (*N. Plains Res. Council*).

[526] *Id.* (quoting *Env't. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006)).

[527] *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 829 (D.C. Cir. 1976).

[528] Final EIS at 4-447 to 4-453.

[529] *Id.* at 4-451 to 4-452.

[530] An agency's choice among reasonable analytical methodologies is entitled to deference.  *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (*Cmtys. Against Runway Expansion*) (citing *Citizens Against Burlington*, 938 F.2d at 201).

[531] The final EIS found the 31.5-foot storm surge wall sufficient for a strong Category 4 hurricane, as discussed above.  *See supra* P 122.  Moreover, the final EIS also noted that the data "suggests that the site design can withstand Category 5 Hurricane storm surge SWEL, without waves, equivalent to more than 10,000 year mean return intervals."  Final EIS at 4-450.

changes due to climate change would not present a significant impact to the safety of the LNG facilities."[532]

128.    Petitioners next argue that the Commission's analysis fails to account for cascading or compounding extreme weather events which they assert will become increasing likely due to climate change.[533]  Petitioners cite to Hurricane Delta which closely followed Hurricane Laura's path as an example of such compounding effects and asserts that the Commission failed to discuss Hurricane Delta or flooding risks from potential debris interfering with the Project's water drainage systems.[534]

129.    As discussed above, the Commission is not required to engage in speculation and, thus, cannot assess hypothetical scenarios where storms or weather events are compounded or follow in close succession.  Nevertheless, as explained in the final EIS, "while the climate change impacts taken individually may be manageable for certain communities, the impacts of compounded extreme events (such as simultaneous heat and drought, or flooding associated with high precipitation on top of saturated soils) may exacerbate preexisting community vulnerabilities and have a cumulative adverse impact on environmental justice communities."[535]  An analysis of unknown weather events of unknown intensity and within an unknown time period sometime in the future is too speculative to provide meaningful consideration.[536]

130.    In response to Petitioners' flooding concerns, we note that the design and operation of all stormwater discharge and treatment facilities would be in accordance with applicable regulations and permits, including Louisiana Pollutant Discharge Elimination System (Louisiana PDES) program regulations under the Clean Water Act (CWA), administered by the Louisiana Department of Environmental Quality (Louisiana DEQ).[537]  Floodplain storage, drainage flow, water quality, and flood management would

---

[532] Authorization Order, 187 FERC ¶ 61,199 at P 106.

[533] Rehearing Request at 132.

[534] *Id.*

[535] Final EIS at 4-549.

[536] While speculation is implicit in NEPA, agencies are not required "to do the impractical, if not enough information is available to permit meaningful consideration." *N. Plains Res. Council*, 668 F.3d at 1078 (citing *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d at 1014).

[537] Final EIS at 2-25.

be regulated by the Louisiana DNR/Office of Coastal Management (OCM).[538] Accordingly, we find this proceeding is not the appropriate forum for determining compliance with CP2 LNG's CWA permits.[539]  Petitioners' concerns are more appropriately addressed to the Louisiana DNR OCM.[540]  In any event, under Environmental Condition 10, Venture Global will be required to comply with all applicable permits prior to construction and under Environmental Conditions 7 and 8, Venture Global will be responsible for continued compliance with all permits and mitigation measures.[541]  We find these conditions adequately address Petitioners' concerns.

131.    Petitioners also argue that the Commission failed to consider the increased air pollution that the CP2 LNG Project may emit during hurricanes and other extreme weather.[542]  Petitioners cite to events at Sabine Pass LNG[543] and Freeport LNG,[544] as well as weather events such as Winter Storm Uri and Hurricane Harvey, as examples of extreme weather events that caused increases in air pollution.[545]  Petitioners aver that the Commission must examine whether extreme-weather pollution risks are becoming more

---

[538] *Id.* at 4-124.  CP2 LNG has submitted a Hydrologic Modification Impact Analysis to the Louisiana DNR OCM for the CP2 LNG Project.  *Id.*

[539] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74 (citing *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,117, at 61,448 (2001)).

[540] *Id.*  The Commission often relies on other agencies' expertise for assessing impacts.  *Id.*; *Millennium Pipeline Co.*, 161 FERC ¶ 61,229, at P 132 (2017); *see also EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) (finding agency properly relied outside agency expertise).

[541] Authorization Order, 187 FERC ¶ 61,199 at envtl. conds. 7, 8, 10.

[542] Rehearing Request at 134.

[543] *Id.* (stating that "Sabine Pass experienced significant unplanned emission releases due to Hurricane Laura—including 51.5 tons of methane, 7.5 tons of nitrogen oxide, and 64.4 tons of carbon monoxide").

[544] *Id.* (asserting that Freeport LNG released air pollutants leading up to Hurricane Beryl, including over 1000 pounds each of ethylene and propane, over 1500 pounds of carbon monoxide, over 760 pounds of nitrogen oxides from the liquefaction flare, 3300 pounds of CO, and 426 pounds of $NO_x$).

[545] *Id.*

frequent and severe, particularly when considered cumulatively with air pollution in the region.[546]

132.    The EPA and the states are vested with authority under the Clean Air Act (CAA) to implement and enforce regulations to reduce air pollution, including to establish mitigation measures.[547]  Louisiana DEQ is responsible for enforcing the federally authorized state implementation plan to comply with air quality standards according to the CAA.[548]  We find that this proceeding is not the appropriate forum for determining compliance with CAA permits, particularly with regard to events affecting CP2 LNG that have not occurred, which is a matter within the jurisdiction of the Louisiana DEQ.[549]  As we noted above, any prediction of future weather patterns, behaviors, or events is speculative.  Therefore, an assessment of possible air pollution emitted from the CP2 LNG Project in the future from some unspecified event would render any analysis too speculative to permit any meaningful consideration.[550]  We have, however, found that "most modeling studies project a decrease (or little change) in the global frequency of hurricanes."[551]  The operating history of the U.S. LNG industry has been relatively free of safety-related incidents resulting in adverse effects on the public or the environment.[552]  Nevertheless, we recognize that incidents have occurred, including those cited by Petitioners.[553]  Additional conditions have been imposed in response to these events.[554]  We find that the Commission appropriately considered Petitioners' concerns.

---

[546] *Id.* at 134-35.

[547] Final EIS at 1-20; *Millennium Pipeline Co.*, 145 FERC ¶ 61,007, at P 50 (2013); *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 112-17.

[548] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74; *Columbia Gas Transmission, LLC*, 145 FERC ¶ 61,257, at P 43 (2013).

[549] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74 (citing *San Diego Gas & Elec. Co.*, 96 FERC ¶ at 61,448).

[550] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 at P 35 (citing *Transcon. Gas Pipe Line Co.*, 156 FERC ¶ 61,092, at P 91 (2016)).

[551] Final EIS at 4-452

[552] *Id.* at 4-410.

[553] *Id.* at 4-410 to 4-411 (detailing several incidents over the years).

[554] *Id.*

b.  **Coastal Erosion**

133.    Petitioners disagree with the Commission's assessment that the CP Express Pipeline Project would not be affected by erosion of the Gulf of Mexico shoreline within the 30-year design lifespan of the CP2 LNG Project based on erosion rates of between 5 and 30 feet per year.[555]  Instead, Petitioners maintain that the CP Express Pipeline Project will have a lifespan of at least 50 years, resulting in 1,500 feet of erosion which could place pipeline components at risk.[556]  Petitioners argue that the Commission failed to account for this increased erosion.[557]

134.    We find Petitioners' arguments unpersuasive.  Near the Projects, shoreline erosion is typically between 5 to 30 feet per year.[558]  The portion of the Projects closest to the shore is where the CP Express Pipeline Project enters the CP2 LNG Project's Gas Gate Station which is over 1,000 feet north of the shoreline.[559]  We disagree with Petitioners' use, again, of the upper-bound of the predicted erosion range and a 50-year lifespan to support its assertion that there will be 1,500 feet of erosion.  We note that it is just as likely that erosion will occur at a rate closer to the lower-bound estimates (or somewhere in between), and Petitioners provide no support for their use of only the upper-bound forecast.  Petitioners also fail to discuss the additional protective measures that would be incorporated into the CP2 LNG Project terminal site design, which the Commission concluded would cause the CP Express Pipeline Project to not be affected by erosion of the Gulf of Mexico shoreline within the 30-year design lifespan of the CP2 LNG Project.[560]  These measures also include, as discussed above, a requirement that CP2 LNG maintain the storm surge walls to withstand a minimum of a 500-year mean occurrence interval in consideration of relative sea level rise, local subsidence, site settlement, shoreline recession, erosion and scour effect, and wind-driven wave effects.[561]  Moreover, Environmental Conditions 30 and 36 require inspections to detect erosion and

---

[555] Rehearing Request at 132-33 (citing final EIS at 4-96).

[556] *Id.* at 133 (citing final EIS at 4-259, Table 4.10.1-2).

[557] *Id.*

[558] Final EIS at 4-96.

[559] *Id.*

[560] *Id.* at 4-96, 4-397 to 4-505 (explaining the various reliability and safety requirements for the Project).

[561] Authorization Order, 187 FERC ¶ 61,199 at env't condition 39.

for CP2 LNG to develop an erosion control and prevention plan for the dock area.[562] Thus, erosion will be constantly monitored and corrective measures taken as necessary.

135.    Finally, we note that regardless of the proposed LNG terminals design life, once in operation, the CP2 LNG Project will be subject to regular on-site inspections by Commission staff for as long as the facilities remain subject to our jurisdiction.[563]  We find these ongoing requirements sufficient to address Petitioners' concerns.

### c.    High Temperatures

136.    Petitioners next assert that the Commission ignored EPA's recommendation to examine the risks that extreme temperatures pose to building materials and seals.[564] Petitioners cite findings from the Cybersecurity & Infrastructure Security Agency that extreme heat threatens critical infrastructure across the country and that the Commission must examine whether the CP2 LNG Project will pose greater risks if materials are exposed to increasingly high temperatures, particularly due to its dependence on refrigeration.[565]

137.    Any building materials that utilize concrete will be subject to quality assurance and quality control procedures as required by environmental condition 43 of the Authorization Order.[566]  During construction, concrete samples will be tested to determine if the concrete complies with the project specifications for temperature, air content, density, and compressive strength.  Once installed, CP2 LNG would establish an inspection program to periodically assess the condition of all structural elements that includes concrete foundations and supports.  In addition, equipment that utilize industrial seals such as valves, pumps, compressors, etc. would be designed to operate in a wide range of temperatures.  Generally, these seals would not be exposed to ambient temperatures because valve seals would be inside the valve body and compressor/pump seals would generally be enclosed within the equipment.  Furthermore, the specific

---

[562] *Id.* at env't conditions 30 & 36.

[563] Authorization Order, 187 FERC ¶ 61,199 at env't conditions 132-135 (requiring reports and monitoring *for the life* of the CP2 LNG Project); *Nat'l Grid LNG LLC*, 165 FERC ¶ 61,031, at P 67 (2018).

[564] Rehearing Request at 133.

[565] *Id*. (citing Ex. 55, Cybersecurity & Infrastructure Security Agency, Extreme Heat, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/extreme-weather-and-climate-change/extreme-heat).

[566] Authorization Order, 187 FERC ¶ 61,199 at env't condition 43.

temperature range for these seals would be dependent on the material of construction (i.e., rubber, ceramic, graphite, silicone, Teflon, metal, composite, etc.). These seals have an upper temperature limit that ranges from approximately 250°F to 1000°F. Thus, any potential extreme heat event is not expected to cause seal failures. Furthermore, as required by environmental condition 130 of the Authorization Order, CP2 LNG must develop plans for preventative and predictive maintenance programs to perform periodic or continuous equipment condition monitoring.[567] In addition, as required by environmental condition 132 of the Authorization Order, CP2 LNG will be subject to regular field inspections conducted by Commission staff, as a result of which staff could identify and assess any future issues.[568] Moreover, as explained in the final EIS, CP2 LNG will meet or exceed the minimum federal requirements for LNG facilities in the U.S. that then meet or exceed design requirements in codes and standards for other essential infrastructure in the U.S.[569] We find CP2 LNG's compliance with these design requirements and the Authorization Order sufficient to address Petitioners' concerns. to address Petitioners' concerns. sufficient to address Petitioners' concerns. to address Petitioners' concerns.

### d.    <u>Flaring</u>

138.    Petitioners maintain that day and night flaring already causes impacts to the community which the Commission failed to address or remedy the frequency of flaring or ensure such occurrences will not repeat with the CP2 LNG Project.[570]

139.    As explained in the final EIS, "flares are used only for start-up, shutdown, routine maintenance, and non-routine venting of emissions due to excess pressure."[571] The Commission acknowledged that several commenters expressed concern over the duration of flaring at the Venture Global Calcasieu Pass LNG terminal and concerns as to whether the flaring activities for CP2 LNG would differ."[572] In response to these concerns, the

---

[567] *Id.* at env't condition 130.

[568] *Id.* at env't condition 132.

[569] Final EIS at 4-452.

[570] Rehearing Request at 83 (citing Authorization Order, 187 FERC ¶ 61,199 at P 132 and John Allaire March 12, 2023 Comments); *id.* at 149.

[571] Final EIS at 4-359.

[572] *Id.*

final EIS provided detailed analysis of anticipated flaring at the CP2 LNG terminal.[573] Specifically, the final EIS explains that flaring would be conducted as part of CP2 LNG's commissioning and start-up activities and that, given the nature of commissioning, the frequency of flaring is unpredictable.[574] "According to Venture Global, Calcasieu Pass is experiencing unanticipated issues that require daily corrective, testing, and rectification work, thereby prolonging the duration of commissioning."[575] According to CP2 LNG, "these circumstances do not raise any safety concerns and while the flaring conducted at Calcasieu Pass LNG in 2022 was within the limits imposed by the facility's Title V permit [], such issues have resulted in flaring that is both longer in duration and more frequent than anticipated." Once commissioning has been completed, flaring for start-up, shutdown, and periodic routine maintenance is expected to be greatly reduced.[576] We find that the Commission fully addressed the comments concerning flaring.

### 6.    CCS System

140.    Petitioners argue that the Commission failed to take a hard look at the environmental impacts of the non-jurisdictional portion of the proposed CCS system, including the $CO_2$ send-out pipeline and sequestration wells.[577] Specifically, Petitioners assert that the Commission's analysis of the CCS system under its cumulative impacts analysis is insufficient because it does not describe the effects of this infrastructure on wetlands, waterbodies, air, and species and that, instead, the Commission should have evaluated the CCS system as a connected action.[578] Petitioners argue that the CP2 LNG Project and the jurisdictional CCS facilities within the fence-line are interdependent parts that cannot proceed without the non-jurisdictional $CO_2$ pipeline and injection facilities and that neither has substantial independent utility.[579] Petitioners argue that the non-jurisdictional components of the CCS system are federal projects because they require

---

[573] *Id.* at 4-359 to 4-361.

[574] *Id.* at 4-359 to 4-360.

[575] *Id.* at 4-360.

[576] *Id.*

[577] Rehearing Request at 162-63.

[578] *Id.* at 163-64.

[579] *Id.* at 164-65.

federal approvals and that separate agencies' actions can be connected for purposes of the connected actions regulation.[580]

141.    As we explained in the Authorization Order, CP2 LNG's CCS system will capture, compress, and sequester approximately 500,000 tons of $CO_2$ from feed gas entering the CP2 LNG Project.[581]    As part of the pretreatment process, $CO_2$ will be removed from the feed gas as $CO_2$ vapor and sent to the on-site carbon capture facility, where the $CO_2$ vapor will be compressed, condensed into a liquid, and pumped to a higher pressure.[582]    The resulting $CO_2$ liquid will then be routed to a $CO_2$ send-out pipeline for injection into saline aquifers approximately three miles offshore.[583]    In the Authorization Order, the Commission concluded that the CCS facilities located within the terminal fence-line up to the entry point of the send-out pipeline was subject to the Commission's jurisdiction under NGA section 3(e).[584]    Accordingly, the Commission considered this jurisdictional portion of the CCS system in its overall NEPA analysis.[585]    With these facts in mind, we turn to the arguments raised by Petitioners.

142.    We disagree that the Commission was required to consider the non-jurisdictional CCS facilities as a connected action in its NEPA review.    As an initial matter, the Commission is only required to "evaluate, in a single review, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action."[586]

---

[580] *Id.* at 165 (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 35-36, 48-51 (D.C. Cir. 2015) and *City of Bos. Delegation v. FERC*, 897 F.3d 241, 251-52 (D.C. Cir. 2018) (*City of Bos.*)).

[581] Authorization Order, 187 FERC ¶ 61,199 at P 9.

[582] *Id.*

[583] *Id.*

[584] *Id.* P 21.

[585] Petitioners do not dispute this exercise of jurisdiction.

[586] 40 C.F.R. § 1501.3(b).    A proposal "means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can *meaningfully evaluate its effects*."    40 C.F.R. § 1508.1(ff) (emphasis added); *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 54.    Further, for the purposes of NEPA, "'projects' . . . are described as 'proposed actions,' or proposals in which action is imminent."    *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1229 (10th Cir. 2008) (*Wilderness Workshop*);

Courts have indicated that, in considering a pipeline application, the Commission is not required to consider in its NEPA analysis other potential projects for which the project proponent has not yet filed an application, or where construction of a project is not underway.[587]  NEPA "does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions."[588]

143.   We recognize that Venture Global has filed an application for a carbon sequestration permit with the EPA and with Louisiana DNR;[589] however, that application was received by the EPA on July 25, 2023, just 3 days before the Commission issued its final EIS, and received by the Louisiana DNR on February 5, 2024, over six months following issuance of the final EIS.[590]  Accordingly, we find that the CCS proposal cannot be said to be "imminent" for purposes of connected actions consideration.[591]  The Commission has found proposals not sufficiently imminent in similar situations.[592]

_____

O'Reilly v. U.S. Army Corps of Eng'rs, 477 F.3d 225, 236 (5th Cir. 2007) (O'Reilly); E. Shore Nat. Gas Co., 181 FERC ¶ 61,233 at P 27.

[587] Minisink, 762 F.3d at 113 n.11; Algonquin Gas Transmission, LLC, 154 FERC ¶ 61,048 at P 48 & n.77.

[588] Kleppe v. Sierra Club, 427 U.S. 390, 410 n.20 (1976) (Kleppe).

[589] Louisiana DNR, Class VI Carbon Sequestration Program, Permits and Applications, https://www.dnr.louisiana.gov/index.cfm/page/1695 (last visited Nov. 27, 2024).

[590] July 28, 2023 Notice of Availability of Final EIS.  Indeed, at the time the final EIS was issued, the pipeline alignment, platform location, and well location were in the siting stage of project development.  Final EIS at 4-523.

[591] We note that in the event the CCS facilities become unavailable, the $CO_2$ removed from the feed gas can be routed to the jurisdictional facilities and equipment for final disposition.  Authorization Order, 187 FERC ¶ 61,199 at nn.15, 37.  Thus, whether or not the non-jurisdictional facilities are built, the Commission's approval of the Project will not be affected.

[592] See, e.g., E. Shore Nat. Gas Co., 181 FERC ¶ 61,233, at P 32 (2022) (finding project should not have been considered in an Environmental Assessment because it was not imminent); PennEast Pipeline Co., 164 FERC ¶ 61,098 at P 135 (finding projects should not have been considered in an EIS because they "were not imminent"); Const. Pipeline Co., 154 FERC ¶ 61,046, at P 96 (2016) (stating that the project alleged to be

144.    Regardless, the Commission was not required to consider those components of the CCS facility outside of its jurisdiction.  "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration."[593]  NEPA's implementing regulations provide that actions are "connected" if they:  (i) automatically trigger other actions that may require EISs; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification.[594]  In the context of natural gas infrastructure projects, the D.C. Circuit has focused on the projects' "degree of physical and functional interdependence and their temporal overlap."[595]  The requirement that an agency consider connected actions in a single environmental document is to "prevent agencies from dividing one project into multiple individual actions" [596] with less significant environmental effects and "to prevent the government from 'segmenting' its *own* 'federal actions into separate projects and thereby failing to address the true scope and impact of the activities that should be under consideration.'"[597]

145.    Nevertheless, NEPA does not require the Commission to evaluate as connected actions major federal actions outside of its control.[598]  As the court in *Alaska LNG*

---

a connected action was only in the pre-filing process, and, therefore, was not a proposed action); *Tenn. Gas Pipeline Co.*, 154 FERC ¶ 61,191, at P 56 (2016) (same).

[593] *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 19 (quoting *Del. Riverkeeper*, 753 F.3d at 1313).

[594] *Del. Riverkeeper*, 753 F.3d at 1309; 40 C.F.R. § 1501.3(b).

[595] *Evangeline Pass*, 100 F.4th at 212; *Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022) (*Food & Water Watch*).

[596] *Myersville*, 783 F.3d at 1326.

[597] *Big Bend*, 896 F.3d at 423; *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d at 49 (quoting *Del. Riverkeeper*, 753 F.3d at 1313); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 21).

[598] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 at P 60; *see also Tenn. Gas Pipeline Co.*, 157 FERC ¶ 61,254, at P 70 (2016) (stating that because the Commission did not have jurisdiction over powerplant, it could not be a connected action); *Freeport LNG Dev., L.P.*, 167 FERC ¶ 61,155, at P 30 (2019) ("Sierra Club fails to cite to any

explained, NEPA's connected actions requirements "ensure that agencies consider the environmental impacts of closely related actions; however, they do not, and cannot, expand [the Commission's] jurisdiction."[599]  Similarly, the D.C. Circuit in *El Puente v. United States Army Corps of Engineers* stated that the agency had "convincingly argue[d] that it was not required to consider the potential impact of [a federal action], at least as a "connected action," because the Corps has no regulatory authority over the construction or operation of [the area of federal regulation]."[600]  We also note that the CEQ regulations have distinguished between connected actions, cumulative actions, and similar actions with regard to the necessary scope of an EIS.[601]  Only for cumulative actions do the regulations specifically include actions "regardless of what agency (Federal or non-Federal) or person undertakes such actions."[602]  No similar language applies to connected actions.[603]

146.    We recognize that the D.C. Circuit in *City of Port Isabel* recently remanded the Commission's authorizations involving a similar CCS system and required the Commission to evaluate it as a connected action.[604]  We find that case distinguishable.  In *City of Port Isabel*, Rio Grande LNG filed a limited amendment that proposed to incorporate CCS facilities into the *already-approved* site and design of Commission-jurisdictional Rio Grande LNG terminal, necessitating additional NEPA analysis by the Commission.[605]  Although the Commission asserted that it was not required to evaluate the CCS facilities as a connected action, the court in *City of Port Isabel* held, at least in

---

case where 'connected action' has been found to encompass two actions by two separate federal agencies").

[599] *Alaska LNG*, 67 F.4th 1176, 1185 ("We decline to adopt [petitioners] aggressive reading of 40 C.F.R. § 1508.25, which conflicts with our precedent and would require the Commission to consider the indirect effects of actions beyond its delegated authority.")

[600] 100 F.4th 236, 249 (D.C. Cir. 2024).

[601] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 at P 61.

[602] *Id.* (citing 40 C.F.R. § 1508.25(a)(2) (1979)).

[603] *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 22.

[604] *City of Port Isabel*, 111 F.4th 1212-13.

[605] Rio Grande LNG, Notice of Schedule for the Preparation of an Environmental Assessment for the Proposed Carbon Capture and Sequestration System Amendment (filed December 2, 2022).

part, that because the application for limited amendment for the CCS facilities was pending before the Commission at the same time as the court's first remand requiring the Commission to revisit aspects of its environmental analysis and approval of the project, the Commission was required to evaluate the CCS facilities as a connected action.[606]  In this case, the Commission determined that the CCS facilities located within the CP2 LNG Project fence-line up to the entry point of the send-out pipeline was subject to the Commission's jurisdiction under NGA section 3(e).[607]  Accordingly, unlike in *City of Port Isabel*, the Commission considered the jurisdictional portion of the CCS system in its overall NEPA analysis and approval of the CP2 LNG Project site and design. Importantly, the court in *City of Port Isabel* had no occasion to consider the scope of the Commission's environmental review vis-à-vis the connected actions doctrine.

147.    Based on the foregoing, we disagree that the non-jurisdictional $CO_2$ pipeline and injection facilities of the CCS system are connected actions with the CP2 LNG Project for purposes of NEPA review.  Instead, we find that the Commission was not required to consider the components of the CCS system outside of its jurisdiction in its NEPA analysis as a connected action.

148.    Nevertheless, where improper segmentation is usually concerned with projects that have reached the proposal stage, or are within the agency's jurisdiction, a cumulative impact analysis requires the Commission to include present, proposed, and reasonably foreseeable future actions in its review.[608]  Thus, even in circumstances where projects have not reached the "proposal" stage, or may be outside of an agencies' jurisdiction, NEPA still requires the agency to evaluate reasonably foreseeable actions, and we have found cumulative impacts analysis sufficient.[609]

149.    Here, the Commission requested that CP2 LNG "[p]rovide details regarding CP2 LNG's proposed [CCS], including . . . (i) a description and location of all associated

---

[606] *City of Port Isabel*, 111 F.4th 1212-13.

[607] Authorization Order, 187 FERC ¶ 61,199 at P 21.

[608] *O'Reilly*, 477 F.3d at 236–37 (citing *Env't Def. Fund v. Marsh,* 651 F.2d 983, 999 (5th Cir. 1981)); *Wilderness Workshop*, 531 F.3d at 1229.

[609] *Minisink*, 762 F.3d at 113 n.11 (finding cumulative impacts analysis sufficient where proposal submitted to the Commission once construction already began on another project); *ANR Pipeline Co.*, 185 FERC ¶ 61,191, at P 55 (2023) ("We find that the potential impacts of the non-jurisdictional electric transmission line and substation are sufficiently addressed in the EA's cumulative impacts section."); *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 49 (stating that the Commission evaluated projects as cumulative impacts even though there were no pending proposals).

facilities (e.g., capture equipment, sequestration wells, and pipeline); (ii) description of impacts on land use type and acreage, water resources (including number of impacted waterbodies), safety, air and noise, and any other impacted resources . . . ."[610] In response, CP2 LNG indicated that the initial portion of the pipeline will be installed via horizontal directional drilling, but[611] CP2 LNG also stated that "impacts outside the Terminal site cannot be further described at this time" and that "the pipeline alignment, platform location, and well location are in the siting stage of project development."[612] Accordingly, at the time of the data request, information related to the Commission's cumulative impact analysis was simply unavailable given the early stages of project development.  Indeed, as identified above, CP2 LNG's application to the EPA and Louisiana DNR for a carbon sequestration permit three days before and six months after the Commission issuance of its final EIS, respectively, and even then, it is not clear whether the permit application contains finalized plans or routes for the other components of the CCS system, e.g., $CO_2$ pipeline.  Accordingly, the Commission conducted cumulative impact analyses with the information available with respect to the non-jurisdictional CCS system.[613]  Thus, we find that our analysis has complied with NEPA and applicable precedent and we disagree that the Commission failed to adequately consider cumulative impacts.

150.    We also find the Commission's NEPA analysis of the CCS facilities consistent with directives in *Delaware Riverkeeper*.[614]  There, the D.C. Circuit determined that the Commission's NEPA analysis violated the segmentation rule because it failed to evaluate the environmental effects of four Commission-jurisdictional upgrade projects and remanded the proceeding back to the Commission for further consideration of segmentation and cumulative impacts.[615]  On remand, the Commission prepared a supplemental analysis to examine the additive environmental impacts of the four Commission-jurisdictional projects, as well as to incorporate the projects into the

---

[610] Commission July 15, 2022 Data Request at 3.

[611] CP2 LNG July 22, 2022 Response to Data Request at 1-4.

[612] *Id.*

[613] *See* final EIS at 4-516, 4-523 (identifying CP2 LNG's CCS project as a project and reasonably foreseeable future action with the potential to contribute to cumulative impacts); *id.* at 4-523 – 4-524 (analyzing non-jurisdictional CCS facility components workspace in geology and soils).

[614] 753 F.3d 1304.

[615] *Id.* at 1308-09.

cumulative impacts analysis.[616] The Commission used the term additive impacts to refer to the combine direct and combined indirect impacts of the four Commission-jurisdictional projects.[617] Here, the Commission examined the additive environmental impacts of the Commission-jurisdictional CCS facilities by incorporating them into the Commission's review of the entire Project, and examined the cumulative environmental impacts of the non-jurisdictional CCS facilities.[618] We find this consistent with the Commission's NEPA obligations, and, importantly, we note that Petitioners fail to explain how an analysis of the non-jurisdictional facilities would materially differ under a connected actions analysis as opposed to cumulative analysis.[619]

151.   Last, we also find that other federal and state authorities will consider the environmental impacts from the non-jurisdictional CCS facilities. Although "the lead agency supervises the preparation of the environmental document where more than one federal agency is involved, the 'lead agency' designation does not alter the scope of the project before the Commission either for approval or environmental review."[620] The lead

---

[616] *Tenn. Gas Pipeline, L.L.C.*, 153 FERC ¶ 61,215, at P 21 (2015), *order on reh'g*, 156 FERC ¶ 61,007 (2016).

[617] *Tenn. Gas Pipeline, L.L.C.*, 153 FERC ¶ 61,215 at n.38.

[618] Final EIS at 1-13 ("[F]or purposes of the NEPA analysis, we evaluate the portion of the CCS system within the LNG Terminal footprint as FERC jurisdictional components of the Project; while the proposed $CO_2$ pipeline and ancillary facilities under EPA's jurisdiction are considered non-FERC jurisdictional in this EIS."); *id.* at 1-14 ("[P]otential environmental impacts associated with all non-jurisdictional facilities located outside of the Project footprint are discussed in section 4.14 (Cumulative Impacts)."); *see also id.* at 4-516, 4-523 (identifying CP2 LNG's CCS project as a project and reasonably foreseeable future action with the potential to contribute to cumulative impacts); *id.* at 4-523 to 4-524 (analyzing non-jurisdictional CCS facility components workspace in geology and soils).

[619] *See Rockies Express Pipeline LLC*, 154 FERC ¶ 61,139 (2016) ("an agency is not required to analyze actions in the same environmental document if that agency did not intend to segment its review to minimize its cumulative impacts analysis"); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 50 ("Sierra Club adds a step that the regulation does not support: The connected actions regulation requires agencies to review the picture as a whole rather than conduct separate NEPA reviews on pieces of an agency-action jigsaw puzzle; it does not add a multitude of private pieces to the puzzle and so require review of a much larger picture").

[620] *Elba Liquefaction Co.*, 157 FERC ¶ 61,195, at P 15 (2016) (citing 40 C.F.R. § 1501.5(a)).

agency role does not "make the Commission responsible for ensuring a cooperating federal agency's compliance with its own NEPA responsibilities."[621]  NEPA is not intended to require duplication of work by state and federal agencies.[622]  "Neither should NEPA be construed to require the [an agency] to essentially federalize an environmental review process that has already been delegated to federally approved state programs."[623]

152.    As we explained in the Authorization Order, the geological sequestration of $CO_2$ is subject to the EPA's jurisdiction under the UIC program.[624]  The State of Louisiana has primary enforcement authority for CCS projects under the federal UIC program.[625]  The Louisiana DNR administers the UIC Class VI program in Louisiana.[626]  In addition, the CCS system will require other federal permits and/or consultations with the Corps, U.S. Department of Commerce, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and the U.S. Fish and Wildlife Service.[627]  At the state level, the CCS system will require permits and/or consultations with the Louisiana DEQ, Louisiana DWF, Louisiana Department of Culture, Recreation, and Tourism, and the Louisiana Office of State Lands.[628]

---

[621] *Id.*

[622] *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 196 (4th Cir. 2009) (citing 40 C.F.R. § 1506.2(b) ("Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements . . .")).

[623] *Id.*; *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 401 (9th Cir. 1989) ("ordinary notions of efficiency suggest a federal environmental review should not duplicate competently performed state environmental analyses").

[624] Authorization Order, 187 FERC ¶ 61,199 at n.16.

[625] *Id.*

[626] *Id.* (citing *State of Louisiana Underground Injection Control Program*; *Class VI Primacy*, 89 Fed. Reg. 703 (Jan. 5, 2024)).

[627] CP2 LNG July 22, 2022 Response to Environmental Information Request at attach. 1-a.

[628] Final EIS at 1-16 to 1-19, table 1.5-1.

### 7.     Socioeconomics

#### a.     Investments and Employment

153.   Petitioners assert that the Projects will be assembled on site from modules that are constructed overseas and shipped intact to the U.S., significantly decreasing domestic benefits, and instead benefitting the economies of foreign nations, and increasing Venture Global's profit margin.[629]  Petitioners maintain that because only 10% of Projects' costs will be spent locally or regionally, the Commission should have considered this factor.[630]

154.   As an initial matter, the modular method of construction is applicable only to the CP2 LNG Project and not the CP Express Pipeline Project.  With regard to the CP2 LNG Project, the final EIS acknowledges that CP2 LNG "anticipates that a significant portion of materials, equipment, and modular plant components (including the liquefaction units) would be brought to the site by barge."[631]  CP2 LNG "intends to have the pretreatment and liquefaction equipment and piping prefabricated at an offsite location as modules and transport the modules to the site for installation."[632]   The final EIS also expressly recognized that "an estimated 10 percent of [the Projects] costs would be spent at locally or regionally based suppliers."[633]   Therefore, despite Petitioners' assertions, the Commission considered this factor.

155.   Petitioners also assert that Venture Global's offshore construction model will reduce the number and tenure of domestic jobs, with many of the engineering and construction jobs going to foreign workers, thus, decreasing any employment benefits resulting from the Project.[634]  Petitioners argue that most of the jobs associated with the Project will be by non-residents.[635]  Petitioners point to evidence from the construction of

---

[629] Rehearing Request at 64.

[630] *Id.*

[631] Final EIS at 2-24, 4-539.

[632] *Id.* at 4-423.

[633] *Id.* at 4-263.

[634] Rehearing Request at 64-65.

[635] *Id.* at 65-67.

Venture Global's CP1 LNG facility[636] as well as Sabine Pass's LNG facility[637] explaining that most of the workforce was from out-of-state and did not generate significant new business development.[638]

156.    The Commission sufficiently considered the employment benefits flowing from the Projects.  The final EIS explained that "[t]he percentage of the workforce that is locally sourced would be dependent upon several factors, including the availability of local workers, the timing of need for different skilled trades, and the timing of other proposed or ongoing projects in the study area."[639]  The final EIS states that Venture Global anticipates employing approximately 30% of its local workers for construction of the CP2 LNG Project, and 50% for construction of the CP Express Pipeline Project.[640]  Nevertheless, the final EIS recognized that because the Projects "include modular construction methods . . . several of the generated jobs may occur outside of Cameron and Calcasieu Parishes, and even outside of the U.S."[641]  The final EIS also estimated that the temporary workforce for the Projects could peak at approximately 7,550 workers, with about 40% of that workforce being non-local.[642]  We agree with the assessment in the final EIS that, although the Projects "would generate a large number of jobs over a

---

[636] *Id.* at 65-66 (citing Response to Form Letters at Ex. 4) (explaining observations from RV park indicating that Venture Global undercut local business by contracting with companies to house out-of-state workers and that a majority of vehicle license plates were from out-of-state); *id.* at 66-67 (citing U.S. Census Bureau dataset and explaining that any new jobs created by Venture Global's CP1 LNG facility were offset by losses elsewhere and that during construction, civilian jobs actually decreased).

[637] *Id.* at 66 (citing IEEFA November 14, 2023 Comments at 4) (explaining that the Sabine Pass LNG facility did not generate significant new business development with indirect new jobs).

[638] *Id.*

[639] Final EIS at 4-263.

[640] *Id.* The final EIS noted that the CP2 LNG Project would employ an average of 1,600 to 3,200 construction jobs for a period of about 4 years and the CP Express Pipeline Project would employ approximately 830 construction jobs for a period of about 28 months.  *Id.* at 4-539.

[641] *Id.*

[642] *Id.*

period of about 4 years, the overall effect on local unemployment would likely not be significant."[643]

157.    Petitioners next argue that the actual number of permanent jobs remains unclear, that record evidence shows the number could be as low as 130 as opposed to 250, and that the Commission should have requested additional information from Venture Global and further evaluated this economic benefit.[644]

158.    Despite Petitioners' claim that the number of permanent jobs could be as low as 130, the record evidence cited by Petitioners, i.e., comments in support of the project, provide no basis for that figure.[645]  Bare assertions without evidence is insufficient.[646]  In any event, the Commission appropriately considered and disclosed the number of permanent jobs that may be created for both Projects.[647]  The final EIS explained that "[a]pproximately 250 full-time workers would be hired for the [CP2 LNG Project] and approximately 10 full-time workers would be hired for the [CP Express Pipeline Project]."[648]  These figures are supported by detailed analyses provided by CP2 LNG  in its application with the Commission.[649]  We continue to find that the record evidence supports a finding that the Projects will create approximately 260 permanent jobs.[650]  In any case, the provision of even 130 jobs would represent an economic benefit.

---

[643] *Id.*

[644] Rehearing Request at 65.

[645] *Id.* (citing Jane Brown March 27, 2024 Comment).

[646] *Entergy Ark., Inc.*, 141 FERC ¶ 61,269, at P 30 (2012) ("The Commission has long held that protestors must provide more than unsubstantiated allegations in support of their positions"); *Midwest Indep. Transmission Sys. Operator, Inc.*, 131 FERC ¶ 61,173 at P 93 (2010).

[647] We note, as discussed previously, the Commission does not weigh the public benefits against potential harms in its NGA section 3 public interest determination.

[648] Final EIS at 4-320; CP2 LNG December 2, 2021 Application at 42.

[649] *See generally* CP2 LNG December 2, 2021 Application at Resource Report 5

[650] *See* Final EIS at 4-264 ("It is reasonable to assume that the 260 new permanent jobs associated with the Terminal Facilities and Pipeline System would lead to additional indirect employment opportunities and growth in both Cameron and Calcasieu Parishes.").

159.    Next, although Petitioners express concerns with Venture Global contracting with companies to house out-of-state workers for its CP1 LNG project,[651] we note that this is outside the scope of this proceeding.  Nevertheless, the final EIS recognized that "[s]hort-term cumulative impacts on housing from the increased workforce could include higher occupancy and increased room rates for hotels and motels, less availability at recreational vehicle parks, longer commutes for workers living outside the study area, and higher rental costs associated with the increased demand for accommodation."[652]

160.    Moreover, although Petitioners cite to a comment that they claim supports the view that a majority of laborers at the CP1 LNG facility were from out-of-state,[653] we find such assertions of no moment.  In the comment cited by Petitioners, Southeast Laborers' District Council asserted that it surveyed Venture Global's jobsite parking lots in Calcasieu Parish and estimated that of the approximately 1,000 vehicles parked in two parking lots, three-quarters of the vehicles had out-of-state license plates, while only one-quarter of the vehicles had Louisiana license plates.[654]  As an initial matter, we do not consider counting vehicles in a parking lot to be an accurate representation of workforce demographics.[655]  We also find it inappropriate to count vehicle registrations associated with other, unrelated Venture Global projects in the area and extrapolate that data to the yet-to-be-constructed Projects in this proceeding.  Thus, such arguments are at best premature.  In any event, as expressed above, Venture Global anticipates employing approximately 30% of the workforce locally.  Even if we could appropriately extrapolate the data, this is not far from the 25% allegedly observed by Southeast Laborers' District Council.[656]

---

[651] Rehearing Request at 65-66 (citing Response to Form Letters at Ex. 4).

[652] Final EIS at 4-540.

[653] Rehearing Request at 66 (citing Southeast Laborers' District Council March 11, 2022 Comment at 11).

[654] Southeast Laborers' District Council March 11, 2022 Comment at 11

[655] Indeed, a large influx of out-of-state vehicles at any given moment could be caused by a variety of factors.  For example, such a visual survey does not account for out-of-state employees who may have decided to permanently reside in Calcasieu Pass but may have failed to update their vehicle registrations.  In addition, we find the underlying data unreliable because the numbers are expressed in approximations, and it is unclear which Venture Global jobsite was observed.

[656] Southeast Laborers' District Council March 11, 2022 Comment at 11.  We note that, regardless of percentage, out-of-state workers bring many local benefits such as

161.    Petitioners also assert since the CP1 LNG facility began operations, and that businesses, churches, hospitals, and homes sit abandoned with nearly half of the Cameron Parish population remaining when compared to 2005.[657]

162.    Petitioners, however, fail to explain how LNG projects have caused these declines. Multiple factors may cause and/or contribute to declining socioeconomic conditions.  The final EIS explained that "in 2018 and 2019, the Louisiana economy was in the midst of an industrial boom" and that "[l]ow natural gas prices, together with the long-term prospect that they would remain low, encouraged a large number of firms (particularly in the chemical sector) to announce expansion of existing industrial plants or construction of new plants in Louisiana."[658]  Urban and rural parishes benefited from an improving economy.[659]  The global COVID-19 pandemic paused this growth, and it is estimated that Louisiana lost 105,400 jobs (-5.3%) in 2020.[660]  Calcasieu and Cameron Parishes make up the Lake Charles metropolitan statistical area (MSA), which is one of nine MSAs in Louisiana.[661]  The Lake Charles MSA is dominated by three industries: petrochemicals (including natural gas liquefaction and export), gambling, and aircraft repair.[662]  Thus, the economy relies on much more than LNG facilities.  In 2020, the COVID-19 pandemic had devastating consequences for both parishes, with both the casino market and industrial construction resulting in the loss of approximately 7,000 jobs in the Lake Charles MSA.[663]  Nevertheless, recovery in the Lake Charles MSA is expected as there are $13 billion in LNG projects underway and another $58 billion potential projects forecast for the area.[664]  Based on the foregoing, it is reasonable to conclude that the local economies in fact may benefit from such projects.

---

higher demand for rent, *see* final EIS at 4-265 to 4-266, and increased tax revenue, *see id.* at 4-275, to name a few.

[657] Rehearing Request at 67.

[658] Final EIS at 4-260.

[659] *Id.*

[660] *Id.*

[661] *Id.* at 4-261.

[662] *Id.*

[663] *Id.*

[664] *Id.*

b.    **Tax Incentives and Indirect Benefits**

163.   Petitioners next argue that any alleged employment benefits are outweighed by costs to local taxpayers.[665]  Specifically, Petitioners argue that various tax abatements,[666] tax incentives,[667] and rebates[668] will diminish the economic benefits of the Projects.[669] Petitioners cite Venture Global's Plaquemines facility as an example and claims that it received ITEP benefits of $834 million and Quality Jobs benefits of $29.8 million over 10 years at its Plaquemines facility, amounting to roughly $2.9 million tax break per job created.[670]  Petitioners argue that the Commission must consider the impact of these tax breaks in its analysis of Project benefits and that such revenue could have alternatively been used for the local community, which does not have a sales tax.[671]  Petitioners cite to an analysis of Louisiana's ITEP program as evidence that projects that receive ITEP tax breaks have no statistically significant correlation with job growth or personal income growth, and that, the opposite actually occurs.[672]

164.   The Louisiana tax abatements, incentives, and rebates cited by Petitioners are primarily matters of State concern and outside the scope of this proceeding.[673]  While

---

[665] Rehearing Request at 67, 69.

[666] Petitioners point to Louisiana's Industrial Tax Exemption Program (ITEP) which would provide an 80% tax abatement on ad valorem tax for a five-year period. *Id.* at 67.

[667] Petitioners point to Louisiana's Quality Jobs tax incentive, which could provide up to a 6% rebate on annual payroll expenses for up to 10 years.  *Id.* at 67-68.

[668] Petitioners argue that Venture Global could qualify for state sales and use tax rebates on capital expenses or a 1.5% Project facility expense rebate for qualifying expenses.  *Id.* at 68.

[669] *Id.* at 67-69.

[670] *Id.* at 68; *see also id.* (stating that the tax breaks for Venture Global's CP1 LNG facility will be greater).

[671] *Id.*

[672] *Id.* at 69 (citing Response to Form Letters at Ex. 18).

[673] *Confederated Salish & Kootenai Tribes Energy Keepers, Inc.,* 153 FERC ¶ 61,217, at P 21 (2015) ("[T]he Commission is not a taxing authority and the tax impacts of projects are not within our jurisdiction."); *N.Y. Power Auth.*, 118 FERC ¶ 61,206,

CP2 LNG may apply for such tax benefits, it is up to the state of Louisiana to approve such requests and outside of the Commission's control. Regardless, the Commission considered potential tax incentives in its consideration of the Projects' benefits. The final EIS acknowledged that CP2 LNG "may apply for the State of Louisiana's Industrial Tax Exemption Program which, according to current rules, would provide an 80 percent tax abatement on ad valorem tax for a 5-year term with a possible extension for another 5-year term."[674] The final EIS further hypothesized that if "accepted into the program, the Project would pay approximately $50 million per year in property taxes during a 10-year abatement period, and then approximately $160 million per year following the abatement period."[675] Nevertheless, "[d]uring operations, the Project[s] would continue to generate income and sales taxes."[676] "Total payroll for these workers would be approximately $24 million annually, which would generate state income tax in Louisiana."[677] Accordingly, the Commission considered operational impacts on local taxes, government revenues, and the attendant indirect benefits in its conclusion that "the Project[s] would have a minimal positive impact on local economies and stimulate indirect expenditures."[678]

## 8. Impacts to Rice's Whale

165. Petitioners next raise concerns about the adequacy of consideration of impacts on the Rice's whale, an endangered species that has been documented off the coast of Louisiana in the Gulf of Mexico. Specifically, the Petitioners argue that: (1) the EIS did not take the requisite hard look at the project's effects on the Rice's whale; and (2) the failure to conduct a formal section 7 consultation on the Rice's whale violates the Endangered Species Act (ESA).

### a. Hard Look at Impacts on Rice's Whale

166. Petitioners argue that the final EIS fails to disclose or analyze the direct effects of the construction and operation of the project on the Rice's whale population. Specifically, the Petitioners allege that the references to the Rice's whale are brief, few,

---

at P 87 (2007), *reh'g denied*, 120 FERC ¶ 61,266 (2007) ("[T]he tax impacts of a hydroelectric project are a matter of state law, and not within our jurisdiction.").

[674] Final EIS at 4-276.

[675] *Id.*

[676] *Id.*

[677] *Id.*

[678] *Id.*

and vague and the discussion in the final EIS "fails to disclose the degree of potential harm."[679]  They further argue that the analysis in the final EIS is inadequate because the discussion of the Rice's whale was included in a discussion of impacts to whales generally, rather than a more specific discussion of impacts specific to the Rice's whale,[680] and that the discussion did not adequately reference the extended range of the whales through the central and western Gulf of Mexico.[681]  In addition to the direct impacts on the Rice's whale, the Petitioners argue that the analysis of cumulative impacts is insufficient because the appropriate projects were not considered.[682]  Because of these alleged deficiencies, the Petitioners argue that the final EIS must be supplemented with further discussion of impacts on the Rice's whale.[683]

167.    As explained in the Authorization Order, the final EIS considered impacts to whales, including the Rice's whale, and analyzed vessel strikes and impacts from marine pollution.[684]  In addition to considering specific impacts to whales, the final EIS considered impacts to marine mammals generally and recognized that the project carries the risk of both injury and mortality to marine species resulting from vessel strikes.[685]  Nevertheless, the final EIS found that such strikes are unlikely due to the use of mitigating measures, including the use of established, well-traveled shipping lanes and the use of NMFS's Vessel Strike Avoidance Measures.[686]  Similarly, implementation of the Coast Guard's Shipboard Oil Pollution Emergency Plan will reduce potential impacts from marine pollution associated with marine traffic.[687]  Based on these analyses, the final EIS concludes that the construction and operation of the project may affect but is

---

[679] Rehearing Request at 174.

[680] *Id.* at 175.

[681] *Id.* at 174.

[682] *Id.* at 177.

[683] *Id.* at 182.

[684] Authorization Order, 187 FERC ¶ 61,199 at P 89; *see also* final EIS at 4-224.

[685] Final EIS at 4-184.

[686] *Id.*

[687] Authorization Order, 187 FERC ¶ 61,199 at P 92.

not likely to adversely affect the Rice's whale, a conclusion with which the NMFS agrees.[688]

168.    Petitioners object to the reliance on mitigation measures to reach final conclusions on the impacts on the Rice's whale, arguing that such mitigation measures may not be implemented and therefore should not be considered.[689]  It is a long-accepted practice to consider planned mitigation measures when evaluating the potential impacts of a proposed action.[690]  Based upon consideration of all the information in the record, including potential mitigating factors, we continue to find that the project is not likely to adversely affect any listed species, including the Rice's whale.[691]

169.    Petitioners next claim that the Commission's consideration of cumulative impacts on Rice's whale was insufficient.  They argue that the final EIS focuses too narrowly on the incremental effects of the project and that the final EIS should not have focused its cumulative impacts only on vessel strikes.[692]  Moreover, the Petitioners argue that the range of projects considered is too narrow.[693]

170.    On the contrary, the cumulative impacts analysis was based on a consideration of the reasonable impacts of the CP2 LNG Project.  Firstly, because whales are limited to offshore waters, the cumulative impacts analysis excluded construction activities.[694]  Consideration of impacts included impacts from increased LNG carrier traffic from the CP2 LNG Project, and marine traffic associated with other existing and proposed LNG projects and oil and gas development in the Gulf of Mexico.  While the project would contribute to a minor cumulative increase in vessel traffic and would pose a risk to whales, the magnitude of the increase would not be significant, in part because LNG carriers would use established and well-traveled shipping lanes and offshore spill

---

[688] *See id.* P 93.

[689] Rehearing Request at 176.

[690] *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 581-82 (9th Cir. 2016) (NEPA requires consideration of "appropriate mitigation measures that would reduce the environmental impact of the proposed action.") (citing 42 U.S.C. § 4332(2)(C)(ii)).

[691] Authorization Order, 187 FERC ¶ 61,199 at P 93.

[692] Rehearing Request at 178-79.

[693] *Id.* at 180.

[694] Final EIS at 4-535.

plans.[695]  In addition, the final EIS concluded that these impacts would be permanent, but not likely to be significant.[696]  We agree.

171.    Petitioners take issue with the range of projects considered in the final EIS as contributing to cumulative impacts, arguing that it is too narrow.[697]  As discussed above, the final EIS establishes a "geographic scope" in which various resources may be affected by both a proposed project and other past, present, and reasonably foreseeable future actions."[698]  This scope is unique to each impact, defined based on the characteristics of the resource and how far the CP2 LNG Project's effects might extend.[699]  The final EIS concluded that limiting cumulative impacts for aquatic species—including Rice's whale—would sufficiently account for impacts that would be directly affected and for indirect impacts.[700]  We continue to find that the scope of impacts considered for the cumulative impact of the project was appropriate.

172.    Petitioners further argue that the Commission should supplement the final EIS in light of information related to the Rice's whale published by other agencies.[701]  Whether to complete a supplemental EIS is left to agency discretion.[702]  New information must be sufficient to show that the remaining federal action will affect the environment in a significant manner or to a significant extent *not already considered*.[703]  In other words, a supplemental EIS "must only be prepared where new information provides a *seriously different picture of the environmental landscape*."[704]  Here, the information presented by

---

[695] Authorization Order, 187 FERC ¶ 61,199 at P 94; Final EIS at 4-535.

[696] Authorization Order, 187 FERC ¶ 61,199 at P 94; Final EIS at 4-535.

[697] Rehearing Request at 180.

[698] *Kleppe*, 427 U.S. at 413-14; *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 n.6 (9th Cir. 2002) ("[W]e defer to the agency's determination of the geographic scope of its analysis under NEPA.").

[699] Final EIS at 4-507.

[700] *Id.* at Table 4.14-1.

[701] Rehearing Request at 182-183.

[702] *Marsh*, 490 U.S. at 373; *Friends of the River v. FERC*, 720 F.2d 93, 109-10 (D.C. Cir. 1983).

[703] *Marsh*, 490 U.S. at 374.

[704] *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021)

Petitioners pre-dates the final EIS and contains recommendations from other agencies on their programmatic activities, as well as NMFS's proposal to designate the Gulf's central and western-shelf break as critical habitat for the Rice's whale.  These actions or documents neither implicate the potential impacts of this project nor it constitute new information.  Therefore, we continue to find that supplementation is not required to appropriately consider the direct, indirect, or cumulative impacts of the project on the Rice's whale.  Further, as the Commission stated in the Authorization Order, should NMFS designate critical habitat for the Rice's whale, Commission staff will coordinate any necessary consultation with NMFS at that time.[705]

### b.      ESA Consultation

173.    Petitioners argue that the Commission violated Section 7 of the ESA by failing to conduct formal consultation with NMFS regarding impacts to the Rice's whale.[706]  The Commission conducted informal consultation with NMFS, after which NMFS concurred with the final EIS's conclusion that the project is not likely to adversely affect the Rice's whale.[707]  Despite this conclusion, the Petitioners argue that the Commission and NMFS should re-initiate consultation, primarily because NMFS has recently proposed designation of critical habitat for the Rice's whale that would include areas throughout the Gulf of Mexico that could be directly impacted by the CP2 LNG Project.[708]

174.    A proposal to designate critical habitat for a listed species does not trigger re-initiation of consultation under the ESA.[709]  In the future, should NMFS designate critical habitat for the Rice's whale, Commission staff will coordinate any necessary

---

(emphasis in original) (quoting *Friends of Cap. Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (internal quotation marks omitted)).

[705] Authorization Order, 187 FERC ¶ 61,199 at P 95.  NMFS has proposed, but not finalized, a critical habitat designation for the Rice's Whale.  NFMS, *Endangered and Threatened Species; Designation of Critical Habitat for the Rice's Whale,* 88 Fed. Reg. 47,453 (July 24, 2023).

[706] Rehearing Request at 184.

[707] Authorization Order, 187 FERC ¶ 61,199 at P 93.

[708] Rehearing Request at 187.

[709] *See* 40 C.F.R. § 402.16 (2022).

consultation with NMFS.[710]  Furthermore, if reconsultation is required, then only when such consultation is complete will it be possible to determine whether it is necessary to supplement the NEPA analysis.[711]

## 9.    Wetland Impacts

175.    Petitioners argue that the conclusions in the final EIS regarding the impacts from the project on wetlands are arbitrary and do not comply with NEPA.[712]  In particular, the Petitioners argue that the final EIS is incomplete and should not have relied on mitigation measures to categorize the final impacts.[713]  In addition, they argue that the analysis of cumulative impacts was incomplete, particularly when considering the overall loss of wetlands in Louisiana.[714]

176.    The final EIS includes extensive discussion of impacts to wetlands from both construction and operation of the project.  The final EIS acknowledges that there will be permanent impacts to wetlands associated with construction and operation of the Terminal Facilities, but concluded that through compliance with mitigation measures instated by CP2 as well as the Corps[715] and the Louisiana DNR, the impacts on wetlands due to construction of the Terminal Facilities would not be significant.[716]  The final EIS further acknowledged impacts from pipeline construction and other temporary workspaces.[717]  These impacts differ based on the specific type of wetland being disturbed, but all impacts would be mitigated by rehabilitation and revegetation, the

---

[710] Authorization Order, 187 FERC ¶ 61,199 at P 95; *Driftwood LNG LLC*, 186 FERC ¶ 61,112, at P 19 (2024).  NMFS has proposed, but not finalized, a critical habitat designation for the Rice's Whale. 88 Fed. Reg. 47,453 (July 24, 2023).

[711] *Driftwood LNG LLC*, 186 FERC ¶ 61,112 at P 20.

[712] Rehearing Request at 188.

[713] *Id.*

[714] *Id.* at 191.

[715] CP2 LNG will be required to obtain permits from the Corps for permanent loss of wetland habitat; mitigation measures will be required by the Corps as part of the permitting process.  Final EIS at 4-135.

[716] *Id.*

[717] *Id.* at 4-136 to 4-140.

timing of which will also vary by wetland type.[718]  Therefore, the impacts from construction were found to be temporary and not significant.[719]  Overall, due to the use of mitigation measures contained in the Project-specific Procedures, Corps and Louisiana DNR permits, and Commission staff recommendations, the final EIS found that impacts on wetlands would be adequately minimized, but permanent, with the majority of adverse impacts occurring at the CP2 LNG Project site.[720]  Similarly, while impacts to wetlands would include impacts within environmental justice communities, through the use of mitigation measures, these impacts would not be significant.[721]  While Petitioners argue that reliance on mitigation measures is inappropriate,[722] as discussed above, the Commission may appropriately consider planned mitigation measures when evaluating the potential impacts of a proposed action.[723]

177.   The final EIS established a geographic scope to consider the cumulative impacts on wetlands from both the Projects and other past, present, and reasonably foreseeable future actions.[724]  The analysis recognized that other Commission-licensed projects within this scope would be required to adhere to Commission procedures, and other non-Commission-regulated projects would likely follow similar mitigation measures. Therefore, most of the impacts from the Projects and other projects identified within the geographic scope would not result in a significant cumulative impact on wetlands.[725]  We continue to find that both the direct and cumulative impacts to wetlands from the Projects would not be significant.

---

[718] *Id.* at 4-137.

[719] *Id.* at 4-139.

[720] *Id.* at 4-141.

[721] *Id.* at 4-319.

[722] Rehearing request at 188.

[723] *Methow Valley*, 490 U.S. at 353 (holding that "it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act").

[724] Final EIS 4-506 to 4-523.

[725] *Id.* at 4-530.

### 10. __Environmental Justice__

178.    Petitioners argue that the Commission's authorization of the Projects demonstrates disregard for the adverse impacts on environmental justice communities and that the Commission failed to afford the proper weight to environmental justice communities.[726] Petitioners concede that the Commission acknowledged some harms to those communities in its final EIS[727] but allege that the Commission failed to account for the disproportionate and adverse impact on the viewshed and failed to adequately consider the disproportionate impacts of climate change on environmental justice communities.[728] Petitioners assert that emissions alone will disproportionately affect and exacerbate existing health issues and environmental conditions in low-income and minority populations.[729]

179.    We disagree with the claimed omissions.[730]  The final EIS determined that potential impacts on the identified environmental justice communities may include flooding, impacts to surface water resources, wetlands impacts, visual impacts, socioeconomic impacts, recreational and commercial fishing impacts, traffic impacts, and air and noise impacts from construction and operation.[731]  The final EIS also determined that environmental justice concerns were not present for other resource areas such as geology, soils, wildlife, land use, or cultural resources due to the minimal overall impact the Projects would have on these resources and/or the absence of any suggested connection between such resources and environmental justice communities.[732]

180.    With regard to the CP2 LNG Project, the Commission determined that construction and operation would have a disproportionate and adverse impact on environmental justice communities because the impacts would be predominantly borne

---

[726] Rehearing Request at 85.

[727] _Id._

[728] _Id._ at 86.

[729] _Id._

[730] Authorization Order, 187 FERC ¶ 61,199 at PP 119-163; final EIS at 4-299 – 4-329.

[731] Final EIS at 4-317 to 4-327.

[732] _Id._ at 4-318.

by those communities.[733]  Specifically, the Commission found that visual impacts on environmental justice communities near the terminal would be significant[734] and that the project would contribute to significant cumulative visual impacts on environmental justice communities.[735]  The remainder of the temporary and permanent adverse impacts on water resources, wetlands, socioeconomics, traffic, air quality, and noise in environmental justice communities from construction and operation of the CP2 LNG Project would be less than significant.[736]

181.   With regard to the CP Express Pipeline Project, the Commission determined that the construction and operation of the CP Express Pipeline Project (including meter stations, contractor yards, and park and ride locations) would have a disproportionate and adverse impact on environmental justice communities because the impacts would be predominantly borne by those communities, but the Commission determined that the impacts would be less than significant.[737]  The Commission concluded that operation would have permanent adverse impacts on visual resources in environmental justice communities, including from removal of forested vegetation and periodic vegetation clearing within the permanent right-of-way.[738]

182.   Last,  because we cannot identify a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Projects' incremental contribution

---

[733] Authorization Order, 187 FERC ¶ 61,199 at P 162.

[734] *Id.*  As noted in the Authorization Order, the Commission may determine that impacts are disproportionate and adverse, but not significant within the meaning of NEPA and in other circumstances an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA.  *Id.* n.257 (citing EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices) at 3, https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf).  Here, the Commission acknowledged that visual impacts on environmental justice communities would be significant.  *Id.* PP 131, 162.  We note that for all other resource categories, the Commission determined that impacts would be less than significant.  *Id.*  PP 162-63.

[735] *Id.* (citing final EIS at 4-328 to 4-329, 4-546, app. J)

[736] *Id.* (citing final EIS at 4-329).

[737] Authorization Order, 187 FERC ¶ 61,199 at P 162 (citing final EIS at 4-328).

[738] *Id.* P 163.

to GHGs,[739] we cannot meaningfully consider the disproportionate impacts of climate change on environmental justice communities.  As discussed in detail above, for GHG emissions the Commission satisfied the required hard look under NEPA.

## 11.    Air Impacts

183.    Petitioners argue that the Commission's use of Significant Impact Levels (SIL) in this proceeding is improper for the same reasons articulated by the D.C. Circuit in *Healthy Gulf*,[740] and assert that the Commission improperly concluded that the Projects would only contribute a minor amount to cumulative air impacts despite ambient air quality exceeding the EPA's National Ambient Air Quality Standards (NAAQS) for nitrogen dioxide ($NO_2$) and particulate matter less than 2.5 micrometers ($PM_{2.5}$).[741] Petitioners maintain that, although the Projects' contribution to modeled exceedances fall below the SILs, they are not facially insignificant and are more than *de minimis* contributors to cumulative impacts.[742]  Petitioners aver that this error affected the Commission's environmental analysis and public interest determinations.[743]

184.    In *Healthy Gulf*, which was issued after the Authorization Order, the D.C. Circuit disagreed with the Commission's determination there that the cumulative effects of a project's $NO_2$ emissions were insignificant because its incremental $NO_2$ emissions fell below the 1-hour $NO_2$ SIL at each NAAQS exceedance location.[744]  The court remanded the proceeding to the Commission to either explain how its use of the 1-hour $NO_2$ SIL is consistent with a proper cumulative effects analysis or to adequately assess the cumulative effects of the project's $NO_2$ emissions using a different methodology.[745] The court also directed the Commission to reevaluate its NGA section 3 public interest determination because it was based on a deficient NEPA analysis.[746]  In *City of Port Isabel*, the court remanded authorization orders for other LNG projects for failure to issue

---

[739] *Id.* P 179 n.428 (citing final EIS at 4-5-559).

[740] 107 F.4th 1033.

[741] Rehearing Request at 136-39 (citing *Healthy Gulf*, 107 F.4th at 1042-45).

[742] *Id.* at 137-38.

[743] *Id.* at 138-39.

[744] *Healthy Gulf*, 107 F.4th at 1044.

[745] *Id.*

[746] *Id.* (citing *Vecinos I*, 6 F.4th at 1331).

a supplemental EIS[747] where the Commission "issu[ed] an entirely new and significantly expanded" environmental analysis "that reached new conclusions" in an order, without a separate NEPA document.[748]

185.   Given the D.C. Circuit's specific directives to the Commission in *Healthy Gulf* and *City of Port Isabel*, we set aside the Authorization Order, in part, solely regarding the Commission's analysis of $NO_2$ and $PM_{2.5}$, for the purpose of conducting additional environmental review.[749]  Issues related to the Commission's analysis of $NO_2$ and $PM_{2.5}$, as well as other air quality issues raised by Petitioners,[750] will be addressed in a future order to be issued upon completion of the environmental review.

186.   Due to the initiation of supplemental NEPA proceedings, no authorization to proceed with construction of the CP2 LNG Project or CP Express Pipeline Project will be issued, including by the Director of the Office of Energy Projects, until the Commission issues a further merits order.[751]  The Commission's decision here regarding the authorization to proceed is based on the unique facts and record of this case.  We acknowledge that this course of action will result in delay and require additional analysis by the Commission.  However, the Commission must seek to ensure that authorizations are legally durable, and, in light of the D.C. Circuit's recent opinions, we believe that this is the most prudent way to ensure legal durability.  As reflected throughout this order, the Commission remains confident in this authorization, which is why, except as otherwise discussed herein, the Authorization Order remains in full force and effect.[752]

---

[747] *City of Port Isabel*, 111 F.4th at 1215.

[748] *Id*.

[749] Concurrently with this order, Commission staff is issuing a notice disclosing the schedule for a supplemental EIS.  In so doing, we are not prejudging the result the Commission may reach on any issue set for further environmental review.

[750] *See generally* Rehearing Request at 135-62.

[751] To date, no requests to proceed with construction have been authorized by Commission staff.

[752] 15 U.S.C. § 717r(c).

The Commission orders:

     In response to Petitioners' request for rehearing, the Authorization Order is hereby modified and set aside, in part, as discussed in the body of this order.

By the Commission.  Commissioner Chang is not participating.

( S E A L )

Carlos D. Clay,
Acting Deputy Secretary.

**FERC** Online - Web Applications of the Federal Energy Regulatory Commission



FERC Online Home
**About FERC Online**

Log Out

Edit Registration
**Company Registration**

eFiling
eSubscription
eComment

Query Mailing
List/Recipients by State
Query Service List
My Service List
My Filing List

**eLibrary**

**eTariff Viewer**

**Help**

## Service List for CP22-21-000 Venture Global CP2 LNG, LLC

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Anthony Theriot | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Anthony Theriot | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>UNITED STATES<br>ddlugoleski@defenders.org | |
| Branstetter, Stranch & Jennings, PLLC | Clement Tsao<br>Branstetter, Stranch & Jennings, PLLC<br>425 WALNUT ST STE 2315<br>CINCINNATI, OHIO 45202<br>UNITED STATES<br>clementt@bsjfirm.com | |
| Cheniere Creole Trail Pipeline, L.P. | Akayla Broussard<br>Cheniere Energy, Inc.<br>Cheniere Energy, Inc.<br>845 Texas Avenue<br>Suite 1250<br>Houston, TEXAS 77002<br>UNITED STATES<br>akayla.broussard@cheniere.com | Karri Mahmoud<br>Director, Environmental and Re<br>Cheniere Energy, Inc.<br>845 Texas Avenue, Ste. 1250<br>HOUSTON, TEXAS 77002<br>karri.mahmoud@cheniere.com |
| Cheniere Creole Trail Pipeline, L.P. | Taylor Johnson<br>Deputy General Counsel<br>Cheniere Energy, Inc.<br>PO Box Null<br>Houston,TEXAS 77002<br>UNITED STATES<br>taylor.johnson@cheniere.com | |
| Commonwealth LNG, LLC | David Wochner<br>K&L Gates LLP<br>1601 K Street, NW<br>Suite 400<br>Washington, DISTRICT OF COLUMBIA 20006-1600<br>UNITED STATES<br>david.wochner@klgates.com | |
| Commonwealth LNG, LLC | Timothy Furdyna<br>Partner<br>K&L Gates LLP<br>1601 K Street, NW<br>Suite 400<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>tim.furdyna@klgates.com | |
| Donohue Patrick & Scott | Dylan Thompson<br>450 LAUREL ST STE 1600<br>BATON ROUGE, LOUISIANA 70801<br>UNITED STATES<br>dthompson@dps-law.com | |
| Driftwood LNG LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |

| | | |
|---|---|---|
| Driftwood LNG LLC | | Catherine Rourke<br>VP, Reg Affairs and HSE<br>Woodside Energy (USA) Inc<br>1500 POST OAK BLVD<br>DRIFTWOOD LNG<br>HOUSTON, TEXAS 77056<br>cathy.rourke@woodside.com |
| Driftwood Pipeline LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |
| Fishermen Involved in Sustaining Our Heritage | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>UNITED STATES<br>ddlugoleski@defenders.org | |
| Fishermen Involved in Sustaining Our Heritage | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Fishermen Involved in Sustaining Our Heritage | Megan Gibson<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgibson@selcdc.org | |
| Fishermen Involved in Sustaining Our Heritage | Travis Dardar<br>Founder/Director<br>Fishermen Involved in Sustaining Our Heritage<br>11015 LA Hwy 35<br>Kaplan, LOUISIANA 70668<br>UNITED STATES<br>Fish@habitatrecovery.org | |
| For a Better Bayou | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| For a Better Bayou | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Golden Pass LNG Terminal LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Golden Pass Pipeline LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Healthy Gulf | naomi yoder<br>5912 KANSAS ST UNIT A<br>HOUSTON, TEXAS 77007<br>UNITED STATES<br>n_yoder@yahoo.com | |
| Jerryd Tassin | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400 | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD |

| | | |
|---|---|---|
| | Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Jerryd Tassin | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Kent Duhon | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Kent Duhon | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Louisiana Bucket Brigade | James Hiatt<br>3416B Canal Street<br>New Orleans, LOUISIANA 70119<br>UNITED STATES<br>james@labucketbrigade.org | |
| Louisiana Environmental Action Network | Tom Gosselin<br>Sierra Club<br>PO BOX 4998<br>AUSTIN, TEXAS 78765<br>UNITED STATES<br>tom.gosselin@sierraclub.org | |
| Mary Alice Nash | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>UNITED STATES<br>1goodolefarmer@gmail.com | Zoe Klass-Warch<br>Niskanen Center<br>820 First Street, NE, Suite 675<br>Washington DC, DISTRICT OF COLUMBE<br>zklasswarch@niskanencenter.org |
| Mary Alice Nash | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>UNITED STATES<br>ddlugoleski@defenders.org | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>sgall@selcva.org |
| Natural Resources Defense Council | Gillian Giannetti<br>Senior Attorney<br>Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>ggiannetti@nrdc.org | |
| Natural Resources Defense Council | Caroline Reiser<br>Senior Staff Attorney<br>1152 15th Street, NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>creiser@nrdc.org | |
| Nicole Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Nicole Dardar | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Niskanen Center | Zoe Klass-Warch<br>Niskanen Center<br>820 First Street, NE, Suite 675<br>Washington DC, DISTRICT OF COLUMBIA 20002 | |

UNITED STATES
zklasswarch@niskanencenter.org

| | | |
|---|---|---|
| Port Arthur Community Action Network | John Beard<br>Mr.<br>501 W. 15th St. Port Arthur, TX<br>Port Arthur, TEXAS 77640<br>UNITED STATES<br>john.beard901456@outlook.com | |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>Public Citizen's Energy Program<br>215 PENNSYLVANIA AVE SE<br>PUBLIC CITIZEN, INC.<br>WASHINGTON, DISTRICT OF COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| RESTORE | RESTORE RESTORE<br>RESTORE<br>RESTORE<br>PO Box 233<br>Longville,LOUISIANA 70652-0233<br>UNITED STATES<br>michaeltritico@yahoo.com | |
| RESTORE | RESTORE RESTORE<br>RESTORE<br>RESTORE<br>PO Box 233<br>Longville,LOUISIANA 70652-0233<br>UNITED STATES<br>michaeltritico@yahoo.com | |
| Sierra Club | Radhika Swaminarayan<br>Paralegal<br>Sierra Club<br>50 F Street NW<br>8th Floor<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>radhika.swaminarayan@sierraclub.org | Rebecca McCreary<br>Sierra Club<br>1650 38th St<br>Suite 103W<br>Boulder, COLORADO 80301<br>rebecca.mccreary@sierraclub.org |
| Southeast Laborers District Council | Clement Tsao<br>Branstetter, Stranch & Jennings, PLLC<br>425 WALNUT ST STE 2315<br>CINCINNATI, OHIO 45202<br>UNITED STATES<br>clementt@bsjfirm.com | |
| State of Louisiana | Joseph St. John<br>Deputy Solicitor General<br>909 POYDRAS ST STE 1850<br>LOUISIANA DEPARTMENT OF JUSTICE<br>NEW ORLEANS, LOUISIANA 70112<br>UNITED STATES<br>stjohnj@ag.louisiana.gov | |
| Texas Campaign For The Environment | Rebecca McCreary<br>Sierra Club<br>1650 38th St<br>Suite 103W<br>Boulder, COLORADO 80301<br>UNITED STATES<br>rebecca.mccreary@sierraclub.org | Robin Schneider<br>Executive Director<br>Texas Campaign For The Environment<br>814 San Jacinto Boulevard<br>Suite 408<br>Austin, TEXAS 78701<br>robin@texasenvironment.org |
| Travis Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Travis Dardar | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Turtle Island Restoration Network | Joanie Steinhaus<br>Program Director<br>1214 Bowie Drive<br>Galveston, TEXAS 77551 | |

|  | UNITED STATES<br>joanie@tirn.net |  |
|---|---|---|
| Venture Global CP<br>Express LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@venturegloballng.com |
| Venture Global<br>CP2 LNG, LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@venturegloballng.com |

Back to Query Service List   Back to FERCOnline

*Title 18, U.S.C. 1001 makes it a crime for any person knowingly and willingly to make to any Agency or Department of the United States fictitious or fraudulent statements as to any matter within its jurisdiction.*

*FERC Online does not require the submission of personally identifiable Information (PII) (e.g. social security numbers, birthdates, and phone num FERC will not be responsible for any PII submitted to FERC Online, including any accidental or inadvertent submissions of PII.*

*This site contains information collections that are subject to the Paperwork Reduction Act (PRA). Among other things, the PRA requires FERC to with an estimate of the average burden of completing the information collections on this site. Comments regarding the burden estimate or any oth these forms can be directed to FERC's Information Collection Branch at DataClearance@ferc.gov.*

*In addition, you are not required to respond to any collection of information unless it displays a currently valid Office of Management and Budget ( number. FERC provides the OMB Control Numbers of the information collections on this site at www.ferc.gov/information-collections.*

**For any issues regarding FERC Online, please contact FERC Online Support or call Local: 202-502-6652 | Toll-free: 866-208-3676. Please current mail address, telephone number, and e-mail address.**

**FERC** Online - Web Applications of the Federal Energy Regulatory Commission



| | | |
|---|---|---|
| FERC Online Home | | |
| **About FERC Online** | | |
| | | |
| Log Out | | |
| | | |
| Edit Registration | | |
| **Company Registration** | | |
| | | |
| eFiling | | |
| eSubscription | | |
| eComment | | |
| | | |
| Query Mailing List/Recipients by State | | |
| Query Service List | | |
| My Service List | | |
| My Filing List | | |
| **eLibrary** | | |
| **eTariff Viewer** | | |
| **Help** | | |

### Service List for CP22-22-000 Venture Global CP Express, LLC

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Anthony Theriot | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27<br>1goodolefarmer@gmail.com |
| Anthony Theriot | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>UNITED STATES<br>ddlugoleski@defenders.org | |
| Donohue Patrick & Scott | Dylan Thompson<br>450 LAUREL ST STE 1600<br>BATON ROUGE, LOUISIANA 70801<br>UNITED STATES<br>dthompson@dps-law.com | |
| Driftwood LNG LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |
| Driftwood LNG LLC | | Catherine Rourke<br>VP, Reg Affairs and HSE<br>Woodside Energy (USA) Inc<br>1500 POST OAK BLVD<br>DRIFTWOOD LNG<br>HOUSTON, TEXAS 77056<br>cathy.rourke@woodside.com |
| Driftwood Pipeline LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |
| Fishermen Involved in Sustaining Our Heritage | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27<br>1goodolefarmer@gmail.com |
| Fishermen Involved in Sustaining Our Heritage | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Fishermen Involved in Sustaining Our Heritage | Megan Gibson<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgibson@selcdc.org | |
| Fishermen Involved in Sustaining Our Heritage | Travis Dardar<br>Founder/Director<br>Fishermen Involved in Sustaining Our Heritage<br>11015 LA Hwy 35<br>Kaplan, LOUISIANA 70668 | |

| | UNITED STATES<br>Fish@habitatrecovery.org | |
|---|---|---|
| For a Better Bayou | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Cente<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 2<br>1goodolefarmer@gmail.com |
| For a Better Bayou | | Deirdre Dlugoleski<br>Southern Environmental Law Cente<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Golden Pass LNG Terminal LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Golden Pass Pipeline LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Healthy Gulf | naomi yoder<br>5912 KANSAS ST UNIT A<br>HOUSTON, TEXAS 77007<br>UNITED STATES<br>n_yoder@yahoo.com | |
| Jerryd Tassin | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Cente<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 2<br>1goodolefarmer@gmail.com |
| Jerryd Tassin | | Deirdre Dlugoleski<br>Southern Environmental Law Cente<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Kent Duhon | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Cente<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 2<br>1goodolefarmer@gmail.com |
| Kent Duhon | | Deirdre Dlugoleski<br>Southern Environmental Law Cente<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Louisiana Bucket Brigade | James Hiatt<br>3416B Canal Street<br>New Orleans, LOUISIANA 70119<br>UNITED STATES<br>james@labucketbrigade.org | |
| Louisiana Environmental Action Network | Tom Gosselin<br>Sierra Club<br>PO BOX 4998<br>AUSTIN, TEXAS 78765<br>UNITED STATES<br>tom.gosselin@sierraclub.org | |
| Mary Alice Nash | Zoe Klass-Warch<br>Niskanen Center<br>820 First Street, NE, Suite 675<br>Washington DC, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>zklasswarch@niskanencenter.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Cente<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 2<br>1goodolefarmer@gmail.com |

| | | |
|---|---|---|
| Mary Alice Nash | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>UNITED STATES<br>ddlugoleski@defenders.org | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>sgall@selcva.org |
| Natural Resources Defense Council | Gillian Giannetti<br>Senior Attorney<br>Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>ggiannetti@nrdc.org | |
| Natural Resources Defense Council | Caroline Reiser<br>Senior Staff Attorney<br>1152 15th Street, NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>creiser@nrdc.org | |
| Nicole Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27<br>1goodolefarmer@gmail.com |
| Nicole Dardar | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Niskanen Center | Zoe Klass-Warch<br>Niskanen Center<br>820 First Street, NE, Suite 675<br>Washington DC, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>zklasswarch@niskanencenter.org | |
| Port Arthur Community Action Network | John Beard<br>Mr.<br>501 W. 15th St. Port Arthur, TX<br>Port Arthur, TEXAS 77640<br>UNITED STATES<br>john.beard901456@outlook.com | |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>Public Citizen's Energy Program<br>215 PENNSYLVANIA AVE SE<br>PUBLIC CITIZEN, INC.<br>WASHINGTON, DISTRICT OF COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| RESTORE | RESTORE RESTORE<br>RESTORE<br>RESTORE<br>PO Box 233<br>Longville,LOUISIANA 70652-0233<br>UNITED STATES<br>michaeltritico@yahoo.com | |
| Sierra Club | Radhika Swaminarayan<br>Paralegal<br>Sierra Club<br>50 F Street NW<br>8th Floor<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>radhika.swaminarayan@sierraclub.org | Rebecca McCreary<br>Sierra Club<br>1650 38th St<br>Suite 103W<br>Boulder, COLORADO 80301<br>rebecca.mccreary@sierraclub.org |
| Southeast Laborers District Council | Clement Tsao<br>Branstetter, Stranch & Jennings, PLLC<br>425 WALNUT ST STE 2315<br>CINCINNATI, OHIO 45202<br>UNITED STATES<br>clementt@bsjfirm.com | |

| | | |
|---|---|---|
| State of Louisiana | Joseph St. John<br>Deputy Solicitor General<br>909 POYDRAS ST STE 1850<br>LOUISIANA DEPARTMENT OF JUSTICE<br>NEW ORLEANS, LOUISIANA 70112<br>UNITED STATES<br>stjohnj@ag.louisiana.gov | |
| Texas Campaign For The Environment | Rebecca McCreary<br>Sierra Club<br>1650 38th St<br>Suite 103W<br>Boulder, COLORADO 80301<br>UNITED STATES<br>rebecca.mccreary@sierraclub.org | Robin Schneider<br>Executive Director<br>Texas Campaign For The Environm<br>814 San Jacinto Boulevard<br>Suite 408<br>Austin, TEXAS 78701<br>robin@texasenvironment.org |
| Travis Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Cente<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 2<br>1goodolefarmer@gmail.com |
| Travis Dardar | | Deirdre Dlugoleski<br>Southern Environmental Law Cente<br>600 17TH ST STE 450N<br>DENVER, COLORADO 80202<br>ddlugoleski@defenders.org |
| Turtle Island Restoration Network | Joanie Steinhaus<br>Program Director<br>1214 Bowie Drive<br>Galveston, TEXAS 77551<br>UNITED STATES<br>joanie@tirn.net | |
| Venture Global CP Express LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@ventureglobalng.com |
| Venture Global CP2 LNG, LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@ventureglobalng.com |

[ Back to Query Service List ]   [ Back to FERCOnline ]

**Title 18, U.S.C. 1001** makes it a crime for any person knowingly and willingly to make to any Agency or Department of the United States fictitious or fraudulent statements as to any matter within its jurisdiction.

FERC Online does not require the submission of personally identifiable Information (PII) (e.g. social security numbers, birthdates, and phone num FERC will not be responsible for any PII submitted to FERC Online, including any accidental or inadvertent submissions of PII.

This site contains information collections that are subject to the Paperwork Reduction Act (PRA). Among other things, the PRA requires FERC to p with an estimate of the average burden of completing the information collections on this site. Comments regarding the burden estimate or any oth these forms can be directed to FERC's Information Collection Branch at DataClearance@ferc.gov.

In addition, you are not required to respond to any collection of information unless it displays a currently valid Office of Management and Budget ( number. FERC provides the OMB Control Numbers of the information collections on this site at www.ferc.gov/information-collections.

**For any issues regarding FERC Online, please contact FERC Online Support or call Local: 202-502-6652 | Toll-free: 866-208-3676. Pleas**
current mail address, telephone number, and e-mail address.